UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

```
------------------------------------------------------------ x
CloudofChange, LLC,                          )
                                             )
                    Plaintiff,               )
                                             )
          v.                                 ) 6:19-CV-00513-ADA
                                             )
NCR Corporation,                             )
                                             )
                    Defendant.               ) JURY TRIAL DEMANDED
                                             )
------------------------------------------------------------ x
```

## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT</u>

Charles E. Phipps
    Texas State Bar No. 00794457
    cphipps@lockelord.com
Steven F. Meyer
    Admitted *pro hac vice*
    smeyer@lockelord.com
Daniel G. Nguyen
    Texas State Bar No. 24025560
    dnguyen@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8000 Telephone
(214) 740-8800 Facsimile

**ATTORNEYS FOR DEFENDANT
NCR CORPORATION**

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND AND FACTS ..............................................................................2

    A.  THE ASSERTED CLAIMS REQUIRE POS BUILDER SOFTWARE
    AND THAT THE POS BUILDER SOFTWARE BE LOCATED ON
    A WEB SERVER .............................................................................................3

    B.  NCR SILVER DOES NOT HAVE POS BUILDER SOFTWARE .......................8

    C.  NCR SILVER DOES NOT HAVE POS BUILDER SOFTWARE
    LOCATED ON A WEB SERVER ....................................................................12

III.  SUMMARY JUDGMENT LEGAL STANDARDS ................................................14

IV.  ARGUMENT ......................................................................................................15

    A.  THERE IS NO DIRECT INFRINGEMENT AS A MATTER OF LAW .............17

        1.  EVEN AS USED BY A CONSUMER, NCR SILVER LACKS
        MULTIPLE LIMITATIONS FROM THE ASSERTED CLAIMS...........18

            a.  THE BUILDING LIMITATION ......................................................18

            b.  THE WEB SERVER LOCATION LIMITATION.........................21

            c.  THE INTERACTION LIMITATION ...........................................22

            d.  THE WEB SERVER SUBSCRIPTION LIMITATION
            (AS TO THE '640 PATENT) ..........................................................24

        2.  AS SOLD BY NCR, NCR SILVER LACKS MULTIPLE
        LIMITATIONS NECESSARY FOR IT TO BE USED IN
        A SYSTEM ......................................................................................26

            a.  THE NETWORK LIMITATION ...................................................27

            b.  THE NETWORK ACCESS LIMITATION ...................................28

            c.  THE POS TERMINAL LIMITATION .........................................29

            d.  THE PC WORKSTATION LIMITATION ....................................29

i

B.  THERE IS NO INDIRECT INFRINGEMENT AS A MATTER OF LAW .........31

    a.  NO INDUCED INFRINGEMENT .................................................31

    b.  NO CONTRIBUTORY INFRINGEMENT ..................................32

V.  CONCLUSION ..........................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acceleration Bay LLC v. Take-Two Interactive Software, Inc.,*
 2020 WL 1333131 (D. Del. Mar. 23, 2020) ....................................................26

*Advanced Steel Recovery, LLC v. X-Body Equip., Inc.,*
 808 F.3d 1313 (Fed. Cir. 2015)........................................................................17

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986)..............................................................................14, 15

*Bayer AG v. Elan Pharm. Research Corp.,*
 212 F.3d 1241 (Fed. Cir. 2000).................................................................16, 17

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l., Inc.,*
 631 F.3d 1279 (Fed. Cir. 2011).................................................................26, 27

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986)...................................................................................15

*Commil USA, LLC v. Cisco Sys., Inc.,*
 575 U.S. 632 (2015)..............................................................................31, 32

*Creative Compounds, LLC v. Starmark Labs.,*
 651 F.3d 1303 (Fed. Cir. 2011)........................................................................16

*Eason v. Thaler,*
 73 F.3d 1322 (5th Cir. 1996) ........................................................................15

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,*
 279 F.3d 1022 (Fed. Cir. 2002)........................................................................31

*Fujitsu Ltd. v. Netgear Inc.,*
 620 F.3d 1321 (Fed. Cir. 2010)........................................................................33

*Global-Tech Appliances, Inc. v. SEB S.A.,*
 563 U.S. 754 (2011)..............................................................................31, 32

*Kahn v. Gen. Motors Corp.,*
 135 F.3d 1472 (Fed. Cir. 1998).................................................................16, 17

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.,*
    370 F.3d 1131 (Fed. Cir. 2004) ........................................................................16

*HZNP Meds. LLC v. Actavis Labs. UT, Inc.,*
    940 F.3d 680 (Fed. Cir. 2019) ..........................................................................32

*Lamont v. New Jersey,*
    637 F.3d 177 (3d Cir. 2011) ..............................................................................14

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) ............................................................15, 16, 17

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005) ....................................................................................31, 32

*MV3 Partners LLC v. Roku, Inc.,*
    No. 6:18-cv-00308-ADA, Claim Constr. Order (W.D. Tex. Oct. 2, 2019) ................22, 28

*NTP, Inc. v. Research in Motion, Ltd.,*
    418 F.3d 1282 (Fed. Cir. 2005) ..................................................................26, 27

*Schoell v. Regal Marine Indus., Inc.,*
    247 F.3d 1202 (Fed. Cir. 2001) ........................................................................16

*Scott v. Harris,*
    550 U.S. 372 (2007) ..........................................................................................15

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.,*
    655 F.3d 1364 (Fed. Cir. 2011) ........................................................................16

*Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp.,*
    785 F.3d 625 (Fed. Cir. 2015) ................................................................4, 31, 32

*Tinnus Enters., LLC v. Telebrands Corp.,*
    846 F.3d 1190 (Fed. Cir. 2017) ........................................................................15

*Tol-O-Matic, Inc. v. Proma Produkt-Und Mktg. Gesellschaft m.b.H.,*
    945 F.2d 1546 (Fed. Cir. 1991) ........................................................................16

*Voda v. Cordis Corp.,*
    536 F.3d 1311 (Fed. Cir. 2008) ........................................................................16

*Vita-Mix Corp. v. Basic Holding, Inc.,*
    581 F.3d 1317 (Fed. Cir. 2009) ............................................................31, 32, 33

*Wahpeton Canvas Co. v. Frontier, Inc.,*
    870 F.2d 1546 (Fed. Cir. 1989)............................................................................17

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
    520 U.S. 17 (1997)..............................................................................................16

*Wishkin v. Potter,*
    476 F.3d 180 (3d Cir. 2007)................................................................................15

**Statutes**

35 U.S.C.

    § 112, ¶ 4...........................................................................................................33

    § 271 (a)...........................................................................................................3, 5

    § 271 (b)..........................................................................................................3, 31

    § 271 (c)............................................................................................................33

**Rules**

Fed. R. Civ. P.

    56 (a)................................................................................................................14

    56 (c) (1)..........................................................................................................15

v

## **TABLE OF EXHIBITS**

1.      UNITED STATES PATENT 9,400,640 AND PROSECUTION HISTORY

2.      UNITED STATES PATENT 10,083,012 AND PROSECUTION HISTORY

3.      SELECTED PAGES FROM PLAINTIFF'S FINAL INFRINGEMENT CONTENTIONS

4.      SELECTED TRANSCRIPT PAGES FROM DEPOSITION OF MCGILL QUINN (SEALED)

5.      SELECTED TRANSCRIPT PAGES FROM DEPOSITION OF KRISTIN SCHOONOVER (SEALED)

6.      EXHIBIT 27 TO THE DEPOSITION OF MCGILL QUINN

7.      SELECTED TRANSCRIPT PAGES FROM DEPOSITION OF QUENTIN OLSON (SEALED)

8.      NCR CUSTOMER AGREEMENT DEMONSTRATING THAT NCR DOES NOT PROVIDE COMPONENTS OF THE SYSTEM OF THE ASSERTED PATENTS

9.      TRANSCRIPTION OF PORTIONS OF VIDEOS CITED IN PLAINTIFF'S INFRINGEMENT CONTENTIONS

10.     AUGUST 11, 2011 RESPONSE TO OFFICE ACTION FILED BY PLAINTIFF ADMITTING IMPORTANCE OF THE CLAIMS BEING DIRECTED TO A SYSTEM

11.     SELECTED TRANSCRIPT PAGES FROM MARCH 2, 2021 DEPOSITION OF GREGORY CROUSE (SEALED)

12.     SELECTED TRANSCRIPT PAGES FROM MARCH 10, 2021 DEPOSITION OF GREGORY CROUSE (SEALED)

13.     SELECTED TRANSCRIPT PAGES FROM DEPOSITION OF SANDEEP CHATTERJEE, PH.D. (SEALED)

14.     SUPPLEMENTAL EXPERT REPORT OF SANDEEP CHATTERJEE, PH.D. (SEALED)

15.     PLAINTIFF'S E-MAIL OF FEBRUARY 2, 2021 WITHDRAWING CERTAIN DEPENDENT CLAIMS

## I.    **INTRODUCTION**

The case concerns defendant NCR Corporation's ("**NCR**") product, NCR Silver.  NCR includes a pre-built, tablet-based point of sale ("**POS**") software solution that does not utilize (or, for that matter, permit) any building of POS terminals.  Instead, its POS terminal software is provided under a free license either pre-installed or downloaded as a native mobile device application or "app" from the Apple® App Store[SM] resident on a local device.  In order to utilize NCR Silver, NCR customers merely input inventory-specific data and, once they have done so, they have a ready to use POS solution.  As a second component, the NCR Silver also includes a Software as a Service suite of back office applications for reporting and data warehousing and the like ("**Service**").

This distinction is important because plaintiff CloudofChange, LLC's ("**Plaintiff**") asserted patents require, among other things, the presence of POS builder software, which this Court has already construed to mean "software that ***builds*** the POS terminals."  (Emphasis added.) In addition, the asserted patents require that the alleged POS builder software be located on a web server, which NCR Silver is not.  Instead the POS software (to the extent it might be alleged to be POS "builder software") is locally stored as an app on the POS terminal itself, and any interface with the back office software is through remote application servers, which are <u>not</u> web servers. The absence of these product attributes – along with others detailed below – compels a finding that, as a matter of law, NCR has not infringed.

Additionally, and as an independent basis for summary judgment, NCR Silver does not directly infringe because Plaintiff's patent claims are directed to systems.  Plaintiff's direct infringement theories are, however, based only on NCR Silver itself, and NCR Silver does not provide all of the components addressed in Plaintiff's systems claims.  Because NCR does not

1

employ the claimed system as a whole, and because NCR Silver is nothing more than a component of an overall system that involves multiple third-party components, it is again clear that, as a matter of law, NCR cannot be said to have directly infringed.

In the absence of direct infringement, Plaintiff's indirect infringement claims are, of course, not legally viable. But even if this Court concludes that genuine issues of fact exist in connection with Plaintiff's direct infringement claims – and it should not – summary judgment should still enter on Plaintiff's indirect infringement claims because Plaintiff has not and cannot raise any genuine issue of fact as to NCR's intent or establish that NCR Silver lacks substantial non-infringing uses.

On the basis of the foregoing and, as more fully discussed below, NCR now moves the Court for the entry of a summary judgment of non-infringement. There are no genuine issues of material fact, and NCR is, for multiple reasons, entitled to judgment as a matter of law.

## II.    <u>BACKGROUND AND FACTS</u>[1]

Plaintiff's complaint asserts that NCR Silver infringes systems claimed in two patents, *i.e.* U.S. Patent 9,400,640 ("**the '640 patent**") and U.S. Patent 10,083,012 ("**the '012 patent**") (collectively, the "**Asserted Patents**").[2]

This Court conducted a *Markman* hearing on July 10, 2020 and, as a result, issued its July 10, 2020 Claim Construction Order (Document 44), as well as its July 15, 2020 Supplemental Claim Construction Order (Document 47). Plaintiff then submitted its August 31, 2020 Final

---

[1] Additional facts will, as the context requires, also be introduced in the Argument section of this memorandum.

[2] The '640 Patent and the '012 Patent, along with their respective prosecution histories, are attached as <u>Exhibits 1</u> and <u>2</u>, respectively.

Infringement Contentions ("**FICs**") alleging that NCR Silver infringes Claims 1-6 and 8-14 of the '640 patent and Claims 1-4 and 6-13 of the '012 patent.  (*See* Ex. 3, p. 1.)  In connection with submitting its expert witness report alleging infringement, Plaintiff also withdrew certain previously asserted claims (*i.e.*, claims 2, 9 and 10 of the '640 patent and claims 10-13 of the '012 patent), such that the remaining asserted claims are claims 1, 3-6, 8, and 11-14 of the '640 patent and claims 1-4 and 6-9 of the '012 patent (collectively, the "**Asserted Claims**").  (*See* Ex. 15.) More specifically, Plaintiff claims direct infringement pursuant to 35 U.S.C. § 271 (a), literally or under the doctrine of equivalents, as well as indirect infringement under 35 U.S.C. § 271 (b) or (c).

### A.    THE ASSERTED CLAIMS REQUIRE POS BUILDER SOFTWARE

All of the Asserted Claims are directed to a "web-based point of sale (POS) builder *system*."  (Ex. 1, Col. 6, line 11 (emphasis added); Ex. 2, Col. 6, line 26 (emphasis added).)  This includes POS builder software stored remotely on web servers used to build POS terminal software over a communications network, such as the internet.  (Ex. 1, Col. 6, line 18; Ex. 2, Col. 6, line 28.)

As the Court has previously observed, the Asserted Patents "disclose a system 'for online, web-based point of sale (POS) *building* and configuration . . . .'"  (Doc. 47, p. 1 (emphasis added).) The Court has likewise construed the claim limitation "point of sale builder software" to mean "software *that builds* the POS terminals."  (Doc. 44, p. 3 (emphasis added).)

The Asserted Claims include only two independent claims, specifically Claim 1 from each patent, and both such claims include two limitations central to this motion:  (1) the "point of sale builder software" limitation and (2) that such builder software be located remotely on a web server.

Axiomatically, Plaintiff's dependent claims thus also include these same limitations.  *See* 35 U.S.C. §112, ¶ 4.

In particular, Claim 1 from the '012 patent provides as follows:

> 1. A web-based ***point of sale (POS) builder system*** comprising:
>
> a web server including ***POS builder software*** installed thereon;
>
> ***one or more POS terminals generated by said POS builder software*** and said one or more POS terminals configured to be accessible at one or more terminal devices, said POS terminals configured to accept POS transactions and collect corresponding transaction data; and
>
> a POS builder interface configured to be accessible via network communication with said web server over a communications network;
>
> wherein said POS builder interface is configured to be utilized to access said POS builder software ***for programmatically creating or modifying said one or more POS terminals*** in real time over the communications network;
>
> wherein said ***POS builder software*** is configured to interact with said one or more POS terminals over the communications network in order for the web-based ***point of sale (POS) builder system*** to perform functions in accordance with instructions sent from the POS builder interface;
>
> wherein said POS transactions and corresponding transaction data from said one or more POS terminals are configured to be transmitted to said web server via the communications network; and
>
> wherein each POS transaction is correlated with corresponding transaction data occurring at said one or more POS terminals.

(Emphases added.)

4

Claim 1 from the '640 patent similarly states as follows:

1.     A web-based ***point of sale (POS) builder system*** comprising:

one or more point of sale terminals, that display POS screens,

an internet connection from said one or more point of sale terminals to a web server,

one or more local or remote ***PC workstations***, and

***point of sale builder software*** that runs on said web server, wherein said local or remote ***workstations are utilized to build or edit said POS terminals*** in real time, from anywhere in the world and over the worldwide web,

wherein said ***web servers are provided as a vendor subscription service*** wherein web server software resides and is hosted on said vendor's remote servers and wherein subscriber company's POS terminals access and repeatedly interact with said web server software from said vendor's remote servers, in order to perform the subscriber's desired terminal function, over a network, wherein the network comprises the Internet.

(Emphases added.)

As both claims thus make clear, the Asserted Claims thus require:

A.     A system that includes POS builder software which software must generate POS terminals (the "**Building Limitation**");

B.     The POS builder software must be installed on a web server (as per Claim 1 of the '012 patent) or run on a web server (as per Claim 1 of the '640 patent) (the "**Web Server Location Limitation**").

C.     Such POS builder software must interact with the POS terminals to perform functions (the "**Interaction Limitation**");

D.     The system must include one or more POS terminals (the "**POS Terminal Limitation**");

5

E.    The system must include a communications network, such as the internet (the "**Network Limitation**"); and

F.    That there is access to the communications network, such as via "an internet connection" (the "**Network Access Limitation**").

Claim 1 of the '640 patent contains all of the above limitations but, in addition, further requires:

G.    A PC workstation must be used to access the POS builder software (the "**PC Workstation Limitation**"); and

H.    That access to web servers must be provided as a vendor subscription service (the "**Web Server Subscription Limitation**").

**B.    NCR SILVER DOES NOT HAVE POS BUILDER SOFTWARE[3]**

NCR Silver does not provide software used to build POS terminal software.  (Ex. 4, Tr. 54:20-22 ("[NCR Silver] is a prebuilt point-of-sale application that runs on IOS or Android devices."); Ex. 5, Tr. 34:23-35:2 ("[NCR Silver] is a prebuilt point-of-sale app that functions the same for everybody and out of the box works exactly the same and so it is easy to use and is a low-cost solution.").)

---

[3]  On January 7, 2021, Plaintiff took the deposition of the Director of Engineering for NCR Silver, McGill Quinn, and selected pages of his deposition transcript are attached hereto as Ex. 4.  (Ex. 4, Tr. 56:22-23.)  Quinn also served as one of NCR's corporate designees in connection with Plaintiff's deposition of NCR pursuant to Fed. R. Civ. P. 30 (b) (6).  On January 22, 2021, Plaintiff took the deposition of Kristin Schoonover, who also served as a NCR 30 (b) (6) designee.  Selected pages of the Schoonover deposition transcript are attached hereto as Ex. 5.  NCR's designations of these two witnesses as corporate representatives is reflected in NCR's written responses to the Notice of Corporate Representative Deposition.  (Ex. 6, marked as Ex. 27 during the deposition of McGill Quinn.)

6

Instead, its POS terminal software is pre-built and is obtained by a customer either by: (a) downloading it from the Apple® App Store<sup>SM</sup> onto an iOS device; or (b) receiving it pre-installed on an Android® tablet. (Ex. 4, Tr. 54:20-22; *id.*, Tr. 61:16-20 ("Q: And if I want to get the software to run NCR as a customer, where do I get it? A: You can download it from the app store for IOS. For Android, it is delivered as part of the devices that are purchased."); *id.*, Tr. 178:19-24; *id.*, Tr. 120:11-122:8; *id.*, Tr. 182:14-18 ("Q: And as you discussed earlier, the Android version has the NCR Silver preinstalled; is that correct? A: NCR Silver comes preinstalled on the Android version.").)

Once the POS terminal software is downloaded or obtained, NCR Silver is ready for use and the customer need only enter specific merchandise data such as an individual item name, price or tax rate ("**Data Entry**"). Plaintiff contends that such Data Entry constitutes building, but it does not. (*Id.*, Tr. 201:17-18 (stating that entry of a menu item "is not building. It is data entry . . . ."); *id.*, Tr. 120:25-121:14 ("Adding a menu item is not building the solution . . . ."); *id.*, Tr. 121:18-19 ("You're not adding a button. The button already exists."); *id.*, Tr. 121:22-122:1 ("You just tell it how many inventory items you want and it is displayed. So again, the solution is already prebuilt. They are just customizing it to have the pricing related to their particular inventory items."); Ex. 11, Tr. 38:10-39:4 (Plaintiff's technical expert: "That data entry is not building.").) And, although an NCR Silver customer may modify the product's screen *color*, the screen itself cannot be modified. (Ex. 4, Tr. 81:1-10.)

Indeed, when an NCR Silver customer performs Data Entry and adds a new item, a pre-existing but invisible button becomes visible. (Ex. 5, Tr. 46:23-25; 47:4-5 ("Where that button goes and how it is displayed is already hard-coded in the app."); *id*., Tr. 83:22-24 ("The buttons already exist. They just show up – they are hidden or unhidden if the item is – for every item that's

7

added.").)  NCR's Director of Engineering for NCR Silver, McGill Quinn, testified that when an NCR Silver customer adds a new menu item, the corresponding button for that new item already exists in the originally downloaded software:

> Q.    And it's your understanding that that's not a builder when you add a button to a screen?
>
> A.    You're not adding a button.  The button already exists.  As a builder of a code, as an engineer, there is code that you have to write in order for a button to be displayed.  This is already performed.  You just tell it how many inventory items you want and it is displayed.  So again, the solution is already prebuilt.  They are just customizing it to have the pricing related to their particular inventory items.

(Ex. 4, Tr. 121:16 – 122:1.)  As NCR's technical expert, Dr. Chatterjee, explained, the pre-existing button toggles, between being invisible and visible depending on whether data has been entered for the button:

> The button's already there and it simply caused it to show up.  I believe that's the phrasing that you used, and so you, yourself, seem to have answered your own question because the functionality is already there.  You simply toggle it on and off.  There's no building that's being done.  It's simple data entry and that's it.

(Ex. 13, Tr. 82:17 – 83:6 & Tr. 127:11 – 128:1.)

Even Plaintiff's corporate representative, who is also one of the listed inventors on the Asserted Patents, admitted that Data Entry (in the context of a prior art system deployed in a pretzel store) is not building:

> Q:    So the owner could add prices in connection with the POS system?
>
> A:    They could change prices.
>
> Q:    Did they also add the tax rate?
>
> A:    Yes.

8

> Q:     You don't consider that data entry to be POS building do you?
>
> A:     No because without my efforts, they wouldn't have anything . . . .

(Ex. 7, 42:22-43:6.)  NCR's technical expert, Dr. Chatterjee, agrees that data entry, such as adding a new menu item or changing the price, is not building as recited in the Asserted Claims:

> Q.     What is building in the context of the '012 and '640 Patent?
>
> A.     I think building is very clear to one of ordinary skill.  Again, your question was in the context of the asserted patents.  The patents make very clear that building is creating.  It provides examples of defining, and the specification in the claims and Mr. Crouse makes it further clear that building is different than editing, configuring, data entry, data configuration, and so building is very clearly understood to mean building, to create the [POS] terminals.

(Ex. 13, Tr. 77:25 – 78:20.)

Furthermore, to the extent Plaintiff contends that toggling a button from invisible to visible, when adding a new menu item, is building (it isn't), the software for such toggling resides locally on the downloaded app on the POS device, not remotely on a web server (or any server for that matter).  Dr. Chatterjee explained that the software for toggling by adding a new menu item or changing the price is on the POS terminal itself and that such toggling can be done without that POS terminal being connected to the internet or to a web server.

> ... things like entering data like "large pretzel" entering data like "1.50" for the large pretzel versus $5 for the large pretzel, they're simply data entry.  That can be done on the POS application even without a Web browser, even without Internet access, even without anything.  It's all stand alone.  So this is what I explained to you earlier.  Even if you want to say that data entry is building, which it clearly is not, and one of ordinary skill would clearly understand within the context of the asserted patents that building is different than data entry, even for argument's sakes, if you say that all of that

9

**is on the POS application, it's not on the back-end as recited and required by the claims**.

(Ex. 13, Tr. 125:13 – 126:13 (emphasis added).)  Thus, to the extent Plaintiff argues that adding a menu item and/or changing the price is "building" (and again, it is not), the functionality for doing so in NCR Silver is located on the POS terminal, not on any remote server including the web server as recited in the Asserted Claims.  (*Id*., Tr. 126:7-13.)

NCR Silver's pre-built POS terminal software does everything necessary to allow the affected customer to fully utilize all POS terminal features, including the display of template POS screens.  No software building is contemplated, utilized, needed or permitted.  (Ex. 4, Tr. 163:11-14 ("As I said previously, the user cannot modify the point of sale directly.  They have to get modifications that are made specifically for that customer through our engineering team."); Ex. 5, Tr. 35:3-8 ("Q: Does the NCR Silver prebuilt point-of-sale app allow the small business customers to themselves make changes to their point-of-sale system?  A: No.  They cannot make any changes to the way the point-of-sale works.  It's static POS code.  All they can do is data entry."); *id.,* Tr. 82:20-24.)

In fact, NCR Silver customers are required to enter into the *NCR Silver Merchant Agreement* ("***Agreement***") (attached as Exhibit 8), which *Agreement* defines the pre-built POS terminal software as "user application software and updates" ("**Software**").  (Ex. 8, preamble.)  The *Agreement* goes on to provide that, while NCR Silver customers are afforded a license to use the Software, they have no ability or legal authority to create or edit it.  (*Id.*, Section 1.5)

The process used by the Asserted Patents to build POS software is "initiated [] from a Web page action."  (Ex. 1, Col. 4, line 57.)  In contrast, NCR Silver has pre-built POS terminal software which does not utilize (or even allow) interaction with a website in order to obtain such software.

10

(Ex. 4, Tr. 61:16-20 ("Q: And if I want to get the software to run NCR Silver as a customer, where do I get it?  A: You can download it from the app store for iOS.  For Android, it is delivered as part of the devices that are purchased.").)  Consequently, NCR Silver does not provide a web-based solution but, instead, is dependent upon an app resident on the POS terminal:

> Q.    So if I were to go take, as a new user, and go download onto my iPad NCR Silver that I got from the app store, I would be downloading an already built system that has already gone through the builder process?
>
> A.    That is correct.  That is correct.  It has already been built.

(Id., 122:2-8.)  Data Entry can occur directly through that app, thus wholly obviating the need for website interaction:

> Q.    Can you tell us – can you walk us through how a menu item would be added by a restaurant owner who wants a new button to appear with a new menu offering?
>
> A.    On the point-of-sale tablet in the store, locally, they can press a "add item" button and a screen shows where they enter the name and the price.  And they hit "save" and it appears on the point-of-sale directly at that moment.
>
>        Or they can log back into the Back Office and, through data entry, enter a name and a price.  And that is updated at the store and shows on the point-of-sale tablet.
>
> Q.    So if a customer was going through your example with a tablet and adding an item, would that process involve going through a web browser?
>
> A.    No.
>
> Q.    Why not?
>
> A.    The point-of-sale app is a static code, a file of the – the actual code that is installed directly on the point-of-sale tablet and runs on the point-of-sale tablet independent of any connection to the internet.

11

(Ex. 5, Tr. 51:18-52:15.)

Importantly, after the downloading or installation of NCR Silver's pre-built POS terminal software, the POS terminals used with NCR Silver do not interact with a server having POS builder software installed thereon because NCR Silver does not have POS builder software.  (Ex. 4, Tr. 199:10-12 ("Q: Does NCR Silver include POS builder software?  A: It does not.").)  Nor does NCR provide a communications network or access to such a network.  (Id., Tr. 198:19-21 ("Q: Does NCR provide Internet access to customers of NCR silver. A:  It does not."); Tr. 71:18 ("NCR does not provide Internet.").)  The *Agreement* again contains an explicit acknowledgement by the NCR Silver customer that NCR does not provide internet access and that the customer must obtain their own internet access from a third-party provider.  (Ex. 8, Section 8.2.)

Pursuant to the *Agreement*, NCR Silver customers acknowledge that they are being provided, on a subscription basis, with access to remote application support services defined as "Software as a Service suite of applications" ("**Service**") (Ex. 8, p. 1.)  This Service does not include access to POS builder software on web servers.  (Ex. 4, Tr. 198:5-8 ("Q: Is NCR Silver a Web-based point-of-sale builder system?  A: It is not.").)  Nor does it include a fee for access to web servers of NCR.  (Ex. 8; Ex. 4, Tr. 65:20-21 ("As a user of Silver, you would not have access to our Web servers."); *id.*, Tr. 114:12-14 ("We do not rent or lease specific servers from Google. We have an agreement for cloud usage.").)  NCR does not even own the servers that it uses.  (Ex. 4, Tr. 65:11-13 ("NCR doesn't send up its own servers.  We leverage Google Cloud for their servers . . . ."; *id.,* Tr. 114:6-8 ("NCR does not have direct servers in-house that it uses for NCR Silver.  It is located in the cloud, in Google Cloud . . . .").)  The Service also does not provide PC workstations, and any PC workstation (*e.g.* Dell laptop) that might be used with NCR Silver must be obtained from a third party. (*Id.*, Tr. 57:24-58:1 ("NCR Silver is a service.  They purchase a

12

service, and then they purchase their hardware separately."); *id.*, Tr. 198:11-12 ("Q: Does NCR provide PC workstations?  A: It does not.").)

### C.    NCR SILVER DOES NOT HAVE POS BUILDER SOFTWARE LOCATED ON A WEB SERVER

Plaintiff has failed to provide any evidence addressing the Web Server Location Limitation. Indeed, its technical expert, Gregory Crouse, admitted during his deposition that he did not know the type of servers on which the remote server-based software used with NCR Silver is located:

> Q.    So NCR Silver is hosted remotely on servers that are not web servers, correct?
>
> MR. YATES:  Objection.  Form.
>
> A.    I -- sorry, answer the -- sorry, rephrase the question.
>
> MR. PHIPPS:  Yeah, can we have it read back -- please?
>
> THE REPORTER:  QUESTION:
>
> A.    The hosting relationship appears to have web servers, application servers, database servers.
>
> Q.    Do you know which aspects of the remotely software used with NCR Silver is hosted on a web server versus an application server?
>
> MR. YATES:  Objection.  Form.
>
> A.    I don't know which functions are on which -- which -- which functional area, no, I do not.

(Ex. 11, Tr. 167:15-168:12.)[4]

---

[4]  In contrast, NCR's technical expert witness has confirmed that the remote server-based software used with NCR Silver is not located on a web server.  (Ex. 14, Dr. Sandeep Chatterjee Rebuttal Expert Report, ¶ 97-103 and 122-126; Dr. Chatterjee Supplemental Report, ¶ 8.)

Mr. Crouse then went on to acknowledge that if the remote server-based software used with NCR Silver was not located on a web server, then there would be no infringement of the Asserted Claims:

> Q.      Would a company be able to place whatever software it is
>          hosting remotely on a non-web server and avoid the asserted
>          claims of the asserted patents?
>
> MR. YATES:  Object to form.
>
> A.       I'm sorry, could you rephrase.
>
> MR. PHIPPS:  I'll have the court reporter read it back.
>
> THE REPORTER:  QUESTION:
>
> A.       I believe so.

(Ex. 11, Tr. 246:22-247:11.).

## III.    SUMMARY JUDGMENT LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Id*. at 330.

"By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637

14

F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).  The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case.  *Celotex*, 477 U.S. at 323.

Once the movant demonstrates the absence of a genuine dispute over any material fact, the burden shifts to the non-movant to show that there is a genuine factual issue for trial.  *Celotex*, 477 U.S. at 323–24; Fed. R. Civ. P. 56 (c) (1).  When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 322. "[M]ere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment." *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

## IV.    ARGUMENT

A patent is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent . . . ."  35 U.S.C. § 271(a).  A patent infringement analysis proceeds in two steps.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995); *Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1203 (Fed. Cir. 2017).  First, the court construes the asserted claims as a matter of law.  *Markman* at 976.  Second, the factfinder compares the properly construed claims to the accused device.  *Id*.

15

"The patentee bears the burden of proving infringement by a preponderance of the evidence." *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1314 (Fed. Cir. 2011). "To prove infringement, a plaintiff must prove the presence of each and every claim element or its equivalent in the accused method or device." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011). "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). In other words, "the absence of even one [claim] element avoids infringement." *Tol-O-Matic, Inc. v. Proma Produkt-Und Marketing Gesellschaft m.b.H.*, 945 F.2d 1546, 1552 (Fed. Cir. 1991), *abrogated on other grounds by Markman*, 52 F.3d at 977.[5]

Although infringement is a question of fact, a "[s]ummary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed

---

[5] Absent literal infringement, an accused instrumentality may, of course, still infringe under the doctrine of equivalents. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997). The Federal Circuit applies two tests in determining equivalence. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008) (citing *Warner-Jenkinson*, 520 U.S. at 21). "Under the insubstantial differences test, '[a]n element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial.'" *Id.* (quoting *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004)). "'Alternatively, under the function-way-result test, an element in the accused device is equivalent to a claim limitation if it 'performs substantially the same function in substantially the same way to obtain substantially the same result.'" *Id.* (quoting *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1209-10 (Fed. Cir. 2001)). The doctrine "must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson Co.*, 520 U.S. at 29.

claim is found in the accused device either literally or under the doctrine of equivalents."[6] *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1317 (Fed. Cir. 2015).

Non-infringement of an independent claim precludes a finding of infringement of any claims that derives from the independent claim, since the dependent claims assume all the features and characteristics of the independent claim.  35 U.S.C. § 112, ¶ 4.  "One may infringe an independent claim and not infringe a claim dependent on that claim.  The reverse is not true.  One who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim."  *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed. Cir. 1989).

## A.    THERE IS NO DIRECT INFRINGEMENT AS A MATTER OF LAW

The Court has already conducted a *Markman* hearing, thus completing the first step in its analysis of alleged patent infringement.  *See Markman*, 52 F.3d at 976.  The second step in that analysis requires the Court to compare the properly construed claims to the accused device.  *Id*.  In the context of this summary judgment proceeding, the issue is whether the genuinely uncontroverted facts establish that there is the absence in NCR Silver of at least one claim limitation in the Asserted Claims.  If any such singular absence exists, there can be no infringement as a matter of law.  *Bayer*, 212 F.3d at 1247; *Kahn*, 135 F.3d at 1472.

NCR respectfully submits that it easily shoulders this burden.  As discussed below, multiple limitations from the Asserted Claims are not present in NCR Silver.  NCR will examine each such

---

[6] To date, the FICs have not clearly argued how infringement of the Asserted Claims would be premised upon an allegation of equivalence.  Indeed, Plaintiff's expert has admitted that he has no theory of infringement under the doctrine of equivalents.  (Ex. 11, Tr. 197:3-16.)  NCR has thus eschewed further discussion of the doctrine here.

17

limitation, first by focusing on the Court's construction of the claim with respect thereto (if any), next by addressing Plaintiff's individualized infringement contentions and, finally, by succinctly explaining why each such limitation is not met by NCR Silver.[7]

### 1.    EVEN AS USED BY A CONSUMER, NCR SILVER LACKS MULTIPLE LIMITATIONS FROM THE ASSERTED CLAIMS

#### a.    The Building Limitation

The Building Limitation requires "point of sale builder software," which this Court has construed to mean "software ***that builds*** the POS terminals."  (Doc. 44, p. 3 (emphasis added).)

Plaintiff's infringement contentions as regards the Building Limitation are premised upon portions of two NCR videos.[8]  As to the '640 patent, Plaintiff references two portions of a YouTube video entitled "NCR Silver Webinar."  (Ex. 3, Ex. A to FICs, pp. 22-23 (citing to COC0001047, referencing video portions appearing at 19:40 and 20:10).)  But as even a quick review of those video clips reveal, they only discuss customer performance of Data Entry: "You can just put in an item name, price and tax rate . . . different sizes . . . assign a barcode number . . . ." *Id.*  Of course, entering data into a built system is wholly dissimilar from the actual building of that system itself.

Plaintiff relies on this same video to allege that NCR Silver meets the Building Limitation in the '012 patent, *see* Ex. 3, Ex. B to FICs, p. 21 (referencing video portion appearing from 19:40 to 20:30), while also citing an additional video entitled "NCR Silver Training Video" (*id.* at 22-26, (citing to COC0001046, referencing video portions appearing at 15:30-18:32 and 31:20-32:25.)).  But again, both videos do nothing more than discuss the simple process of Data Entry

---

[7] NCR addresses the absence of claim limitations in NCR Silver in both the context of its use as actually provided to a consumer and, separately, by a consumer as part of a system.

[8] A transcription of the cited portions of both videos is attached as Exhibit 9.

18

which, quite plainly, is distinct from the actual building of a POS terminal.  Indeed, the second video, both in name and substance, is an NCR Silver training video (not a "How to Build a POS Terminal" video) that simply explains how to use NCR Silver, first addressing issues like the adding of a new category, the naming of that category (*e.g.* Dessert), the addition of an individual item within that category (*e.g.* Horchata Ice Cream), the inclusion of variations (*e.g.* sizes of small, medium or large), and the like before turning to the setting up of an order ticket (*e.g.* selecting the item Horchata Ice Cream, as well as modifiers such as sprinkles and sizing).

As the above demonstrates, NCR Silver does not meet the Building Limitation because it is a ***pre-built*** POS solution.  It uses POS terminal software that, at the time of purchase, has been fully fabricated and is either pre-loaded on an Android® tablet or obtained from the Apple® App Store[SM].  The FICs themselves highlight the pre-built nature of NCR Silver's POS software by including a quote from the NCR Silver training video: "The POS, if you have an iPad screen, you'll know that ***you have to get the application*** by downloading if from your app store.  Otherwise if you have an Android system, the application is ***already uploaded*** for you."  (Ex. 3, Ex. A to FICs, p. 10 (emphases added).)

The stand-alone nature of the Software is also manifest given the terms of the *Agreement*. In particular, the *Agreement* defines the Software and makes clear that, although NCR Silver customers are licensed to use that Software, they have no ability or legal authority to create or modify it.  (Ex. 8, Section 1.5.)  Simply put, an NCR Silver user lacks both the practical ability and legal right to build, change or edit the Software.  Specifically, they cannot alter the layout or the flow of the POS terminal.  (Ex. 4, Tr. 67:6-8 ("You would use whatever template that is available to you from the system.  You're not changing the layout or the flow of Silver.").)  In fact, that is the entire point and one of the chief sales attributes of NCR Silver: it's convenient and easy

19

to use **because it is pre-built**.  It is static code.  (Ex. 4, Tr. 163:11-14 ("As I said previously, the user cannot modify the point of sale directly.  They have to get modifications that are made specifically for that customer through our engineering team."); Ex. 5, Tr. 35:3-8 ("Q: Does the NCR Silver prebuilt point-of-sale app allow the small business customers to themselves make changes to their point-of-sale system?  A: No.  They cannot make any changes to the way the point-of-sale works.  It's static POS code.  All they can do is data entry."); *id.*, Tr. 82:20-24.)

Plaintiff's attempts to conflate the entry of merchandise specific data with the "editing" of a POS terminal fly in the face of common sense.  Indeed, Plaintiff's assertion is akin to alleging that the entry of numbers into a calculator would infringe on claims to a system used to build the software that makes that calculator operate, an obviously vapid proposition.

In every commercial use of a POS, **every** POS terminal must have merchandise specific data entered into the system in order to be used.  McDonalds sells different merchandise than the local clothier, and different states have different sales tax structures and rates.  Entering merchandise specific information to address those simple realities is not "building and editing" a POS terminal; rather, it's the provisioning of data to an already existing terminal – here, NCR Silver.[9]

In contrast to the Software – which independently provides the functionality necessary to conduct all POS terminal functions (including the display of template POS screens) – the process of building and editing POS terminal software necessitates computer programming (and someone

---

[9]    It bears mention that, if the mere entry of merchandise specific data is the equivalent of "building and editing" a POS terminal, then the Asserted Patents are invalid as anticipated by numerous prior art references, including Woycik.  *See* NCR's motion for summary judgment of invalidity, filed concurrently herewith.

with the requisite skillset) to establish the structure, templates, logic and flow of the software. This process is facially distinct from the simple process of Data Entry to an already existing POS system.

At bottom, the Software is fully existent when purchased and cannot be altered. Mere Data Entry by an NCR Silver customer does not meet the Building Limitation because that simple task is not the equivalent of software building/editing. Because the Building Limitation of the Asserted Claims is not met by NCR Silver, NCR is entitled to the entry of a summary judgment of non-infringement as a matter of law.

The '012 patent is not infringed for the further reason that NCR Silver does not satisfy the limitation of claim 1 requiring "POS builder software for programmatically creating or modifying said one or more POS terminals." Plaintiff's technical expert, in the context of explaining the prior art, stated that "programmatically creating or modifying," as recited in claim 1, requires creating or modifying source code. Ex. 12, Tr. 94:2-19. Because the undisputed evidence is that NCR Silver's source code is static, there is no evidence that NCR Silver modifies the POS terminal software as required by claim 1. On this separate basis, NCR Silver does not infringe the Asserted Claims of the '012 patent.

**b.      The Web Server Location Limitation**

The Asserted Claims all include a limitation requiring that the POS builder software be located on a web server. Plaintiff, however, has failed to provide any evidence to show that NCR Silver satisfies this limitation. As quoted above, Plaintiff's own technical expert does not know the type of servers upon which NCR's remote back office software is located, while NCR's technical expert confirmed that the remote back office software being used in connection with NCR silver is located on application servers, not web servers. Because the Web Server Location

21

Limitation is not met by NCR Silver, NCR is entitled to the entry of a summary judgment of non-infringement as a matter of law.

Moreover, as noted above, any contention by Plaintiff that the toggling of category or menu item buttons from invisible to visible is "building" still fails as a matter of law. Even if such toggling is building, the POS software for performing such function is within a native app that resides on the POS terminal itself. One knows *a priori* that the foregoing must be true because of the undisputed fact that the POS buttons can toggle to visible without any connection to a remote server whatsoever. While it is also true that Data Entry can be completed remotely through the back office functions, the transmission of category and item data to the local device does not cause the POS buttons to toggle to visible. Rather, the software that instructs "to toggle on" is on the local POS device. (Ex. 13, Tr. 125:13-126:13.)

### c.    The Interaction Limitation

The Asserted Claims all include a limitation requiring interaction between the POS builder software on a remote web server and a POS terminal in order to build or edit the POS terminal software in response to instructions.[10] The Court was not asked to construe these interaction limitations. As such, they must be afforded their plain and ordinary meaning. *MV3 Partners LLC*

---

[10] Specifically, the limitation from Claim 1 of the '012 patent reads as follows: "wherein said **POS builder software** is configured **to interact with** said one or more **POS terminals** over the communications network in order for the web-based point of sale (POS) builder system to perform functions in accordance with **instructions** sent from the POS builder interface . . . ." (Emphases added.) These "instructions" are defined in the claim to be instructions "for programmatically creating or modifying" the POS terminal, which instructions come from the POS builder interface. (Ex. 2, Col. 6, lines 39-41.) In similar fashion, the limitation from Claim 1 of the '640 patent states: "wherein subscriber company's **POS terminals** access and **repeatedly interact** with said web server software from said vendor's remote servers, in order to perform the subscriber's **desired terminal function** . . . ." (Emphases added.) The claim therefore makes the interaction a requirement in order for the POS terminal to function.

22

*v. Roku, Inc*., No. 6:18-CV-00308-ADA, Claim Construction Order, at *3 (W.D. Tex., Oct. 2, 2019) (citing *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*)).

Plaintiff cites the *Agreement* in support of its infringement contentions as to the Interaction Limitation in the '012 patent. (Ex. 3, Ex. B to FICs, pp. 26-27 ("NCR will use commercially reasonable efforts to make the Service available to you 24 hours per day via Internet access, other than for interruptions due to service maintenance and upgrades, system failure, system backup and recovery, and for causes beyond NCR's control.").) The cited passage, however, relates only to ensuring the availability of the suite of online back office applications that NCR provides as the Service. (Ex. 8, Section 1.2.)

The availability of the back office Service, however, is distinguished from operation of the NCR Software (which, as discussed *supra*, is defined as the pre-built POS terminal software). Nothing in the *Agreement* suggests the pre-built POS terminal software must interact with some POS builder software to perform POS functions. There is thus no evidentiary support for Plaintiff's claim that the *Agreement* provides POS builder software on a remote web server, or that the POS builder software interacts with a POS terminal in order for the system "to perform functions in accordance with instructions sent from the POS builder interface." (Ex. 2, Col. 6, lines 44-47.) An examination of the FICs reveals that they do not even attempt to identify any support for the conclusory assertion that there are instructions "for programmatically creating or modifying" submitted to a POS terminal. (*Id*., Col. 6, lines 39-41.)

As regards the Interaction Limitation in the '640 patent, Plaintiff cites to the same clause of the *Agreement*. (Ex. 3, Ex. B to FICs, pp. 27-29.) But again, that clause relates only to the availability of the back office Service, not to whether there are repeated interactions between the NCR POS terminal software and web server software from a vendor's remote servers, "in order to

23

perform the subscriber's desired terminal function . . . ." (Ex. 1, Col. 6, lines 24-27.)  Other than in its opening conclusory statement, Plaintiff's infringement contentions do not even use the words "access" or "repeatedly."  Nor do they identify any support for the conclusory assertion that repeated interactions are necessary to perform POS terminal functions.

Contrary to Plaintiff's unsubstantiated claims, NCR Silver does not build POS terminal software, nor does an NCR Silver customer build any POS terminal software from initiation of a web-page action.  (Ex. 4, Tr. 122:2-8; Ex. 5, Tr. 51:18-52:15.)  Also, a POS terminal as used with NCR Silver need not repeatedly interact with remote web server software in order for the POS terminal to perform its desired functions.  (Ex. 4, Tr. 80:11-14 ("Q: And devices can operate either stand-alone or where they're connected to the Internet; is that correct?  A: That is correct."); id., Tr. 80:21-23 ("Q: So in general NCR Silver works even if the Internet's down temporarily?  A: That is correct."); id., Tr. 180:1-10.)

NCR Silver does not meet the Interaction Limitation.  Plaintiff points to no evidence (because there is none) to support its claim that repeated interactions with web server software is necessary in order for NCR's POS terminal to perform POS functions.  Nor does Plaintiff point to any evidence that: (a) there is a POS software building process used in connection with NCR Silver that is initiated by a web page action; or (b) the POS software is built according to instructions from POS builder software.  Without these proofs, Plaintiff's infringement theory again fails as a matter of law.

> **d.    The Web Server Subscription Limitation (As To The '640 Patent)**

Claim 1 of the '640 patent includes a specific wherein limitation concerning the web server previously defined in Claim 1:  "wherein said web servers are provided as a vendor subscription

service wherein web server software resides and is hosted on said vendor's remote servers . . . ." (Ex. 1, Col. 6, lines 22-24.)  The Court construed the phrase "said web servers are provided as a vendor subscription service" as "wherein a web server is provided by a vendor to a subscriber as a subscription service."  (Doc. 44, p. 3.)

In support of its contention that NCR Silver meets this limitation, Plaintiff quotes from the *Agreement* and from various portions of NCR's website.  (Ex. 3, Ex. A to FICs, p. 16.)  Tellingly, however, none of the passages cited by Plaintiff include the word "server."

NCR does not provide a web server to NCR Silver customers as a subscription service. (Ex. 8; Ex. 4, Tr. 65:20-21  ("As a user of Silver, you would not have access to our Web servers.")); *id.,* Tr. 114:12-14 ("We do not rent or lease specific servers from Google.  We have an agreement for cloud usage.").)  NCR does not even own the servers that is uses, but instead uses cloud servers provided by Google.  (Ex. 4, Tr. 65:11-13 "NCR doesn't send up its own servers. We leverage Google Cloud for their servers . . . ."; *id.,* Tr. 114:6-8 "NCR does not have direct servers in-house that it uses for NCR Silver.  It is located in the cloud, in Google Cloud . . . .").)

Nor do NCR Silver customers pay NCR a subscription fee for using a web server.  (Ex. 8.) Pursuant to the *Agreement*, these customers acknowledge that their subscription affords them access to the back office Service only.  (*Id.*, Section 1.)  NCR does not, therefore, provide web servers as part of a vendor subscription service.  (Ex. 4, Tr. 62:13-17.)  Indeed, by signing the *Agreement*, NCR Silver customers acknowledge that NCR only affords them access to the Service and that the fee for the Service does not include a fee for use of web servers (which is, instead, paid by NCR to the web servers' owner(s)).  (Ex. 8, Section 8.2 ("you must maintain Internet access at your own expense.  NCR IS NOT RESPONSIBLE FOR AND DOES NOT WARRANT THE PERFORMANCE OF ANY INTERNET SERVICE . . . .") (capitalization in original).)

NCR Silver thus cannot meet the Web Server Subscription Limitation as to the '640 Patent.

## 2.    AS SOLD BY NCR, NCR SILVER LACKS MULTIPLE LIMITATIONS NECESSARY FOR IT TO BE USED IN A SYSTEM

An independent basis for a summary judgment of non-infringement is present in this case because the Asserted Claims are directed to systems.[11]  To directly infringe a system claim, the law requires that a single entity make, use, sell or offer to sell the entire system.  *Centillion Data Sys., LLC v. Qwest Commc's Int'l., Inc.*, 631 F.3d 1279, 1288 (Fed. Cir. 2011)).

"To 'make' a system, a single entity must combine all the claim elements."  *Acceleration Bay LLC v. Take-Two Interactive Software, Inc.*, 2020 WL 1333131, *4 (D. Del. Mar. 23, 2020) (granting summary judgment of non-infringement, citing *Centillion*, *supra*), appeal docketed, No. 20-1725 (Fed. Cir. Apr. 21, 2020).  "If a customer, rather than a defendant company, performs the final step to assemble the system, then the defendant has not infringed."  *Id.*

"Use" of a system for purposes of infringement means that a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it.  *Centillion*, 631 F.3d at 1284 (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)).

NCR Silver, however, does not provide all of the components of the system required by the Asserted Claims.  As a matter of law, NCR thus does not directly infringe because it did not put the alleged system into service.  Specifically, NCR does not control the claimed system as a whole and obtain benefit from it.  Instead, NCR Silver is, at most, a component of the overall

---

[11] Notably, during prosecution of the '640 patent, Plaintiff amended certain claims to add the word "system" to the preamble in order to overcome the Examiner's rejection of those claims.  (Ex. 10, August 11, 2011 Response to Office Action, p. 10.)  Plaintiff stated that the word "system" in that preamble connects "the process steps and the system of the preamble."  (*Id.*)  Plaintiff's statement amounts to an admission that the claims of the Asserted Patents cover a system, and each claim limitation represents a component that must be present in the system.

system that is employed by a customer in connection with multiple other components provided by third parties. *Id*.

As discussed below, many of the relevant system components are not even provided by NCR, much less put into service by NCR. It is to be recalled that, pursuant to the *Agreement*, NCR Silver customers acknowledge their receipt of Hardware (as therein defined), Software (by license), and Service. (Ex. 8, preamble.) The Software – be it downloaded or pre-installed – is provided by NCR by license to the NCR Silver customer free of charge, and not as a subscription service. (*Id.*, Section 1.4.) The Service is offered as a subscription (*id.*), but that subscription does not include web servers and, although NCR charges for the Service, it does not charge for any web servers. (*Id.*, Section 2.0.)

The *Agreement* also contains an acknowledgement that NCR does not provide a communications network. (Ex. 8, Section 8.2 ("To use the Service, you must maintain Internet access at your own expense.").) NCR Silver customers further acknowledge that "the iOS version of the Software" is "available for download in the App Store . . . ." (*Id.*, p. 11.)

The NCR customer, <u>not</u> NCR, obtains from third parties and puts into service the components needed to operate any system that includes NCR Silver. (Ex. 8, p. 11.) As such, NCR has not infringed. Simply stated, NCR does not "use" the system for purposes of infringement, because it does not put the system into service, *i.e.*, control the system as a whole and obtain benefit from it. *Centillion*, 631 F.3d at 1284 (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)).

### a.    The Network Limitation

As established by Claim 1 of the '640 patent, the Network Limitation requires the presence of "a network, wherein the network comprises the Internet" (Ex. 1, Col. 6, line 28) and/or "the

27

worldwide web" (*id.*, Col. 6, line 21).  In similar fashion, Claim 1 of the '012 patent requires "a communications network."  (Ex. 2, Col. 6, lines 36-37.)  The Court was not asked to construe, and did not construe, the terms "network," "Internet" or "worldwide web."  Accordingly, those terms must be given their plain and ordinary meaning.  *MV3 Partners*, *supra*.

Plaintiff's infringement contentions merely assert that customers use the internet in connection with NCR Silver; Plaintiff does not claim that NCR provides the network, internet or worldwide web.

NCR does <u>not</u> provide the network used by NCR Silver customers.  Nor does NCR provide a communications network or access to such network.  (Ex. 4, Tr. 198:19-21 ("Q: Does NCR provide Internet access to customers of NCR silver.  A: It does not."); *id.*, Tr. 71:18 ("NCR does not provide Internet.").)  In the *Agreement*, customers explicitly acknowledge that NCR does not provide internet access and that they must obtain their own internet access from a third-party provider.  (Ex. 8, Section 8.2.)  NCR Silver thus does not meet the Network Limitation.

### b.    The Network Access Limitation

As another component of the system, the Network Access Limitation, as described in Claim 1 of the '640 patent, requires that there be "access" to "a network, wherein the network comprises the Internet."  (Ex. 1, Col. 6, lines 25 and 28.)  Likewise, Claim 1 of the '012 patent requires that the system components be "accessible via network communication . . . over a communications network."  (Ex. 2, Col. 6, lines 35-37.)  The Court again was not asked to construe, and did not construe, the terms requiring network access and, as such, those terms have their plain and ordinary meaning.  *MV3 Partners*, *supra*.

NCR Silver does not meet the Network Access Limitation because NCR does not provide network access to NCR Silver customers.  (Ex. 4, Tr. 198:19-21 ("Q: Does NCR provide Internet

28

access to customers of NCR silver. A:  It does not.”); *id*., Tr. 71:18 (“NCR does not provide Internet.”).)  Once again, the *Agreement* itself contains an acknowledgement by those customers that such access is not provided by NCR and that they must obtain their own internet access from third-party providers.  (Ex. 8, Section 8.2.)

### c.      The POS Terminal Limitation

As yet another component of the system, the POS Terminal Limitation, as described in Claim 1 of the ’640 patent, requires the presence of “one or more point of sale terminals, that display POS screens.”  (Ex. 1, Col. 6, lines 13-14.)  Claim 1 from the ’012 Patent similarly requires the presence of “one or more POS terminals.”  (Ex. 2, Col. 6, line 30.)  The Court stated that the claim limitation “point of sale terminals” should have its plain and ordinary meaning.  (Doc. 44, p. 2.)

Plaintiff’s infringement contentions assert that NCR Silver Quantum, which is an NCR Silver solution provided *via* an Android based Samsung Galaxy A® tablet with pre-installed POS terminal software, is a POS terminal.  (Ex. 3, Ex. A to FICs, p. 9.)  The FICs also acknowledge, however, that the NCR Silver POS terminal software can be used without an NCR Silver Quantum device, and can instead be used with iPads® that are provided by customers.  (*Id*. at p. 10 (“The POS, if you have an iPad screen . . . .”).)  Indeed, the vast majority of NCR Silver sales do not include a Quantum device, such sales instead involving customers who use their own Apple® devices, primarily iPads®.  (Ex. 4, Tr. 58:9-17.)  Therefore, as to NCR Silver sales that do not include a Quantum device, there can be no direct infringement by NCR as a matter of law.

### d.      The PC Workstation Limitation

The PC Workstation Limitation as enunciated in Claim 1 of the ’640 patent requires the presence of “one or more local or remote PC workstations” as part of the system.  (Ex. 1, Col. 6,

line 17.)  The Court held that the claim term "PC workstation(s)" from Claim 1 of the '640 patent should have its plain and ordinary meaning.  (Doc. 44, p. 2.)

To support its claim that the PC Workstation Limitation is met by NCR Silver, Plaintiff references an NCR Silver YouTube video depicting a Dell® laptop being used for Data Entry. (Ex. 3, Ex. A to FICs, p. 16) ("using my Dell laptop . . . you don't have to be on the iPad . . . .").)

But NCR does not require, provide, or offer PC workstations in connection with NCR Silver sales.  (Ex. 4: Tr. 57:24-58:1 ("NCR Silver is a service.  They purchase a service, and then they purchase their hardware separately."); *id*., Tr. 198:11-12 ("Q: Does NCR provide PC workstations?  A: It does not.").)  Any PC workstation that a customer wishes to use with NCR Silver is obtained by the customer from a third party. (*Id*.)  Plaintiff even seemingly acknowledges this undisputed fact in its FICs by referencing the use of a laptop from Dell® with NCR Silver. (Ex. 3, Ex. A to FICS, p. 16.)

The use of a PC workstation is not required for a user to use NCR Silver, and NCR Silver can be used entirely without such a device.  (Ex. 4, Tr. 180:8-10.)  Customers can perform Data Entry and use POS functions from the POS terminal software.  (Ex. 5, Tr. 51:18-52:15.)

Any contention by Plaintiff that the POS terminal itself meets the PC Workstation Limitation equally fails as a matter of law.  The Asserted Claims of the '640 patent require as separate devices, PC workstations acting on "said POS terminals."  It would be a non-sensical construction to read the claim as stating that POS terminals can act upon themselves, and it likewise renders the "from anywhere in the world" limitation superfluous.  If POS terminals are the claimed PC workstations, then of course they can be acted upon anywhere they reside.

For these reasons, NCR Silver does not meet the PC Workstation Limitation.

30

### B.    THERE IS NO INDIRECT INFRINGEMENT AS A MATTER OF LAW

Necessarily, Plaintiff's claims of indirect infringement fail because there can be neither inducement of infringement nor contributory infringement without direct infringement.  *Limelight Networks, Inc. v. Akamai Techs., Inc*., 572 U.S. 915, 922 (2014); *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1033 (Fed. Cir. 2002).  Should the Court, however, find a genuine issue of fact as to direct infringement, there still can be no indirect infringement as a matter of law because Plaintiff has failed to raise, and cannot raise, a genuine issue of fact as to NCR's intent, or show that NCR Silver lacks substantial non-infringing uses.

### 1.    No Induced Infringement

Section 271 (b) of the Patent Act provides: "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271 (b).  "[L]iability for inducing infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'"  *Commil USA, LLC v. Cisco Sys., Inc.*, 576 U.S. 632, 135 S. Ct. 1920, 1926 (2015) (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)).  "Intent can be shown by circumstantial evidence, but the mere knowledge of possible infringement will not suffice."  *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009).

"Inducement can be found where there is '[e]vidence of active steps taken to encourage direct infringement,' which can in turn be found in 'advertising an infringing use or instructing how to engage in an infringing use.'"  *Takeda Pharm. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 630-31 (Fed. Cir. 2015) (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005)).  Such instructions must, however, "evidence 'intent to encourage infringement.'"  *Id*. at 631 (quoting *Vita-Mix*, 581 F.3d at 1329).  "The focus is not on whether the instructions describe the mode of infringement, but rather on whether the 'instructions teach an

31

infringing use of the device such that [the court is] willing to infer from those instructions an affirmative intent to infringe the patent.'" *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 701 (Fed. Cir. 2019) (quoting *Vita-Mix*, 581 F.3d at 1329 n. 2). "Merely 'describ[ing]' an infringing mode is not the same as 'recommend[ing],' 'encourag[ing],' or 'promot[ing],' an infringing use, or suggesting that an infringing use 'should' be performed." *Takeda*, 785 F.3d at 631 (citations omitted).

Plaintiff's indirect infringement theory based upon inducement fails because there is no evidence that NCR knew that customers who used NCR Silver would be infringing the Asserted Patents. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639, 135 S. Ct. 1920, 1926 (2015) (liability for inducing infringement requires that defendant know of patent <u>and</u> that acts induced will infringe), citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009) ("the mere knowledge of possible infringement will not suffice.").

There also is no evidence that NCR intentionally induced consumers to directly infringe, either through advertising an infringing use or instructing them as to how to engage in an infringing use. *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 630-31 (Fed. Cir. 2015) (citing *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005)). To the contrary, NCR specifically told NCR Silver customers they could **<u>not</u>** modify its POS terminal software. (<u>Ex. 8</u>, Section 1.5.) Plaintiff further lacks any evidence – because there is none – that user instructions provided by NCR evidence an intent to encourage infringement. *Takeda Pharm.* at 631 (citing *Vita-Mix*, 581 F.3d at 1329).

## 2.    No Contributory Infringement

32

Contributory infringement is defined by 35 U.S.C. § 271 (c) as follows:

> Whoever offers to sell or sells within the United States . . . a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

To establish contributory infringement, a patentee must show that: (a) there is direct infringement; (b) the accused infringer had knowledge of the patent; (c) the component has no substantial non-infringing uses; and (d) the component is a material part of the invention. *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

Here, Plaintiff's contributory infringement theory fails because: (a) there is no direct infringement; and (b) NCR Silver has substantial non-infringing uses. *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010). Indeed, while the lack of direct infringement has already been discussed and is dispositive, even if it is assumed that direct infringement is present, there is no genuine dispute that NCR Silver has substantial non-infringing uses.

A substantial non-infringing use is one that is "not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix*, 581 F.3d at 1327. NCR Silver has several non-infringing uses that are neither unusual, impractical, nor far-fetched. For example, NCR Silver can be (and is) used without POS builder software because the NCR POS terminal software comes pre-built (*see* Section IV (A) (1) (a), The Building Limitation). (Ex. 4, Tr. 54:20-22; Ex. 5, Tr. 34:23-35:2). NCR Silver can also be used without a PC workstation because Data Entry and POS functions are available directly through the POS terminal software (*see* Section IV (A) (2) (d), The PC Workstation Limitation). (Ex. 5, Tr. 51:18-52:15). As yet another example,

33

NCR Silver can be used without interaction between a POS terminal and POS builder software because the POS terminal can operate without being online (*see* Section IV (A) (1) (b), The Interaction Limitation).  (<u>Ex. 4</u>, Tr. 180:8-10 ("There are customers that operate in food trucks that use NCR on a tablet and do not connect to the Internet for days.").)  This capability allows customers to continue using their POS terminals even when their internet connection is down, an occurrence which is neither unusual nor far-fetched.  These examples make the point – NCR Silver has multiple legitimate and substantial non-infringing uses.

## V.    <u>CONCLUSION</u>

NCR does not infringe as a matter of law because NCR Silver does not provide, among other things, software used to build POS terminal software, an internet connection, a PC workstation, or a web server as a subscription.  The remote server based software used with NCR Silver is not located on a web server. The POS terminal software used with NCR Silver does not interact with POS builder software to perform POS functions.  Moreover, because NCR Silver is used by the consumer as part of a system and NCR does not employ or obtain the benefit thereof, NCR again cannot directly infringe the asserted system claims as a matter of law.

NCR does not indirectly infringe as a matter of law because direct infringement is absent. But even assuming its existence *arguendo*, there is no evidence demonstrating that NCR had the intent to cause consumers to directly infringe, thus precluding indirect infringement by inducement.  There also are no genuine issues as to material fact concerning whether NCR Silver has substantial non-infringing uses and, as a result, NCR cannot be held liable for indirect infringement by way of contributory infringement.

For these reasons, summary judgment of noninfringement should enter in NCR's favor.

91460758v.1

Dated: March 12, 2021

Respectfully submitted,

/s/ *Charles E. Phipps*
Charles E. Phipps
   Texas State Bar No. 00794457
   cphipps@lockelord.com
Steven F. Meyer
   Admitted *pro hac vice*
   smeyer@lockelord.com
Daniel G. Nguyen
   Texas State Bar No. 24025560
   dnguyen@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8000 Telephone
(214) 740-8800 Facsimile

**ATTORNEYS FOR DEFENDANT**
**NCR CORPORATION**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent electronic notification of such filing to all other counsel of record.

/s/ *Charles E. Phipps*
Charles E. Phipps

35

91460758v.1