**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

CloudofChange, LLC,

    Plaintiff,

              v.

NCR Corporation,

    Defendant.

Case No. 6:19-CV-00513-ADA

**JURY TRIAL DEMANDED**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

**PUBLIC VERSION**

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 1

II.     LEGAL STANDARD ............................................................................................ 2

III.    ARGUMENT ......................................................................................................... 4

   A.   Point of Sale Builder Software ........................................................................... 4

   B.   Web Server ......................................................................................................... 7

   C.   Interaction ......................................................................................................... 12

   D.   Web Servers are Provided as a Vendor Subscription Service ........................... 14

   E.   NCR Silver Meets the "System" Claim Limitations ........................................ 16

   F.   Indirect Infringement ........................................................................................ 19

IV.     CONCLUSION .................................................................................................... 19

## **TABLE OF AUTHORITIES**

**Cases**                                                                                              **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................................................2

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................................2

*Centillion Data Sys. LLC v. Qwest Commc'ns Int'l Inc.*,

  631 F.3d 1279 (Fed. Cir. 2011).......................................................................................4, 19

*DIRECTV Inc. v. Robson*, 420 F.3d 532 (5th Cir. 2006) .........................................................2

*FINALROD IP, LLC v. John Crane, Inc.*, 2019 U.S. Dist. LEXIS 149649,

  (W.D. Tex. May 30, 2019)...............................................................................................2, 3

*Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216 (5th Cir. 2011) ..........................................3

*In re Gabapentin Patent Litig.*, 503 F.3d 1254 (Fed. Cir. 2007) .............................................3

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007)...............................................................4

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) .........................................................2

*Lyda v. CBS Corp.*, 838 F.3d 1331 (Fed. Cir. 2016) ..........................................................4, 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)...............................3

*Medical Instrumentation and Diagnostics Corp. v. Elekta AB*,

  344 F.3d 1205 (Fed. Cir. 2003).........................................................................................3

*PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359 (Fed. Cir. 2005)................3

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999) .........................3

*U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371 (Fed. Cir. 2007) ...............................3

*Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193 (5th Cir. 1995) .....................................2

*Zoltek Corp. v. U.S.*, 95 Fed. Cl. 681 (Fed. Cl. Dec. 16, 2010) ...............................................4

**Rules**

FED. R. CIV. P. 56(a) ...............................................................................................................2

Plaintiff CloudofChange, LLC ("CloudofChange" or "Plaintiff") files this Response in Opposition to Defendant NCR Corporation's ("NCR" or "Defendant") Motion for Summary Judgment of Non-Infringement (Dkt. 64 or "Motion").

## I.    INTRODUCTION

Plaintiff CloudofChange asserts that the accused NCR Silver product meets all of the limitations of Claims 1, 3-6, and 11-13 of U.S. Patent No. 9,400,640 ("the '640 Patent") and Claims 1-4 and 9 of U.S. Patent No. 10,083,012 ("the '012 Patent") (collectively, the "Asserted Claims"). *See* Dkt. 79. As discussed in detail herein, Plaintiff's infringement arguments are supported by expert testimony and by evidence provided by NCR.

In its motion, NCR denies that the Accused Product meets certain specified claim limitations. *First*, NCR contends that NCR Silver does not meet the point of sale (POS) builder limitation of the Asserted Patents. However, NCR's contention that its software is "prebuilt" is contrary to their own documentation and at odds with express claim language about instruction "not being formatted in programming code." *Second*, NCR denies that NCR Silver meets the web server limitation of the Asserted Patents. NCR's denial ignores the clear testimony of its own corporate representative, disregards the Court's claim construction, and substitutes its own definition of "web server." *Third*, NCR denies that NCR Silver includes the interaction limitation. But NCR's denial ignores its own corporate representative. *Fourth*, NCR denies that NCR Silver includes a subscription service limitation. NCR's denial is contradicted by testimony of their corporate representative. *Finally*, NCR denies that NCR Silver meets the "system" claim limitation by exercising control and benefitting from the NCR Silver system. NCR's denial is contradicted by the testimony of their own corporate representatives and their own documentation. Clearly, NCR also uses the components of the NCR Silver systems, however provided.

1

Based on the evidence discussed in this Response, Defendant, NCR's defenses to Plaintiff's infringement allegations all fail as a matter of law.   At a minimum, significant issues of material fact preclude summary judgment regarding non-infringement in this case.

## II.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a summary judgment is appropriate only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 254 (1986).

The party seeking summary judgment always has the initial burden of "informing the district court of the basis for its motion" as well as identifying portions of the record that the moving party "believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The motion for summary judgment should be denied if the moving party fails to meet the initial burden, regardless of the non-moving party's response. *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994).

Only when the moving party meets the initial burden does the burden shift to the non-moving party "for establishing the existence of a genuine issue for trial." *FINALROD IP, LLC v. John Crane, Inc.*, 2019 U.S. Dist. LEXIS 149649 at *5 (W.D. Tex. May 30, 2019) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995)).  "A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006).

In reviewing the evidence presented, the court "will view the summary judgment evidence in the light most favorable to the non-movant." *FINALROD IP, LLC v. John Crane, Inc.*, 2019 U.S. Dist. LEXIS 149649 at *5 (W.D. Tex. May 30, 2019) (citing *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 221 (5th Cir. 2011)).

Determining summary judgment in infringement requires a two-step analysis. "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citations omitted). As such, "[s]ummary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1374-1375 (Fed. Cir. 2007) (quoting *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005)). Additionally, summary judgment is not appropriate when both parties have proffered conflicting expert reports. Moreover, summary judgment is not appropriate where the parties have proffered conflicting expert opinions. *See In re Gabapentin Patent Litig.*, 503 F.3d 1254, 1259-62 (Fed. Cir. 2007) (reversing summary judgment when the parties had proffered conflicting expert opinions).[1]

---

[1] *See Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1220 (Fed. Cir. 2003) (explaining where a non-moving party presents an expert who "quote[s] particular portions of the references that [are] relevant for each of the claim limitations...[does] not simply make conclusory statement[s] that, in his opinion, the claims [are] invalid...and for each claim limitation...connect[s] it with disclosures in the prior art that he believe[s] [teach] each particular limitation," then to the extent that such assertions conflict with similarly specific testimony by the patent holder's expert, there exists a triable issue of fact); *see also Zoltek Corp. v. U.S.*, 95 Fed.

Further, the standard for analysis of claims are different for system claims in comparison to method claims—"to use a system for purposes of infringement, a party must put the invention into service, i.e., control the system as a whole and obtain benefit from it." *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339 (Fed. Cir. 2016) (citing *Centillion Data Sys. LLC v. Qwest Commc'ns Int'l Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) (internal quotations omitted)).

## III.    ARGUMENT

### A.    Point of Sale Builder Software

Plaintiff's expert Gregory Crouse inspected the accused product NCR Silver on February 2, 2021.  Ex. A, Crouse Deposition (Infringement), 110:13-16.  At that inspection, Mr. Crouse was able to perform building functions, such as adding buttons and menu items.

```
12              BY MR. PHIPPS:
13         Q.  And what did you do during the
14    inspection?
15         A.  I was able to perform building
16    functions, which were creating menu items,
17    creating categories, adding all of the data that
18    described the menu items that I had put in, the
19    category items, I changed pricing, I changed
20    tax -- tax regimes, I entered in descriptions, I
21    was able to, you know, add buttons, remove
22    buttons, add categories, remove categories.
23    Performing the functions that the -- you know, a
24    builder, a person who was building the content on
25    the device would do.
```

*Id.*, 113:12-25.  Of course, NCR disputes that this activity is "building."

Central to NCR's argument that the Accused Product does not include "point of sale builder software" is that NCR maintains "its POS terminal software is pre-built."  Dkt, 64, p. 7.  NCR's

Cl. 681, 693 (Fed. Cl. Dec. 16, 2010) (citing *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 427 (2007)).

expert Dr. Chatterjee explains: "As soon as you download it, the entire application is available. The application does not change over time, it's static and it's pre-built." Ex. B, Chatterjee Deposition (Non-Infringement), 55:9-11.

Consistent with this "pre-built" argument, NCR contends in its Motion, "when an NCR Silver customer performs Data Entry and adds a new item, a pre-existing but invisible button becomes visible." Dkt. 64, p. 7. Dr. Chatterjee echoes: "It's pre-built. Everything's already there. You simply toggle it on and off. There's no building that's being done. It's simple data entry and that's it." Ex. B, Chatterjee Deposition (Non-Infringement), 82:4-7. Similarly, Dr. Chatterjee opines that schedules in NCR Silver are pre-built. *Id*., 137:3-5 ("Q. So is it your understanding that all of the schedules are pre-built in the NCR Silver products? A. The schedule functionality is pre-built.").

NCR's argument is contradicted by its own documents concerning its product. Indeed, the NCR Silver Pro Restaurant Manager's Guide expressly states that it allows a user "to build a schedule," as follows:



Ex. C, Exhibit 16, NCR Silver Pro Restaurant Manager's Guide (emphasis added). That is, there is a factual dispute between NCR Silver's documentation for NCR Silver on the one hand, and Dr. Chatterjee on the other.

The opinion of Plaintiff's expert Mr. Crouse directly contradicts the opinion of Dr. Chatterjee. In summary, according to Mr. Crouse, if the POS software is being utilized to

change the content of the POS, then POS building is occurring.

```
 6        Q.  Do you believe that the Court's
 7   Construction can cover mere data -- data entry?
 8          MR. YATES:  Objection.  Form.
 9       A.  To the extent that data is used to
10   build content, yes.
```

Ex. A, Crouse Deposition (Infringement), 149:6-10.

In fact the claim language of the '012 Patent expressly provides that building may occur where "instructions … are not formatted in programming code":

> **2.** The web-based point of sale (POS) builder system of claim **1**, wherein instructions to the POS builder interface for programmatic creation and modification of the one or more POS terminals are not formatted in programming code.

Dkt. 64-2, '012 Patent, Claim 2. NCR is unable to reconcile this "not formatted in programming code" claim language with its "pre-built" argument and the fact that POS building occurs without utilization of programming code is entirely consistent with the objective of the Asserted Patents, which are intended "for online, web-based point of sale (POS) building and configuration, which can assist non-expert business operators in building, editing and testing a point of sale system to manage their businesses." Dkt. 64-1, '640 Patent, Abstract. At a minimum, issues of material fact exist based on the evidence and on the directly contradictory opinions of the Parties' respective expert witnesses concerning whether or not the POS builder limitation is met by the Accused Products such that summary judgement on this issue would be erroneous.[2]

---

[2] NCR's Motion includes an inappropriate, alternative reference suggesting that the Court find the Asserted Patents invalid as anticipated by *Woycik*. Dkt. 64, p. 20, n.9. In response, CloudofChange incorporates by reference its response in opposition to NCR's Invalidity MSJ, filed concurrently herewith.

B.    <u>Web Server</u>

The Court's construction for "a web server" includes: "hardware and software that uses HTTP (hypertext transfer protocol) to serve data or files that form web pages."  Dkt. 47 (footnote omitted).   NCR's corporate representative McGill Quinn testified that the Accused Product contains each of these elements:

```
22        Q  So the cloud that NCR uses consists of
23   hardware and software; is that fair?
24        A  That is correct.
25        Q  And that hardware and software uses HTTP;
```

```
1    is that correct?
2         A  It can use other communication services,
3    TCP, UDP.  It doesn't necessarily have to be HTTP
4    in order to send communication back and forth
5    between the devices.
6         Q  And this cloud hardware and software
7    serves data or files; is that correct?
8            MR. PHIPPS:  Objection.  Vague.  Compound.
9    BY MR. YATES:
10        Q  You can answer.
11        A  Data or files, correct.
```

```
12        Q  And as we saw this earlier, it serves me
13   data or files as a user that can form Web pages,
14   correct?
15        A  Can you restate the question?
16        Q  So the cloud services that are being
17   provided by NCR use hardware and software that use
18   HTTP to serve data or files that form Web pages?
19        A  So let's be clear.  NCR is not delivering
20   cloud services.  We are leveraging the cloud
21   services that are provided through Google.  Our
22   customers are not aware of these services in the
23   back end.
24        Q  But those are the services you're
25   providing as part of NCR Silver, correct?
```

```
1        A  Again, the services are not known to the
2   customer.  To your question earlier, they hit the
3   Web browser.  They don't know what the back end
4   is, and we do not tell them what the back end is.
5        Q  But from the video, we saw that we were
6   using HTTP, correct?
7        A  In order to hit a Web page, typically you
8   would go HTTP.
```

Ex. D, Quinn Deposition, 117:22-119:8.

```
11        Q  So the NCR Silver Back Office does include
12   a Web server?
13        A  It may or may not.  As I have spoken
14   earlier, the Google Cloud environment is created
15   and utilized by Google Cloud.  We take advantage
16   of the infrastructure that is provided for us.
17           However, to the statement the user is not
18   made aware of a Web server if one exists, they
19   don't know what protocols we're using outside of
20   the Web browser to get the information.
```

*Id.*, 133:11-20.  Indeed, Plaintiff's expert Mr. Crouse cites to these deposition pages as some of the evidence supporting his opinion that NCR Silver has a web server.  Ex. E, Crouse Expert Report, pp. 31, 39, 40.

In addition, NCR's other corporate representative Kristin Schoonover, Executive Director for Product, also testified that the Accused Product utilizes web servers:

```
16   Q    Okay.  Ms. Schoonover, this is a document that's
17        been produced by NCR.  It starts with the number
18        NCR006160 and it's the Google Cloud Addendum.  Have
19        you seen this --
20   A    Yes.
21   Q    -- document previously?
22   A    Yes, I have.
23   Q    What is it?
24   A    This is an agreement with Google for hosting
25        services, I believe.
```

```
 1   Q    This is the hosting services in the cloud that
 2        relates to the NCR Silver product?
 3   A    Yes.  The Back Office is hosted in Google Cloud
 4        platform.
 5   Q    Other than hosting, does Google provide any other
 6        services to NCR related to this agreement?
 7   A    Not that I'm aware of, no.
 8   Q    Do the services offered include a server or
 9        servers?
10   A    Yes, there are servers that are in the Google Cloud
11        hosting center, yes.
12   Q    Are those web servers?
13   A    Yes.
```

Ex. F, Schoonover Deposition, 198:16-199:13.

NCR's argument denying the web server limitation—"that the remote back office software being used in connection with NCR silver is located on application servers, not web servers" (Dkt. 64, p. 21)—ignores the clear testimony of its own corporate representatives, disregards the Court's claim construction, and substitutes its own definition of "web server."  Despite its best efforts to do so, NCR cannot negate the evidence that its software (what Plaintiff indicates as NCR's builder software) resides on "hardware and software that uses HTTP (hypertext transfer protocol) to serve data or files that form web pages."  *See* Dkt. 47.

When asked about this issue directly, NCR's expert Dr. Chatterjee characteristically attempts to evade and obfuscate, but cannot credibly deny that the Accused Products use a web server:

3  Q  Did you see Mr. Crouse at the February inspection use a
4     Web browser to connect to the NCR Silver Back Office?
5  A  I remember that he used his laptop and he opened a browser
6     from his laptop to view different NCR pages.
7  Q  And did Mr. Crouse view Web pages through the Web browser
8     at his inspection in February?
9  A  I believe that's what I just stated, that I recall, like I
10    stated, that he gave me express permission to look over
11    his shoulder and he used his laptop to open a browser, and
12    then he was viewing Web pages, yes.
13 Q  And did Mr. Crouse use HTTP to access the NCR Silver Back
14    Office?
15 A  I believe he used HTTPS.
16 Q  Thank you.
17              So does NCR Silver ever serve data or file
18    that forms Web pages?
19 A  NCR Silver may do a lot of things.  I'm not sure what
20    you're asking.  In relation to what is your -- is your
21    question?
22 Q  I'm asking if NCR Silver ever serves data or files that
23    form Web pages, to your knowledge?
24 A  Well, like we've talked about, the -- when Mr. Crouse was
25    accessing or viewing certain aspects of NCR Silver, he

1     used a browser, but -- and -- in that case, but that has
2     no relevance or bearing on what is actually running on any
3     Web server, and again, this was further confirmed by
4     Mr. Crouse at his deposition where he expressly stated
5     that, despite using a Web browser, he cannot say and he
6     does not know what functionality is on a Web server or an
7     application server or any other type of server.  So simply
8     using a Web browser gives no insight into what is actually
9     running on a Web server, which is the opinion that I've
10    set forth clearly and repeatedly in my report, and it's
11    also a fact.

```
12              And then on top of that, as I've reconfirmed
13    in my supplementary expert report, Mr. Crouse agrees with
14    me, stating that just because you're using a Web browser,
15    it provides no insight whatsoever into the functionality
16    that is provided by that Web server.  So both Dr. -- both
17    Mr. Crouse and I are in agreement that using a browser
18    does not provide any information on what the actual
19    functionality is that's running on that Web server.  And
20    on top of that, I have confirmed, based on my own
21    analysis, that the claim limitations are not met because
22    the functionality is not on the Web server.
23              MR. YATES:  Object as nonresponsive.
```

Ex. B, Chatterjee Deposition (Non-Infringement), 43:3-44.  Consistent with this argument, and

contrary to the Court's construction, Dr. Chatterjee denies that a web server can have a database.

```
14  Q  So can a Web server have a database, in your opinion?
15  A  Can a Web server have a database?  No, a Web server does
16     not have a database.  There could be a database separate
17     from a Web server.
```

*Id.*, 70:14-17.  Contrary to Dr. Chatterjee's attempted diversion, the '640 and '012 Patents show

that a Web Server (item 36) having a database.



Dkt. 64-1, '640 Patent, Fig. 3.

Therefore, based on at least the foregoing evidence, Plaintiff asserts that NCR Silver meets the web server limitation of the Asserted Patents, with the builder software located on the web server.  At a minimum, issues of material fact remain regarding whether the web server limitation is met by the Accused Products, and summary judgment is precluded.

C.    **Interaction**

Plaintiff's assertion that NCR Silver includes the interaction limitation is supported by Mr. Crouse's investigation and expert report:

> During the February 2 inspection, it was observed that NCR Silver is available over the internet.  I was able to connect to the NCR Silver back office system over the internet.  I observed the ability to repeatedly interact with the back-office server over the internet and observe changes made on the local NCR Silver environment.

Ex. E, Crouse Expert Report, p. 34.

NCR again disputes the presence of this limitation, including by rehashing its "no builder" argument (*see* Dkt. 64, p. 24 ("NCR Silver does not build POS terminal software")) and by making a "stand-alone mode" argument.  *See id*. ("stand-alone" and "NCR Silver works even if the Internet's down temporarily").  There no evidence and it would be illogical that the Accused Product would operate as intended as a POS without ever being connected to the Internet, as it would have no ability to process credit card sales transactions, for example.  Moreover, NCR's corporate representative admitted that the Internet is necessary to the function of the Accused Product, when he testified that customers ultimately must connect to the Internet in order to process sales transactions.

> 5    Q  And are there customers that are using NCR
> 6  Silver stand-alone with no connection to the
> 7  Internet or the Back Office services?
> 8    A  There are customers that operate in food
> 9  trucks that use NCR on a tablet and do not connect
> 10  to the Internet for days.
> 11    Q  Then they ultimately -- these customers
> 12  connect to the Internet at some point?
> 13    A  In order to process their transactions,
> 14  they have to connect to the Internet.

Ex. D, Quinn Deposition, 180:5-14.

Importantly, the '640 and '012 Patents discloses a "loose coupling" of the POS to the back office software, consistent with food truck and other temporary stand-alone operations and consistent with the described operation of the Accused Product even when in the alleged "stand alone" mode.

> FIG. **3** shows a high level diagram of this invention. There are N POS terminals (POS **1**, POS **2** . . . POS N) in "Store" **31** and in "Store" **32**. POS **31** is in Store **1** and POS **2** (**32**) is in Store **2**. Each POS includes personal computer hardware and software. Additional POS terminals beyond those shown, as well as additional stores beyond the two shown, are within the scope of the invention. Each POS normally operates with a hardware/software connection **35** to the Internet or Web. However, if the web goes down, the POS terminal continues to operate. There is a "loose coupling" of the POS to the back office (BO): the POS to BO connection is not required for the basic business functions of the POS. All transaction data is stored in a relational database on the hard drive in the POS.

Dkt. 64-1, '640 Patent, 3:38-49.

Therefore, evidence exists that NCR Silver includes the interaction limitation as discussed herein. Plaintiff supports its assertion with expert testimony and evidence provided by NCR itself. At a minimum, Plaintiff has provided sufficient evidence that issues of material fact preclude summary judgment on the issue of the disputed interaction limitation.

### D.    Web Servers are Provided as a Vendor Subscription Service

Plaintiff asserts that NCR Silver meets the vendor subscription service limitation.  Indeed, NCR's corporate representative McGill Quinn testified about what is included with the subscription:

```
1       Q  And so the $149 per month represents a
2    monthly fee or subscription fee for using NCR
3    Silver?
4       A  It gives access to the hardware, software,
5    our concierge service, and our customer care.
```

Ex. D, Quinn Deposition, 96:1-5.  Mr. Quinn further explains:

```
11       Q  So the NCR Silver Back Office does include
12    a Web server?
13       A  It may or may not.  As I have spoken
14    earlier, the Google Cloud environment is created
15    and utilized by Google Cloud.  We take advantage
16    of the infrastructure that is provided for us.
17          However, to the statement the user is not
18    made aware of a Web server if one exists, they
19    don't know what protocols we're using outside of
20    the Web browser to get the information.
```

Ex. D, Quinn Deposition, 133:11-20.

Further, NCR's other corporate representative, Kristin Schoonover, testified that NCR Silver products are licensed as a vendor subscription service or Subscription-as-a-Service (SaaS).

```
17    Q   Well, I guess you did tell me -- is it correct you
18        did tell me earlier that all of the Silver is
19        licensed, not sold?  They're actually Sas -- SaaS
20        licenses; is that right?
21    A   It's a monthly subscription fee, that's correct.
```

Ex. F, Schoonover Deposition, 202:17-21.

14

```
10  Q    Can you tell us what's included in the SaaS license
11       fee that's paid monthly by your customers for NCR
12       Silver?
13  A    So the software subscription is what is include --
14       included in that monthly subscription price.
```

Ex. F, Schoonover Deposition, 203:10-14.

```
4   Q    That that's where the market's moving.  That
5        companies are going to -- do you agree with that,
6        that the market is moving in the direction that
7        companies like these retailers and merchants will
8        be running purely on SaaS point-of-sale systems?
9   A    Well, SaaS is just -- is a pricing model.  It means
10       charging on a monthly subscription versus charging
11       upfront.  So that just refers to the pricing model.
12  Q    And that's the pricing model that you guys use at
13       NCR for the Silver product; right?
14  A    We charge a monthly subscription, yes.
```

Ex. F, Schoonover Deposition, 212:4-14.

Contrary to the sworn testimony of its corporate representatives, NCR now argues "NCR does not provide a web server to NCR Silver customers as a subscription service."  Dkt. 64, p. 25. NCR further explains that "by signing the *Agreement*, NCR Silver customers acknowledge that NCR only affords them access to the Service and that the fee for the Service does not include a fee for use of web servers (which is, instead, paid by NCR to the web servers' owner(s))."  *Id.*

However, the NCR Silver Merchant Agreement states:  "This Agreement between you and NCR Corporation or one of its designated affiliates ("NCR") governs your use of the NCR Silver® Software as a Service suite of applications ("Service"), the related hardware ("Hardware") and the user application software and updates ("Software") that NCR provides you in connection with the Service including but not limited to NCR Silver One (together, "Products") you purchase from NCR or from an authorized NCR reseller ("Reseller").  Dkt. 64-5, p. 1.  Further, the NCR Silver Merchant Agreement references "servers" in Clause 9.9 that "you agree not to…interfere with or

disrupt….” *Id*. at p. 7.  Indeed, Mr. Crouse relies, in part, on the NCR Silver Merchant Agreement. Ex. E, Crouse Report, pp. 2, 32, 33, 37.

Therefore, evidence exists that NCR Silver includes the vendor subscription service limitation as discussed herein.  Plaintiff supports its assertion with expert testimony and evidence provided by NCR itself.  At a minimum, Plaintiff has provided sufficient evidence that issues of material fact preclude summary judgment on the issue of the disputed limitation.

### E.    NCR Silver Meets the "System" Claim Limitations

Plaintiff asserts that NCR Silver meets the "system" claim limitations by exercising control and benefitting from the NCR Silver system.

While NCR maintains that it does not provide the network limitation (*see* Dkt. 64, pp. 27-28), the network access limitation (*see id*., pp. 28-29), the POS terminal limitation (*see id*., p. 29), and the PC workstation limitation (*see id*., p. 29-30), NCR's corporate representative McGill Quinn testified to the contrary regarding the control and benefit of the system.

```
 2      Q  And when NCR provides NCR Silver, it's
 3  responsible for the entire system of NCR Silver,
 4  correct?
 5      A  The point of sale is separate from the
 6  Back Office.  And then there's additional add-ons
 7  and products that a user can purchase.  So the
 8  definition of NCR Silver could mean multiple
 9  things in this context.
10      Q  NCR benefits from charging customers for
11  NCR Silver, correct?
12      A  That is correct.
13      Q  And in the context of NCR Silver, that
14  includes both point-of-sale application as well as
15  Back Office software and services, correct?
16      A  NCR benefits from the sale of NCR Silver.
```

Ex. D, Quinn Deposition, 191:2-16.  Furthermore, NCR sells POS hardware in addition to the subscription service.

```
 6        Q  And NCR sells both hardware and the
 7    subscription service; is that correct?
 8        A  It does.
 9        Q  And can people buy their own -- use their
10    own hardware and use NCR's software and still have
11    an NCR Silver system?
12        A  For the IOS product, yes.
13        Q  Is that also true for the Android product?
14        A  That is not.
15        Q  So if I want to use the Android product, I
16    have to get the hardware from NCR?
17        A  That is correct.
```

*Id.*, 58:6-17.

Even assuming that a customer provides the Internet and PC workstation (or other components), it is still NCR (through NCR Silver) that gains the benefit. The network limitation, the network access limitation, the Internet, the POS terminal limitation, and the PC workstation limitation are all part of the NCR Silver system that provides benefit to NCR and are used by NCR. For example, when a merchant processes a transaction using NCR Silver at a POS terminal, the transaction information is transmitted from the POS terminal, using the network access, across the Internet, to NCR's Back Office software. Then, the NCR Silver Back Office can present this transaction and payment information to the merchant using a PC workstation, or other browser enabled device, for viewing. This transaction information is controlled by NCR, and NCR benefits by selling its subscription service.

```
 1        Q  So the first icon that's labeled "Point of
 2    Sale," what does that -- what does that icon allow
 3    me to do?
 4        A  It allows you to go into the point-of-sale
 5    view.
 6        Q  And what can I do there?
 7        A  You can start taking transactions and
 8    payments.
```

Ex. D, Quinn Deposition, 75:1-8.

```
20      Q  So this is reflecting, through a browser,
21   individual sales transactions compiled into a
22   table; is that correct?
23      A  That is correct.
24      Q  Then if we look at page 8, can you just
25   explain to me what the POS transaction information
```
```
1   is?
2      A  It is the sales transactions performed
3   through the point of sale.
4      Q  And so those transactions were entered
5   into a point of sale where the transaction
6   happened.  The information is communicated up into
7   your cloud-based services and then, as depicted
8   here, are made available to me as a user through
9   the browser; is that correct?
10      A  Correct.
```

Ex. D_, Quinn Deposition, 82:20-83:10.

```
23   Q     "Cloud-based point-of-sale" is terminology you're
24        not familiar with?  Is that what you're telling us?
25   A     I'm saying it can mean multiple things.  But, yes,
```
```
1        a point-of-sale system can either live completely
2        in the cloud, or it can live in the store
3        physically on the device and still connect to the
4        cloud but for more limited functionality like
5        uploading sales transactions so that reports can be
6        accessed in the cloud.
7   Q     NCR Silver is a type of system that connects
8        directly to the cloud via a wireless internet
9        connection; correct?
10   A    For some data, yes.
```

Ex. F, Schoonover Deposition, 214:23-215:10.

This is confirmed by the NCR Silver Merchant Agreement that states a merchant "will provide NCR access to your network, system, data, and relevant information as reasonably required to perform the Service." Dkt. 64-5, p. 5. Clearly, NCR also uses the components of the

NCR Silver systems, however provided.  Further, it is clear that the terms of the NCR Silver Merchant Agreement control these components for which NCR derives a benefit from.  *See generally* Dkt. 64-5.

> 8.    Your Responsibilities
>
> 8.1    You are responsible for installing and configuring, and using the Service, Software, and Hardware, including account set up and configuration settings (unless NCR provides remote support for any of the foregoing as part of your subscription to the Service), compliance with applicable laws and regulations, and establishing any payment processing or other services certified by NCR for use with the Service (including through NCR's wholly owned affiliate, Jetpay).  You will provide NCR access to your network, system, data, and relevant information as reasonably required to perform the Service.  You acknowledge that NCR personnel may require, and you will provide, the ability to access and correct transaction or input data while the Service is being provided to you. NCR is not responsible for any damage caused by errors or omissions in any information, instructions, data or scripts you or a third party provides on your behalf in connection with the Service, or any actions NCR takes at your direction.

Dkt. 64-5, p. 5.

Substantial evidence exists that NCR Silver meets the "system" claim limitation the vendor subscription service limitation as discussed herein.  *Lyda*, 838 F.3d at 1339; *Centillion Data*, 631 F.3d at 1284.  Plaintiff supports its assertion with expert testimony and evidence provided by NCR itself.  At a minimum, Plaintiff has provided sufficient evidence that issues of material fact preclude summary judgment on the issue of the disputed limitation.

### F.    Indirect Infringement

While Plaintiff reserves the right to pursue indirect infringement claims in view of the rulings from the Court and other evidence, Plaintiff's expert has provided opinions related to direct, literal infringement, which is consistent with all of the evidence to date.  In order to exercise such reservation, permission from the Court is necessary in view of the Docket Control Order, therefore, summary judgment on this issue is moot and should be denied.

## IV.    CONCLUSION

Based on the foregoing reasons, Plaintiff respectfully requests the Court to deny Defendant's Motion for Summary Judgment of Non-Infringement.

Dated:  March 26, 2021                    Respectfully submitted,

                                          By: */s/ John H. Barr, Jr.*

                                          John H. Barr, Jr.
                                          Attorney In Charge
                                          Texas Bar No. 00783605
                                          jbarr@pattersonsheridan.com

                                          John A. Yates
                                          Texas Bar No. 24056569
                                          jyates@pattersonsheridan.com

                                          B. Todd Patterson
                                          Texas Bar No. 00789537
                                          tpatterson@pattersonsheridan.com

                                          Edgar N. Gonzalez
                                          Texas Bar No. 24092431
                                          egonzalez@pattersonsheridan.com

                                          Patterson + Sheridan LLP
                                          24 Greenway Plaza, Suite 1600
                                          Houston, Texas 77046
                                          (Tel.): 713-623-4844
                                          (Fax): 713-623-4846

                                          Abelino Reyna
                                          Texas Bar No. 24000087
                                          areyna@pattersonsheridan.com

                                          Patterson + Sheridan LLP
                                          900 Washington Ave., Suite 503
                                          Waco, Texas 76701
                                          (Tel.): 254-777-5248
                                          (Fax): 877-777-8071

                                          *Attorneys for Plaintiff,*
                                          *CloudofChange, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2021, I caused the foregoing and its exhibits to be electronically served upon counsel of record below.

/s/ John H. Barr, Jr.

John H. Barr, Jr.

Charles E. Phipps, cphipps@lockelord.com
Daniel G. Nguyen, dnguyen@lockelord.com
Steven F. Meyer, smeyer@lockelord.com
Donald E. Frechette, donald.frechette@lockelord.com
Charles S. Baker, cbaker@lockelord.com
Scarlett Collings, scarlett.collings@lockelord.com


**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201

*Counsel for Defendant NCR Corporation*

## FILED UNDER SEAL

I hereby certify that on March 26, 2021, I electronically filed the foregoing document under seal with the Clerk of the Court using the CM/ECF system pursuant to the Court's Standing Order regarding Filing Documents under Seal in Patent Cases and Redacted Pleadings (Dkt. 60).

/s/ John H. Barr, Jr.

John H. Barr, Jr.
