UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

------------------------------------------------------------- x
CloudofChange, LLC,                    ) **PUBLIC VERSION**
                                       )
                    Plaintiff,         )
                                       )
        v.                             ) 6:19-CV-00513-ADA
                                       )
NCR Corporation,                       )
                                       )
                    Defendant.         ) JURY TRIAL DEMANDED
                                       )
------------------------------------------------------------- x

### DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF AMBREEN SALTERS

Charles E. Phipps
    Texas State Bar No. 00794457
    cphipps@lockelord.com
Charles S. Baker
    Texas State Bar No. 01566200
    cbaker@lockelord.com
Steven F. Meyer
    Admitted *pro hac vice*
    smeyer@lockelord.com
Donald E. Frechette
    Admitted *pro hac vice*
    donald.frechette@lockelord.com
Scarlett Collings
    Texas State Bar No. 24001906
    scarlett.collings@lockelord.com
Daniel G. Nguyen
    Texas State Bar No. 24025560
    dnguyen@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8000 Telephone
(214) 740-8800 Facsimile

**ATTORNEYS FOR DEFENDANT
NCR CORPORATION**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ..................................................................................................1

II.    BACKGROUND ...................................................................................................1

    A.    The Parties, Patents, and Products .........................................................1

    B.    The Opinions And Report Of Ms. Salters................................................2

III.   LEGAL STANDARD...........................................................................................3

IV.   ANALYSIS AND ARGUMENT .........................................................................5

    A.    The Gross Profit Margin employed by Ms. Salters should be excluded. ................5

        1.    Protesting "insufficiency of information" does not allow Salters to disregard NCR's financials ..........................................................6

        2.    Opinions underlying Salters' margin calculation should be excluded ......................................................................................10

            a.    Salters is not qualified to opine on what constitutes a typical range of gross profit margins for SaaS businesses.............11

            b.    Sources cited by Salters to support her inflated margin are unreliable and irrelevant ..............................................11

    B.    The 80% apportionment ratio Salters applies to the MSRP of NCR Silver's subscriptions should be excluded as unreliable and irrelevant. ............................13

        1.    Salters' "Apportionment of Benefits" is Unreliable and Irrelevant..........14

        2.    Salters' regurgitation of Crouse's 80% apportionment is unreliable.........15

        3.    The Entire Market Approach is not appropriate .......................................16

    C.    Salters' Convoyed Sales Assertion is Improper and Unreliable............................19

    D.    Salters fails to connect her opinions to the Georgia-Pacific factors. .....................20

        1.    Salters' analysis of the "Technology Considerations" are disconnected...............................................................................21

        2.    Salters' analysis of the Financial & Commercial Considerations do not support her damages opinions..................................................22

V.    CONCLUSION...................................................................................................23

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Farm Fire & Cas. Co. v. Bell*,
    30 F. Supp. 3d 1085 (D. Kan. (2014 ..................................................................................12

*Universal City Studios, Inc. v. Nintendo Co.*,
    746 F.2d  112(2d Cir.1984) ............................................................................................13

*In re Agent Orange Product Liab. Litig.*,
     611F.Supp.  1223(D.C. N.Y. (1985 ..............................................................................16

*Citizen Fin. Grp., Inc. v. Citizens Nat'l Bank*,
    No. Civ.A. 01–1524, 2003 WL 24010950 (W.D.Pa. Apr. 23, 2004) .....................................14

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) .......................................................................................21

*Cornell Univ. v. Hewlett-Packard Co.*,
    No. 01-cv-1974, 2008 WL 2222189 (N.D.N.Y. May 27, 2008) ..............................................4

*Daubert II*, 43 F.3d 1311, 1317 (9th Cir. 1997) ...........................................................................12

*Daubert v. Merrell Dow Pharms. Inc.*,
    509 U.S. 579 (1993)..........................................................................................3, 4, 5, 12, 21

*Dynetix Design Solutions, Inc. v. Synopsis, Inc.*,
    No. 11-cv-05973 PSG, 2013 WL 4538210 (N.D. Cal. Aug. 22, 2013)....................................3

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)......................................................................................................13

*Good Tech. Corp. v. Mobileiron, Inc.*,
    No. 12-05826, 2015 WL 4090431, at *5 (N.D. Cal. July 5, 2015)........................................18

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
    185 F.3d 1341 (Fed. Cir. 1999)........................................................................................4

*Guardant Health, Inc. v. Found. Med., Inc.*,
    No. CV 17-1616-LPS-CJB, 2020 WL 2461551 (D. Del. May 7, 2020) ................................15

*Inventio Ag v. Otis Elevator Co.*,
    2011 WL 3359705 (S.D.N.Y. 2011)................................................................................19

*Kay v. First Continental Trading, Inc.*,
  976 F. Supp.  772(N.D. Ill. (1997 ..................................................................16

*Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*,
  No. CV 12-1369, 2020 WL 3140798, at *4 W.D. Pa. July 25, 2017) ....................15

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)..................................................................................3, 5

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  2010WL 2331311 (E.D. Tex. (2010 ..............................................................19

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)...................................................................4, 15

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,
  452 F.Supp.2d 772 (W.D.Mich.2006) ..........................................................14

*Lucent Technologies v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)....................................................................5

*McDowell v. Brown*,
  392 F.3d 1283 (11th Cir. 2004) ..................................................................12

*Mformation Techs., Inc. v. Research in Motion Ltd.*,
  2012WL 1142537 (N.D. Cal. (2012 ..............................................................19

*Microsoft v. Corel*,
  Case No. 5:15-cv-05836, Order Granting Defendants' Motion to Exclude
  Certain Opinions of Plaintiff's Damages Expert (N.D. Cal., San Jose Div.
  December 11, 2017).....................................................................................9

*Network Prot. Scis., LLC v. Fortinet, Inc.*,
  No. 12-01106, 2013 WL 5402089, at *7 (N.D. Cal. Sept. 26, 2013) ....................17

*Oracle America, Inc. v. Google Inc.*,
  798 F. Supp. 2d 1111, 1115-16 (N.D. Cal. 2011)..............................................18

*Presley v. Commercial Moving & Rigging, Inc.*,
  25 .3d 873 (D.C. 2011) ..............................................................................17

*Riles v. Shell Exploration & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002)......................................................................4

*Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*,
  Case No. 2:15-cv-00512-WCB, Doc. No. 198, Memorandum Opinion and
  Order (E.D. Tex. – Marshall Div., April 10, 2017) ............................................17

*Sherwin-Williams Co. vs. PPG Indus., Inc.,*
   Slip Op. (D. Del) 2020 WL 5077547 at *5 .................................................................14, 15

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,*
   926 F.2d 1161 (Fed.Cir.1991) ................................................................................................21

*Soden v. Freightliner Corp.,*
   714 F.2d  498(5th Cir. (1983 ................................................................................................16

*Sommerfield v. City of Chicago,*
   254 F.R.D. 317 (N.D. Ill. 2008) ...........................................................................................17

*Spraying Systems Co. v. Delavan, Inc.,*
   975F.2d 387, 394 (7th Cir.1992) ..........................................................................................13

*Starter Corp. v. Converse, Inc.,*
   170 F.3d 286, 297 (2d Cir.1999) ...........................................................................................13

*Uniloc USA, Inc. v. Microsoft Corp.,*
   632 F.3d 1292, 1318 (Fed. Cir. 2011) ...................................................................................18

*Uniloc USA Inc. v. Microsoft Corp.,*
   632 F.3d 1292 (Fed. Cir. 2011) ...................................................................................3, 4, 5, 21

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.,*
   173 F.R.D. 675 (D. Kan. 1997) .............................................................................................12

*United States v. Rouco,*
   765 F.2d 983 (11th Cir. 1985) ...............................................................................................12

*Versata Software, Inc. v. SAP Am., Inc.,*
   717 F.3d 1255 (Fed. Cir. 2013) ...............................................................................................4

*Virnetx, Inc. v. Cisco Sys., Inc.,*
   767 F.3d 1308, 1327 (Fed. Cir. 2014) ...................................................................................17

*Virnetx, Inc. v. Cisco Sys., Inc.,*
   767 F.3d 1308 (Fed. Cir. 2014) ...............................................................................................4

*Weisgram v. Marley,*
   169 F.3d 514 (8th Cir. 2000) .................................................................................................16

## Statutes and Rules

Fed. R. Evid. 702 .......................................................................................................3, 11, 21

Fed. R. Evid. 703 ...........................................................................................................16, 17

iv

Rule 403 ........................................................................................................................................13

v

**TABLE OF EXHIBITS**

Exhibit A          Damages Expert Report of Ambreen Salters on Behalf of CloudofChange

Exhibit B          NCR Corporation Form 10-K for fiscal year ended December 31, 2019

Exhibit C          NCR Corporation Form 10-K for fiscal year ended December 31, 2020

Exhibit D          https://www.ncr.com/silver/product

Exhibit E          Deposition of Wayne Barrata

Exhibit F          NCR Silver Income Statement

Exhibit G          Expert Report of Dr. Devrim Ikizler

Exhibit H          Deposition of Kristin Schoonover

Exhibit I          Plaintiff's First Set of Requests for Production to Defendant

Exhibit J          Plaintiff's Second Set of Requests for Production to Defendant

Exhibit K          http://openvviewpartners.com/blog/cost-of-goods-sold-for-software-as-a-service-business

Exhibit L          2020 SaaS Benchmarks Expansion, OpenView Partners

Exhibit M          Deposition of Ambreen Salters

Exhibit N          Deposition of Dr. Devrim Ikizler, Ph.D.

Exhibit O          http://www.ncrsilver.com/faqs

Exhibit P          http://www.techradar.com/reviews/ncr-silver

I.      **INTRODUCTION**

Ms. Salters' opinions and testimony as set forth in her damages report,[1] should be excluded in their entirety because (i) they rely on a wholly incorrect gross profit margin, (ii) Ms. Salters employs an unreliable and irrelevant 80% apportionment ratio; (iii) Salters' opinions and assumptions on convoyed sales are unreliable; and (iv) Salters fails to tie her damages theories to the hypothetical negotiation under the Georgia Pacific factors.  Because a 47% royalty in this case is not reasonable – as a matter of law or facts – the opinions and testimony of Salters that promote it should be excluded.

II.     **BACKGROUND**

   A.      **The Parties, Patents, and Products**

Founded in 1881, under the eventual name "National Cash Register," NCR Corporation is a multi-billion dollar enterprise providing technology solutions to customers in three primary business segments:  banking, retail, and hospitality.[2]  Within the hospitality business segment is the NCR Silver product line, which is a point of sale ("POS") system comprised of two software versions:  Essentials and Pro Restaurant, which includes all of the Essentials product features plus four additional features tailored to restaurants.  Standard features of the NCR Silver solutions, which are marketed through subscription sales, include actionable insights, customer loyalty, inventory/menu, management, multi-store management, employee management, 24/7/365 live

---

[1] Damages Expert Report of Ambreen Salters on Behalf of CloudofChange, dated February 24, 2021, with corresponding StoneTurn exhibits and workpapers ("Report"), attached hereto as Exhibit A.
[2] NCR Corporation Form 10-K for fiscal year ended December 31, 2019, attached as Exhibit B; NCR Corporation Form 10-K for fiscal year ended December 31, 2020, attached as Exhibit C.

support, intuitive design, email marketing, offline credit, and mobility.[3]  In addition, NCR Silver

Pro also includes "86" lists, takeout, and split checks.[4]

Plaintiff CloudofChange ("CoC") is a New York company, formed in 2016, as part of an

effort to monetize the Patents-in-Suit, after years of unprofitable and unsuccessful attempts by the

inventors Wayne Barrata and Greg Olson, to commercialize products that embody the patented

features.  CoC is not currently engaged in any commercial activities beyond owning the Patents-

in-Suit and maintaining a few of the inventors' legacy products in local retailers.[5] The Patents-in-

Suit are 9,400,640 B2 ('640), issued July 26, 2016, and 10,083,012 ('012), issued September 25,

2018.  Both patents are entitled "WEB-BASED POINT OF SALE BUILDER." [6]

## B.    The Opinions And Report Of Ms. Salters

Ms. Salter submitted her Report on February 24, 2021, including her opinions on damages;

she was deposed on March 25, 2021.  Salters claims NCR Corporation owes CoC a reasonable

royalty of at least ██████████[7] In deriving her ███ per unit baseline royalty, Salters begins with

the MSRP price ███████████████, which includes the Accused Software.  Next, Ms. Salters

purports to calculate the amount of per unit revenue attributable to the Patents-in-Suit by

multiplying the MSRP by an 80% technological apportionment developed by CoC's purported

---

[3] Report at ¶¶20-22 and notes 39-41, 42, 44-45.
[4] *Id.* at ¶21 and n.44, which refers to https://www.ncr.com/silver/product, attached here to as Exhibit D.
[5] Deposition of Wayne Barrata, dated January 28, 2021, at 35-39, selected pages attached hereto as Exhibit E.
[6] *See* U.S. Patent No. 9,400,640 B2, and U.S. Patent No. 10,083,012 B2, attached as Exhibits ____ to the Motion to Exclude Crouse, at Dkt. ____.
[7] Report, et seq.  Salters has performed a number of various damages calculations, including calculations for NCR Silver-US-only damages, NCR Silver-worldwide damages, and she has used 3 different damages damage start dates, as directed by CoC.  *See* StoneTurn Exhibits 1, 1.1, and 1.2 and corresponding workpapers ████████████████████████████████████
████████████████████.

2

technical expert, Gregory G. Crouse, which equals ███ per unit of Accused Software subscription sales.  The per unit revenue price is then adjusted using a "gross profit ratio," which Salters calculates by cherry-picking certain costs of revenue itemized on an NCR-produced income statement for the NCR Silver product line.  Salters then fully attributes the resulting 80% of alleged gross-profits-per-unit dollar amount, which ranges from ███████, from 2016 through 2020, to her calculated number of NCR Silver subscription sales, for total damages of ███████.  In other words, Salters applies an average ██ per unit royalty, which corresponds to almost 40% of the gross revenue generated by the sale of NCR Silver subscriptions.

## III.   **LEGAL STANDARD**

The Court must exercise its gatekeeping obligation to ensure that Salters' damages testimony is reliable and tied to the relevant facts and circumstances of the particular case. *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 598 (1993); *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *Dynetix Design Solutions, Inc. v. Synopsis, Inc.*, No. 11-cv-05973 PSG, 2013 WL 4538210, at *2 (N.D. Cal. Aug. 22, 2013). Federal Rule of Evidence 702 requires that experts base opinions on sufficient facts or data, use reliable principles and methods, and reliably apply the principles and methods to the facts of the case. Rule 702 imposes a "special obligation upon a trial judge" to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 152 (1999); *see also Daubert*, 509 U.S. at 589. Vigilance in assessing the admissibility of expert testimony is critical because of its potentially misleading and powerful influence on untrained jurors. *Daubert*, 509 U.S. at 595; Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 590. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

With respect to a patent case, an expert's damages theory must be based on "sound economic and factual predicates." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002)). The proponent of the expert has the burden of establishing the admissibility of the expert's testimony. *Daubert*, 509 U.S. at 592 n. 10. To properly carry this burden, the patentee must sufficiently tie the expert testimony on damages to the facts of the case. *Uniloc*, 632 F.3d at 1315 (citing *Daubert*, 509 U.S. at 589). Although the Federal Circuit allows for "some approximation" in the reasonable royalty context, this "does not negate the Federal Circuit's requirement of 'sound economic and factual predicates' for that analysis." *Cornell Univ. v. Hewlett-Packard Co.*, No. 01-cv-1974, 2008 WL 2222189, at *2 (N.D.N.Y. May 27, 2008) (Rader, C.J., sitting by designation) (citing *Riles*, 298 F.3d at 1311, and granting-in-part HP's *Daubert* motion).

"[W]hen claims are drawn to an individual component of a multi-component product, it is the exception, not the rule, that damages may be based upon the value of the multi-component product." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (citing *LaserDynamics*, 694 F.3d at 67-68). In these instances, "[a] patentee may assess damages based on the entire market value of the accused product ***only*** where the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013) (emphasis added). In the absence of such a showing, principles of apportionment apply. *Virnetx*, 767 F.3d at 1326.

Further, when evaluating damages for patent infringement, the Federal Circuit has been clear that expert testimony "requires sound economic proof." *Grain Processing Corp. v. Am.*

*Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).  Indeed, the court must make certain the testimony is "more than subjective belief or unsupported speculation" and that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Daubert* 509 U.S. at 590; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## IV.   ANALYSIS AND ARGUMENT

Plaintiff bears the burden of showing that the expert damages testimony is relevant and reliable, that is, that the methodology used to ascertain the royalty base and the royalty rate is reliable and reasonable. *Lucent*, 580 F.3d at 1324.  To carry this burden properly, the patentee must tie the expert testimony on damages to the facts of the case. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed.Cir.2011).  Salters' opinion as to the amount of a reasonable royalty and resulting damages calculation should be excluded because at least two fundamental features of the calculation: The gross profit margin and the requisite value apportionment are fundamentally flawed, unreliable, and would be unhelpful, and potentially confusing, to the jury.

### A.   Salters' profitability calculation should be excluded

Salters' profitability calculation bears no relationship to the actual profits generated by NCR Corporation from the relevant NCR Silver subscription sales, and therefore it should be excluded as unreliable and unhelpful to the jury.  Salters' profitability calculation assumes an average gross profit margin of approximately ███████████ to NCR Silver subscription sales from 2016-2020.[8] As confirmed by NCR Corporation's product-based income statement for NCR Silver, this calculation grossly overstates the profitability of the unit sales.[9]  NCR Silver's actual

---

[8] *See* Report at ¶23, and StoneTurn Exhibit 1.
[9] StoneTurn Workpaper 6.2 (included as attachment to Report); *see also* Exhibit 81 ("NCR Silver Income Statement") to the Deposition of Kristin Schoonover dated January 22, 2021 ("Schoonover Dep."), attached hereto as Exhibit F.

financial statements from 2016 through 2020 reflect a ████████████ on NCR Silver subscription sales during this period.[10]  But Salters' profit calculation fails to take into account a host of significant costs of revenue that were reflected in NCR Silver's income statement, including cost categories such as "technology (go to market)," "technology (internal)," "Travel," and "People HR."[11] These omitted expenses are direct **costs** that were incurred to make the sales in question, and therefore must be taken into account if one wishes to accurately calculate the true profitability of the NCR Silver subscription sales.[12]  By not doing so, Salters overinflates the gross margin. In light of her failure to make ***any*** allowance for NCR Silver's complete cost of revenue, Salters should be precluded from testifying as to her profit calculation.

### 1.    Protesting "insufficiency of information" does not rehabilitate Salters' unreliable profitability calculation

Salters has taken the position that she need not deduct certain expense categories because she finds the labeling of the cost categories "vague,"[13] and because she needed more information[14] from NCR Corporation about the NCR Silver costs of revenue.  Summarily concluding that she does not have a reasonable basis to allocate certain expenses between the NCR Silver products at issue in this case and those not at issue here, Salters simply ignores them, and as a result, her gross profit margin expands dramatically.[15]  This position is untenable.  In a case in which the accused products make up a small portion of a diversified product portfolio, fact questions *may* reasonably exist as to whether certain expense categories are required for the production and sale of the accused products. However, this is not such a case.  NCR Silver Software subscriptions are at

---

[10] *Id.*; see also Report of Devrim Ikizler, dated March 4, 2021 ("Ikizler Report") at ¶¶ 38-40 and notes 31-32, attached hereto as Exhibit G.
[11] Report at ¶ 48.
[12] Ikizler Report at ¶¶38-40.
[13] Report at ¶48.
[14] *Id.*
[15] Ikizler Report at ¶40.

issue, and the financial data requested and produced in this case on which Ms. Salters relies for each element of her damages calculation, including sales revenue, is limited to NCR Silver sales.[16] Salters accepts the applicable revenue amount from the NCR Silver income statement without quibble, but considers legitimate and includes only 3 out of 27 listed cost of goods sold because she "need[ed] more information" and thus ignored categories of substantial expenses such as "technology (go to market)."[17] Salters' opinion lacks a rational relationship to the evidence and applicable legal standard in this case.

Salters blames NCR Corporation's representative for not being able to explain what items were included in NCR Silver's costs of goods sold; however, the fault, if any, lies with Plaintiff's counsel, not the witness, because the only two deposition questions regarding the cost of goods sold for NCR Silver's software that the witness was asked but could not answer related to predominantly offsetting "Internal Service Charges (to and from)" and the acronym "DA":[18]

> Q:      Okay. And then Total Services Cost of SaaS Revenue, what does that represent?
>
> A:      (Reviewing.) So this shows all the costs associated that rolls up.
>
> 149:9-13
>
> *      *      *
>
> Q:      The largest component of that cost is Indirect Labor Compensation. Do you see that?
>
> A:      Yes.
>
> Q:      Can you tell us what that is?
>
> A:      That is cost for -- for employees.

---

[16] See supra n.10.

[17] Ikizler Report at ¶¶38-40.

[18] Schoonover Dep. at 149-152, selective pages attached hereto as Exhibit H.

Q:      I'm just asking about the line under Indirect Labor Compensation. And it goes from 3.3 million all the way up to 3.6 million. Actually, it goes from 3.3 million to 8.2 million and then down to 3.6 million. I want to understand what that is. Are those employees? Who are they? What's Indirect Labor?

A:      Yes. So all the labor costs are employees. And it can be developers; there's the sales force; there's operations people. So there's multiple labor lines here, and it reflects the cost of labor.

Q:      Okay. Are these developers and sales force and administrative people only working on NCR Silver?

A:      Yes.

150:12-25

*       *       *

Q:      What is Indirect Labor Variable Compensation that appears directly underneath Indirect Labor     Compensation?

A:      That is things that are, like, bonuses or commissions. That is variable.

Q:      And those are for this same group of people that are -- the developers, the sales force, the administrative people for NCR Silver only?

A:      Yes.

151:11-19

*       *       *

Q:      What are the Internal Service Charges that you have in here? There's some From and some To. Do you     know what those are -- represent?[19]

A:      I don't know what those are.

---

[19] A simple review of the line items on the NCR Silver Income Statement (Exhibit F), reflects that these costs are largely offsetting, and therefore Ms. Schoonover's lack of familiarity with those two specific cost items is of minimal if any consequence, and it is certainly no justification to disregard entirely all other costs of goods sold cost categories that Ms. Schoonover was never asked about.

91561418v.3

151:20-23

\*      \*      \*

Q:     What's "DA"?

A:     I don't know what "DA" stands for.

152:24-25

Plaintiff's counsel – for whatever reason – chose not to ask the witness about any of the other costs of goods sold, including "technology (go to market)."[20]  Not only is that the highest cost item that Salters disregarded,[21] the witness testified that her job was to manage go-to-market strategy for the NCR Silver product line.  Yet in her deposition, she was never questioned about any go-to-market costs.[22]

In any event, if Salters or CoC believed that NCR Silver's income statement reflected erroneous or irrelevant cost information, then CoC could have conducted written discovery on the issue of NCR Silver's cost of revenue, and if CoC believed NCR Corporation's responses to those discovery requests were inadequate, CoC could have moved to compel additional discovery.  *See Microsoft v. Corel*, Case No. 5:15-cv-05836, Order Granting Defendants' Motion to Exclude Certain Opinions of Plaintiff's Damages Expert (N.D. Cal., San Jose Div. December 11, 2017) (excluding portions of Salters' patent damages opinion as unreliable notwithstanding her claim of "insufficient information").  It did neither.  Instead, throughout months of written discovery, CoC

---

[20]Nor was it clear throughout the deposition of Ms. Schoonover whether counsel was referring to costs of revenue like costs of goods sold or operating margin, which are also included in NCR Silver's income statement; the NCR Silver Income Statement uses identical labels consistently for cost categories under both operating costs and costs of revenue.  See Exhibit F.
[21] *See id.*
[22] Schoonover Dep., at 145-155.

9

focused primarily on NCR Silver pricing and sales revenue.[23]  Not until NCR Corporation's witness was deposed did CoC make any inquiry, albeit incomplete and unclear, about NCR Silver's costs.  Consequently, Salters' "lack of information" is not a reasonable basis to disregard almost entirely NCR Silver software cost of revenue, including nearly 90% of the costs of goods sold categories included on the NCR Silver income statement.[24]

### 2.   Assumptions underlying Salters' profitability calculation should be excluded

After disregarding NCR Silver's cost of revenue in order to inflate the estimated gross profit margin that NCR Corporation allegedly earned on the NCR Silver software subscriptions, Salters purports to justify the inflated 47% margin by opining that "typical gross profit margins for SaaS businesses range from 70-95%."[25]  To be clear, Defendant NCR Corporation, not its product line NCR Silver, arguably could be considered, a SaaS business, and NCR Corporation's publicly available, highly regulated, and regularly audited consolidated financials do not reflect anywhere near a 70-95% gross profit margin – during the relevant time period,[26]  Because Salters is not qualified to render an opinion on the typicality of gross profit margins among SaaS businesses, her 70-95% gross profit margin opinion should be excluded.  Furthermore, the blog posts and internet-only, self-described "benchmark study" of SaaS profitability that Salters relies on for her inflated margin opinion are irrelevant and unreliable.[27]  Accordingly her opinions should be excluded.

---

[23] *See, e.g.*, Plaintiff's First Set of Production to Defendant (Nos. 1-26), attached as Exhibit I; Plaintiff's Second Set of Requests for Production to Defendant (Nos. 27-43), attached as Exhibit J.
[24] *See* Report at ¶48, including StoneTurn workpaper 6.2 (reflecting 24 out of 27 costs of goods sold ignored by Salters), and Exhibit F.
[25] *See* Report at ¶¶15, 48, and n.27.
[26] *See* supra note 2.
[27] *See, e.g.*, Report at ¶¶12-16 and n.27; *see also* OpenView Partners' blog, attached hereto as Exhibit K; and 2020 SaaS Expansion Benchmarks by OpenView Partners,

### a.    Salters is not qualified to opine on what constitutes a typical range of gross profit margins for SaaS businesses

Salters admits that she is not and does not hold herself out as an expert on SaaS businesses. Nowhere in her report does she purport to have any type of specialized knowledge of SaaS businesses, their financial accounting, or their "typical" profit margins.[28]  Salters makes clear that she is not offering opinions on POS systems, SaaS companies, or the SaaS business model.[29]  In fact, throughout her Report, Salters simply restates alleged "facts" and assumptions regarding SaaS businesses from a variety of internet-based posts, but she never claims to have independent knowledge or experience evaluating SaaS companies nor does she establish any particular experience, education, training, skill, or knowledge in the field of SaaS businesses and financial accounting relevant to the SaaS business model.[30] Salters has no apparent qualification to opine on the SaaS business model, and she is not qualified to render an opinion on typical or average gross profit margins among SaaS – or any – going concern businesses or products.

### b.    Sources cited by Salters to support her inflated margin are unreliable and irrelevant

Two principal ways to show that a proffered expert's opinions are reliable under Rule 702 are that the expert's testimony grows out of *pre-litigation* research, or that the expert's research has been subjected to peer review. *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 173 F.R.D. 675, 682 (D. Kan. 1997) (citing *Daubert II*, 43 F.3d 1311, 1317 (9th Cir. 1997)). Here, Salters'

---

http://openvviewpartners.com/blog/cost-of-goods-sold-for-software-as-a-service-business, attached hereto as Exhibit L.

[28] *See* Report at ¶¶2-5 (Salters' experience does not include reference to SaaS, SaaS business models, or SaaS company finances); ¶¶13-16 and notes 14-16, 17-23, 24-29, and 31 (reflecting no independent or pre-litigation knowledge or expertise in SaaS economics, Salters relies exclusively on internet-based summaries, media postings, and blogs).

[29] *Id.*; *see also* Deposition of Ambreen Salters, dated March 25, 2021 ("Salters Dep.") at 23:15-25, 24:6-11, selected pages attached hereto as Exhibit M.

[30] *Id.*

opinions on SaaS businesses grew strictly out of her litigation-related research conducted in preparation of her Report.[31]   And Salters' research consists only of internet content, including the 2020 SaaS Benchmarks Expansion – none of which has been subjected to peer-review. Furthermore, the blog's promoter, OpenView Partners is a venture capital firm, using its blog to market new SaaS business focusing primarily on start-ups and other small businesses, unlike NCR Corporation.[32] ████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████

        Expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the proffered opinion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).  Here, the Benchmarks Expansion is irrelevant, unhelpful to the jury, and unreliable.

        When deficiencies are so substantial that they render the proposed conclusions untrustworthy, the court should exclude the information from evidence. *See Spraying Systems Co. v. Delavan, Inc*., 975 F.2d 387, 394 (7th Cir.1992) (affirming summary judgment by finding consumer survey too flawed to create genuine issue of material fact because questions were biased and not reliable); *Universal City Studios, Inc. v. Nintendo Co*., 746 F.2d 112, 118 (2d Cir.1984)

---

[31] *See* supra notes 28-30; Salters Dep. at 62:19-63:15.
[32] *See* Deposition of Devrim Ikizler dated March 29, 2021 ("Ikizler Dep.") at 26:20-28:9, attached hereto as Exhibit N.
[33] *See* supra note 2 (NCR Corporation 10-Ks and consolidated financials).

(finding survey "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion"); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir.1999) (affirming Rule 403 exclusion of survey evidence that amounted to "little more than a memory test"). To determine if research is reliable and trustworthy, courts consider a variety of factors that include whether: (1) the universe was properly chosen and defined; (2) the sample chosen was representative of that universe; (3) the questions asked of the interviewees were framed in a clear, precise and nonleading manner; (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted; (5) the data gathered were accurately reported; (6) the data were analyzed in accordance with accepted statistical principles; and (7) objectivity of the entire process was assured.  See *Citizen Fin. Grp., Inc. v. Citizens Nat'l Bank*, No. Civ.A. 01–1524, 2003 WL 24010950, at *1 (W.D.Pa. Apr. 23, 2004); *see also Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F.Supp.2d 772, 778 (W.D.Mich.2006).  Nothing on the face of the 2020 SaaS Benchmarks Expansion reflects any of the reliability factors, and therefore Salters' opinions on the 70-95% profit margins of SaaS companies, which are based on nothing more than her internet research, should be excluded.

**B.** **The 80% apportionment ratio Salters applies to the MSRP of NCR Silver's subscriptions should be excluded as unreliable and irrelevant.**

A patent "damages expert must provide a specific economic analysis to support an opinion that reasonable royalties should be apportioned to reflect nonpatented characteristics of a multi-factor product."  *Sherwin-Williams Co. vs. PPG Indus., Inc., Slip Op*. (D. Del) 2020 WL 5077547 at *5.

91561418v.3

1.      **Salters' "Apportionment of Benefits" is Unreliable and Irrelevant**

Salters did not perform any analysis, much less a quantitative analysis, to determine that Crouse's identified "high-level components" constitute 80% of the market value of NCR Silver software subscription sales (or any other facet of NCR Silver).  In *Sherwin-Williams*, the court excluded a similar "apportionment of benefits" opinion because the damages expert did not articulate any precise basis for the 50% apportionment.  *Id.*  Likewise, in *Koninklijke Philips Elecs. N.V. v. Zoll Lifecor Corp.*, No. CV 12-1369, 2020 WL 3140798, at *4 W.D. Pa. July 25, 2017), the court rejected the damages expert's attempt to rely on an undocumented conversation with a technical expert in support of the proffered apportionment opinion.  *Id.* at *4 n.5; s*ee also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (excluding apportionment of benefits opinion where expert's apportionment was not based on a credible economic analysis).

The same analysis applies here. Salters' opinion about the allocation of benefits is supported only by Crouse, including an undocumented conversation with him, as well as his Report and Declaration.  Salters did not conduct any analysis about the benefits of the various features of NCR Silver, and if allowed to testify on benefit apportionment, her opinion necessarily would invite the jury to speculate about the value of the non-patented features.  By failing to explain how the 80% technical apportionment was calculated, Ms. Salters essentially asks the jury to trust her black box approach, which discloses no method at all and certainly falls well short of any "reliable principles and methods."  *See e.g., LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2010) ("Ms. Murtha's one-third apportionment to bring her royalty rate down from 6% per ODD to 2% per laptop computer appears to have been plucked out of thin air based on vague qualitative notions of the relative importance of the ODD technology."); *see also Sherwin-Williams*, at *5 (citing *Guardant Health, Inc. v. Found. Med., Inc.*, No. CV 17-1616-LPS-

14

CJB, 2020 WL 2461551, at \*19 (D. Del. May 7, 2020) (because damages expert provided no concrete tie to the specific allocation value, the opinions lacked a sufficiently reliable methodology)).    Moreover, Salters cannot remedy her error by opining that the allocation is conservative. *Guardant Health, Inc.*, No. CV 17-1616-LPS-CJB, 2020 WL 2461551, at \*18 (D. Del. May 7, 2020) ("merely labelling a value 'conservative' is no substitute for a showing that there is an evidentiary foundation for the particular percentage selected").

### 2.      Salters' regurgitation of Crouse's 80% apportionment is unreliable

Having failed to perform her own economic analysis to apportion NCR Silver's profits to the claimed invention of the Patents-in-Suit, Salters nevertheless claims "apportionment is not necessarily required in this case since the patented functionality drives demand for the Accused Products."[34]    Salters' conclusory remarks, based entirely on CoC's putative technical expert Crouse, are unsupported, unreliable, and inadmissible.    Courts have cautioned that Rule 703 "creates an obvious potential for the use of such opinions as a vehicle for creating a 'back door' hearsay exception." *Kay v. First Continental Trading, Inc.*, 976 F. Supp. 772, 774 (N.D. Ill. 1997). In *Weisgram v. Marley*, 169 F.3d at 519-20, expert testimony of a fire investigator was excluded because the expert had drawn his conclusions largely from the observations of others who had inspected the scene of the fire. The investigator himself never visited the scene, and did no testing to support his theory. *Id.* The court held that "there was insufficient foundation for [the expert's] testimony; the ostensibly expert opinion testimony was rank speculation." *Id.* at 520. Similarly, in *In re Agent Orange Product Liab. Litig.*, 611 F.Supp. 1223, 1246 (D.C. N.Y. 1985), the Court excluded proposed expert testimony from a physician as to causation on the ground that "no reputable physician relies on hearsay checklists by litigants to reach a conclusion with respect to

---

[34] *See* Report at ¶¶ 52-53 and notes 98-101 (citing and relying upon nothing but Crouse).

91561418v.3

the cause of their afflictions." *See also Soden v. Freightliner Corp.*, 714 F.2d 498, 505 (5th Cir. 1983) (Defendant's expert was precluded from giving expert testimony based on statistics prepared strictly in anticipation of litigation and based on information received from a sister company.).

Informal communications, exchanging expert opinions, like those between Crouse and Salters are not reliable.[35]  *See Fed. R. Evid.* 703. *See also Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, Case No. 2:15-cv-00512-WCB, Docket No. 198, Memorandum Opinion and Order (E.D. Tex. – Marshall Div., April 10, 2017), at 23 and n.3 (excluding portions of Salters' damages opinions as a mere conduit for hearsay, *citing Presley v. Commercial Moving & Rigging, Inc.*, 25 .3d 873, 893 (D.C. 2011) ("[W]hile experts may rely on hearsay to form their opinions, their testimony is not a vehicle by which evidence that is otherwise inadmissible may be introduced….") and excluding portions of Salters' damages opinions because "[e]ven if the evidence in question is otherwise admissible, it is not helpful to the jury for a witness with no expertise in a field to offer particular evidence and then repeat, in the form of an expert opinion, the evidence just offered," *citing Sommerfield v. City of Chicago*, 254 F.R.D. 317, 331 (N.D. Ill. 2008)).

### 3.     The Entire Market Approach is not appropriate

The Federal Circuit has made clear that identifying the smallest patent-practicing unit ("SSPU"), such as the NCR Silver software subscriptions identified by Salters,  is "simply a step toward meeting the requirement of apportionment." *See, e.g., Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014) (emphasis added). Where the SSPU "contain[s] several non-infringing features with no relation to the patented feature," the patentee "must do more to estimate what portion of the value of that product is attributable to the patented technology." *Id.* at 1327-28

---

[35]*See* Report at ¶¶52-53 and notes 98-101; 42 and notes 67-71 (relying entirely on Crouse's apportionment opinions and referencing Crouse's own reports, declarations, and statements made in conversation with Salters); Salters Dep. at 142:5-20; 143:20-144:3; 146:9-17; 147:23-148:3.

(emphasis added); *see also Network Prot. Scis., LLC v. Fortinet, Inc.*, No. 12-01106, 2013 WL 5402089, at *7 (N.D. Cal. Sept. 26, 2013) (where the SSPU has both infringing and non-infringing features, the patentee "must still show that the patented feature drives demand for the entire product.") (emphasis in original) (emphasis in original); *Good Tech. Corp. v. Mobileiron, Inc.*, No. 12-05826, 2015 WL 4090431, at *5 (N.D. Cal. July 5, 2015) ("Weinstein's analysis does focus on Advanced Management rather than the broader bundles in which it is sold, and Good offers evidence that no smaller unit is available for purchase. But the Federal Circuit requires that Weinstein further apportion to exclude from the Advanced Management products the value of unpatented functionalities.").

Here, Salters uses Crouse to base her incremental profit calculation on NCR Silver components that have functionality unrelated to the Patents-in-Suit, such as customer service, security, and support.[36]  She was therefore required to show that the patented features actually do drive demand for the subscriptions, or else apportion out the value of the non-infringing functionality.  She failed to meet either requirement, and her reliance on Crouse to bolster her putative opinions are improper.

Attributing the economic value of a product to 100% of the alleged technological overlap between the product unit and the asserted claims is appropriate only when, unlike here, the patentee can establish that "the patented feature creates the basis for customer demand or substantially creates the value of the component parts."  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (emphasis added and internal quotations omitted).  As numerous cases make clear, a patentee cannot satisfy this test when the patented feature is, at most, one of several features that drive demand. *See, e.g., Oracle America, Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1115-16

---

[36]Report at ¶53; Salters Dep. at 131-139; 225:25-226:5; 226:11-227:13.

(N.D. Cal. 2011) (refusing to apply entire market value rule: "The fact that Java may be a critical component of Android does not justify application of the entire market value rule. Wheels are critical to an automobile, but no one would apportion all of the demand for a car to just the wheels. It seems highly unlikely that Android derives its entire value from a small set of infringing features, given its breadth."); *Mformation Techs., Inc. v. Research in Motion Ltd.*, 2012 WL 1142537, *4 (N.D. Cal. 2012) ("[T]he application of the entire market value rule is not warranted in this case, because [plaintiff's expert] did not adequately attribute all of Defendants' customer demand to use of the Patent-In-Suit."); *Inventio Ag v. Otis Elevator Co.*, 2011 WL 3359705, *4 (S.D.N.Y. 2011) (characterizing relevant inquiry as whether "customer demand for an entire elevator system was based on one aspect of that system . . . rather than on other factors"); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 2010 WL 2331311, *3 (E.D. Tex. 2010) (same).

NCR Silver software subscriptions include multiple demand drivers, reflected in a multitude of sources,[37] such as "24/7 LIVE customer support," software updates, 130-year-brand recognition, integrated loyalty programs, email marketing, inventory management, and the Silver concierge service.[38] Additional demand drivers are described in a number of product features that are unique to NCR Silver's business model, as well as a number of product features that are specifically referenced by NCR Silver customers and described in a variety of NCR Silver marketing materials.[39] Yet Salters discounts, and ignores entirely, the economic value of any NCR Silver feature that is not included in Crouse's 80% apportionment of the technology, and therefore

---

[37] *See* Report at ¶¶20-22 and notes 38-41.

[38] *See* Report a ¶ 20 and notes 39-41, including reference to http://www.ncrsilver.com/faqs, attached hereto as Exhibit O and http://www.techradar.com/reviews/ncr-silver, attached hereto as Exhibit P; *see also* Ikizler Report at ¶44, n.34, and Exhibits 8a, 8b attached thereto (citing NCR006345).

[39] *See* Ikizler Report at ¶44; *see also, e.g.*, Salters Dep. at 142:5-20; 143:20-144:3; 146:9-17; 147:23-148:3.

assumes without any support that 100% of the value of the NCR Silver software subscriptions is attributable to the alleged technological overlap of the claimed invention and the NCR Silver software.[40]

### C.     Salters' Convoyed Sales Assertion is Improper and Unreliable

Parroting Crouse, Salters appears to include a general opinion on the existence, but not economic value attributed to, convoyed sales.[41]  Summarizing the unremarkable observation that NCR Silver software can only run on certain hardware devices and that NCR's customers have the option to purchase from NCR hardware devices to run NCR Silver software, or to purchase elsewhere,[42] Salters then leaps to Crouse's opinion that "NCR's hardware revenues and profits are driven by sales of the accused NCR Silver product and the core functionality of the Patents-in-Suit."[43]

Salters does not purport to be an expert on, and sets forth no qualifications indicating, that she is an expert in the area of market demand or NCR Silver hardware sales.  Moreover, she performed no market survey or economic analysis to evaluate demand for NCR Silver hardware as a function of NCR Silver software subscription sales, much less a survey designed to determine which factors did or did not drive demand for any of NCR Silver's products.  Serving as a mere

---

[40]Crouse explains his technical apportionment as "approximately 80% of the NCR Silver Essentials product embod[ying] the asserted patented components of the [CoC] Patents," and his 80% apportionment thus reflects this alleged overlap. Salters, in turn, uses the Crouse opinion to mean that 80% of the NCR Silver product at issue is fully attributable to the Patents-in-Suit.  When one product "embodies" a technology, however, the value attributable to the "embodied technology" could be as little as 1% of the total value of the product or 99% of the total value. Here, by simply inserting Crouse's 80% technical apportionment into her damage calculation, Salters implicitly assumes 100% of the value of the subscription units sold by NCR Corporation is attributable to the overlap between the claimed invention and the NCR Silver product.  *See* Motion to Exclude Crouse at pages 13-16, Docket No. 68.

[41] *See* Report at ¶50 and n.95 (citing nothing more than Crouse's declaration).

[42] *Id.* at ¶49.

[43] *Id.* at ¶50.

conduit for Crouse's unqualified, conclusory opinion on convoyed sales is improper testimony for an expert witness, and Salters' opinions on the existence of, or value attributable to, any alleged NCR Silver convoyed sales should be excluded as unreliable.[44]

### D.   Salters fails to connect her opinions to the Georgia-Pacific factors.

Rule 702 requires that expert testimony "assist the trier of fact to understand or determine a fact in issue." FED. R. EVID. 702. "'Expert testimony which does not relate to an issue in the case is not relevant, and, ergo, nonhelpful.' " *Daubert*, 509 U.S. at 591. Thus "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592.  "The Court referred to this requirement as 'fit,' meaning that the expert testimony must not only be based on reliable science but must also 'fit' the particular facts of the case." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000).

A court must focus on the reasonableness of the expert's approach, along with the method of analysis "to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Id.*  "Even a theory that might meet certain *Daubert* factors ... should not be admitted if it does not apply to the specific facts of the case," and admission of such evidence is reversible error. *Id.* at 1056-57.  The Federal Circuit has adopted the fifteen Georgia–Pacific factors as the benchmark for reasonable royalty determinations, s*ee SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed.Cir.1991), and has expressly "sanctioned the use of the Georgia–Pacific factors to frame the reasonable royalty inquiry," *Uniloc*, 632 F.3d at 1317.

Likewise, Salters purports to consider the Georgia-Pacific factors in promoting her royalty calculation.  Notwithstanding her claim, she fails to connect her opinions with the facts of the case,

---

[44] *See supra* pages 15-17 and n. 36.

and thus her opinions as to the impact of the Georgia-Pacific factors on her royalty calculation are unreliable, irrelevant, and unhelpful to the jury and should be excluded.

### 1. Salters' analysis of the "Technology Considerations" are disconnected

Relying almost entirely on the opinions of Crouse, yet referring to no asserted claims or product features at issue in this case, Salters grossly overstates the importance of the claimed invention by attributing *all* benefits of *any and all* cloud-based POS systems to the claimed invention in the case, which assumes that *the claimed invention* equates to NCR Silver's software.[45] NCR Silver POS applications are technologically distinct from the claimed inventions. For example, the NCR Silver software is already pre-built and customers are able to customize only limited aspects of it by simple data entry;[46] however, according to the patent specifications, users would have the ability to assemble the POS system on their own and reconfigure the software as they see fit.[47] Salters does not mention this fundamental difference between the claimed invention and the NCR Silver software, much less consider the difference in light of the Georgia-Pacific technological factors.[48] By not tying the actual claims of the invention to any of the accused product features in this case, Salters' analysis is untethered to the facts and circumstances of this case and is therefore unreliable and inadequate.[49]

Further, Salters overstates the importance of the claimed invention; in reality the inventors had absolutely no success commercializing their products, which embody the claimed invention.[50]

---

[45] *See* Report at ¶¶34-36 and notes 56-60.

[46] *See* Schoonover Dep. at 35:17-36:8.

[47] *See* U.S. Patent No. 9,400,640 B2, and U.S. Patent No. 10,083,012 B2, attached as Exhibits 1 and 2 to Defendant's Motion to Exclude the Opinions and Testimony of Mr. Gregory C. Crouse ("Motion to Exclude Crouse"), at Docket No. 68.

[48] *See* Report at ¶18 and n.35 (relying on Crouse).

[49] Likewise, Crouse's opinions, on which Salters relies exclusively for her patent apportionment opinion (or assumptions), as to apportionment are equally unreliable. *See* Motion to Exclude Crouse at pages 13-16, Docket No. 68.

[50] *See* Barrata Deposition at 35-39.

Similarly, Salters' opinions fail to account for the lack of any meaningful forward citation to the Patents-in-Suit.  From a technological perspective, as of a hypothetical negotiation, the licensee is presented with no indicia of value attributable to the claimed invention, yet Salters does not give any weight to the inventors' failure to launch.

Third, Salters does not even consider or otherwise attempt to value any potential design-around technology solutions.  Instead, she baselessly concludes, relying exclusively on Crouse, that no alternatives were possible.[51]  Without considering this Georgia-Pacific  factor beyond professing "it cannot be done," Salters does not evaluate whether and to what extent any of the particular features of the claimed invention, such as the web-based server, could be removed to develop a design-around, and if so, for what amount of time and cost relative to the value of the feature to NCR Corporation.

### 2.    Salters' analysis of the Financial & Commercial Considerations do not support her damages opinions

Salters opines that apportionment is unnecessary because the patented functionality drives demand for NCR Silver.[52]  But nowhere does she cite any support or analysis for this conclusion, other than Crouse.[53]  And nowhere does Salters evaluate the relative contribution of the claimed invention to the alleged profitability of NCR Silver.  Instead, Salters applies Crouse's baseless technological apportionment to her miscalculated gross profit margin without any consideration or explanation as to how that apportionment reflects actual value in relation to NCR Silver's entire software subscription.[54]  And while there can be multiple ways of calculating the profitability of a product, Salters relies on just one – NCR Silver's gross profit margin – but fails to identify or

---

[51] *See* Salters Dep. at 67:22-68:10.
[52] *See* Report at ¶¶51-53 and notes 97-101.
[53] *Id.*
[54] *See* supra pages 15-17 and n.36.

explain why the accused product has negative income levels,[55] or to evaluate how the drop in NCR Silver's margin – both gross and operating – would impact the parties during the hypothetical negotiation.

Equally troubling, Salters does not factor into her analysis the incomparable size, brand-recognition, and consolidated economic power of NCR Corporation, which fills the seat across the tale as the would-be licensee to the inventors in the hypothetical negotiation.  Nor does she provide any theory as to why the board of directors of a publicly-traded enterprise company like NCR Corporation could reasonably, in the exercise of their business judgment, pay a royalty rate ███████████████████████████ on a claimed invention that barely, if at all, corresponds to any value of NCR Silver, particularly where, as here, Plaintiff has made no effort to demonstrate that NCR Silver is a substantial value-add to NCR Corporation as a whole.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant NCR Corporation's motion, preclude Salters' testimony on damages, and ensure that the jury is not presented with Salters' unreliable, speculative opinions as to what constitutes an appropriate measure of damages based upon a reasonable royalty.

---

[55] *See* Report and StoneTurn Workpaper 6.6 (reflecting profitability ratios from 2016-2020 based on NCR Silver software gross and operating margins); *see also* Ikizler Report at ¶¶79-81 (including a chart and explaining the calculation of NCR Silver software gross and operating margins); *see also* Ikizler Dep. at 25:15-26:5.

Dated: April 2, 2021

Respectfully submitted,

/s/ *Charles E. Phipps*

Charles E. Phipps
    Texas State Bar No. 00794457
    cphipps@lockelord.com
Charles S. Baker
    Texas State Bar No. 01566200
    cbaker@lockelord.com
Steven F. Meyer
    Admitted *pro hac vice*
    smeyer@lockelord.com
Donald E. Frechette
    Admitted *pro hac vice*
    donald.frechette@lockelord.com
Scarlett Collings
    Texas State Bar No. 24001906
    scarlett.collings@lockelord.com
Daniel G. Nguyen
    Texas State Bar No. 24025560
    dnguyen@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8000 Telephone
(214) 740-8800 Facsimile

**ATTORNEYS FOR DEFENDANT**
**NCR CORPORATION**

24

**FILED UNDER SEAL**

Pursuant to the Court's Standing Order regarding Filing Documents under Seal in Patent Cases and Redacted Pleadings (Dkt. 60), I hereby certify that on April 2, 2021, I electronically filed the foregoing document under seal with the Clerk of the Court using the CM/ECF system, which sent electronic notification of such filing to all other counsel of record.

*/s/ Charles E. Phipps*
Charles E. Phipps

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2021, I served the foregoing and its exhibits on all counsel of record via e-mail.

*/s/ Daniel G. Nguyen*
Daniel G. Nguyen

91561418v.3