## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| CloudofChange, LLC, | |
| Plaintiff, | Case No. 6:19-CV-00513-ADA |
| v. | |
| NCR Corporation, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF AMBREEN SALTERS

### PUBLIC VERSION

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  LEGAL STANDARD ......................................................................................... 3

III. ARGUMENT ...................................................................................................... 4

   A.  Ms. Salters' Profitability Calculations are Reasonable and Reliable ............... 4

      1.  Ms. Salters Based Her Opinions on Available NCR Documents and Testimony............ 5

      2.  Ms. Salters' Approach is Supported by NCR's 30(b)(6) Witness's Knowledge—Or Lack Thereof ..................................................................................................... 8

      3.  NCR's Damages Expert Agrees that NCR should have Underlying Documents .......... 10

      4.  NCR's Damages Expert Also Agrees that Ms. Salters' Growth Rate Calculations are "Pretty Similar" to those of Similar Companies ........................................... 11

   B.  Ms. Salters Appropriately Relied Upon the Opinions and Testimony of Greg Crouse in Her Technical Apportionment ......................................................... 15

   C.  Ms. Salters' Damages Calculations Do Not Include "Convoyed Sales" ......... 16

   D.  Ms. Salters Connects Her Opinions to the *Georgia Pacific* Factors................ 17

IV.  CONCLUSION.................................................................................................. 20

## **TABLE OF AUTHORITIES**

*Page(s)*

**Cases**

*Apple Inc. v. Motorola, Inc.*,
    757 F.3d 1286 (Fed. Cir. 2014)........................................................................ 4, 16, 18, 19

*Chrastecky v. C. R. Bard, Inc.*,
    2020 U.S. Dist. LEXIS 25837 (W.D. Tex. Feb. 14, 2020)............................................. 3, 4

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................................................ 3, 4, 14

*Dixon v. International Harvester Co.*,
    754 F.2d 573 (5th Cir. 1985) .................................................................................. 14

*GREE, Inc. v. Supercell Oy,*
    2021 U.S. Dist. LEXIS 26074 (E.D. Tex. Feb. 11, 2021) ........................................... 2, 16

*Guzman v. Mem'l Hermann Hosp. Sys.*,
    2008 U.S. Dist. LEXIS 101781 (S.D. Tex. Dec. 17, 2008)........................................... 3, 12

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) .................................................................................. 15

*Innovation Ventures, L.L.C. v. Custom Nutrition Labs.*, L.L.C.,
    2021 U.S. Dist. LEXIS 28254 (E.D. Mich.  Feb. 16, 2021)........................................... 15

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)............................................................................................... 4

*Moore v. Ashland Chem. Inc.*,
    151 F.3d 269 (5th Cir. 1998) ................................................................................. 3, 4

*Protradenet, LLC v. Predictive Profiles, Inc.*,
    2019 U.S. Dist. LEXIS 210737 (W.D. Tex. Oct. 11, 2019) .......................................... 3, 4

*Sims v. Kia Motors of Am., Inc.*,
    839 F.3d 393 (5th Cir. 2016) ................................................................................... 4

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015)................................................................................. 4

*Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*,
    2017 U.S. Dist. LEXIS 42978 (W.D. Tex. Mar. 24, 2017) .......................................... 3, 4

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)........................................................................................ 4

**Rules**

Fed. R. Evid. 401 .................................................................................................................. 3

Fed. R. Evid. 702 .............................................................................................................. 1, 4

Plaintiff CloudofChange, LLC ("CloudofChange") files this Response in Opposition to Defendant NCR Corporation's ("NCR") Motion to Exclude the Opinions and Testimony of Ambreen Salters (Dkt. 97).

## I.    INTRODUCTION

NCR has ▮ people working on its NCR Silver product line, which has generated nearly ▮ in revenue during the relevant time frame.[1][2] Indeed, NCR has not identified any other NCR product line with ▮ dedicated team members.  Yet, NCR now claims to have ▮ ▮ for NCR Silver.  *See* Dkt. 97, Ex. G, Ikizler Report, ¶¶ 79-81.  Tellingly, NCR has not produced documents to support its claims.  Ms. Salters' profitability and apportionment calculations—which led Ms. Salters to a reasonable royalty of ▮ (Dkt. 97, Ex. A., Salters Report, ¶ 23)[3] are reasonable and reliable.[4]  Ms. Salters is well-qualified to testify as an expert regarding the damages at issue in this case, her opinions will assist the trier of fact, and she should be allowed to testify.  *See* FED. R. EVID. 702.  NCR's arguments to the contrary fail for several reasons.

---

[1] *See* Ex. 2, Schoonover Depo, 43:22-44:4.

[2] From July 26, 2016 through 2020, NCR earned revenues of approximately ▮ from its Accused Software and hardware.  Dkt. 97, Ex. A, Salters Report, StoneTurn Ex. 3.  *See also* Dkt. 97, Ex. G, Ikizler Report, ¶ 135; Dkt. 97, Ex. N, Ikizler Depo, 116:2-8.

[3] NCR alleges that ▮ "corresponds to almost ▮ of the gross revenue" of NCR Silver. Dkt. 97, p. 3.  That is not correct.  As Ms. Salters' explained, ▮ n is about ▮ of Accused Product Revenue.  *See* Dkt. 97, Ex. A, Salters Report, StoneTurn Exhibit 3 (spreadsheet).

[4] NCR alleges that the MSRP price of ▮ per subscription used by Ms. Salters in her analysis **includes** the Accused Software.  Dkt. 97, p. 2.  To be clear, the MSRP price of ▮ **is the software price**—and it is a reasonable one since NCR has offered and sold more than ▮0 different Silver Essentials software subscriptions since 2018 with prices up to ▮ per month (Dkt. 97, Ex. A, Salters Report, ¶ 21), which is well over the conservative MSRP price of ▮ used by Ms. Salters.

*First,* Ms. Salters' NCR Silver software profitability calculations are not flawed as she clearly explains in her deposition (which is ignored by NCR in its Motion). Ms. Salters is fully qualified to opine on financial accounting and profitability, and the research used to reach her opinions is credible and supported. Further, NCR's arguments regarding profitability is not a *Daubert* issue, but rather it is a disagreement between experts that is better left to a jury to decide.

*Second,* Ms. Salters appropriately relied upon the opinions and testimony of CloudofChange's technical expert, Gregory C. Crouse, regarding his apportionment of the technical features of NCR Silver.[5] NCR's erroneous argument regarding technical apportionment also disregards Ms. Salter's first apportionment to the smallest salable patent practicing unit, the NCR Silver software baseline price.

*Third,* Ms. Salters has not claimed convoyed sales in reaching her reasonable royalty, making NCR's argument moot. NCR Silver hardware is, in fact, an Accused Product, not a convoyed sale.

*Fourth,* Ms. Salters' opinions appropriately consider and are connected to the *Georgia Pacific* factors. NCR's assertions to the contrary are simply repetitive of arguments already made.

---

[5] NCR's complaints regarding Mr. Crouse's testimony are inappropriate for this *Daubert* motion. *See GREE, Inc. v. Supercell Oy,* 2021 U.S. Dist. LEXIS 26074, at * 24 (E.D. Tex. Feb. 11, 2021) ("The Court finds that Dr. Becker's testimony concerning this issue rests on a sufficiently reliable foundation if it is assumed that the asserted patents are all technologically comparable. Dr. Becker is not a technical expert. Therefore, it was proper as well as logical that he would rely on Dr. Akl, a technical expert, who concluded that the patents are technologically comparable. It is perfectly acceptable for experts to rely on other experts. Furthermore, Dr. Akl's testimony is not at issue in this motion. Therefore, this portion of Supercell's motion fails because Dr. Becker reasonably relied on another expert's opinions for comparability of the patents—opinions that are not at issue in this motion—and conducted a reliable analysis based on those opinions. Accordingly, the Court finds that Supercell's challenge to Dr. Becker's opinions on this basis fails and should be and is denied.") (internal citations omitted).

## II.    LEGAL STANDARD

Under *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993), "expert testimony is admissible only if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable." *Chrastecky v. C. R. Bard, Inc*., 2020 U.S. Dist. LEXIS 25837, *6 (W.D. Tex. Feb. 14, 2020) (citing *Moore v. Ashland Chem. Inc*., 151 F.3d 269, 276 (5th Cir. 1998)); *see also Protradenet, LLC v. Predictive Profiles, Inc*., 2019 U.S. Dist. LEXIS 210737, *6 (W.D. Tex. Oct. 11, 2019).

The "focus of a *Daubert* inquiry is the validity and thus evidentiary relevance and reliability of the principles that underlie a proposed submission." *Wealthmark Advisors Inc. v. Phoenix Life Ins. Co.*, 2017 U.S. Dist. LEXIS 42978, *7 (W.D. Tex. Mar. 24, 2017) (internal citations and quotations omitted). It is not necessary that the proponent of expert testimony prove that the expert's testimony is correct but rather that the expert testimony is reliable. *Id.* (citing *Moore*, 151 F.3d at 276).

In general, "[t]he standard for qualifying expert witnesses is fairly liberal; the witness need not have specialized expertise in the area directly pertinent to the issue in question if the witness has qualifications in the general field related to the subject matter in question." *Id*. (citing *Guzman v. Mem'l Hermann Hosp. Sys*., 2008 U.S. Dist. LEXIS 101781, *48 (S.D. Tex. Dec. 17, 2008)). Relevant evidence "is defined as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Daubert*, 509 U.S. at 587 (quoting FED. R. EVID. 401). "The Rules' basic standard of relevance thus is a liberal one." *Id*.

The proponent "bears the burden of establishing the *reliability* of the expert's testimony" based on a preponderance of evidence. *Chrastecky*, 2020 U.S. Dist. LEXIS 25837 at *6 (quoting

3

*Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016)); *Protradenet, LLC*, 2019 U.S. Dist. LEXIS 210737 at *6 (citing *Moore*, 151 F.3d at 276).  The test for determining reliability of expert testimony is "flexible" and the factors "neither necessarily nor exclusively apply to all experts or in every case." *Chrastecky*, 2020 U.S. Dist. LEXIS 25837 at *6 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)).  Indeed, "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142 (emphasis in original).

Ultimately, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014), *overruled in part not relevant here by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015)).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

More often than not, upon reviewing an expert's qualifications, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." *Wealthmark Advisors Inc*., 2017 U.S. Dist. LEXIS 42978 at *8 (quoting FED. R. EVID. 702, Adv. Comm. Notes (2000)).

## III.   ARGUMENT

### A.   <u>Ms. Salters' Profitability Calculations are Reasonable and Reliable</u>

In calculating the NCR Silver software Gross Profit Margin, Ms. Salters relied on the summary profits and losses spreadsheet (Dkt. 97, Ex. F, "NCR Silver Income Statement") produced by NCR.  As of the date of her report, Ms. Salters "assumed that the Accused Software products provide gross profit margins of ▮ based on costs of goods sold ('COGS') comprised

4

of Indirect Labor Compensation, Indirect Labor Variable Compensation, and Depreciation/Amortization."  Dkt. 97, Ex. A, Salters Report, ¶ 48.  Ms. Salters also notes in her report (which is incorporated herein) that the summary profits & losses spreadsheet contains other ambiguous and unconventional expense categories, but "based on NCR's vague labeling, these expenses may not be directly related to NCR's software."  *Id.*  A qualified damages expert in economics, finance, and accounting, Ms. Salters is fully credible to opine on expenses typically included in software COGS. *Id.*, ¶ 2; *infra* III.A.4.

As set forth below, Ms. Salters' explanation in her deposition, notably absent from NCR's motion, establishes that she performed her analysis according to a reasonable and reliable method that is applied to the facts of the case.  Additionally, at a minimum, NCR's arguments fail because the incomplete testimony of NCR's witnesses Ms. Schoonover and Dr. Ikizler, as well as NCR's refusal to provide supporting documentation for verification, erroneously attempts to shift the burden to Plaintiffs to back up NCR's questionable COGS, for which Ms. Salters reasonably provides an informed and supported estimate.  Ms. Salters' opinions and testimony should not be excluded.

### 1. Ms. Salters Based Her Opinions on Available NCR Documents and Testimony

NCR's primary complaint is that Ms. Salters' "profit calculation fails to take into account a host of significant costs of revenue that were reflected in NCR Silver's income statement, including cost categories such as 'technology (go to market),' 'technology (internal),' 'Travel,' and 'People HR'" and thus "overinflates the gross margin."  Dkt. 97, p. 6.  NCR's statement is untrue.  Ms. Salters did consider, and endeavor to investigate, each of the COGS listed in the NCR Silver Income Statement, but she did not include certain COGS in her computations—for good reasons.  Dkt. 97, Ex. A, Salters Report, ¶ 48.  As Ms. Salters explained,

Q.  You made a decision, given the NCR Silver income statement that had approximately █ categories of costs that were characterized as SaaS Cost of Goods Sold, you determined to include only the depreciation/amortization line item and the two labor line items and deciding not to include the remaining line items under Cost of Goods Sold.  What did you base that decision on?

…

A.  So all of – a significant portion, nearly all of these line items in Cost of Goods Sold are not typical line items that you see in Cost of Goods Sold. You don't typically see, for example, Internal Service Charges From or Internal Service Charges To.  Very significant amounts, no explanation of what those necessarily relate to.  I'm not sure what Technology (Go To Market) is, per se.  So these are not typical service category -- typical expense categories that you would see in Cost of Goods Sold, and there is no additional explanation of what these relate to Cost of Goods Sold is direct costs for production.  Here in -- even in the description of labor, it's Indirect Labor Compensation.  It's Indirect Labor Variable Compensation.  There's discussions of operations people in there, and so it's just -- yeah, there's third party field services in there.  I think that relates to hardware, but somehow it is in this software category.  **So really this profit and loss statement has more questions, quite frankly, than answers**, and so that is the reason that I utilized -- I was trying to get Labor, Direct Labor.  Indirect Labor was the closest category that I could find, and my understanding is Indirect Labor variable is the bonuses that go with Indirect Labor.  So I included those in there.  Depreciation and Amortization I understood that there is a web hosting provided by Google.  Quite frankly, the Google agreements that I received had pricing anywhere between ██████████.  I didn't know if that was what was being included in this depreciation and amortization here, and so I tried to include that web hosting cost.  **There is just no information on where that actually is.**  So I was trying to put in and recreate the normal categories of Cost of Goods Sold that you would see.

Dkt. 97, Ex. M, Salters Depo, 178:2-180:13 (emphasis added).  Ms. Salters' concerns regarding NCR's unexplained, unsupported software COGS were further compounded by the fact that the summary-level software revenue data in the NCR Silver Income Statement was inconsistent with the separately produced, invoice-level software revenue data provided by NCR to the tune of more than ██████.  *See* Dkt. 97, Ex. A, Salters Report, StoneTurn Exhibit 4 (calculating differences in invoice data and financial statement data).

NCR then suggests that for Ms. Salters' profitability calculations to be reasonable and reliable, CloudofChange's counsel would have had to move to compel NCR's documents—which NCR "does not have." *Compare* Dkt. 97, p. 9 ("CoC could have conducted written discovery on the issue of NCR Silver's cost of revenue, and if CoC believed NCR Corporation's responses to those discovery requests were inadequate, CoC could have moved to compel additional discovery") *with* Ex. 1 (Reply E-mail from C. Phipps to J. Barr dated 1/20/21) (excerpted below). NCR's argument is illogical and directly contrary to the representations of NCR and its counsel.

Indeed, after NCR produced the single NCR Silver Income Statement (Dkt. 97, Ex. F) without any underlying explanations or information as to what the rows within the document contained, CloudofChange's counsel requested that NCR "produce accused sales by product, item number, date, sale price, units, and cost." *Id*. NCR's counsel responded that,

> NCR **does not have** the information [CloudofChange] request[s]. The documents already produced contain **all** of the financial information concerning sales of NCR Silver that is maintained by NCR.

*Id.* (emphasis added). In fact, counsel for CloudofChange and counsel for NCR, including NCR in house counsel, had numerous telephone calls regarding NCR's lack of supporting documents. *See* Ex. 1. Since NCR expressly and repeatedly represented that it "does not have" any further financial information concerning sales of NCR Silver, a motion to compel would have been fruitless.[6] The fact that NCR scolds Plaintiff's counsel for trusting the express representations of

---

[6] For this reason alone, this case is distinguishable from the *Microsoft v. Corel* case in which one of Ms. Salters' two offered scenarios regarding design-around damages was excluded when "Microsoft could have conducted discovery on that issue; and if Microsoft believed Corel's responses to those discovery requests were inadequate, Microsoft could have moved to compel." *Microsoft v. Corel*, Case No. 5:15-cv-05836 (N.D. Cal. San Jose Div. Dec. 11, 2007). Here, despite CloudofChange's numerous requests, NCR did not—and could not—produce the underlying data since it does not exist. *See* Ex. 1; *supra* III.A.

its lawyers that no documents exist and improperly tries to shift the burden to Plaintiff to document NCR's own alleged COGS, flies in the face of Federal Rule of Civil Procedure 26.

### 2.     Ms. Salters' Approach is Supported by NCR's 30(b)(6) Witness's Knowledge—Or Lack Thereof

NCR's financial witness, Ms. Schoonover, was wholly uninformed and could not provide any additional information to support the data included in the NCR Silver Income Statement despite being designated to address these topics pursuant to the deposition notice. *See* Ex. 4. For example, Ms. Schoonover, could not explain the "Time and Materials" revenue.

> Q.  All right.  So Revenue category, we've got several descriptions there of revenue.  Do you see Time and Materials?
>
> A.  Yes.
>
> Q.  Can you tell me what's included in that?
>
> A.  **I really don't know**.  It's small and it was only – let's see -- 2016.  I don't know exactly what that covers.

Ex. 2, Schoonover Depo, 147:8-15.  Nor could Ms. Schoonover explain certain "costs."

> Q.  What are the Internal Service Charges that you have in here?  There's some From and some To. Do you know what those are -- represent?
>
> A.  I don't know what those are.
>
> Q.  If you look down, if you click down to line 81, there's -- you know, one column there is pretty -- pretty long -- I mean, both of those are pretty large numbers.  You don't know what those represent, in 81 and 82?
>
> A. I don't.

*Id.*, 151:20-152:4.

> Q.  What's "DA"?
>
> A.  I don't know what "DA" stands for.

*Id.*, 152:24-25.  In fact, Ms. Schoonover could not even identify any NCR documents that would address these open questions and resolve the uncertainties regarding the costs and any relevance they may have to NCR Silver.

> Q.  Okay.  Is there documents that would show these numbers by -- by quarter of the year?
>
> A.  I don't know.
>
> Q.  Is there any document that would show the revenues by software version or specific hardware?
>
> A.  I don't know.
>
> Q.  Or cost by specific software version or hardware?
>
> A.  I don't know.
>
> Q.  Is there anything in this document -- are you aware of any documents that show the rate of renewals for subscriptions by month -- or by quarter?
>
> A.  I'm not aware of any.
>
> Q.  What about forecasts, does NCR do any forecasts for renewals for subscriptions, either month or – by month or by quarter or annually?
>
> A.  I have not seen any.

*Id.*, 156:2-17.  Similarly, Ms. Schoonover explained,

> Q.  And as far as the costs go, I think you've already told us that you're not able to tell us, by customer, what each customer is paying monthly for those licenses, you can only tell us the gross revenue.  Is that right?
>
> A.  That's correct.

*Id.*, 203:4-9.  As NCR confirmed, NCR does not have any such documents.  *See* Ex. 1; *supra* III.A. This fact makes NCR's complaints that CloudofChange's counsel should have asked more questions regarding costs during Ms. Schoonover's deposition even more unreasonable.  Not only is CloudofChange's counsel's deposition questioning to an NCR witness in no way related to the reliability of Ms. Salters' opinions and testimony, it was abundantly clear from the beginning of

the deposition that Ms. Schoonover was not prepared to provide any additional information regarding the costs and revenues for NCR's Silver product line and further questioning would not have changed that fact—particularly since NCR does not have the underlying documents to begin with.

Ms. Schoonover's inability to explain, rationalize, or give further information on the ambiguous and unconventional costs listed in the NCR Silver Income Statement further supports Ms. Salters' decision not to include the suspect costs, which are not typically included in Gross Profit Margin calculations any way, from her computation.  *See* Dkt. 97, Ex. A, Salters Report, ¶ 48.

### 3.   NCR's Damages Expert Agrees that NCR should have Underlying Documents

NCR's damages expert agreed that NCR should have underlying documents to explain the data summarized in the NCR Silver Income Statement (Ex. 81 to Ms. Schoonover's deposition).

> Q. …as an expert witness in damages and financial areas, sir, are you telling me that there are documents at a company like NCR that would document evidence, tell us what are the numbers that we're seeing summarized in Exhibit [81] or not?
>
> A. …yes, I think it would be more possible to find out where these numbers come from, if NCR went ahead and looked for them, they probably could find that information.

Dkt. 97, Ex. N, Ikizler Depo, 68:3-12.  Notwithstanding this document deficiency, Dr. Ikizler took NCR Silver's Income Statement at face value and formulated opinions regarding damages without asking any questions about the atypical and vague cost descriptions, or reviewing any underlying documents.

> Q.  But you did not look at any underlying source documents, to use your term, for the cost of goods sold that we see in the various costs that are listed on the P&L; is that right?
>
> A.  Correct.

*Id.*, 68:25-69:4; *see also* 71:6-11.

Nor could Dr. Ikizler explain the suspect COGS.  For example,

> Q.  Sir, as specifically to NCR and Exhibit 81, which relates to NCR's business, you don't know what NCR included in the "technology (go to market)" line item, number 37; do you, sir?
>
> A.  The same answer as I gave you, John.
>
> Q.  And the answer is you don't know; right?
>
> A.  I don't have the hard data that goes into these numbers.
>
> Q.  Okay.
>
> A.  Therefore, you are correct.
>
>            …
>
> Q.  Okay.  You didn't do any investigation of whether or not the hosting agreements with NCR in this case relate to the entire company or relate to NCR Silver only; right?
>
> A.  Correct.
>
> Q.  Okay.  And certainly, if any costs related to, in the -- in the "technology (go-to-market)" cost category relate to parts of NCR's business other than NCR Silver products only, it would not be appropriate to charge those costs only to NCR Silver products; right?
>
> A.  Yes, I agree very much.

Dkt. 97, Ex. N, Ikizler Depo, 95:15-23; 99:7-16. Dr. Ikizler's failure to inquire further into the suspect revenue and costs data only further supports the detailed analysis and reasonable conclusions reached by Ms. Salters.

> **4.    NCR's Damages Expert Also Agrees that Ms. Salters' Growth Rate Calculations are "Pretty Similar" to those of Similar Companies**

Dr. Ikizler's testimony similarly shows why NCR's arguments regarding Ms. Salters' opinions concerning typical gross profit margins for SaaS business are better decided by a jury.

*First,* Ms. Salters is fully qualified to offer opinions regarding a typical range of gross profit margins for a particular industry, including SaaS businesses.  Ms. Salters has a Master of Science Degree in Economics and a Bachelor of Business Administration Degree with a double major in Finance and Economics from Baylor University.  Dkt. 97, Ex. A, ¶ 2.  Ms. Salters has worked as a professional economist for 25 years.  *Id.*  Through her work as the Strategic Initiatives Coordinator for the Houston Branch of Federal Reserve Bank of Dallas, Ms. Salters was responsible for **the analysis of and reporting on various economic industries**, evaluation of the Federal Reserve's role in the U.S. check system and its competitive effects on the payments industry, and decentralization issues within the Federal Reserve System.  *Id.*  Ms. Salters has served as a damages expert in more than 50 intellectual property cases in the last 6 years.  *Id.*, ¶¶ 3-4; *see also* Dkt. 97, Ex. A, Salters CV, pp. 1-6.  Ms. Salters need not have specialized expertise in the industry directly pertinent to the issue in question, *i.e.*, SaaS business models, if the witness has qualifications in the general field related to the subject matter in question.  *See Guzman*, 2008 U.S. Dist. LEXIS 101781 at *48.  Ms. Salters' significant experience in evaluating gross profit margins across a variety of industries is more than sufficient to qualify her as an expert who may offer opinions regarding gross profit margins for NCR and similar businesses.

*Second*, Ms. Salters' reasonably relied on a 2020 SaaS Benchmark Survey (the "Survey") that compiled data from more than 1,200 respondents to enable operators to compare themselves against their exact peers across the metrics that matter most in a SaaS business.  NCR's arguments here are a regurgitation Dr. Ikizler's opinions, which were ultimately debunked during his deposition.  *See, e.g.*, Dkt. 97, Ex. N, Ikizler Depo, 39:16-20, 106:2-9.

To be clear, NCR has not cited a single case to support its proposition that surveys posted on the Internet are inherently unreliable—nor has NCR provided any evidence to suggest that

OpenView Partners, an established and respected firm, would publish unreliable data.  Indeed, as Dr. Ikizler ultimately acknowledged, the Survey considered more than 1,000 respondents in the SaaS industry and the resulting data is actually similar to that of the NCR Silver product line.

NCR's arguments are misinformed, comparing the 70-95% gross profit margin stated by the 2020 SaaS Benchmark Survey to NCR Corporation's gross profit margin as a whole company, which is approximately ███ during the damages period and includes all product lines, the largest of which is banking, and completely unrelated to the Accused Products.  Instead, the appropriate comparison is profit margins cited in the Survey to the profit margins related to the NCR Silver product line alone.[7]  Even Dr. Ikizler admitted that companies like NCR analyze profitability on a product line basis.  *Id.*, 43:25-44:3.  Even more tellingly, despite Dr. Ikizler's unsupported criticisms of the Survey cited by Ms. Salters, Dr. Ikizler ultimately agreed that the annual growth rates he calculated are consistent with the growth rates of the respondent companies who participated in the Survey that Ms. Salters consulted.

> Q.  Does NCR Silver product line generate between ███████████ a year in revenue on the years you looked at?
>
> A.  That's roughly correct, yes.
>
> Q.  And if we look at the year over year growth rate for the companies that have ██████ in revenue, that number is █ percent; is that right, sir?
>
> …
>
> A.  For this survey, yes, for – yeah, correct.

---

[7] NCR continuously cites to data about NCR Corporation, rather than the NCR Silver product line, in support of its erroneous calculations and conclusions.  For example, NCR has produced a Google Cloud Master Agreement with Google effective December 28, 2018.  *See* Dkt. 97, Ex. A, ¶¶ 65-67.  But, as Dr. Ikizler agrees, the cost of the Google license exceeds the revenues for all of the NCR Silver products and relates to countries all over the world.  *See* Dkt. 97, Ex. N, Ikizler Depo, 107:5-109:4.  Similarly, NCR tries to conflate the data for NCR Corporation as a whole with that of the NCR Silver product line by citing the NCR Corporation Form 10-K for fiscal years ending December 31, 2019 and 2020.  *See* Dkt. 97, Exs. B-C.

> Q.  And ▮ percent is pretty close to ▮ percent, isn't it, sir?
>
> A.  Yea, it's within ▮ percent of each other.

*Id.*, 106:2-9.  Similarly, Dr. Ikizler complained that the surveyed companies were not "similarly size[d]," and were "faster growing."  Dkt. 97, Ex. N, Ikizler Depo, 30:21-31:7; 31:23-32:3.  But, Dr. Ikizler admitted he "did not find out how many employees work in the NCR Silver product line" before he did his analysis and criticized the Survey.  *Id.*, 39:16-20.

As Ms. Salters explained, certain ambiguous and vaguely-labeled COGS in the NCR Silver Income Statement need further explanation, especially given their mismatch with the 70-95% gross profit margins reported by SaaS-oriented businesses.  And, neither Ms. Schoonover nor Dr. Ikizler can explain the detail of or basis for including any COGS that Ms. Salters did not include in her calculations.  *See id.*, 68:25-69:4, 71:6-11, 95:15-23; 99:7-16.  As the foregoing demonstrates, Ms. Salters' opinions and testimony regarding NCR's profitability are reliable.  Contrary to NCR's wholly unsupported statement that Ms. Salters disregarded "nearly 90% of the costs of goods sold categories included on the NCR Silver income statement," the excluded COGS amount to only about ▮.  *See* Dkt. 97, Ex. A, Salters Report, StoneTurn Workpaper 6.  Similarly, her gross profit calculations are consistent with, and even conservative compared to those of similarly-situated SaaS businesses as discussed in the survey.  Ms. Salters' opinions are reasonable and were analyzed using reliable methodologies.

At best, NCR's arguments relate to the "weight" to be given to Ms. Salters' opinions and testimony rather than the reliability of the methodologies she used.  The weight of the evidence is a question for the trier of fact at trial, not for courts considering a *Daubert* motion.  *See Dixon v.*

*International Harvester Co.,* 754 F.2d 573, 580 (5th Cir. 1985).[8]   Ms. Salters' opinions and testimony should not be excluded.

### B.      Ms. Salters Appropriately Relied Upon the Opinions and Testimony of Greg Crouse in Her Technical Apportionment

NCR's arguments regarding Ms. Salters' ▮▮▮ technical apportionment ratio are misplaced. The patented functionality drives the demand for the Accused Products as is evidenced both from NCR's own documents and depositions and from the testimony and report of CloudofChange's technical expert, Mr. Crouse.  Consequently, Ms. Salters' technical apportionment analysis was not required, but was included as a matter of conservatism.  *See* Dkt. 97, Ex. A, Salters Report, ¶¶ 51-52.  Regardless, Ms. Salters' technical apportionment analysis followed a reliable methodology, which included relying on CloudofChange's technical expert, Mr. Crouse, for his technical apportionment based on technical features.

*First*, NCR's arguments regarding Ms. Salters' technical apportionment analysis are nothing more than a side door attempt to reassert its Motion to Exclude the Opinions and Testimony of Mr. Gregory C. Crouse (Dkt. 68), and are not an appropriate ground on which to challenge Ms. Salters' damages opinions.  None of NCR's arguments demonstrate that Ms. Salters' methodologies are unreliable.  Rather, they are nothing more than an unsupported challenge to the

---

[8] *See, e.g.*, *Innovation Ventures, L.L.C. v. Custom Nutrition Labs*., L.L.C., 2021 U.S. Dist. LEXIS 28254, at *13-14 (E.D. Mich.  Feb. 16, 2021) (citing *In re Scrap Metal Antitrust Litig*., 527 F.3d 517 (6th Cir. 2008) (explaining that reliability requires that the expert's testimony "be supported by appropriate validation—i.e., 'good grounds,' based on what is known" and that in a *Daubert* motion, district courts are merely required to assess whether the expert testimony "rests upon a reliable foundation, as opposed to, say, unsupported speculation" and finding that because the expert witness offered a foundation for how and why he analyzed the data the way he did, that was enough to establish that he performed his analysis according to a reliable method and reliably applied that method to the facts of the case).

reliability of Mr. Crouse's underlying testimony.  *See GREE, Inc.,* 2021 U.S. Dist. LEXIS 26074 at * 24.

*Second*, Ms. Salters appropriately relied on Mr. Crouse's technical apportionment of technical features since Ms. Salters herself is not a technical expert.  Indeed, "[e]xperts routinely rely upon other experts hired by the party they represent for expertise outside of their field."  *See Apple Inc.*, 757 F.3d at 1321.  On the one hand, NCR must make this "smoke and mirrors" argument criticizing Ms. Salters' reliance on Mr. Crouse because NCR's own damages expert wholly failed to consult NCR's technical expert, Dr. Chatterjee, in his own apportionment analysis.  *See* Dkt. 97, Ex. N, Ikizler Depo, 182:21-183:8; *see also* 189:9-16, 176:21-25 ("I didn't consult with Dr. Chatterjee for this analysis.").  On the other hand, the damages arguments of its own expert, Dr. Ikizler, are even more susceptible to the same criticisms since all of Dr. Ikizler's opinions, other than those regarding apportionment, are supported only by a single conversation with Dr. Chatterjee or a single conversation with Mr. Dunphy.  *See* Dkt. 97, Ex. N, Ikizler Depo, 18:13-21.

In any event, Ms. Salters' appropriately relied on Mr. Crouse's sound technical apportionment analysis.  *See* Dkt. 97, Ex. A, Salters Report, ¶¶ 53-54.  NCR's criticisms of Mr. Crouse's opinions and testimony are related to his reliability, not Ms. Salters, and are appropriately decided on NCR's Motion to Exclude Mr. Crouse (Dkt. 68) because the Court's decision on that motion will moot NCR's arguments regarding Mr. Crouse's underlying opinions either way.

**C.**     **Ms. Salters' Damages Calculations Do Not Include "Convoyed Sales"**

NCR asserts that "Salters Convoyed Sales Assertion is Improper and Unreliable."  Dkt. 97, p. 19.  NCR's arguments wholly ignore Ms. Salters' unequivocal statement that the "infringing hardware revenues and profits, which are driven by sales of NCR's software, **are not directly**

**included in [her] reasonable royalty calculation**." Dkt. 97, Ex. A, Salters Report, ¶ 50 (emphasis added) (internal citations omitted).  Not only does NCR's argument miss the mark entirely, but it actually supports the reasonableness and reliability of Ms. Salters' damages calculations since she did not include "convoyed sales" in her computations. *Id.*

> D.    **Ms. Salters Connects Her Opinions to the *Georgia Pacific* Factors**

NCR's bald and unreasoned assertion that Ms. Salters "fails to connect her opinions to the Georgia-Pacific factors" is false.  *See* Dkt. 97, p. 20.  To the contrary, Ms. Salters addresses each "GP factor," and the specific facts relevant thereto, in her report and groups them by related factors. *See* Dkt. 97, Ex. A, Salters Report, ¶¶ 27, 31-32.

|  | **GP factors** | **Paragraphs of Salters Report** |
|---|---|---|
| **Technology Considerations** | 9 and 10 | ¶¶ 33-39 |
| **Financial & Commercial Considerations** | 6, 8, 11 and 13 | ¶¶ 40-55 |
| **Licensing Considerations** | 1, 2, 3, 4 and 7 | ¶¶ 56-73 |
| **Other Considerations** | 5, 12, 14 and 15 | ¶¶ 74-77 |

Nonetheless, NCR complains that Ms. Salters "technical considerations" and "financial & commercial considerations" are disconnected from the *Georgia Pacific* factors.

Regarding the "technical considerations," NCR asserts that Ms. Salters failed to consider that "NCR Silver software is already pre-built and customers are able to customize only limited aspects of it by simple data entry." Dkt. 97, p. 21.  Here again, NCR's real complaints are not against Ms. Salters' methodologies—they are against Mr. Crouse's technical opinions, with which they disagree, particularly his opinions regarding CloudofChange's claimed "builder."  Setting aside that NCR's technical argument is not an appropriate *Daubert* challenge to a damages expert, and that NCR's own manuals (Ex. 3, NCR Silver Pro Restaurant Manager's Guide, p. NCR005609 (discusses "build a schedule")) confirm the building capabilities of NCR Silver, NCR has not cited any specific portion of the Patents-in-Suit to support these alleged technical differences.  Instead,

NCR cites "U.S. Patent No. 9,400,640 B2, and U.S. Patent No. 10,083,012 B2" in their entirety. Dkt. 97, p. 21, n. 47.  Ms. Salters appropriately relied on Mr. Crouse's technical opinions tying the actual claims of the Patents-in-Suit to the accused product features in this case.  *See Apple Inc.*, 757 F.3d at 1321 ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field.").  Similarly, Ms. Salters appropriately relied on Mr. Crouse's opinions regarding the lack of potential design around technology solutions.  *See* Dkt. 97, Ex. A, ¶ 38.

NCR also argues that Ms. Salters' "opinions fail to account for the lack of any meaningful forward citation to the Patents-in-Suit." Dkt. 97, p. 22.  But, as CloudofChange pointed out, using an article cited by Dr. Ikizler, "several experts' Patent Citation Analyses have been excluded by the courts over concerns about reliability."  Dkt. 89 (Sealed Motion to Exclude Ikizler), pp. 11-12 (citing Ex. 6 thereto).  Certainly, Ms. Salters' decision not to use this "patent citation analysis" method that has been considered unreliable by the courts does not render her opinions unreliable.

Still further, NCR alleges that Ms. Salters "does not give any weight to the inventors' failure to launch."  Dkt. 97, p. 22.  To the contrary, Ms. Salters expressly considered the commercial struggles faced by CloudofChange's predecessor entities and explained,

> [u]ltimately the Interegister products were not profitable because, operating 'way ahead of [their] time,' they required hardware components that were expensive and customers were hesitant to load their data to the internet for security reasons.  Interegister ceased actively selling POS systems sometime between 2014 and 2016.

Dkt. 97, Ex. A, Salters Report, ¶ 8.

NCR's arguments regarding the "financial & commercial considerations" fare no better. Again, NCR criticizes Ms. Salters' reliance on the opinions of Mr. Crouse, particularly that the patented functionality drives demand for NCR Silver.  As set forth above, this argument fails for two reasons: (1) this argument is wholly unrelated to the "reliability" of Ms. Salters'

methodologies, and (2) courts have repeatedly upheld a damages expert's reliance on the technical

opinions of the party's technical expert.  *See Apple Inc.*, 757 F.3d at 1321.

Finally, NCR alleges that Ms. Salters "does not factor into her analysis the incomparable

size, brand recognition, and consolidated economic power of **NCR Corporation**."  Dkt. 97, p. 23

(emphasis added).  Once again, NCR here erroneously conflates NCR Corporation "as a whole"

with the NCR Silver product line—which is the only appropriate NCR division for this analysis.[9]

Moreover, NCR's statement that Ms. Salters did not consider these factors does not make it so.

Indeed, Ms. Salters was aware of these considerations, and appropriately addressed them in her

report.

> A worldwide, publicly traded entity, NCR has more than 34,000 employees
> in 160 countries and is headquartered in Atlanta, Georgia.

Dkt. 97, Ex. A, Salters Report, ¶ 10.

Although Ms. Salters considered NCR Corporation's size and brand recognition, she also

correctly recognized that this element is not related to a technical features apportionment, which

specifically considers patented and non-patented elements of the technical features within the

accused product. *See id.*, ¶¶ 10, 11, 74.  Further, Dr. Ikizler did not offer an opinion on an

apportionment for size and brand recognition, nor did he establish that size or brand recognition

are even important to NCR's accused Silver software revenues.

At best, NCR has identified factual disputes for cross-examination disputes between the

opposing experts, and disputes regarding the weight of the evidence, that are best left to be decided

by the jury.  NCR has identified no legitimate basis to exclude Ambreen Salters.

---

[9] NCR again includes some erroneous math to suggest that Ms. Salters' calculated reasonable royalty rate "approach[es] 50% of sales revenue," it does not.  Ms. Salters' $16.5 million royalty sum is about 19% of Accused Product Revenue.  *See* Dkt. 97, Ex. A, StoneTurn Exhibit 3 (spreadsheet).

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's

Motion to Exclude the Opinions and Testimony of Ambreen Salters.


 Dated:  April 8, 2021                         Respectfully submitted,

                                               By: */s/ John H. Barr, Jr.*

                                               John H. Barr, Jr.
                                               Attorney In Charge
                                               Texas Bar No. 00783605
                                               jbarr@pattersonsheridan.com

                                               John A. Yates
                                               Texas Bar No. 24056569
                                               jyates@pattersonsheridan.com

                                               B. Todd Patterson
                                               Texas Bar No. 00789537
                                               tpatterson@pattersonsheridan.com

                                               Kyrie K. Cameron
                                               Texas Bar No. 24097450
                                               kcameron@pattersonsheridan.com

                                               Edgar N. Gonzalez
                                               Texas Bar No. 24092431
                                               egonzalez@pattersonsheridan.com

                                               Patterson + Sheridan LLP
                                               24 Greenway Plaza, Suite 1600
                                               Houston, Texas 77046
                                               (Tel.): 713-623-4844
                                               (Fax): 713-623-4846

                                               Abelino Reyna
                                               Texas Bar No. 24000087
                                               areyna@pattersonsheridan.com

                                               Patterson + Sheridan LLP
                                               900 Washington Ave., Suite 503
                                               Waco, Texas 76701
                                               (Tel.): 254-777-5248
                                               (Fax): 877-777-8071

                                            20 *Attorneys for Plaintiff,*
                                               *CloudofChange, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 8, 2021, I caused the foregoing and its exhibits to be electronically served upon counsel of record below.

*/s/ John H. Barr, Jr.*
John H. Barr, Jr.

Charles E. Phipps, cphipps@lockelord.com
Daniel G. Nguyen, dnguyen@lockelord.com
Steven F. Meyer, smeyer@lockelord.com
Donald E. Frechette, donald.frechette@lockelord.com
Charles S. Baker, cbaker@lockelord.com
Scarlett Collings, scarlett.collings@lockelord.com

**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201

*Counsel for Defendant NCR Corporation*

## <u>FILED UNDER SEAL</u>

I hereby certify that on April 8, 2021, I electronically filed the foregoing document under seal with the Clerk of the Court using the CM/ECF system pursuant to the Court's Standing Order regarding Filing Documents under Seal in Patent Cases and Redacted Pleadings (Dkt. 60).

*/s/ John H. Barr, Jr.*
John H. Barr, Jr.
