```
 1                    UNITED STATES DISTRICT COURT

 2                 FOR THE WESTERN DISTRICT OF TEXAS

 3                          WACO DIVISION

 4   CloudofChange, LLC,    )No. 6:19-cv-00513

 5            Plaintiff, )

 6   vs.                   )Waco, Texas

 7   NCR Corporation      )
                 Defendant, )May 13, 2021
 8   _____

 9                          VOIR DIRE

10            Before the Honorable Jeffrey Manske

11   A P P E A R A N C E S:
     ----------------------
12   FOR PLAINTIFF:

13   MR. JOHN H. BARR, JR.
     MR. JOHN YATES
14   MS. KYRIE CAMERON
     MR. ABELINO REYNA
15   MR. EDGAR GONZALEZ
     --------------------------------
16   Patterson & Sheridan, LLP
     24 Greenway Plaza, Suite 1600
17   Houston, Texas 77046

18

19   FOR DEFENDANT:

20   MR. CHARLES S. BAKER
     MR. CHARLES E. PHIPPS
21   MS. SCARLETT COLLINGS
     ----------------------
22   Locke Lord
     600 Travis, Suite 2800
23   Houston, Texas 77002

24       Proceedings reported by stenotype.  Transcript produced by

25   computer-aided transcription.
```

1           MS. MILLER:  Jury selection in Case No. W:19-cv-513,

2     CloudofChange vs. NCR Corporation.

3           THE COURT:  Good morning.  If counsel would announce

4     their appearances beginning with plaintiff.

5           MR. BARR:  John Barr for plaintiff CloudofChange.

6           THE COURT:  Good morning.

7           MR. BAKER:  Charles Baker for NCR.  Along with me is

8     Charles Phipps and Scarlett Collings.

9           THE COURT:  Welcome.  Did you have the opportunity to

10    review the preliminary instructions as ordered by Mr. Gardner?

11    Any objections from plaintiff?

12          MR. BARR:  No objection.

13          MR. BAKER:  No objection from Defense.

14          THE COURT:  Ready to go?  I will let everyone go

15    through the materials, and I will start highlighting the

16    questionnaires for matters that I can address with the jurors

17    in their individual questioning.

18       Any other questions before we begin this morning?

19          MR. BAKER:  No.

20          MR. BARR:  No.

21          THE COURT:  I like that.  Thank you.

22          MR. BARR:  I have a question.  I was noticing the

23    sheet on the COVID protocol.  About people in the family, I

24    have a son who had COVID, and it was -- it will be 14 days ago

25    tomorrow he had the diagnosis.  I have been tested, and I don't

1   have it.  I have been vaccinated.

2           THE COURT:  Thank you for the full disclosure.  I

3   think we are all in good shape, and there shouldn't be any

4   issue.

5           [Jury panel enters]

6           THE COURT:  Please be seated.

7           MS. MILLER:  Calling case W:19-cv-513,

8   CloudofChange, LLC, versus NCR Corporation.  This case is

9   called for jury selection.

10           THE COURT:  Counsel, announce the appearances, please.

11           MR. BARR:  John Barr for the plaintiff CloudofChange

12   with John Yates, Kyrie Cameron, Abelino Reyna, and

13   Edgar Gonzalez.

14           THE COURT:  Thank you.

15           MR. BAKER:  Good morning, Your Honor.  Charles Baker

16   on behalf of NCR Corporation.  With me is Charles Phipps and

17   Scarlet Collings.

18           THE COURT:  Thank you very much.

19       Good morning, everyone.  Welcome to jury duty.  My name is

20   Jeffrey Manske.  I am one of two federal judges that operate

21   out of the Waco Division.  My time with you will just be today.

22   I am the opening act.  I'm just here for jury selection.

23   Judge Alan Albright will be the judge that will be presiding

24   over the trial, and you all will meet him on Monday morning, at

25   least those of you who are selected to serve on this jury.

1        I want to thank you for your time and effort in being here

2   this morning.  I know some of you have traveled at least an

3   hour plus to be able to get here and had to leave your home at

4   a very early hour.  On behalf of the attorneys, and the court

5   staff, we thank you for that.

6        Jury service is a very critical part of the United States

7   justice system.  The judge and the jury serve as partners in

8   seeking to do justice in the case before them.  The judge makes

9   the rulings of law that bind the attorneys, the parties, the

10  witnesses, and those of you who will serve on the jury.

11       Those of you that are chosen to serve on the jury also act

12  as judges.  You decide the facts based upon the testimony and

13  the evidence.

14       I want to begin by giving you a little brief overview of

15  how it is going to proceed this morning.  Those of you not

16  selected on the jury, I will do my best to have you all out of

17  here by lunchtime.  No promises, but I will do my best.

18  Sometimes it takes a little longer, and sometimes it takes a

19  little less.

20       Because of COVID, we are going to be operating a little

21  differently.  Typically, I would be asking the question of you

22  all, and you would raise your hand if you had an affirmative

23  response, and we hand you the microphone, and pass the

24  microphone to someone else.  We don't want to be passing

25  microphones and things of that nature.  We want to be able to

1   keep everyone as socially distant as possible and be safe.

2        When I ask questions, or the attorneys are asking questions

3   of you, and you have an affirmative response to the question, I

4   want you to raise your right hand high.  I want you to keep it

5   high until I recognize you.  Part of the process is that we

6   make a record of who has a yes, or affirmative, response to any

7   of the questions.

8        I will cover general concepts that are related to the case,

9   and I will ask specific questions about the case, and I will

10  give the lawyers 15 minutes a side to be able to ask general

11  questions about the case.  To all of those, the only way you

12  respond is by raising your right hand if you have an

13  affirmative response.  We will furiously be taking notes.  At

14  the conclusion of that part, I'll excuse you all back to the

15  jury assembly room, and we'll bring you back in one at a time

16  where you will stand at the microphone there in front of the

17  bar.

18       When you come back, and we are all safely socially

19  distanced, it is appropriate for you to pull off the mask to

20  hear you if you're comfortable doing so.  If you would like to

21  have a shield when you do that, let us know, and we will make

22  one available for you.  We are certainly very concerned about

23  everyone's safety.

24       The good news is this is about our sixth, or seventh, jury

25  trial since the beginning of the year or late November.  We

1   have gotten pretty good at making certain we treat everyone

2   well here in the COVID environment.

3       This morning, we're going to be selecting a jury of seven

4   people.  Jury selection does take time.  It is critically

5   important to your ability to fulfill your essential role.  Let

6   me explain why it is not just a group of randomly selected

7   people.

8       The parties in a case deserve a trial where people are

9   unbiased, or not prejudiced, about the issues in their

10  particular case.  This applies to me as well as to you.  I can

11  excuse myself or the attorneys can ask me to step down if there

12  is a risk of preconceptions or bias.

13      For instance, if I were to have owned a stock in a

14  particular company appearing before me that would be one where

15  it would be important for me to step down just to avoid what we

16  call the appearance of impropriety.  If you're excused during

17  jury selection, please don't feel insulted or singled out.

18  Your life experiences may simply bring you too close to this

19  particular case to be objective.  We rarely use the first seven

20  jurors called in.

21      If you were involved in a trial, I would pose this question

22  to you.  Would you not want that case to be decided by the

23  people who had no biases in favor of either party or prejudices

24  against anyone?

25      Jury duty is not a duty to be taken lightly.  The effort

1    and sacrifice you took to come here today is not taken for

2    granted by me, Judge Albright, or the attorneys, or courthouse

3    staff.  Being a juror is a duty that requires independent

4    thought and judgment.  You will be an officer of the court if

5    you are selected for this jury.  You will take an oath that you

6    will follow the law as given to you by the Court while you

7    exercise your individual discretion in making the decisions

8    asked of you.

9        Jury selection is also known as the voir dire process.

10   Voir dire simply means to speak the truth.  During this

11   process, myself, and the lawyers, will be asking you questions

12   about many different subjects that relate to the law and what

13   we perceive the facts to be in this case.

14       Importantly, you need to know that there are no right, or

15   wrong, answers to any of the questions we are asking.  All we

16   ask is that you answer honestly and be forthright with your

17   responses.  Being a good juror means that if this case is not

18   the right one for you to serve on, let me know, and we'll

19   discuss it.

20       Many times jurors want to talk privately about an answer to

21   a question.  That's okay.  We don't want to ever embarrass

22   anyone.  If for any reason you would like to discuss something

23   privately with me, raise your hand, and I will have you come to

24   the bench with one attorney from each side.

25       Further, it has been my experience in my 20 years serving

1    as a judge that many potential jurors believe that if they

2    don't talk, they won't be selected.  Let me assure you that the

3    absolute quickest way to get selected is to not say anything.

4    In other words, jurors who talk, walk.  Those who have nothing

5    to say, stay.  Please be honest and share your thoughts with

6    both me and the attorneys.  I think you will find your jury

7    service to be deeply rewarding if you're ultimately selected

8    for the jury.

9        Particularly, you will get to see our system in action.

10   You are often going to be evaluating the witnesses, their

11   credibility, as well as written, or other, evidence before

12   determining what the facts in the case truly are.  You will get

13   to exercise your independent thought and judgment.  You will do

14   that as a member of a jury sharing a seriousness of purpose and

15   a respect for the dignity of our legal process of trial by

16   jury.

17       One caution I want to give you.  That is to please do not

18   prejudge this case.  Wait to make a decision until you have

19   heard all of the evidence and have the benefit of the attorneys

20   closing statements in this matter as well as receiving the

21   Court's instructions on the law before making a decision.

22       We are now about to select a jury for a case styled

23   CloudofChange, LLC versus NCR Corporation.  The Court has

24   requested the parties to prepare a statement summarizing what

25   they believe this case is about.  What I am about to read to

1    you is not evidence but merely the parties belief as to what

2    the lawsuit involves.  This is a patent case.  Here is the

3    parties joint statement.

4        This is a civil action relating to alleged direct and

5    literal infringement of CloudofChange's US Patent

6    No. 9,400,640, hereinafter referred to as the '640 patent, and

7    US Patent No. 10,083,012, hereinafter referred to as the '012

8    patent.  Collectively, they will be referred to as the

9    Asserted Patents.

10       CloudofChange alleges that NCR's Silver point-of-sale

11   system infringes Claims 1, 3, 4, 5, 6, 11, 12, and 13 of the

12   '640 patent and Claims 1 through 4 and 9 of the '012 patent,

13   collectively the Asserted Claims.

14       CloudofChange further contends that NCR's alleged

15   infringement is and has been willful.  CloudofChange seeks

16   pre-verdict damages up to the time of judgment to compensate

17   CloudofChange for NCR's alleged infringement, but in no event

18   less than a reasonable royalty as well as permanent injunctive

19   relief.

20       CloudofChange also seeks treble damages together with

21   prejudgment and post-judgment interest and costs pursuant to

22   Title 35 of United States Code Section 285 and attorneys fees

23   pursuant to that same section.

24       NCR responds that NCR Silver does not infringe any of the

25   Asserted Claims of the Asserted Patents and asserts

1  counterclaims seeking declarations that all of the

2  Asserted Claims of the Asserted Patents are not infringed and

3  are invalid, including for failure to comply with one or more

4  requirements of 35 United States Code Sections 102, 103.

5       NCR further responds that CloudofChange is not entitled to

6  an award of damages.  In the event NCR is found to infringe an

7  Asserted Claim that is not invalid, damages, if any, are

8  limited to a lump sum award for the life of the

9  Asserted Patents.

10      Both parties seek a declaration that this is an exceptional

11 case and request an award of attorneys fees and costs.

12      That concludes the reading of the joint statement.  I

13 realize that I used a lot of words and terms if I were sitting

14 out there before I went to law school that I would have no idea

15 what I just said.  Rest assured that you will be educated and

16 will fully understand all of the terminology that is used.

17      If you're selected on the jury, even before the trial

18 begins, I will give you some preliminary instructions defining

19 terminology talking about the matters in greater detail, and

20 we'll also give those of you who are selected on this jury an

21 opportunity to watch a very brief video explaining the patent

22 law system.

23      Do not be intimidated by the fact that this case does

24 involve potentially some terminology with which you may not be

25 familiar.

1       At this time, I will ask Mr. John Barr to please stand.  He
2   is an attorney with Patterson & Sheridan who represents the
3   plaintiff in this case, CloudofChange, LLC.
4       Mr. Barr, if you would identify the firm, where the firm is
5   located, and, once again, everyone at the table with you as
6   well as your corporate reps.
7       Before I have him do that, the reason I am doing that is I
8   want to find out if any of you all have any knowledge of anyone
9   here.
10              MR. BARR:  Thank you.  May I remove the mask?
11              THE COURT:  You may.
12              MR. BARR:  Good morning, Ladies and Gentlemen.  My
13  name is John Barr.  I am proud to represent the folks who filed
14  the patent infringement lawsuit, CloudofChange.
15      I am joined here with my co-counsel I will introduce you to
16  this morning, and also with Mr. Baratta, and Mr. Olson, who are
17  with CloudofChange, and who are the inventors of the patents at
18  issue in this case.
19      I have three sons.  One son is 16, and one is 21, and
20  another son who is 23.  My wife and I have been married 28
21  years, and we often talk to our sons about how things were when
22  we were young back in the day and how things are today.
23  Nowhere is that more true than dealing with technology.
24      Credit cards are a great example.  Many of you, like me,
25  remember when credit cards had raised numbers on them.  If you

1    went to the store to buy something, they put the credit card in

2    the machine, and put a piece of paper on it, and slid the paper

3    a couple of times over the credit card to see if they got your

4    name on there, and the merchant would have to fill it out by

5    hand, and you would have to sign it.

6            THE COURT:  I'll give you about 45 seconds to complete

7    your introduction.  This is not the time for the opening

8    remarks to the jury panel.  Introduce everyone, if you would.

9            MR. BARR:  I apologize.  I jumped the gun.

10           THE COURT:  Finish everyone else there.

11           MR. BARR:  Patterson & Sheridan in Houston.  We also

12   have an office in Waco which our Baylor grads love.  I'm here

13   with Mr. Yates, and Ms. Cameron, and Mr. Reyna, and also

14   Mr. Gonzalez.

15           THE COURT:  Ladies and Gentlemen, are any of you

16   familiar with, or know, any of the attorneys that have been

17   introduced to you or any of the corporate representatives that

18   were introduced?  If so, raise your right hand.

19       I see back in the far left.  Is that Mr. Wilhite or

20   Mr. Hoyt?  Is it Mr. Gutierrez?

21           PANEL MEMBER GUTIERREZ:  Yes.

22           THE COURT:  Juror 24, Mr. Gutierrez.

23       Anyone else over here?  That would be Mr. Mathis,

24   Juror No. 9.  Is that correct?

25           PANEL MEMBER MATHIS:  You said familiar with.  Does

1   that count?

2        THE COURT:  That does count.  I will follow-up with

3   that shortly, thank you.

4     Anyone else?  Mr. Quintanilla?

5        PANEL MEMBER QUINTANILLA:  Yes.

6        THE COURT:  Juror 25, very good.

7     Mr. Barr, if you will read your list of anticipated

8   witnesses.

9     Again, Ladies and Gentlemen, I am having him do that to see

10  if you all are familiar, or recognize, any of the names on that

11  list.

12       MR. BARR:  We will have Mr. Olson as a witness.  We

13  will also have Mr. Baratta as a witness.  We will anticipate

14  that we will call some of the employees of NCR, who I don't

15  believe are here today, but that is Mr. MacGill Quinn.  I

16  believe he is from Atlanta, Georgia, and Ms. Kristen Skoonover

17  who also is from Atlanta, Georgia.

18    We will also call a couple of expert witnesses in this

19  case, Gregory Crouse and Ambreen Salters.

20       THE COURT:  Ladies and Gentlemen, by a show of hands,

21  does anyone recognize any of the names on the anticipated

22  witness list for the plaintiff?  The Court notes for the record

23  that no hands were raised.

24    Prior to today, has anyone ever had any familiarity with

25  the plaintiff, CloudofChange, LLC, or know them from any

1    source?  Raise your right hand.  The Court notes for the record

2    that no hands were raised.

3        Has anyone ever retained or been in a lawsuit involving the

4    law firm of Patterson & Sheridan?  The Court notes for the

5    record that no hands were raised.

6        Has anyone ever retained any of the attorneys represented

7    by Mr. Barr to serve as their attorney?  Raise your hand.  The

8    Court notes for the record no hands were raised.

9        At this time, I am going to introduce Mr. Charles Baker.

10       Mr. Baker, if you would stand and introduce yourself, and

11   let us know where you are from, where your firm is located, and

12   who is at the table as your corporate rep.

13           MR. BAKER:  Good morning, Ladies and Gentlemen.  I

14   proudly represent NCR Corporation.  Today with me, as

15   co-counsel, I have Mr. Charles Phipps and

16   Ms. Scarlett Collings.  We are all from the law firm of

17   Locke Lord.  Our main offices in Texas are in Houston and

18   Dallas, and also we have an office in Austin.  With us today is

19   our consultant, Matt Melano.

20       I am going to keep it short.  I will save my time for my

21   presentation.  That's who I wanted to introduce you to today.

22   Thank you.

23           THE COURT:  Thank you, Mr. Baker.

24       Anyone familiar with either Mr. Baker, or any of the

25   individuals at the Locke Lord law firm, or his consultant that

1    he introduced?  If so, raise your right hand at this time.

2         Has anyone ever retained the firm of Locke Lord, or any of

3    its attorneys, to represent them or been in litigation where

4    Locke Lord was involved as an attorney representing another

5    party?  Raise your right hand.  The Court notes for the record

6    no hands were raised.

7         If you will please read your list of anticipated witnesses.

8              MR. BAKER:  Yes, Your Honor, thank you.

9         We intend to call two employees of NCR Corporation,

10   Kristen Skoonover and MacGill Quinn.  We also intend to call

11   two expert witnesses, Sandeep Chatterjee, a University of Texas

12   professor, and another University of Texas professor who is

13   Devrim Ikizler.

14        We also intend to call in cross-examination some of the

15   other side's witnesses, including the inventors here today, as

16   well as their experts as well.

17        Thank you.

18             THE COURT:  Ladies and Gentlemen, are any of you

19   familiar with, or recognize, any of the names on the

20   Defendant's list?  The Court notes for the record no hands were

21   raised.

22        As I mentioned, Mr. Baker represents the Defendant,

23   NCR Corporation.  Other than being generally familiar with that

24   name, has anyone interacted, or worked with, or had any

25   specialized knowledge regarding the Defendant, NCR Corporation,

1    in this matter?  Raise your right hand.  The Court notes for

2    the record no hands were raised.

3        The parties have estimated this case is going to take

4    approximately five days to try beginning on Monday.  Is there

5    anyone who would suffer any undue hardship, or have a special

6    problem, serving on a jury for that length of time?  If you

7    could, raise your right hand.

8        That's Mr. Summerill, Juror No. 6.  I will visit with you

9    about that shortly, thank you.

10       Anyone else?

11       Does anyone have any hearing issues or issues with sitting

12   essentially from nine to five every day that would cause them

13   any difficulty?

14       Yes, ma'am?  Ms. Wooden, Juror No. 10, thank you.

15       Let me ask you, prior to coming into court here today and

16   hearing my summary of what the parties have shared with us this

17   case is about, has anyone heard about this case from any source

18   whatsoever?  Raise your hand.  The Court notes for the record

19   no hands were raised.

20       At this time, I am going to be covering a lot of general

21   principles you probably are familiar with, or remember, from

22   your Government class in high school or political science in

23   college.  I will have a few questions for you after I go

24   through and as I go through the concepts.

25       Those of you on the Panel that have already served on

1    juries before, and I saw them going through the questionnaires,
2    it is quite a few of you, you become the judges of the facts in
3    this case, and the judge of the credibility of the witnesses,
4    and the judge of the weight to be given to the testimony of the
5    witnesses.

6         It will be your prerogative, as a juror, to believe all of
7    the testimony of a witness, only part of a witness's testimony,
8    or you may totally disbelieve a witness's testimony.  That will
9    be completely up to you.

10        As jurors, you will be the exclusive judges of the facts,
11   the credibility of the witnesses, and the weight to be given
12   their testimony.

13        Does anyone have any issues of any type determining the
14   credibility, or believability, of a witness?  If so, raise your
15   right hand at this time.  The Court notes for the record that
16   no hands were raised.

17        Whereas the jury will be the exclusive judge of the facts,
18   the Court, who will be represented by Judge Albright during the
19   trial, will be the sole judge of the law applicable in this
20   case.

21        At the conclusion of all of the testimony, and before the
22   attorneys for both sides have presented their closing
23   arguments, the Court will explain the law controlling the
24   issues involved in this lawsuit.  You will be governed by the
25   Court's explanation of the applicable law which will be set out

1    in what is termed the Court's instructions and charge.

2         Are there any among you who would be unwilling, or unable,

3    to render a verdict solely based upon the evidence presented at

4    the trial and the law as Judge Albright instructs you at the

5    conclusion of the trial and disregarding any other ideas,

6    notions, or belief about the law you may have encountered?

7    Anyone that has any problem doing that?  The Court notes for

8    the record no hands were raised.

9         This is a civil case.  Therefore, the plaintiff,

10   CloudofChange, LLC, has the burden of proving its case by what

11   is called the preponderance of the evidence.  Those of you who

12   served on criminal juries are familiar with the requirement of

13   proof beyond a reasonable doubt.  Please bear in mind that in

14   civil cases the proof standard is not beyond a reasonable doubt

15   as in criminal cases, but rather the plaintiff must prove the

16   case by a preponderance of the evidence.  That means that the

17   plaintiffs have to produce evidence which, when considered in

18   light of all facts, leads you to believe what plaintiff claims

19   is more likely true than not true.

20        Is there anyone among you unable to require the plaintiff

21   to prove their case by a preponderance of the evidence as I

22   have just explained the term to you?  Please raise your right

23   hand.  The Court notes for the record no hands are raised.

24        I have been informed that during the presentation of

25   evidence in this case that there may be instances where

1    depositions are either read, or shown, to the jury on

2    videotape.  A deposition is merely a transcript of questions

3    previously asked of a witness by an attorney and the witness's

4    answers to those questions.  Depositions are taken before a

5    court reporter, and they are questioned, and the individual

6    answering those questions are under oath.

7        A deposition is to be treated exactly the same as the

8    evidence which is presented to you by a live witness's

9    testimony and the exhibits admitted into evidence during the

10   course of the trial.  You are to treat the deposition as the

11   testimony of that witness, and you are to accord whatever

12   credibility and weight to that deposition as you wish just as

13   you would if the witness were here in person testifying in your

14   presence.

15       I will have some questions that are more general related.

16   That sort of concludes the instructions as they relate to those

17   general concepts.

18       Before I move on, anyone that would have any difficulty

19   attributing the same weight to a witness called by deposition

20   as opposed to one presented live?  If so, raise your right

21   hand.  The Court notes for the record no hands were raised.

22       Does anyone here have any familiarity with how the

23   United States patent system works?  If so, raise your right

24   hand.  The Court notes for the record no hands were raised.

25       Does anyone have any degree, training, or work experience

1    in technical, engineering, scientific, IT, or software related

2    areas?  If so, raise your right hand at this time.

3         Anyone on my right?  No hands on the right.

4         On my left, I have Ms. Martin.  It is Juror 16.  And I have

5    Mr. Hix, Juror 23.

6         Anyone else?  Also, Juror 20, Mr. Mayfield.

7         Has anyone ever served in what is known as a focus group,

8    or as a mock juror, in any type of proceeding that was related

9    to patents previously?  If so, can you raise your right hand?

10   The Court notes for the record no hands were raised.

11        Did any of you, or close family member, I mean a parent,

12   child, and the like, own a small business or restaurant?

13        That would be Mr. Perkins, Juror No. 4, and Mr. Summerill,

14   Juror No. 6.  Not Perkins, Juror No. 4.  That is Juror No. 12,

15   Ms. Borg; and Juror No. 11, Mr. Dickinson; and Juror 13,

16   Mr. Morris.

17        Anyone on the left side?

18        Did any of you have any experience in using point-of-sale,

19   POS, systems such as a point-of-sale system having a tablet and

20   having a card reader?  Any familiarity with that?

21        Keep your hands up.  It is Juror No. 1, Jessica Davis;

22   Juror No. 6, Mr. Summerill; Juror No. 8, Ms. Glass;

23   Juror No. 12, Ms. Borg; and that's Juror 23, Mr. Hix.

24        Is there anyone that just because this is a patent case,

25   and it involves point-of-sale systems, and what you may know

1    about those that because that's the subject matter that this

2    isn't the right case for you?  Mr. Summerill with an eager and

3    quick hand.

4        Anyone else?  The Court notes for the record that no hands

5    were raised.

6        In this case, you may be called to decide liability and to

7    award money damages.

8        Do any of you have any religious, philosophical, or other

9    belief that prevents you from deciding liability and/or

10   awarding money damages in this case?  If so, raise your right

11   hand.  The Court notes for the record no hands were raised.

12       Does anyone have any difficulty reading, hearing, or

13   understanding the English language?  The Court notes for the

14   record no hands were raised.

15       Take a look around at your fellow panelists.  Do any of you

16   all recognize each other from anyplace?  Anyone know anyone

17   from any other source?

18       I have to tell you that the number of times I have gone to

19   have a drink and stabbed myself in the mask is multiple.  I was

20   proud I didn't do it that time.

21       The Court notes for the record that no hands were raised in

22   response to the question do you know anyone.

23       Ladies and Gentlemen, do you know any of the Court staff?

24   That would be the folks on the second level behind the lawyers.

25   Anyone know any of the Court staff including me?  The Court

 1    notes for the record that no hands were raised.

 2        At this point, I am going to recognize counsel for the

 3    plaintiff.  At this point, you may have your 15 minutes to

 4    conduct your general voir dire, Mr. Barr.

 5            MR. BARR:  Thank you, Your Honor.  I will give a

 6    minute back for the time I jumped the gun earlier.

 7            THE COURT:  Thank you.

 8            MR. BARR:  Back to my card reader example.  Many of

 9    you remember the card readers.  We talked about it.  It was the

10    way it was done back in the day.  I think, as many of you saw,

11    you raised your hands that you had experience with

12    point-of-sale readers.

13        You know how it is done today.  Is it different today?

14    Today we see often an iPad at the store and just a card reader

15    there, and it is all that has to be done.  It is a lot quicker

16    and easier than it used to be back in the day.  Technology

17    changed.

18        In the next few days, we will hear a lot more about the

19    point-of-sale systems.  We will often refer to those as POS for

20    short, and you will be learning a lot about those from the

21    witnesses and from the expert witnesses.

22        As the Court mentioned, this is a patent case.  The first

23    patent that was filed that is at issue in the case, the '640

24    patent, was filed back in 2008.  For this case, you will have

25    to put yourself back in time a little bit and think about what

1   technology was known back in 2008.  That's going to be the

2   relevant time when this invention came about.  We will not

3   apply in hindsight what is 20/20 about what we know today and

4   what was not known in 2008.

5        Mr. Olson and Mr. Baratta are sitting behind me here.  They

6   are the inventors and came up with the system as I mentioned.

7   The patent was filed in 2008 to help small businesses and

8   merchants manage the inventory, deal with the transactions,

9   create customized menus from the stores and businesses, and

10  they did that in a way that a computer programmer is not

11  required to build the mediums and customized mediums for the

12  business.

13       Also, we think excitingly, you are able to use the Internet

14  so it is not necessary to have a computer server in your store

15  with all the software loaded on it.  There is cloud computing,

16  and we will talk more about that in this case.  That is used to

17  allow the software to be in the cloud and letters through the

18  Internet to not have a separate server in the store.

19       Mr. Baratta and Mr. Olson were awarded two United States

20  patents on their invention.  We contend in the lawsuit that NCR

21  is using these patents without our permission and that, as a

22  result of that, as the Court mentioned, we're seeking damages

23  in this lawsuit.  We are asking to be paid damages to

24  compensate the inventors for the use of the patents.

25       NCR is going to give you a long list of excuses why they

1    contend they do not infringe the patents.  Here, I think it is

2    important to keep in mind a lesson my 82 year-old father says

3    often.  That is that actions speak louder than words.  We need

4    to focus on what NCR did in this case and not on what they say

5    they did in this case.

6        An example of NCR's arguments you will hear a lot more

7    about in this case regarding infringement is they will say

8    their software is pre-built.  This is just a distraction.  If

9    you look at what they actually do with the software, you will

10   see they build just as claimed by the patents in this case.

11       What is important in this case, and what we're trying to

12   accomplish here in this jury selection procedure, is tell you a

13   little bit about the case and give us the opportunity, as the

14   Court mentioned, to learn a little more about you and things

15   you bring into this case based on your life experiences.

16       Since this is a patent case, I would like to ask all of you

17   if you would raise your right hand if you are against the idea

18   of patents or think that patents hurt competition.  Anybody

19   that thinks that?

20            THE COURT:  Juror No. 6, Mr. Summerill.

21            MR. BARR:  The evidence will be in this case that

22   Mr. Olson and Mr. Baratta tried to make a commercial product

23   with their invention.  They were not successful initially in

24   the market with that.

25       Please raise your hand if you believe that an invention

1     that doesn't sell right away means it doesn't have any value.

2          Mr. Baratta will tell you there are two reasons that the

3     invention was not commercially successful.  It is really both

4     based on the fact that the invention was ahead of its time.

5     The reason it was ahead of its time is, again, we go back to

6     2008.  Back in those days, the iPad had not been invented yet,

7     and tablets were not invented yet.  The hardware for the use

8     for the point-of-sale system was hardware that cost thousands

9     of dollars.  Many small businesses were hesitant to spend that

10    kind of money on new technology.

11         The other reason the invention was not commercially

12    successful is the Internet.  At that time, people didn't feel

13    as comfortable with it as they do today.  People were

14    uncomfortable putting their financial information out there on

15    the Internet, and they were hesitant to use the invention for

16    that reason.

17         Now we know that iPads can be bought for a few hundred

18    dollars, and people, tens of millions, or maybe hundreds of

19    millions, over the world use Amazon and others to buy things,

20    and put the credit card out there, and post pictures of the

21    family and children on the Facebook pages.  People have become

22    over the years more comfortable with the Internet which helps

23    if they are going to use the Internet to do financial

24    transactions.

25         I would like to ask you if you could raise your hand if you

1    are one of those people who still is a little concerned about

2    the Internet and about using the Internet for your financial

3    transactions.   Anybody?

4        Now, my 16 year-old son is one of the people who loves

5    gadgets.   Any new technical gadget that comes out, he wants it.

6    I would like to ask you if there is any of you that are like my

7    son and that any new technology that comes out that you are

8    very interested in learning about that?

9        THE COURT:   Keep your hands up.   That is Juror No. 1,

10   Jessica Davis; Juror No. 3, Ms. Smith; Juror 5, Ms. Gadson; and

11   Juror No. 6, Mr. Summerill.   It is also Juror 15, Mr. Fajardo;

12   Juror 16, Ms. Martin; Juror 23, Mr. Hix; Juror 24,

13   Mr. Gutierrez.   It concludes everyone.

14       MR. BARR:   Some people are on the Internet at least a

15   part of every day.   Other people don't use the Internet very

16   much at all.

17       Could you raise your right hand if you are one of the

18   people who is online at least a part of every day?   I won't ask

19   the Court to write those down.   I think it is almost everyone.

20       THE COURT:   All right.

21       MR. BARR:   Thank you, Your Honor.

22       The Court mentioned earlier the idea of bias and prejudice.

23   I would like to hit that for a minute.

24       Outside of the courtroom, those words have one meaning, and

25   the meaning is generally bad.   Bias and prejudice outside of

1   the courthouse in the context is usually a very bad thing.

2       The type of bias that we are talking about in a lawsuit is

3   a different kind of bias.  It is not a bad thing.  Bias just

4   means you're leaning one way or the other.  Based on the facts,

5   and based on your life experiences, maybe you're leaning more

6   in favor of my client, or more against my client and more in

7   favor of NCR, or against NCR.  It would be an example of bias

8   in a courtroom.

9       Since the parties need a fair trial, we need to start the

10  race at the same place at the starting line, and nobody needs

11  to start out ahead of the other one.

12      As to the prejudice issue, that would be that you -- an

13  example of that is you have your mind made up already for any

14  reason.  That would be something that also would not give the

15  parties a fair trial.

16      An example of bias would be my partner, Mr. Yates, has a

17  13 year-old son.  If Mr. Yates was asked to be the referee at

18  one of his son's basketball games, he might be biased and not

19  be the best person to do that.  He might not call all the fouls

20  that occur in the game.  It is an example of bias we might see

21  in this case.

22      I will ask you at this point if you could please raise your

23  hand if you're leaning one way or the other in this case based

24  on what you heard so far, based on your life experiences.

25              THE COURT:  Juror No. 6, Mr. Summerill, was the only

```
 1    hand raised.
 2             MR. BARR:  I would like to talk for a moment about
 3    damages.
 4        As the Court mentioned, it is a lawsuit.  We are seeking
 5    compensation for the use of the patents in this case.  You will
 6    -- those of you selected for this jury will get to watch a
 7    video that will tell you a lot about the patent system.  That
 8    video will tell you that a patent is a lot like a deed for
 9    land.  The claims of the patent are very similar to the metes
10    and bounds of a deed.
11        Similar to a deed for land, an owner of a patent can charge
12    rent for someone using their property, and the rent essentially
13    in a patent case is called royalty.  Some of you may have heard
14    about royalties in other contexts such as mineral rights.  Many
15    fortunate people in Texas own mineral rights which can mean oil
16    and gas royalties which are very valuable.
17        Other things and -- one of the things in the pandemic is
18    that timber rights are a lot of money.  The price of wood had
19    gone up 400%.  Those are issues that provide royalties to you
20    outside of the patent context.
21        Suppose with regard to your timber property, the lumber
22    company came in and said they wanted to cut your trees.  Is
23    there anyone here -- raise your hand if you think the decision
24    of whether your trees can be cut is the choice of the logging
25    company.  Does anybody think that?
```

1    We believe that NCR has used the patents to make a lot of

2    money.  We think the evidence will be they made over a hundred

3    million dollars off of the patents, and we will be seeking a

4    reasonable royalty in this case, and it will be a lot of money.

5    I would like to ask if you could raise your hand that

6    regardless of the evidence we bring to you in this case that

7    you could never award millions of dollars in a case no matter

8    what.  Raise your hand if you feel that way.

9        THE COURT:  You have gone 11 minutes.

10       MR. BARR:  One other issue the Court mentioned is

11   burden of proof briefly.  You will hearing a lot more of the

12   burden of proof in this case.  There is two that will apply.

13   The first burden of proof is the one that applies to

14   CloudofChange and proving infringement and damages.  That is

15   called the preponderance of the evidence standard.  Don't

16   worry, you will have a jury charge that will have it in black

17   and white to read it.

18   The preponderance of the evidence standard, we believe you

19   will be instructed, means more likely than not.  It applies to

20   CloudofChange in proving infringement and damages in this case.

21   NCR has claims against CloudofChange in this case.  Their

22   claim is that the patents are invalid and that the patent

23   office made a mistake in issuing both of the patents.

24   There is a different burden of proof that applies to that.

25   It is called clear and convincing evidence.  It is a higher

1    burden of proof, and the rule for that is you have to find more

2    likely than not.

3          What I will ask you to do if anyone could raise your hand

4    if you feel like it doesn't seem right that a different burden

5    of proof would apply to CloudofChange on their claims versus

6    NCR on their claims.  Anybody have a problem with that concept?

7          Is there anybody here -- I think the Court asked you about

8    working for NCR.  Anybody here that owns stock in NCR?

9          Anybody here that can recall they actually used an NCR

10   product such as a cash register?

11               THE COURT:  Juror No. 6, Summerill.

12               MR. BARR:  By the way, if someone hadn't said it, NCR

13   stands for National Cash Register.  It is the original company

14   name.

15         I have two more points in closing, and I think the Judge

16   asked one of my questions.  I have one final question.

17         Anybody that is sitting here today thinking to themselves

18   if Mr. Barr had just asked me a question that I would have told

19   him something that would be important for him to know and would

20   be relevant to this case?  If you feel that way, please raise

21   your hand.

22         Thank you.

23               THE COURT:  Mr. Baker, 15 minutes.

24               MR. BAKER:  Thank you, Your Honor.  I will try to be

25   brief.

1      Mr. Barr covered a few of my questions I intended to ask.
2   I want to start and tell about NCR.
3      As Mr. Barr mentioned, it used to be the
4   National Cash Register company.  They have been around since
5   the late 1800s, and they were the first company that came out
6   with the cash register.  They have been in business over 130
7   years and are an innovative company.  You will find out through
8   the case they have over a thousand patents, and they have been
9   around many years and are very innovative.  Not only the
10   original cash register, they came up with the original electric
11   cash register and are heavily involved in computing systems
12   over the years.
13      You may have seen one of the largest products, ATMs.  You
14   use them every day.  I didn't notice it until I went to my
15   Bank of America and got money out when I first was involved in
16   this case, and I said that is NCR.
17      Getting more involved in the case and point-of-sale
18   terminals.  We all go to restaurants, bars, any type of retail
19   space these days, and they have these point-of-sale systems.
20   It is what this case is about.  It is whether or not my
21   client's product, NCR Silver, whether it infringes the two
22   patents.
23      One thing you need to know is we came up with our system in
24   2012.  It is called NCR Silver.  It is a particular
25   point-of-sale system that we sell.  We have the actual iPad

1   product you see in the store and a back end where the consumer
2   can go in the merchant, and change, and add items to the menus
3   on the point-of-sale.
4       This case is going to be very technical, I will tell you.
5   At the end of the day, you will have a couple of experts up
6   here who will talk for hours about whether or not they infringe
7   or not.  We believe strenuously they don't infringe.  You will
8   hear testimony from our experts and their expert witnesses.
9       One of the questions I have for you, do you have any
10  problems with, as Mr. Barr alluded to, dealing with the
11  credibility?  It will be one of your No. 1 jobs in this case.
12  Can you sit there and determine in all honesty who is telling
13  the truth and who is not?  Does anyone have a problem with
14  that?
15      Thank you.
16      Mr. Barr mentioned about the fact that they are seeking a
17  large amount of money.  There is no doubt about it.  He
18  mentioned the fact of a hundred million dollars in sales.
19  That's over a long period of time, and it also doesn't take
20  into account what did we make on the product at the end of the
21  day.  It is one thing we know about revenue and another about
22  profits.
23      Does anybody have a problem with understanding revenue
24  versus profits at the end of the day?
25      Thank you.

1    Let me ask you a couple of more specific questions.  One

2  thing Mr. Barr mentioned about was the fact about a patent

3  system.  If you will be selected, you will hear a video from a

4  Judge Fogle in the Northern District of California who tries a

5  lot of patent cases there, and he will talk to you about the

6  system, and, as Mr. Barr mentioned, one of the more important

7  things in the patent infringement cases are claims.

8    You will see written words out of the patents.  They will

9  have to prove by preponderance of the evidence that we meet

10  every element, every word, in the claims.

11    My question is if my client can prove to you through a

12  preponderance of the evidence they don't meet a particular

13  claim, or element, or word in a patent, do you have any problem

14  finding non-infringement?

15    Thank you.  No hands raised, Your Honor.

16    Mr. Barr mentioned invalidity.  He will tell you and will

17  bring out the patents with the little gold seal on them issued

18  by the United States Patent Office, and he will say they are

19  presumed valid as a matter of law, and they are presumed valid.

20    We are attacking the validity of the patents.  Judge Fogle

21  will tell you in the video that we have every right because we

22  have been accused of doing something, and we believe it is not

23  fair and right.

24    Does anybody have a problem in this Court with NCR

25  attacking the validity of the patents?  Thank you, no hands

1    raised.

2        Let me ask you more specific questions then.  NCR is a

3    large company, no doubt about it.  We have over 34,000 people

4    across the world in 140 countries.

5        Does anybody have any bias, as Mr. Barr mentioned, about

6    big companies?  You have a tendency to distrust large

7    companies?  No hands raised.

8        How many of you had any training, education, or job

9    experience related to accounting?

10            THE COURT:  That is Juror No. 1, Ms. Davis;

11   Juror No. 2, Ms. Drozd; Juror No. 6, Mr. Summerill;

12   Juror No. 10, Ms. Wooden.  It is everyone on the right side.

13        On the left side, it is Juror 19, Ms. Torija; Juror 21,

14   Mr. Rueter.  I think that's everyone.

15            MR. BAKER:  Thank you, Your Honor.

16        Have any of you done any Internet research, or other

17   searching for information, about either CloudofChange or NCR

18   before today?  One hand.

19            THE COURT:  That's Juror No. 1, Ms. Davis.

20            MR. BAKER:  Other than in divorce proceedings, have

21   you, or a close family member, ever been involved in a lawsuit?

22            THE COURT:  We covered that in the individual

23   questioning.  Let's not address that now.

24            MR. BAKER:  Sorry, Your Honor.

25            THE COURT:  You can put your hands down.

1          MR. BAKER:  Have any of you ever been accused of doing

2     something you did not do?  Have you had experience of when you

3     thought someone used an idea you had without your permission?

4          THE COURT:  That's Juror 27, Mr. Bedwell.

5          MR. BAKER:  I don't believe this question was asked.

6     I think the general question was asked about patent and patent

7     law by the Judge.  I have one particular question.

8        Have any of you thought about filing for a patent but

9     decided not to?

10         THE COURT:  Juror No. 6, Mr. Summerill.  I covered a

11    lot of the questions coming up in the individual questioning as

12    well.

13         MR. BAKER:  Have any of you had training by computer

14    code or programming?

15         THE COURT:  Juror 16, Ms. Martin.

16         MR. BAKER:  I don't think we have any further

17    questions.

18         THE COURT:  Thank you.

19      Ladies and Gentlemen, in a moment, I'll have you retire to

20    the jury assembly room, and I will call you back in

21    individually for some more specific questions.

22      Let me tell you what that will be.  It will not be a very

23    deep dive.  It will be pretty light.  The first thing I will

24    say is tell us about yourself.  What I will want to know is who

25    are you, tell us your name, where you're from, what do you do

1    for a living, whether or not you are married, what does your

2    spouse does for a living, and other than family law, ever been

3    a party to a lawsuit, do you have any legal training, have you

4    ever served in the military, ever worked for the government,

5    ever served on a jury?

6        I will ask you about your hobbies and interests.  I will

7    talk to you about your answers to the individual questions, and

8    I am going to ask you a couple of more questions about patent

9    cases, and then I will give the lawyers about a minute each to

10   follow-up with you individually.  You're not going to be on

11   your feet for more than a few minutes.  It is not a big deal,

12   relax.  I promise I will do my best to make it comfortable and

13   painless for everyone.

14       Before I allow you to retire, there are a couple of

15   instructions I need to cover with you.

16       First, you may not communicate with anyone about the case,

17   including your fellow jurors, until it is time to deliberate.

18   That even means whatever we discuss in here with you

19   individually, you can't go back and respond when someone says

20   what did they ask you.  Don't ask what did they ask you if you

21   would.

22       I understand you will want to tell your family, close

23   friends, and other people that you had been called for jury

24   service so you can explain when you are required to be in

25   court.  You should warn them not to ask you about this case,

1    tell you anything they know, or think they know, about it, or
2    discuss this case in your presence until the judge has accepted
3    your verdict or you have been excused as a juror.

4        Similarly, you must not give any information to anyone by
5    any means about this case.  For example, don't talk
6    face-to-face, or use any electronic device, or media, the
7    telephone, cell or smartphone, camera, recording device, PDA,
8    computer, Internet, any Internet service, any text or instant
9    messaging service, any websites such as Facebook, YouTube,
10   Snapchat, Instagram, or Twitter, or any other way to
11   communicate to anyone any information about this case until
12   your verdict has been accepted and you're excused as a juror.
13   This includes any information about the parties, witnesses,
14   participants, evidence, or anything related to this case.

15       Next, do not speak to anyone in and around the courthouse
16   other than your fellow jurors or court personnel.  Some of the
17   people you may encounter may have connections to the case.  If
18   you speak with them, it would create the appearance perhaps or
19   raise a potential suspicion of impropriety.

20       Third; please do not do any research on the Internet, in
21   libraries, books, newspapers, magazines, or using any other
22   source or method.  Do not make any investigation about this
23   case on your own.  Do not visit, or view, any place discussed
24   in this case, and do not use any Internet programs, or other
25   devices, to search for, or view, any place discussed in this

1    testimony.

2        Do not in any way research any information about the case,

3    the law, the people involved, including the parties, the

4    witnesses, the judge until after you have been excused as

5    jurors.

6        If you happen to see, or hear, anything related to this

7    case in the media, turn away and report it to Judge Albright,

8    or myself, as soon as possible.  These rules protect the

9    parties rights to have this case decided only on the evidence

10   they know about that has been presented here in court.

11       If you do any research investigation, or experiment, that

12   we don't know about, or gain any information through improper

13   communications, your verdict may be influenced by inaccurate,

14   or misleading, information that was not tested by the trial

15   process which includes the oath to tell the truth and

16   cross-examination.

17       It could also be unfair to the parties right to know the

18   information the jurors are relying on to decide the case.  Each

19   of these parties is entitled to a fair trial by an impartial

20   jury, and you must conduct yourselves to maintain the integrity

21   of the trial process.  If you decide the case based on

22   information not presented in court, you will have denied the

23   parties a fair trial in accordance with the rules of this

24   country, and you will have done an injustice.  It is very

25   important that you abide by the rules.

1    To my knowledge, I don't believe anyone has brought in any

2    cell phones or personal devices.  Is that correct, Ms. Kopp?

3         MS. KOPP:  Yes.

4         THE COURT:  If you have the opportunity to take a

5    break, don't go to your car and check them.  I know that is

6    hard not to do.  You want to find out what text messages.

7    There is a reason we ask you not to do that.  Like I said,

8    we will get you out of here as quickly as we possibly can and

9    hopefully no less than noon.

10    At this time, I will excuse all of you back to the jury

11    assembly room, and we'll call you back one at a time.  Thank

12    you.

13    All rise for the Panel.

14                        [Jury panel exits]

15         THE COURT:  Please be seated.

16    In an attempt at efficiency, and I will see how it goes

17    and float it out there.  Anyone that has any objection to the

18    Court excusing Juror No. 6, Mr. Summerill, at this time before

19    we do a deep dive?  He has concerns about the length, he is

20    biased he says, this is not the right type of case for him,

21    there are all types of issues.  Anyone that would have any

22    objections to that?  I'm happy to bring him in if you have an

23    objection.  There is certainly quite a few red flags.

24    From the Plaintiff?

25         MR. BARR:  No objection.

1          THE COURT:  From the Defense?

2          MR. BAKER:  We would like to have some opportunity.

3   Do you believe he is intentionally trying to get himself off

4   the case?

5          THE COURT:  I think it is pretty obvious he is not

6   happy to be here, and he pretty much identified every reason I

7   can think of, the element of the case being five days, not the

8   right type of case for him, he is biased in favor of one side

9   or the other, he owns a small business, he is familiar with

10  point-of-sale, he has a problem against patents that he

11  identified, and the like.

12      If you would like to hear more, by all means, I

13  certainly --

14          MR. BAKER:  That's fine.  We agree.

15          THE COURT:  I was trying to telegraph what was likely

16  to happen here.  I appreciate snapping to it like that.

17      I will give everyone a five minute comfort break, and I

18  will go ahead and begin with bringing Juror No. 1 in.  I will

19  let you stretch your legs and hit the restroom.

20      We stand in recess.

21                      [Recess taken]

22          THE COURT:  Hello, Ms. Davis, welcome.  Take off your

23  mask if you would like.

24      Good morning.  Tell us about yourself.

25          PANEL MEMBER DAVIS:  My name is Jessica Davis.  I am

1    married, I have two kids.

2            THE COURT:  Hold on.  I don't know the microphone is

3    on.  Let's get it fixed first.  Speak closely to it.

4            PANEL MEMBER DAVIS:  My name is Jessica Davis.  I have

5    two kids.  I am married.

6            THE COURT:  What do you do for a living?

7            PANEL MEMBER DAVIS:  Bank auditor.

8            THE COURT:  Where?

9            PANEL MEMBER DAVIS:  In Point West Bank.

10           THE COURT:  How long have you been in that position?

11           PANEL MEMBER DAVIS:  Seven years.

12           THE COURT:  I see your husband is self-employed as a

13   welder.  Is it still what he is doing?

14           PANEL MEMBER DAVIS:  Yes, sir.

15           THE COURT:  How long has he done that?

16           PANEL MEMBER DAVIS:  Only about a year.

17           THE COURT:  I see you have familiarity with the POS

18   system.  Tell us what your knowledge is and how you are

19   familiar with that.

20           PANEL MEMBER DAVIS:  As a bank, we have to run

21   point-of-sale systems.  We also run ATMs, and we dispute

22   point-of-sale systems transactions.

23           THE COURT:  You're personally involved in that?

24           PANEL MEMBER DAVIS:  I am the second review for the

25   point-of-sale disputes, the ATM.  I am the one that makes sure

1    the ATMs are working properly and transacting the way they

2    should if they go down.

3            THE COURT:  Is there anything about your familiarity

4    through working as a bank auditor for Point West that would

5    cause you to be anything other than fair and impartial here?

6            PANEL MEMBER DAVIS:  I don't think so.  I will tell

7    you that we do have an NCR system at our bank at one of our

8    locations.

9            THE COURT:  Just because you have an NCR system, it

10   doesn't mean you would be leaning one way or the other before

11   we start or treat NCR more fairly and less fairly as the case

12   may be?

13           PANEL MEMBER DAVIS:  No.

14           THE COURT:  You have an accounting background.  I

15   assume it is through your work as a bank auditor and training?

16           PANEL MEMBER DAVIS:  Yes.

17           THE COURT:  You indicated you had done independent

18   research prior to coming here.  Share with us what you have

19   done and why.

20           PANEL MEMBER DAVIS:  Our NCR ATM frequently goes down.

21   If it goes down, it needs a part replaced or the latest thing

22   was the hard drive.  We were having problems getting the

23   transactions off the hard drive to the actual network to charge

24   the point-of-sale transactions that had been charged.  Our ATM

25   had dispensed the money to the customers, but, in turn, that

1  money was not sent back to us.  I had to do research how to get

2  our money back.

3           THE COURT:  It was completely unrelated to the

4  litigation?  It was because you used NCR systems at your bank?

5           PANEL MEMBER DAVIS:  Correct.  It is only one out of

6  all three branches.

7           THE COURT:  Is it at the branch you work?

8           PANEL MEMBER DAVIS:  No.

9           THE COURT:  Other than family law, ever been a party

10  to a lawsuit?

11           PANEL MEMBER DAVIS:  No.

12           THE COURT:  Any legal training of any type?

13           PANEL MEMBER DAVIS:  I was escrow officer prior to

14  being a banker.  Yes, I did -- as far as legal training, no.  I

15  did correspond with quite a few attorneys.

16           THE COURT:  I understand.  Ever served in the

17  military?

18           PANEL MEMBER DAVIS:  No.

19           THE COURT:  Ever worked for the United States

20  government?

21           PANEL MEMBER DAVIS:  No.

22           THE COURT:  Ever served on a jury?

23           PANEL MEMBER DAVIS:  Yes.

24           THE COURT:  Civil or criminal?

25           PANEL MEMBER DAVIS:  Civil.

```
 1              THE COURT:  When and where?

 2              PANEL MEMBER DAVIS:  In Hill County.  I would say

 3   probably seven years ago.

 4              THE COURT:  Was it a civil case or criminal?

 5              PANEL MEMBER DAVIS:  Civil.

 6              THE COURT:  Tell us generally what the case was about?

 7              PANEL MEMBER DAVIS:  It was about a pipeline easement.

 8   The landowner had blocked the pipeline company from coming in

 9   and -- he blocked access to their easement.

10              THE COURT:  Don't tell us how you ruled.  You were

11   able to reach a verdict?

12              PANEL MEMBER DAVIS:  Yes.

13              THE COURT:  Were you, by chance, the foreperson?

14              PANEL MEMBER DAVIS:  No.

15              THE COURT:  Any engineering experience or training?

16              PANEL MEMBER DAVIS:  No.

17              THE COURT:  Have you ever obtained a patent or know

18   anyone who has?

19              PANEL MEMBER DAVIS:  No.

20              THE COURT:  Any familiarity with the patent system at

21   all?

22              PANEL MEMBER DAVIS:  No.

23              THE COURT:  What do you like to do when you're not

24   working other than take care of the 15 and 13 year-old?

25              PANEL MEMBER DAVIS:  16 and 13 now.  They play
```

1    basketball and softball.  We're always on the road with them.

2    They both play travel ball.

3              THE COURT:  Excluding that, what do you like to do for

4    yourself, your hobbies and interests other than supporting your

5    kids?

6              PANEL MEMBER DAVIS:  Right now, that is my hobby and

7    interest because that's all I can do.

8              THE COURT:  What is your favorite show you binged

9    during COVID?

10             PANEL MEMBER DAVIS:  Probably Yellowstone.

11             THE COURT:  That was good.  I like that one too.  I

12   got it.

13        I will turn it over to Mr. Barr.

14             MR. BARR:  Ms. Davis, I would like to know, do you

15   have any feelings about lawsuits or lawyers?  The fact we are

16   the plaintiffs and filed the case, would that cause you to lean

17   one way or the other?

18             PANEL MEMBER DAVIS:  No, sir.

19             THE COURT:  Mr. Baker?

20             MR. BAKER:  Talk about the NCR.  It is an ATM at one

21   of your branches?

22             PANEL MEMBER DAVIS:  Correct.

23             MR. BAKER:  What kind of issues have you had with the

24   ATM?

25             PANEL MEMBER DAVIS:  It is probably our ATM to go down

1     the most frequent.  We have NCR, and NCR is constantly the one

2     down.

3               MR. BAKER:  As it compares to other systems, not as

4     good?

5               PANEL MEMBER DAVIS:  I don't know that.  Our other

6     systems are older.  I don't think that I am able to correctly

7     compare them.

8               MR. BAKER:  You did say the NCR goes down more often

9     than the older ones?

10              PANEL MEMBER DAVIS:  It does.

11              MR. BAKER:  Thank you.

12              THE COURT:  Thank you, ma'am.  We appreciate it.  I

13    told you short and sweet.  Send in Cynthia Drozd.

14        How are you?  If you tell us about yourself and adjust the

15    microphone to hear you.

16              PANEL MEMBER DROZD:  What would you like to know?

17              THE COURT:  Who you are, where you're from, what you

18    do for a living?

19              PANEL MEMBER DROZD:  I live in Temple, Texas, and

20    originally from San Antonio.  I have been living in Temple for

21    at least 20 years now, and I work at Pactive.  I am a machine

22    operator.

23              THE COURT:  Where?

24              PANEL MEMBER DROZD:  Pactive.

25              THE COURT:  I saw that you had worked at someplace

1    called Brown Box Ninja?

2                PANEL MEMBER DROZD:  Yes.

3                THE COURT:  It was an interesting name.  What did they

4    do, and what did you to for them?

5                PANEL MEMBER DROZD:  I was started out as Amazon

6    fulfillment and I -- right before I quit, I started -- I was a

7    receiving clerk, and I was in charge of the warehouse in

8    incoming inventory.

9                THE COURT:  I see your spouse is involved in

10   maintenance.  For whom does he work?

11               PANEL MEMBER DROZD:  Pactive.  He is maintenance.

12               THE COURT:  You expressed you have some accounting

13   experience in your background.  Share with us.

14               PANEL MEMBER DROZD:  That was a very long time ago.  I

15   was not sure if I raised my hand.  I went to school for

16   accounting and got my Associate's.  I never pursued a career in

17   accounting.  Schooling is not -- office work or anything like

18   that is not for me.

19               THE COURT:  I appreciate you erring on the side of

20   caution and raising your hand.

21        Other than family law, have you ever been party to a

22   lawsuit?

23               PANEL MEMBER DROZD:  No.

24               THE COURT:  Any legal training?

25               PANEL MEMBER DROZD:  No.

1          THE COURT:  Have you ever served in the military?

2          PANEL MEMBER DROZD:  No.

3          THE COURT:  Have you ever worked for the United States

4    government?

5          PANEL MEMBER DROZD:  No.

6          THE COURT:  Have you ever served on a jury previously?

7          PANEL MEMBER DROZD:  Like?

8          THE COURT:  You indicated on your questionnaire you

9    served on a civil case before?

10          PANEL MEMBER DROZD:  It was in Temple a long time ago.

11   I don't remember.

12          THE COURT:  Do you remember what the case was about at

13   all?

14          PANEL MEMBER DROZD:  No.

15          THE COURT:  Were you able to reach a verdict in the

16   case.  Don't tell me what it was?

17          PANEL MEMBER DROZD:  Yes, I think we did.

18          THE COURT:  Were you, by chance, the foreperson?

19          PANEL MEMBER DROZD:  I'm not sure.  It was so long

20   ago.

21          THE COURT:  Do you have any engineering experience or

22   training?

23          PANEL MEMBER DROZD:  No.

24          THE COURT:  Have you ever obtained a patent?

25          PANEL MEMBER DROZD:  No.

1          THE COURT:  Know anyone who has?

2          PANEL MEMBER DROZD:  No.

3          THE COURT:  Do you know anything about patents?

4          PANEL MEMBER DROZD:  No.

5          THE COURT:  What are your hobbies and interests?  What

6    do you do when you're not working?

7          PANEL MEMBER DROZD:  Pretty simple.  I like to crochet

8    and read.

9          THE COURT:  What was the last book you read?  I am a

10   big reader too.

11         PANEL MEMBER DROZD:  Right now, Ghost Story.

12         THE COURT:  By Peter Strau?

13         PANEL MEMBER DROZD:  Yes.

14         THE COURT:  It is a book from the 1970s?

15         PANEL MEMBER DROZD:  Yes.

16         THE COURT:  It is a good book.  I remembered reading

17   it a while back.

18         PANEL MEMBER DROZD:  It keeps me up at night.

19         THE COURT:  I would not read that book before I went

20   to sleep.

21      I will turn it over to Mr. Barr.

22         MR. BARR:  Why didn't you pursue accounting after

23   school?

24         PANEL MEMBER DROZD:  I had moved to Killeen.  My

25   ex-husband was in the military, and he got transferred to

1    Fort Hood.  It was hard for me coming out of school to find a

2    job.

3        Like I said, office work is not for me.  I don't like it.

4            MR. BARR:  One other question.  Do you have any

5    feelings about lawyers or lawsuits?  The fact we filed the case

6    as the plaintiff cause you any concern or make you lean one way

7    or the other?

8            PANEL MEMBER DROZD:  No, not really.  I don't know.

9    Everybody has their right.  If they feel like they were done

10   wrong, they have the right to do what they feel is necessary to

11   get their justice.

12           THE COURT:  Ms. Drozd, as both parties stand before

13   you today, can you treat them both or are you treating them

14   both equally?

15           PANEL MEMBER DROZD:  I believe so.

16           THE COURT:  Can you be fair and impartial if selected

17   to serve on this jury?

18           PANEL MEMBER DROZD:  I believe so.

19           THE COURT:  Mr. Baker, any questions?

20           MR. BAKER:  You keep saying you believe so.  Do you

21   feel strongly about that?

22           THE COURT:  What was the question?

23           MR. BAKER:  I was asking about how strongly.  She kept

24   saying I believe so.

25           THE COURT:  I see.

```
 1              PANEL MEMBER DROZD:  You want a direct answer?
 2              MR. BAKER:  If you could.
 3              PANEL MEMBER DROZD:  I understand.  I don't know.
 4   Tell you the truth, I would not know.  It would be -- yeah, it
 5   would be hard for me because if these people worked really hard
 6   to develop what they developed, and they had such faith and
 7   belief in what they developed that they pursued a patent for
 8   it, then if they feel like this company came in and took away
 9   from what they developed, or something like that, it is not
10   right.
11              THE COURT:  I will ask you this.  If the Court were to
12   instruct you that before you could rule on their favor that
13   they must prove their case by a preponderance of the evidence,
14   would you be able to follow the law as the Court is instructing
15   you and apply that law to the facts?
16              PANEL MEMBER DROZD:  Yes, sir, I would.
17              THE COURT:  Despite what you just indicated --
18              PANEL MEMBER DROZD:  If you ask me to, I would.
19              THE COURT:  Is the Plaintiff in a greater position
20   right now as the case starts out than the Defendant?  Are you
21   slightly leaning more that way than this way?
22              PANEL MEMBER DROZD:  It is my personal belief.  As a
23   citizen, if I had to come in here and listen to -- what is it,
24   the preponderance --
25              THE COURT:  The burden of proof?
```

```
 1                PANEL MEMBER DROZD:  I would.  I would do my best to
 2    give an honest and --
 3                THE COURT:  I appreciate that 100%.  Thank you.
 4         Any further questions, Mr. Barr or Mr. Baker?
 5                MR. BAKER:  No, Your Honor.
 6                MR. BARR:  No, Your Honor.
 7                THE COURT:  Thank you.  I will let you step outside.
 8    Thank you very much for your time.  Return to the jury assembly
 9    room if you would.
10         Ms. Smith, how are you?  I appreciate you being here.  Tell
11    us about yourself, who you are, where you're from, what you do,
12    all that good stuff?
13                PANEL MEMBER SMITH:  Katelyn Smith.  I am a middle
14    school teacher locally.  I lived in Waco for college and the
15    last seven or eight years.  I grew up in Texas.  My family is
16    from upstate New York.
17                THE COURT:  What type of subject do you teach?
18                PANEL MEMBER SMITH:  Midway Middle School.  I teach
19    theatre.
20                THE COURT:  Very good.  I imagine you're very
21    comfortable standing up in front of people?
22                PANEL MEMBER SMITH:  Yes.  In front of students more
23    so.
24                THE COURT:  I understand.  I am looking through your
25    questionnaire here.
```

1      You indicated that you are the type of person that as soon

2  as some new technology comes out, you like to learn about it.

3  Give us examples of that.

4      PANEL MEMBER SMITH:  With the past school year, we had

5  to utilize technology more than ever.  It has been quite a

6  learning curve.  I am constantly learning new things on what is

7  out.  It is either stuff I have to work with in school or I

8  talk to the kids to understand kind of where they are at.

9      Me personally, I am using Internet almost every day and the

10  newest streaming device or things like that.  Personally, and

11  professionally, I feel I have to expose myself to something new

12  all the time.

13      THE COURT:  I am curious.  Working virtually with

14  theatre kids, I can imagine having them act on Zoom, and you

15  don't have the large gestures, and the projection, and the

16  facial expressions.  How do you handle that?

17      PANEL MEMBER SMITH:  Well, it has been quite a curve

18  with students coming into 7th grade.  We had them film their

19  monologues and send it to me.  The students I had in class

20  before will have a Google meet and perform it for me.  It just

21  is very different.

22      I'm very -- I like to be in front and see everything.  With

23  the virtual, you're definitely missing that intimacy of knowing

24  the student.  I have seen videos of students I never met in

25  person.  It is very weird.  I am not used to that.

1          THE COURT:  Odd question.  It is to give the lawyers

2    the opportunity to know you a little better.

3       What is your favorite musical and play?

4          PANEL MEMBER SMITH:  My favorite musical depends on my

5    period in life.  I would have to say Beauty & The Beast, and my

6    favorite play is The Curious Savage.  It is a classic.

7          THE COURT:  Interesting.

8       Other than family law, have you ever been party to a

9    lawsuit?

10         PANEL MEMBER SMITH:  No.

11         THE COURT:  Do you have any legal training?

12         PANEL MEMBER SMITH:  No.

13         THE COURT:  Have you ever served in the military?

14         PANEL MEMBER SMITH:  No.

15         THE COURT:  Have you ever served on a jury before?

16         PANEL MEMBER SMITH:  No.

17         THE COURT:  Do you have any engineering experience or

18   training?

19         PANEL MEMBER SMITH:  No.

20         THE COURT:  Have you ever obtained a patent or know

21   someone who has?

22         PANEL MEMBER SMITH:  My father obtained patents.

23         THE COURT:  Talk to me about that.

24         PANEL MEMBER SMITH:  I don't know a lot of details.  I

25   am very much arts driven and not engineering driven.  I know he

1    has them, and when he used to work for IBM that he got it

2    through the workplace.  It is all I know.

3            THE COURT:  What did he do for IBM?

4            PANEL MEMBER SMITH:  Software engineer.

5            THE COURT:  Have you ever copyrighted anything?

6            PANEL MEMBER SMITH:  No.

7            THE COURT:  Do you fashion yourself a playwright or

8    created material?

9            PANEL MEMBER SMITH:  I created stuff for class.  I

10   never gone through the process of getting it published.

11           THE COURT:  Any familiarity with how the patent system

12   works?

13           PANEL MEMBER SMITH:  No.

14           THE COURT:  Outside of theatre, what are your hobbies

15   and interests?

16           PANEL MEMBER SMITH:  I like to play board games, and I

17   like to read, I like to see plays when they are happening, I

18   just like theatre.  I like to consume stories, and movies, and

19   television shows.

20           THE COURT:  The last book you read not theatre

21   related?

22           PANEL MEMBER SMITH:  The Vanishing Half.

23           THE COURT:  I am not familiar with it.  By who?

24           PANEL MEMBER SMITH:  Brook Bennett.

25           THE COURT:  Thank you.

1      Mr. Barr?

2              MR. BARR:  Ms. Smith, what did you study in college?

3              PANEL MEMBER SMITH:  Theatre Arts and Education.

4              MR. BARR:  Are there any virtual theatre shows you are

5      preparing for currently?

6              PANEL MEMBER SMITH:  No.

7              MR. BARR:  The fact we are the plaintiffs, and brought

8      the lawsuit, and filed the case, does it cause to you lean one

9      way or the other?

10             PANEL MEMBER SMITH:  No.

11             MR. BARR:  Thank you.

12             THE COURT:  Mr. Baker?

13             MR. BAKER:  I understand the background.  My daughter

14     is a musical theatre major at the University of Arizona and

15     struggling actress.

16        Talk about the patents your dad had.  Did he ever license a

17     patent?

18             PANEL MEMBER SMITH:  I don't know.  I know he has

19     several patents.  I never seen them.  I never asked what they

20     are called.  I just don't know the jargon.

21             MR. BAKER:  You are not -- did he ever sue anybody

22     over the patents?

23             PANEL MEMBER SMITH:  No.

24             MR. BAKER:  How long did he work at IBM?

25             PANEL MEMBER SMITH:  I want to say 35 years because he

```
 1   recently retired.
 2              MR. BAKER:  Did he like working at IBM?
 3              PANEL MEMBER SMITH:  They moved him around a little
 4   bit.  Initially when he started, he was moving around.  That's
 5   where he worked the longest.
 6              MR. BAKER:  Thank you.
 7              THE COURT:  I will let you return to the jury assembly
 8   room.  Hold off on the next person for a moment.
 9        I tend to ask generalized questions.  Do you want me to go
10   down that path or would you prefer me to do less of that?
11              MR. BARR:  Proceed.
12              MR. BAKER:  You are doing my job for me.  Proceed.
13              THE COURT:  I wanted to make sure you were comfortable
14   with that.
15        Let's have Mr. Perkins.  Good morning, Mr. Perkins.  How
16   are you?
17              PANEL MEMBER PERKINS:  Doing good.
18              THE COURT:  I see you are from Moody, and you own your
19   own home inspection business.  I bet you are a busy man right
20   now.
21              PANEL MEMBER PERKINS:  Yes, sir.
22              THE COURT:  You work all over McLennan County or
23   generally the Moody McGregor area?
24              PANEL MEMBER PERKINS:  The Temple/Killeen area.
25              THE COURT:  You're all over there?
```

```
 1              PANEL MEMBER PERKINS:  Yes, sir.  I just sleep in

 2    Moody.  I am from Temple.

 3              THE COURT:  I understand that.  How long have you been

 4    a home inspector?

 5              PANEL MEMBER PERKINS:  21 years, sir.

 6              THE COURT:  Tell us what your spouse does.

 7              PANEL MEMBER PERKINS:  She works for the Scott White

 8    Health Plan doing billing and everything for Scott White there

 9    at Temple.

10              THE COURT:  Where did you go to college?

11              PANEL MEMBER PERKINS:  Texas Tech University.

12              THE COURT:  Go Red Raiders.  My dad as well.

13       What was your degree in?

14              PANEL MEMBER PERKINS:  Animal Science.

15              THE COURT:  Other than family law, have you ever been

16    a party to a lawsuit?

17              PANEL MEMBER PERKINS:  No, sir.

18              THE COURT:  Do you have any legal training?

19              PANEL MEMBER PERKINS:  No.

20              THE COURT:  Ever served in the military?

21              PANEL MEMBER PERKINS:  No.

22              THE COURT:  Ever worked for the government?

23              PANEL MEMBER PERKINS:  No, sir.

24              THE COURT:  Ever served on a jury?

25              PANEL MEMBER PERKINS:  Yes.
```

```
 1              THE COURT:  Looks like it was a criminal case?
 2              PANEL MEMBER PERKINS:  I'm not sure 100%.  When they
 3   did the video, they said criminal, and there was 12 jurors.
 4   There was six of us.
 5              THE COURT:  It could have been traffic court.  It
 6   could have been JP?
 7              PANEL MEMBER PERKINS:  A gentleman that threatened his
 8   girlfriend's life with a gun.
 9              THE COURT:  Trying to send him to jail or asking for
10   money?
11              PANEL MEMBER PERKINS:  Send him to jail.  We didn't do
12   the verdict or the sentencing part.
13              THE COURT:  You had to find him guilty or not guilty?
14              PANEL MEMBER PERKINS:  Yes.
15              THE COURT:  Were you able to reach a verdict?
16              PANEL MEMBER PERKINS:  Yes.
17              THE COURT:  Were you, by chance, the foreperson?
18              PANEL MEMBER PERKINS:  No, sir.
19              THE COURT:  Do you have any engineering experience or
20   training?
21              PANEL MEMBER PERKINS:  No.
22              THE COURT:  Have you ever obtained a patent?
23              PANEL MEMBER PERKINS:  No.
24              THE COURT:  Do you know anyone who ever obtained a
25   patent?
```

```
 1                    PANEL MEMBER PERKINS:  No.

 2                    THE COURT:  Do you have any familiarity with the

 3       patent system?

 4                    PANEL MEMBER PERKINS:  No.

 5                    THE COURT:  What do you like to do when not with your

 6       young kids or home inspecting?

 7                    PANEL MEMBER PERKINS:  I am an outdoors hunting and

 8       fishing type of guy.

 9                    THE COURT:  What is your favorite thing to hunt?

10                    PANEL MEMBER PERKINS:  Deer.

11                    THE COURT:  Where do you do that?

12                    PANEL MEMBER PERKINS:  We have a couple of places

13       throughout Texas we go to.

14                    THE COURT:  Very good.  Any luck this year?  Were you

15       able to get out?

16                    PANEL MEMBER PERKINS:  Yes, sir.  We got a place

17       outside of Gatesville.  I was able to get a nice ten pointer.

18                    THE COURT:  Very nice.  It is a good feeling.  I love

19       chicken fried back strap.  One of my first things.

20          Mr. Barr?

21                    MR. BARR:  Mr. Perkins, I was wondering what type of

22       computer system you use to process your transactions at

23       Perkins Home Inspection?

24                    PANEL MEMBER PERKINS:  Not -- it is just me.  I don't

25       have really -- I just use Quick Books.
```

```
 1              MR. BARR:  As far as Perkins Home Inspection, do you
 2   inspect commercial and residential or just residential?
 3              PANEL MEMBER PERKINS:  New construction residential.
 4              MR. BARR:  Thank you.
 5              THE COURT:  Mr. Baker?
 6              MR. BAKER:  When you use that Quick Books, you're
 7   entering data?
 8              PANEL MEMBER PERKINS:  Usually mainly to printout POs.
 9   It is basically what I do, purchase orders.
10              MR. BAKER:  In order to do that, you put in the amount
11   of time you spend, and you are mainly doing manual labor?
12              PANEL MEMBER PERKINS:  Per job, yes.
13              MR. BAKER:  Thank you.
14              THE COURT:  Thank you very much.  We'll let you return
15   to the jury assembly room and have Ms. Gadson.
16       Good morning.
17              PANEL MEMBER GADSON:  Good morning.  How are you?
18              THE COURT:  I am good.  You may remove your mask if so
19   inclined.  Thank you for your service.
20       You're retired army or another branch?
21              PANEL MEMBER GADSON:  Army.
22              THE COURT:  I assumed retiring in the Killeen area.
23   What was your MOS?
24              PANEL MEMBER GADSON:  94 Bravo.
25              THE COURT:  Share.
```

```
 1              PANEL MEMBER GADSON:  Food service.

 2              THE COURT:  Very good.  What was your rank upon

 3    retirement?

 4              PANEL MEMBER GADSON:  E-6, staff sergeant.

 5              THE COURT:  Your spouse was in the service?

 6              PANEL MEMBER GADSON:  Yes, sir.

 7              THE COURT:  Met him in the army?

 8              PANEL MEMBER GADSON:  Yes.

 9              THE COURT:  What did he do?

10              PANEL MEMBER GADSON:  Supply.

11              THE COURT:  Thank you.

12         Any other government experience other than working in the

13    military?

14              PANEL MEMBER GADSON:  No, sir.

15              THE COURT:  You indicated that as soon as some new

16    technology came out, you were one who was interested in

17    checking it out.  Give us examples.

18              PANEL MEMBER GADSON:  The new phones and computers.

19              THE COURT:  What kind of phone do you own?

20              PANEL MEMBER GADSON:  iPhones.

21              THE COURT:  Do you own iPhone or Android?

22              PANEL MEMBER GADSON:  iPhone 8 Plus right now.  I went

23    to iPhone 12 Pro Mac right now.  I want it.

24              THE COURT:  I understand.  We all like the new shiny

25    things.  I get that completely.
```

1          What about the iPhone 12 makes you want it?

2               PANEL MEMBER GADSON:  The new gadgets on it, the face

3     recognition, and nice pretty pictures.

4               THE COURT:  Very good.

5          Any legal training?

6               PANEL MEMBER GADSON:  No, sir.

7               THE COURT:  Have you ever served in the -- sorry.

8     Have you ever served on a jury?

9               PANEL MEMBER GADSON:  I was not picked.  I was going

10    to, but not picked.  I had to go, but I was dismissed.  They

11    had enough people.

12              THE COURT:  I know you said you were in food service.

13    While in the army, did you ever have any engineering experience

14    or training?

15              PANEL MEMBER GADSON:  We had a lot of different

16    training.

17              THE COURT:  I figured as much.  If you had any

18    engineering training, explain to us a little about that.

19              PANEL MEMBER GADSON:  I was in an engineering

20    battalion.  As far as building the actual things, no, we didn't

21    do that.  I kind of picked up different things.  Going to

22    actual build things, no, sir, I didn't do that.

23              THE COURT:  You said you picked up a few things as

24    part of the process.  I will follow-up on that.

25         What do you mean there?

```
 1              PANEL MEMBER GADSON:  For training, I worked in a
 2   training room.  I learned how to manually --
 3              THE COURT:  By osmosis, you picked up a few things
 4   here and there?
 5              PANEL MEMBER GADSON:  We had different regulations.
 6   To read the regulations on how things -- I'm not sure how to
 7   put it.  On different equipment we used -- they used because I
 8   didn't use it -- it has been so long since I have been in.
 9              THE COURT:  I understand.  Lawyers are just interested
10   in what equipment you may have worked on, what your experience
11   with that kind of thing.
12       Being in food service, did you ever work on any
13   point-of-sale systems, or worked the register, or was it mainly
14   behind the scenes and working the line?
15              PANEL MEMBER GADSON:  I worked on the line.  The
16   soldiers actually had cards.  Their ID card was their --
17              THE COURT:  It is how they went through that?
18              PANEL MEMBER GADSON:  Yes.  We didn't get actual cash
19   registers until I was on my way out.  It is when they started
20   changing the food service.
21              THE COURT:  I will switch gears for a second.
22       Do you have any familiarity with how the patent system
23   works?
24              PANEL MEMBER GADSON:  No, sir.
25              THE COURT:  Have you ever obtained a patent or tried
```

1   to?

2           PANEL MEMBER GADSON:  No, sir.

3           THE COURT:  Do you know anybody that has?

4           PANEL MEMBER GADSON:  No.

5           THE COURT:  Do you know -- now that you are retired

6   from the military, what do you do?  What are your hobbies and

7   interests?

8           PANEL MEMBER GADSON:  Grandmother of four boys.

9           THE COURT:  Outstanding.  It keeps you busy?

10          PANEL MEMBER GADSON:  And I am in school now.

11          THE COURT:  What are you studying?

12          PANEL MEMBER GADSON:  I am obtaining a degree,

13  Bachelor's in Liberal Arts with a minor in Criminal Justice,

14  Sociology, and Psychology.

15          THE COURT:  Outstanding.  What do you want to do?

16          PANEL MEMBER GADSON:  I'm not sure yet.

17          THE COURT:  Common in a college student.

18          PANEL MEMBER GADSON:  Actually, I would like to be a

19  teacher.

20          THE COURT:  I definitely respect that.

21      Mr. Barr?

22          MR. BARR:  Thank you for your service.

23      On your jury questionnaire, you mentioned you had medical

24  training.  Can you tell us about that?

25          PANEL MEMBER GADSON:  I have an Associate's in medical

 1    insurance billing and coding.

 2              MR. BARR:  You also mentioned banking training.  Can

 3    you explain that?

 4              PANEL MEMBER GADSON:  I worked as a banker in the -- I

 5    worked in the post office, and I worked in obtaining where they

 6    got their LLCs.

 7              MR. BARR:  Thank you.

 8              THE COURT:  Mr. Baker?

 9              MR. BAKER:  Few questions, thank you.

10         How long have you been retired?

11              PANEL MEMBER GADSON:  Since 2002.

12              MR. BAKER:  It was awhile.  Good for you.

13         Your spouse still active duty?

14              PANEL MEMBER GADSON:  No.  2010 he retired.

15              MR. BAKER:  Thank you.

16              THE COURT:  Thank you, ma'am.  We'll let you return to

17    the jury assembly room, and we'll see Lynn Wright.

18         Good morning, Mr. Wright.  You may remove the mask if so

19    inclined.

20              PANEL MEMBER WRIGHT:  Thank you.

21              THE COURT:  Thank you for your service.

22              PANEL MEMBER WRIGHT:  Thank you.

23              THE COURT:  Tell us what you retired from, army?  What

24    was your rank and MOS?  Tell everyone what it means.

25              PANEL MEMBER WRIGHT:  I was retired from the

1    United States Army as a sergeant first class.  I was in the

2    infantry, master gunner, and we designed gun ranges for the

3    Bradley vehicles preparing for combat.

4              THE COURT:  How long did you serve?

5              PANEL MEMBER WRIGHT:  15 years.  I had submissions to

6    the first Gulf War.

7              THE COURT:  Very nice, thank you.  Part of my duty is

8    a run a veterans treatment court on the military base at

9    Fort Hood.  I respect everyone's service.

10       You received a postgraduate degree.  What was your

11   postgraduate degree in?

12             PANEL MEMBER WRIGHT:  Bachelor's Degree in

13   Political Science and History.

14             THE COURT:  Where did you go to school?

15             PANEL MEMBER WRIGHT:  Charlton State University in

16   central Texas.

17             THE COURT:  Other than family law, ever been a party

18   to a lawsuit?

19             PANEL MEMBER WRIGHT:  I have.

20             THE COURT:  Share with us.

21             PANEL MEMBER WRIGHT:  It was a car accident that was a

22   lawsuit.

23             THE COURT:  Were you the one bringing the suit?

24             PANEL MEMBER WRIGHT:  I was bringing the suit.

25             THE COURT:  Was it resolved to your satisfaction?

```
 1              PANEL MEMBER WRIGHT:  It was.
 2              THE COURT:  Other than that one example, have you ever
 3  been a party to a lawsuit other than that?
 4              PANEL MEMBER WRIGHT:  No, sir.
 5              THE COURT:  When was that?
 6              PANEL MEMBER WRIGHT:  1986 or 1987.
 7              THE COURT:  I assume nothing about that causes you to
 8  be anything but fair and impartial here?
 9              PANEL MEMBER WRIGHT:  No, sir.
10              THE COURT:  Very good.
11       Have you ever worked for the government other than your
12  military service?
13              PANEL MEMBER WRIGHT:  No, sir.
14              THE COURT:  I see you have served on a jury before.
15  When and where was that?
16              PANEL MEMBER WRIGHT:  City of Killeen.  City jury,
17  traffic accident.
18              THE COURT:  When was that?
19              PANEL MEMBER WRIGHT:  1988.
20              THE COURT:  Were you able to reach a verdict?
21              PANEL MEMBER WRIGHT:  We did.
22              THE COURT:  Were you, by chance, the foreperson?
23              PANEL MEMBER WRIGHT:  No, I was not.
24              THE COURT:  Go ahead.  Any engineering experience or
25  training?
```

1               PANEL MEMBER WRIGHT:  No, sir.

2               THE COURT:  Any familiarity with how the patent system

3      works?

4               PANEL MEMBER WRIGHT:  I am a little familiar.

5               THE COURT:  Tell us more.

6               PANEL MEMBER WRIGHT:  Just as far as when a person

7      invents something that they have the right to patent it to

8      prevent others from using it, stealing it, or whatever for

9      their own protection.

10              THE COURT:  Anything beyond general knowledge?

11              PANEL MEMBER WRIGHT:  No.  Pretty much general

12     knowledge.

13              THE COURT:  Have you ever applied for a patent?

14              PANEL MEMBER WRIGHT:  No.

15              THE COURT:  Do you know anyone that has?

16              PANEL MEMBER WRIGHT:  No, sir.

17              THE COURT:  Share with us what your hobbies and

18     interests are?  What do you like to do?

19              PANEL MEMBER WRIGHT:  I like sports, and watching

20     them, and playing some of them, and working on vehicles.

21              THE COURT:  Working on?

22              PANEL MEMBER WRIGHT:  My vehicles.

23              THE COURT:  Tell me what is your favorite sport to

24     watch and who is your team?

25              PANEL MEMBER:  Football; Seattle Seahawks.

```
 1              THE COURT:  I bet you were nervous when
 2   Russell Wilson, they thought of trading him?
 3              PANEL MEMBER WRIGHT:  It got a little tough there.
 4              THE COURT:  I imagine that.  Understandable.
 5         What kind of vehicle do you work on?
 6              PANEL MEMBER WRIGHT:  I have a BMW 7 Series, 3 Series,
 7   and a Honda pickup.  I keep them going.
 8              THE COURT:  Share with us your level of mechanical
 9   skill.  When do you reach the point you have to turn it over to
10   a professional?  What can't you do, and when do you need
11   someone else for?
12              PANEL MEMBER WRIGHT:  When you have me confused, I let
13   it go.  I have friends that are mechanics and help me out.
14              THE COURT:  I think we all rely on YouTube.
15              PANEL MEMBER WRIGHT:  I am good.
16              THE COURT:  I am there with you.
17         Mr. Barr?
18              MR. BARR:  Thank you for your service in the war.
19         Having received a Bachelor's Degree in Political Science,
20   are you familiar with the process, the court process?
21              PANEL MEMBER WRIGHT:  Pretty much.
22              MR. BARR:  Do you feel it generally works the way it
23   is supposed to?
24              PANEL MEMBER WRIGHT:  For the most part.
25              MR. BARR:  When you were in the army, did you ever
```

1    serve on one of the separation boards or anything like that?

2            PANEL MEMBER WRIGHT:  I went through one.  I didn't

3    serve on one.

4            MR. BARR:  What type of case was that?

5            PANEL MEMBER WRIGHT:  Medical.

6            MR. BARR:  Thank you.

7            THE COURT:  Mr. Baker?

8            MR. BAKER:  Couple of questions.

9       You listed you own a business called CD and WD?

10           THE COURT:  It was Mr. Summerill.

11           MR. BAKER:  No questions.

12           THE COURT:  Thank you very much.  You may be excused

13   and return to the jury assembly room.

14      We'll see Megan Glass.  Good morning, Ms. Glass.  How are

15   you?  You can take the mask off if you like.  I saw you go for

16   it.  It is good to have a break from it.

17           PANEL MEMBER GLASS:  It is.

18           THE COURT:  You responded you have familiarity with

19   the POS system.

20      What did you mean by that?

21           PANEL MEMBER GLASS:  I had a friend who owned a

22   business, and I would help her.  As far as POS -- what is it?

23           THE COURT:  POS.

24           PANEL MEMBER GLASS:  That's as far as I know.  How to

25   ring up and take people's money.

```
 1              THE COURT:  Do you remember what kind of system it
 2   was?
 3              PANEL MEMBER GLASS:  No.  It was years ago.
 4              THE COURT:  I see you are from Gatesville.
 5       Do you work outside of the home currently?
 6              PANEL MEMBER GLASS:  No.  I am actually from
 7   Texarkana.  I have a 13 year-old so when I met my husband, I
 8   was working in cardiovascular medicine, and we moved up here
 9   because he was in the military, and we have been here ten years
10   now in Gatesville.
11              THE COURT:  I saw you had put on the questionnaire you
12   had medical background.  I was going to ask you about that.
13       What kind of education did you have to be whatever you did
14   in the cardiovascular field?
15              PANEL MEMBER GLASS:  I had to take special classes
16   because I did EKGs, EEGs, and halter monitors to make sure
17   everything was going good.  A little bit of college but not
18   much.
19              THE COURT:  Did you get a specific degree in
20   something?
21              PANEL MEMBER GLASS:  No.  It is like a tech position
22   basically.
23              THE COURT:  Very good.  I see you have been on the
24   grand jury before?
25              PANEL MEMBER GLASS:  Twice.
```

1          THE COURT:  Twice both in Coryell County?

2          PANEL MEMBER GLASS:  Yes.  The one in Coryell County I

3    was on in 2017, and again last year when COVID happened so they

4    could not pull another grand jury.  We were the longest running

5    grand jury in Coryell County.

6          THE COURT:  Were you, by chance, the foreperson?

7          PANEL MEMBER GLASS:  I was not.  I did not get picked

8    to be the foreperson.  I help plenty of experience.  I don't

9    know.

10          THE COURT:  Maybe next time.

11          PANEL MEMBER GLASS:  Maybe.

12          THE COURT:  Anything about that experience that would

13    cause you to be anything other than fair and impartial?

14          PANEL MEMBER GLASS:  No.

15          THE COURT:  Other than family law, have you ever been

16    a party to a lawsuit?

17          PANEL MEMBER GLASS:  No.  Never been in trouble.

18          THE COURT:  Glad to hear that.

19          PANEL MEMBER GLASS:  One speeding ticket.  That's it.

20          THE COURT:  Any legal training?

21          PANEL MEMBER GLASS:  No.

22          THE COURT:  Other than the grand jury, have you ever

23    served on any other type of jury?

24          PANEL MEMBER GLASS:  No.

25          THE COURT:  Any engineering experience or training?

 1              PANEL MEMBER GLASS:  No.

 2              THE COURT:  Any familiarity with how the patent system

 3    works?

 4              PANEL MEMBER GLASS:  No.

 5              THE COURT:  Ever obtained a patent?

 6              PANEL MEMBER GLASS:  No.

 7              THE COURT:  Do you know anyone who has?

 8              PANEL MEMBER GLASS:  I don't.

 9              THE COURT:  Tell us what are your hobbies and

10    interests?

11              PANEL MEMBER GLASS:  Before COVID hit, I volunteered a

12    lot at the food bank, and my husband is a disabled veteran and

13    retired.  We spend our days fishing and hunting, and I take

14    care of the house, and we are still remote learning with the

15    teenagers and working on that.  That's pretty much it.

16              THE COURT:  Share with us what your favorite show you

17    watched during COVID was?

18              PANEL MEMBER GLASS:  Tiger King.

19              THE COURT:  Sure.

20              PANEL MEMBER GLASS:  Come on.  I think it carried us

21    all as a nation.  I believe in that.

22              THE COURT:  Very good.

23         I will turn it over to Mr. Barr.

24              MR. BARR:  Thank you, Your Honor.

25         Ms. Glass, one question.  You said you loved jury service.

```
1    Can you expand on that?
2             PANEL MEMBER GLASS:  I do.  Because I am very nosy,
3    and I just like to see how the process works.  I don't know
4    about trial jury.  Grand jury is you almost become like a
5    family there because you spend so much time together.
6    Especially in Coryell County because at the time we were buying
7    a home, and I knew what roads I did not want to live on in
8    Coryell County.  Just learning and taking it in.  That's it.
9             MR. BARR:  Thank you very much.
10            THE COURT:  Mr. Baker?
11            MR. BAKER:  How would you describe your experience
12   with that point-of-sale you were using with the friend?
13            PANEL MEMBER GLASS:  She had a system, and you put in
14   code.  She ran kind of like an upscale resale type business.
15   You would take clothes in, and process them, and put them in
16   the system, and print out the tag, and tag them.  When somebody
17   buys it, you bring it out and pull that out of the POS so that
18   the tag was not in there anymore.  There was only that item.
19   It is as far as I know.
20            MR. BAKER:  Was it a positive experience for you?
21            PANEL MEMBER GLASS:  Is it ever positive when you are
22   learning how to use POS?  I am sure I made a lot of mistakes.
23   She didn't pay me.  I did it for free.  I worked as hard for
24   free as I could.
25            MR. BAKER:  Did you buy the house or build it?
```

```
 1              PANEL MEMBER GLASS:  We bought one in a little brick
 2    neighborhood across from the sheriff so we knew it would be
 3    quiet.  We like quiet and boring.  It is why we love
 4    Gatesville.
 5              THE COURT:  Anything else?
 6              MR. BAKER:  No, Your Honor.
 7              THE COURT:  Thank you, ma'am.  It was a pleasure.
 8              PANEL MEMBER GLASS:  Have a great day.
 9              THE COURT:  You too.  Thank you.
10        Mr. Mathis, how are you?
11              PANEL MEMBER MATHIS:  Good.
12              THE COURT:  How is the morning going?
13              PANEL MEMBER MATHIS:  Very good.  Thank you.
14              THE COURT:  Good.  You are retired from being a
15    pediatric dentist?
16              PANEL MEMBER MATHIS:  Yes, sir.
17              THE COURT:  Where did you practice; in
18    McLennan County?
19              PANEL MEMBER MATHIS:  Yes.
20              THE COURT:  Waco?
21              PANEL MEMBER MATHIS:  Yes.
22              THE COURT:  How long did you retire?
23              PANEL MEMBER MATHIS:  Long time, 1998.
24              THE COURT:  Good for you.  What have you done to keep
25    yourself busy in retirement?
```

```
 1              PANEL MEMBER MATHIS:  Some of it was just hobby stuff.
 2              THE COURT:  Let's talk about those.  Share that with
 3   us.
 4              PANEL MEMBER MATHIS:  I retired early because of a
 5   hearing problem.  It was associated with a hunting accident.
 6   That effected my hearing and my ability to be a pediatric
 7   dentist.
 8              THE COURT:  Anything about your accident and the
 9   hearing issues that would cause you any difficulty during the
10   course of the trial?
11              PANEL MEMBER MATHIS:  No.
12              THE COURT:  I didn't think so.  You seem to be
13   tracking 100%.
14              PANEL MEMBER MATHIS:  I could not hear a high
15   frequency sound like a drill, and I could not understand
16   children's soft voices in a loud environment.  The
17   communication part -- I could hear fine in here.
18              THE COURT:  Very good.
19              PANEL MEMBER MATHIS:  I taught at TSTC for a number of
20   years in the math department and the dental assistant
21   department.  Most recently, I am a retired guy taking care of
22   an elderly mother, and mother-in-law, and getting to be a
23   grandfather.
24              THE COURT:  Very good.  I see your spouse is a
25   licensed counselor.  Is she still in that position?
```

```
1                  PANEL MEMBER MATHIS:  No.

2                  THE COURT:  For whom did she work?

3                  PANEL MEMBER MATHIS:  She worked for MHMR in Waco.

4                  THE COURT:  How many years did she work there?

5                  PANEL MEMBER MATHIS:  She was one of those who went

6      back to school as an adult.  She didn't have a long career.

7      She worked there for six or seven years.

8                  THE COURT:  I believe in the beginning of the

9      voir dire process you indicated you were at least familiar with

10     someone on the plaintiff's side?

11                 PANEL MEMBER MATHIS:  I heard a name.

12                 THE COURT:  Who was that?

13                 PANEL MEMBER MATHIS:  Help me.

14                 THE COURT:  You are looking at Abel Reyna?

15                 PANEL MEMBER MATHIS:  I recognize the name.

16                 THE COURT:  Because he was former elected DA in town?

17                 PANEL MEMBER MATHIS:  Yes.

18                 THE COURT:  Other than knowing him in that position,

19     any familiarity, or acquaintance, with him?

20                 PANEL MEMBER MATHIS:  No.

21                 THE COURT:  Ever met the man?  Is this the closest you

22     have ever been to him?

23                 PANEL MEMBER MATHIS:  This is it.

24                 THE COURT:  I see you have been a witness in a murder

25     case before.  Can you share a little bit about that?  I don't
```

1    want to revisit anything unpleasant.

2              PANEL MEMBER MATHIS:  I had dental records that could

3    identify a victim.  She had been a resident at Waco Center for

4    Youth, or someplace like that, or Methodist Home.  I don't

5    recall which.  It was out of Amarillo.  I was called in to

6    briefly testify that's who that was.

7              THE COURT:  Never served on a jury?

8              PANEL MEMBER MATHIS:  No, sir.

9              THE COURT:  Never been a party to a lawsuit of any

10   type?

11             PANEL MEMBER MATHIS:  No.

12             THE COURT:  Any engineering training?

13             PANEL MEMBER MATHIS:  No, sir.

14             THE COURT:  Are you generally familiar with how the

15   patent system works?

16             PANEL MEMBER MATHIS:  In general as a layperson is.

17             THE COURT:  Any specialized training?

18             PANEL MEMBER MATHIS:  Besides?

19             THE COURT:  Besides the general knowledge as it

20   relates to patents?

21             PANEL MEMBER MATHIS:  My only specialized training is

22   in dentistry.  That's it.

23             THE COURT:  I understand that.

24      Have you ever obtained a patent?

25             PANEL MEMBER MATHIS:  No.

1           THE COURT:  Know anyone who ever obtained a patent?

2           PANEL MEMBER MATHIS:  I'm not sure.  Not that I am

3   aware of.

4           THE COURT:  Do you know anyone involved in a dispute

5   regarding a patent?

6           PANEL MEMBER MATHIS:  No.

7           THE COURT:  I will turn it over to Mr. Barr.

8           MR. BARR:  You said that you taught math.  Is that

9   correct?

10          PANEL MEMBER MATHIS:  It was remedial math.

11          MR. BARR:  Have you thought about a patent, filing one

12  for yourself?

13          PANEL MEMBER MATHIS:  No.

14          MR. BARR:  Thank you.

15          THE COURT:  Mr. Baker?

16          MR. BAKER:  Did you run your own dental business?

17          PANEL MEMBER MATHIS:  Yes.

18          MR. BAKER:  Thank you.

19          THE COURT:  Thank you very much, Doctor.  I will let

20  you return to the jury assembly room.

21          PANEL MEMBER MATHIS:  I know the guy in the back.

22          THE COURT:  The one that walked in; Blake?

23          PANEL MEMBER MATHIS:  It is a long time.  I know his

24  family, and Blake was a patient of mine.

25          THE COURT:  Anything that knowing Blake is the IT

```
 1    specialist for the Waco Division that causes you to be anything
 2    other than fair and impartial here?
 3              PANEL MEMBER MATHIS:  Not at all.
 4              THE COURT:  I told you to stay out of the courtroom.
 5    Thank you.  I appreciate it.
 6              PANEL MEMBER MATHIS:  Thank you.
 7              THE COURT:  Good morning, Ms. Wooden.  If inclined,
 8    you may remove the mask or keep it on, whatever you prefer.
 9              PANEL MEMBER WOODEN:  Can I sit?
10              THE COURT:  Of course.  Lower the microphone a bit so
11    we can hear you.
12       Ms. Wooden, I see you are originally from Kansas and
13    currently living in Waco here in McLennan County.  You are a
14    receptionist.  Who do you work for?
15              PANEL MEMBER WOODEN:  Veterans One Stop.
16              THE COURT:  I am familiar with that.  On LaSalle?
17              PANEL MEMBER WOODEN:  Yes.
18              THE COURT:  How long have you worked there?
19              PANEL MEMBER WOODEN:  Last August.
20              THE COURT:  What did you do prior to that?
21              PANEL MEMBER WOODEN:  I worked at Experience Works
22    State Office at 900 Austin Avenue.  Experience Works is an
23    organization that helps people 55 and older get back to
24    employment.
25              THE COURT:  During my questioning, you indicated that
```

1    you might have difficulty sitting for five days.  Can you

2    expand upon the answer?

3             PANEL MEMBER WOODEN:  If we have breaks -- I have to

4    move around a lot because of my hip.  It gets uncomfortable.

5             THE COURT:  We break about every hour and a half.

6             PANEL MEMBER WOODEN:  Not a problem then.

7             THE COURT:  I am pleased to hear that.  You indicated

8    an accounting background?

9             PANEL MEMBER WOODEN:  I worked for Jackson Hewitt ten

10   plus years doing tax prep.

11            THE COURT:  Any type of educational training for that

12   position?

13            PANEL MEMBER WOODEN:  Just their training, not any

14   formal college for it.

15            THE COURT:  I see your husband that you described him

16   as working in the position as a laborer.  What does he do

17   specifically?

18            PANEL MEMBER WOODEN:  Actually works for a concrete

19   company, LB Foster in Hillsborough.  He makes cages.  You know

20   the highways where they put the paneling and things up?  He

21   works for a company that does that.  They also make septic

22   tanks, and the parks restrooms, they make those as well.

23            THE COURT:  I see you have been a party to a lawsuit

24   involving your home.  Tell us briefly about that.

25            PANEL MEMBER WOODEN:  My husband got sick in 2007.  We

1    were losing the home.  It went to a foreclosure.  I don't know.

2    It is a lawsuit.  They were going to arrest him.  I asked them

3    to put it on me for not paying it.  Someone overnight, thank

4    God, did a quick deeds claim and took all the money off of our

5    having to pay it.

6              THE COURT:  That resolved in a satisfactorily manner?

7              PANEL MEMBER WOODEN:  Yes.

8        There was also my first husband worked at a company called

9    Prime Tanning, and they were in a lawsuit because of the

10   chemicals and things they used.  Erin Brockovich came and was

11   trying to do a lawsuit against them.  It was dropped.  I don't

12   know why it was dropped.

13             THE COURT:  You actually met with Erin Brockovich?

14             PANEL MEMBER WOODEN:  I did not meet her.  It was her

15   assistants emailed us and called us.  I didn't get to meet her.

16             THE COURT:  Other than those experiences, any other

17   times you have been a party to a lawsuit?

18             PANEL MEMBER WOODEN:  Just those ones they send you in

19   the mail saying they are doing the lawsuits, and you really

20   never do anything with it.  You know.

21             THE COURT:  The solicitation letter so to speak?

22             PANEL MEMBER WOODEN:  That's it.

23             THE COURT:  I see you served on a jury before,

24   criminal case?

25             PANEL MEMBER WOODEN:  Yes.

1          THE COURT:  What county was that?

2          PANEL MEMBER WOODEN:  Buchanan County, Missouri.

3          THE COURT:  How long ago was that?

4          PANEL MEMBER WOODEN:  20 or 30 years ago.

5          THE COURT:  Were you able to reach a verdict in the

6  case?

7          PANEL MEMBER WOODEN:  We did.

8          THE COURT:  Were you the foreperson?

9          PANEL MEMBER WOODEN:  I was not.

10          THE COURT:  Did you ever have any engineering training

11  or experience?

12          PANEL MEMBER WOODEN:  No.

13          THE COURT:  Any legal training?

14          PANEL MEMBER WOODEN:  No.

15          THE COURT:  Ever served in the military?

16          PANEL MEMBER WOODEN:  No.

17          THE COURT:  Any familiarity with how the patent system

18  works?

19          PANEL MEMBER WOODEN:  A teeny tiny bit.  I had an idea

20  and contacted a company that was supposed to help you invent

21  things and talked about patents.  I don't know enough except to

22  be dangerous maybe.

23          THE COURT:  Have you ever obtained a patent or tried

24  to?

25          PANEL MEMBER WOODEN:  Again, with that company,

1    whatever it was called.  It cost too much money, and I didn't

2    do anything else with it.

3              THE COURT:  Anything about that experience that would

4    cause you to be anything other than fair and impartial here?

5              PANEL MEMBER WOODEN:  No.

6              THE COURT:  There was another question that you

7    responded to, and I think it had to do with applying the fact

8    of the law.  Was that it or something different?  I wrote apply

9    in my notes.

10             PANEL MEMBER WOODEN:  When you asked about using

11   point-of-sale cash registers.  I have, but I don't know if I

12   used the kind you guys were mentioning.

13             THE COURT:  Tell us the kind you used.

14             PANEL MEMBER WOODEN:  At Jackson Hewitt, we used the

15   ones that slid.  You put the carbon paper on there.  We used

16   those.  Later on the computer, we had a program that we

17   inserted the money documents, and stuff, and had to take the

18   photocopies of them and things like that.

19             THE COURT:  Anything about that would cause you to be

20   anything other than fair and impartial here?

21             PANEL MEMBER WOODEN:  No.

22             THE COURT:  What do you like to do for your hobbies

23   and interests?

24             PANEL MEMBER WOODEN:  I like to read and fish.

25             THE COURT:  Tell me the last book you read.

1          PANEL MEMBER WOODEN:  The Bible.  It is my favorite

2     thing.  There are Sunday school books.

3          THE COURT:  Are there other types of fiction or

4     nonfiction reading you enjoy doing?

5          PANEL MEMBER WOODEN:  I haven't for a long time.  I

6     used to like Isaac Azimov.

7          THE COURT:  Science fiction?

8          PANEL MEMBER WOODEN:  Frank Carrete.  He is a

9     Christian writer.  Torre Hayden, she write books about kids

10    with disabilities and these kinds of things.  I like true

11    factual things.

12         THE COURT:  Thank you for sharing.

13      Mr. Barr?

14         MR. BARR:  Ms. Wooden, the story you mentioned about

15    the terrible experience you had with the legal system and your

16    home.  Sorry that happened to you.

17      Is there anything about that experience, we are the

18    plaintiffs and brought the lawsuit, anything about that

19    experience that would cause you to lean one way or the other or

20    be against people who file lawsuits in cases?

21         PANEL MEMBER WOODEN:  No.  I know sometimes it is

22    necessary.

23         MR. BARR:  I think you said, and I don't remember the

24    response, did you say you had used an NCR product but were not

25    sure what it was?

```
 1            PANEL MEMBER WOODEN:  I used cash registers.  We had
 2   the old cash registers we used a couple of times.  Mostly it
 3   was on the computer we did anything.  The little lockboxes and
 4   stuff.  Not really to use -- I use ATMs all the time.
 5            MR. BARR:  Thank you.
 6            THE COURT:  Mr. Baker?
 7            MR. BAKER:  Was it NCR ATMs?
 8            PANEL MEMBER WOODEN:  I don't know, sir.  I didn't pay
 9   attention.  All I wanted was money.
10            MR. BAKER:  I didn't know until recently.  I looked
11   and there's an NCR machine.  I understand completely.
12      You talked a little bit about the lawsuit with your first
13   husband.  He had a tanning business?
14            PANEL MEMBER WOODEN:  No.  We were losing the home
15   because he got sick.
16            MR. BAKER:  I am talking about the one with the
17   Erin Brockovich.
18            PANEL MEMBER WOODEN:  He ended up having lung cancer,
19   and a bunch of people in the area had lung cancer.  She came in
20   like the movie seeking out the evidence and stuff.  It didn't
21   -- they just dropped it after a few years.  They said the judge
22   had said we had to know exact times and dates he was exposed
23   and everyone else was exposed to the chemicals which was every
24   day.  They dropped it for whatever reason.  I didn't hear any
25   more about it.
```

1          MR. BAKER:  Do you have any feelings, positive or

2     negative, about that experience?

3          PANEL MEMBER WOODEN:  No.  It happens.

4          MR. BAKER:  Do you have an undergraduate college

5     degree?

6          PANEL MEMBER WOODEN:  No.  I had a year of college.

7          MR. BAKER:  Thank you.

8          THE COURT:  Thank you.  Ma'am, we will let you return

9     to the jury assembly room.

10        We'll see Mr. Dickinson next.  How are you, sir?

11         PANEL MEMBER DICKINSON:  I am well.

12         THE COURT:  Good morning.  Good to have you here.

13    Tell us where you're from and what you do for a living?

14         PANEL MEMBER DICKINSON:  I live here in Waco.  I am

15    from Arkansas, and I am a lineman for Charter Communications.

16         THE COURT:  Share with us what specifically a lineman

17    does?

18         PANEL MEMBER DICKINSON:  Troubleshoot coaxial, and

19    fiber issues, and stuff like that.

20         THE COURT:  What type of training, or educational

21    background, have you had to be able to learn how to do that?

22         PANEL MEMBER DICKINSON:  Hands on.

23         THE COURT:  Practical experience more than anything.

24    How long have you been in the position?

25         PANEL MEMBER DICKINSON:  Ten years maybe.

```
 1              THE COURT:  Do you own your own business?
 2              PANEL MEMBER DICKINSON:  No.
 3              THE COURT:  I see when we were asking questions
 4    generally of the Panel you responded that yes, you had owned a
 5    small business or restaurant?
 6              PANEL MEMBER DICKINSON:  Or had a family member.
 7              THE COURT:  Or had a family member.  Thank you.
 8         Which would that have been?
 9              PANEL MEMBER DICKINSON:  All of them.
10              THE COURT:  Go through that.  Which family members
11    have owned small businesses?
12              PANEL MEMBER DICKINSON:  My sister owns her real
13    estate, my mother is in trucking, dump trucks, and tractors,
14    and stuff like that.  My father had a private practice for
15    psychology.
16              THE COURT:  Very good.  Other than family law, have
17    you ever been a party to a lawsuit?
18              PANEL MEMBER DICKINSON:  No.
19              THE COURT:  Do you have any legal training of any
20    kind?
21              PANEL MEMBER DICKINSON:  No.
22              THE COURT:  Have you ever served in the military?
23              PANEL MEMBER DICKINSON:  No.
24              THE COURT:  Have you ever worked for the United States
25    government?
```

```
 1                    PANEL MEMBER DICKINSON:  No.

 2                    THE COURT:  Have you ever served on a jury?

 3                    PANEL MEMBER DICKINSON:  No.

 4                    THE COURT:  Have you any engineering experience or

 5       training?

 6                    PANEL MEMBER DICKINSON:  The department I work in for

 7       Charter.  I am not --

 8                    THE COURT:  You said more hands on by osmosis, if you

 9       will, picking it up?

10                    PANEL MEMBER DICKINSON:  Yes.

11                    THE COURT:  Any familiarity or just general knowledge

12       regarding how the patent system works?

13                    PANEL MEMBER DICKINSON:  No.

14                    THE COURT:  Have you ever filed for a patent?

15                    PANEL MEMBER DICKINSON:  No.

16                    THE COURT:  Do you know anyone that filed for a

17       patent?

18                    PANEL MEMBER DICKINSON:  No.

19                    THE COURT:  Have any of the companies you ever worked

20       for been involved in a patent dispute?

21                    PANEL MEMBER DICKINSON:  I am sure.  I work for

22       Charter Communications.

23                    THE COURT:  Do you have any knowledge of any of that

24       litigation, if any?

25                    PANEL MEMBER DICKINSON:  No.
```

1              THE COURT:  What do you like to do if not working,
2     hobbies and interests?
3              PANEL MEMBER DICKINSON:  Metal work.
4              THE COURT:  Tell us what you do with metal.  What kind
5     of pieces do you construct?
6              PANEL MEMBER DICKINSON:  I built a flatbed for my
7     truck and stuff like that.  I built a trailer a few years back.
8              THE COURT:  Very good.
9         Mr. Barr?
10             MR. BARR:  You mentioned that your company, Charter,
11    has patents.  Does the fact that our clients in this case have
12    filed this lawsuit for patent infringement, does it cause you
13    to lean one way or the other?
14             PANEL MEMBER DICKINSON:  There's a disconnect between
15    me and what they do.  I do my job and go home.  No.
16             THE COURT:  You are coming in this case fairly and
17    looking at both sides equally?
18             PANEL MEMBER DICKINSON:  Yes.
19             MR. BARR:  Thank you.
20             THE COURT:  Mr. Baker?
21             MR. BAKER:  What did you do before you worked for
22    Charter?
23             PANEL MEMBER DICKINSON:  Heavy equipment operating, I
24    guess.
25             MR. BAKER:  It was for a company?

```
 1                    PANEL MEMBER DICKINSON:  Yes.

 2                    MR. BAKER:  Do you remember the name?

 3                    PANEL MEMBER DICKINSON:  R&R Sales.

 4                    MR. BAKER:  Thank you.

 5                    THE COURT:  Thank you, sir.  We'll let you return to

 6      the jury assembly room.

 7          We'll see Ms. Borg next.  Welcome, how are you?  Good

 8      morning.

 9                    PANEL MEMBER BORG:  Good.  How are you?

10                    THE COURT:  You may take the mask off if so inclined.

11                    PANEL MEMBER BORG:  Thank you.

12                    THE COURT:  You're welcome.  It is good to have a

13      little break from that.

14                    PANEL MEMBER BORG:  Sneezing all morning.  It is bad

15      and rough.

16                    THE COURT:  Tell us about where you are from, what you

17      do?

18                    PANEL MEMBER BORG:  My name is Susan Borg.  I live in

19      Hill County and work in Waco.  I work as a marketing director

20      business development and director for a financial institution

21      here in town.  We have six locations, and I am mainly in charge

22      of the online banking.

23                    THE COURT:  We all know what marketing and business

24      development involves.  You're working in the online stuff.

25      Tell us what you would do on a day-to-day basis as it relates
```

1    to this.

2           PANEL MEMBER BORG:  Day-to-day basis?  I am a

3    department of one.  I don't know where to begin.

4           THE COURT:  Favorite part of your duties and least

5    favorite part of your duties?

6           PANEL MEMBER BORG:  Favorite part is community and

7    involvement with folks.  Least favorite is anything repetitious

8    that I have to do all the time.  I am in charge of all the

9    digital advertising.  I love the creative part of my job.  I do

10   all of the -- I don't know, social media and everything.

11          THE COURT:  What type of social media accounts do you

12   operate for the credit union?

13          PANEL MEMBER BORG:  First of all, I oversee all the

14   website and online banking stuff both in English and Spanish.

15          THE COURT:  Updating that, and pictures, text,

16   et cetera?

17          PANEL MEMBER BORG:  Yes.  And Facebook, Instagram,

18   Twitter.

19          THE COURT:  Any others?

20          PANEL MEMBER BORG:  LinkedIn.  That's it for our

21   needs.

22          THE COURT:  You had responded that you, or a family

23   member, had operated, or owned, a small business or restaurant.

24   Can you expand upon that?

25          PANEL MEMBER BORG:  Between 1995 and 2005, I owned two

1   radio stations.

2          THE COURT:  Interesting.  Locally?

3          PANEL MEMBER BORG:  Mejia and Limestone County.

4          THE COURT:  What were the call letters?

5          PANEL MEMBER BORG:  That would be KYCX 104.9, and 1596

6   KRXTU.  We sold them to 92.9.  I worked for ESPN in transition

7   time.

8          THE COURT:  What do you do for them?

9          PANEL MEMBER BORG:  I sold advertising for ESPN and

10  did on air and running the stations when I owned the others.

11         THE COURT:  What made you switch gears?

12         PANEL MEMBER BORG:  Divorce.

13         THE COURT:  Certainly I have experience with that as

14  well.

15      Other than family law, have you ever been a party to a

16  lawsuit?

17         PANEL MEMBER BORG:  No.

18         THE COURT:  Do you have any legal training?

19         PANEL MEMBER BORG:  No.

20         THE COURT:  Have you ever served in the military?

21         PANEL MEMBER BORG:  No.

22         THE COURT:  Have you ever worked for the government?

23         PANEL MEMBER BORG:  No.

24         THE COURT:  Have you ever served on a jury?

25         PANEL MEMBER BORG:  No.  Nobody ever wanted me.  I was

1    always in media.

2         THE COURT:  Any familiarity with the patent system

3    other than general?

4         PANEL MEMBER BORG:  Just general knowledge.

5         THE COURT:  Do you know anyone that ever applied for a

6    patent?

7         PANEL MEMBER BORG:  I think I have.

8         THE COURT:  Tell me about that.

9         PANEL MEMBER BORG:  Some kind of gotcha item.  Nothing

10   big.

11        THE COURT:  Do you have a specific item in mind?

12        PANEL MEMBER BORG:  Yes.  It was like a beer mug

13   holder made out of leather.  I have a very entrepreneur friend

14   up in Dallas.  He is always talking about his next great.

15        THE COURT:  Did he receive a patent?

16        PANEL MEMBER BORG:  I think so.  They do like dog

17   beds, and children's pillows, and stuff like that.

18        THE COURT:  Anything about your knowledge of applying

19   for patents and the like through him that would cause you to be

20   anything other than fair and impartial here?

21        PANEL MEMBER BORG:  Not at all.  That's all the extent

22   of it.

23        THE COURT:  You indicated --

24        PANEL MEMBER BORG:  I had nothing to do with it.

25        THE COURT:  In response to questioning, you had

 1   familiarity with point-of-sale systems?

 2           PANEL MEMBER BORG:  I do.

 3           THE COURT:  Let's hear more.

 4           PANEL MEMBER BORG:  Banking is going away from brick

 5   and mortar and going to the digital.  We are constantly

 6   introducing that iPad in the lobbies to fill out the

 7   application and do anything.  I am constantly having to work in

 8   that area.

 9           THE COURT:  Have you ever worked with any NCR systems?

10           PANEL MEMBER BORG:  Actually, we use Hyusa for ATMs.

11   We don't do that.

12           THE COURT:  What do you like to do when not working?

13   What are your hobbies and interests?

14           PANEL MEMBER BORG:  Getting poison ivy.  I like to

15   garden.  I like to be outdoors.  I don't know, paint.

16           THE COURT:  Fair enough.

17           PANEL MEMBER BORG:  I do a lot of things.

18           THE COURT:  I will turn it over to Mr. Barr and see if

19   he has questions for you.

20           MR. BARR:  In your work with your company's website

21   that you mentioned, what types of programs do you use to do

22   that website?

23           PANEL MEMBER BORG:  I believe not the web master.  I

24   oversee and coordinate all of that.  I work with a company out

25   of Austin.  They are web master for us.

1              MR. BARR:  You have some computer programmers or more

2      computer technicians?

3              PANEL MEMBER BORG:  I can cut and paste and put

4      something on the web page.  I am not the programmer in any way.

5              MR. BARR:  Thank you.

6              THE COURT:  Mr. Baker?

7              MR. BAKER:  Your husband, current spouse, is the head

8      of a school?

9              PANEL MEMBER BORG:  Yes.  He is the head of school at

10     Vanguard College Prep School in Waco.

11             MR. BAKER:  How long has he been there?

12             PANEL MEMBER BORG:  About 13 years or 12.

13             MR. BAKER:  I think you may have said in your form you

14     had some type of -- done work in accounting.  Is that correct?

15             PANEL MEMBER BORG:  That I worked in accounting?  I

16     would not say that.  I run businesses and done payroll.  I am

17     college educated.  I haven't had training in accounting except

18     the accounting course in college.

19             MR. BAKER:  You have a college degree?

20             PANEL MEMBER BORG:  I do.

21             MR. BAKER:  In what?

22             PANEL MEMBER BORG:  Started out in

23     Business Administration.  Journalism, Public Relations, and a

24     minor in Art.

25             MR. BAKER:  From where?

```
 1            PANEL MEMBER BORG:  Baylor, and I had this
 2    Business Management.  Simmons College of Boston, Massachusetts.
 3            MR. BAKER:  You mentioned quickly about the iPad and
 4    your business use.  Do you have any positive or negative
 5    experiences with it?
 6            PANEL MEMBER BORG:  Explain that.
 7            MR. BAKER:  The iPad, positive or negative experiences
 8    with it in your business?
 9            PANEL MEMBER BORG:  It is where it is going.
10    Everybody is trying to adapt.  COVID helped us with all the
11    digital resources we have to offer with banking.  It did the
12    last year.
13            MR. BAKER:  Thank you.
14            THE COURT:  Thank you, ma'am.  We'll let you return to
15    the jury assembly room.
16        We'll see Mr. James Morris.  Good morning, welcome.  How
17    are you, sir?
18            PANEL MEMBER MORRIS:  Pretty good.  How are you?
19            THE COURT:  If you like, you may shun the mask.  I see
20    that you work for Luminent.  Share with us what you do for them
21    and how long you have been with them?
22            PANEL MEMBER MORRIS:  Going on five years.  I am a
23    mobile equipment specialist driving mainly coal haulers.
24            THE COURT:  Where are you from?
25            PANEL MEMBER MORRIS:  I was born and raised in Buffalo
```

1   and currently living in Doney.

2           THE COURT:  Where is Doney?

3           PANEL MEMBER MORRIS:  About ten miles from Buffalo.

4           THE COURT:  Which is close to I-45?

5           PANEL MEMBER MORRIS:  Yes.  10 miles from I-45.

6           THE COURT:  You had indicated someone in your family,

7   or yourself, had owned a small business or restaurant.  Share

8   more about that.

9           PANEL MEMBER MORRIS:  My brother opened up a branch

10  insurance office in Fairfield, and my father-in-law did have a

11  taxidermy business.

12          THE COURT:  To your knowledge, did they utilize

13  point-of-sale systems?

14          PANEL MEMBER MORRIS:  No, sir.

15          THE COURT:  Do you have any background in

16  point-of-sale systems of any type?

17          PANEL MEMBER MORRIS:  No, sir.

18          THE COURT:  Other than family law, have you been a

19  party to a lawsuit?

20          PANEL MEMBER MORRIS:  No, sir.

21          THE COURT:  Any legal training?

22          PANEL MEMBER MORRIS:  No, sir.

23          THE COURT:  Ever served in the military?

24          PANEL MEMBER MORRIS:  No, sir.

25          THE COURT:  Ever worked for the United States

1  government?

2           PANEL MEMBER MORRIS:  No, sir.

3           THE COURT:  I see you served on a civil jury before.

4  It was in Freestone County?

5           PANEL MEMBER MORRIS:  Yes.

6           THE COURT:  How long ago?

7           PANEL MEMBER MORRIS:  Year and a half maybe or two

8  years.

9           THE COURT:  Generally without telling us how you

10  ruled, what kind of case was it?

11          PANEL MEMBER MORRIS:  Civil case.  It was about a guy

12  was dumping sewage basically into the Tarrant County water

13  supply.

14          THE COURT:  You were able to reach a verdict?

15          PANEL MEMBER MORRIS:  Yes.

16          THE COURT:  Were you, by chance, the foreperson in

17  that case?

18          PANEL MEMBER MORRIS:  No, sir.

19          THE COURT:  Do you have any engineering experience or

20  training?

21          PANEL MEMBER MORRIS:  No, sir.

22          THE COURT:  Any other jury service other than the one

23  I mentioned before I move on?

24          PANEL MEMBER MORRIS:  No.

25          THE COURT:  Any familiarity with the patent system?

```
 1                    PANEL MEMBER MORRIS:  Not really.
 2                    THE COURT:  Know anyone who ever applied for a patent?
 3                    PANEL MEMBER MORRIS:  Not to my knowledge.
 4                    THE COURT:  Have you ever applied for one?
 5                    PANEL MEMBER MORRIS:  No, sir.
 6                    THE COURT:  What do you like to do when not working?
 7    What are your hobbies and interests?
 8                    PANEL MEMBER MORRIS:  Spending time with my kids
 9    mainly.  Aside from that, I volunteer for the fire department
10    in Buffalo.  That's it really.
11                    THE COURT:  How long have you volunteered for the
12    fire department?
13                    PANEL MEMBER MORRIS:  Probably 2005, I guess.
14                    THE COURT:  It is a tough job.  Thank you for that.
15                    PANEL MEMBER MORRIS:  Yes, sir.
16                    THE COURT:  Mr. Barr?
17                    MR. BARR:  Mr. Morris, I was surprised we had coal
18    mines in Texas even though I lived here 54 years.  What is the
19    coal mine?
20                    PANEL MEMBER MORRIS:  Cosey, Texas.
21                    MR. BARR:  Is it a big mine?  How many people work
22    there?
23                    PANEL MEMBER MORRIS:  We employ about 350 people.
24                    MR. BARR:  Thank you.
25                    THE COURT:  Mr. Baker?
```

1              MR. BAKER:  First of all, volunteer fire department, I

2      appreciate your service.

3          Do you have any medical training, or technical training,

4      for that job?

5              PANEL MEMBER MORRIS:  I am a certified emergency

6      responder.

7              MR. BAKER:  What is that?  Are you like EMT?

8              PANEL MEMBER MORRIS:  Step below EMT.

9              MR. BAKER:  You had to take training for that?

10             PANEL MEMBER MORRIS:  Yes, sir.  It is about a 40 hour

11     course.

12             MR. BAKER:  Thank you.

13             THE COURT:  I will let you return to the jury assembly

14     room, Mr. Morris.  Thank you.

15         We'll see Mr. Rodriguez next.  Good morning, Mr. Rodriguez.

16     You can take the mask off if you like or keep it on as you see

17     fit.

18         I see you are from Killeen and have lived there for most of

19     your life and originally from Kansas.  Did your family move

20     from Kansas to Texas?

21             PANEL MEMBER RODRIGUEZ:  My father was born in Texas.

22     He was enlisted in the military.  It was his first duty

23     station.

24             THE COURT:  Very good.  Share with us what you do at

25     HEB.

1          PANEL MEMBER RODRIGUEZ:  I am actually a
2  bagger/cashier.  We have to do volunteer work.  I do many
3  positions, not just specifically cashiering, and also like
4  assist other stores if they need help.
5          THE COURT:  How long have you worked for HEB?
6          PANEL MEMBER RODRIGUEZ:  Three years, sir.
7          THE COURT:  Other than family law, have you ever been
8  party to a lawsuit?
9          PANEL MEMBER RODRIGUEZ:  No.
10          THE COURT:  Do you have any legal training?
11          PANEL MEMBER RODRIGUEZ:  No, sir.
12          THE COURT:  Have you ever served in the military?
13          PANEL MEMBER RODRIGUEZ:  No, sir.
14          THE COURT:  Have you ever worked for the United States
15  government?
16          PANEL MEMBER RODRIGUEZ:  I believe I worked for the
17  Exchange, but I believe it is nonaffiliated.
18          THE COURT:  For AEFIS?
19          PANEL MEMBER RODRIGUEZ:  Yes.
20          THE COURT:  How long did you work for them?
21          PANEL MEMBER RODRIGUEZ:  Five years.
22          THE COURT:  What did you do for them?
23          PANEL MEMBER RODRIGUEZ:  I was a stock clerk literally
24  receiving shipments and putting the merchandise out.  It is
25  what I did.

1          THE COURT:  The one on Fort Hood?

2          PANEL MEMBER RODRIGUEZ:  Yes.

3          THE COURT:  The big one or the smaller ones?

4          PANEL MEMBER RODRIGUEZ:  Actually, one of the big

5   ones.  If I am correct, there's one of them.

6          THE COURT:  The new one built four or five years ago,

7   the big one?

8          PANEL MEMBER RODRIGUEZ:  Yes.

9          THE COURT:  Have you ever served on a jury?

10          PANEL MEMBER RODRIGUEZ:  No.

11          THE COURT:  Any engineering experience or training?

12          PANEL MEMBER RODRIGUEZ:  No, sir.

13          THE COURT:  Other than just basic knowledge, any

14   familiarity with the patent system?

15          PANEL MEMBER RODRIGUEZ:  No, sir.

16          THE COURT:  Do you know anyone that applied for a

17   patent?

18          PANEL MEMBER RODRIGUEZ:  No.

19          THE COURT:  Tell me what your hobbies and interests

20   are.

21          PANEL MEMBER RODRIGUEZ:  Just reading books and

22   comics, playing video games, and, of course, I like to work

23   out, and I like to also learn automotive as a passion.

24          THE COURT:  What is the last book you read?

25          PANEL MEMBER RODRIGUEZ:  Actually, a Marvel comic

1    believe it or not.  I am starting to read Marvel as well.

2              THE COURT:  Who was the Marvel character you focused

3    on?

4              PANEL MEMBER RODRIGUEZ:  Believe it or not, Spiderman.

5    It is what I was reading.

6              THE COURT:  Fair enough.  You said you like to play

7    video games.  My son bought me for Christmas a Google Stadia

8    system if you are familiar with that at all.  What is your

9    favorite video game to play?

10             PANEL MEMBER RODRIGUEZ:  Pretty much, it varies.  I

11   don't have a favorite.  I like to play heavy story oriented

12   games.

13             THE COURT:  I will turn it over to Mr. Barr.

14             MR. BARR:  As a store associate at HEB, you mentioned

15   you are a cashier?

16             PANEL MEMBER RODRIGUEZ:  Yes.

17             MR. BARR:  Do you use point-of-sale systems in that

18   work?

19             PANEL MEMBER RODRIGUEZ:  We use a point system.

20   Mostly, it is we are taking cash or card.  We don't have like

21   Apple Pay or Google Pay.  We don't have that at the moment.

22   Currently, we're working at it.

23             MR. BARR:  The system you have has a register and a

24   card reader?

25             PANEL MEMBER RODRIGUEZ:  Correct.

```
 1                  MR. BARR:  Thank you.

 2                  THE COURT:  Mr. Baker?

 3                  MR. BAKER:  You mentioned you like to play video

 4      games.  Do you do it individually or in a group?

 5                  PANEL MEMBER RODRIGUEZ:  Sometimes we do it

 6      individually.  We also like groups.  I do a mixture of both.

 7                  MR. BAKER:  You mentioned one of your hobbies is kind

 8      of automotive work.  You actually do hands on doing automotive

 9      work?

10                  PANEL MEMBER RODRIGUEZ:  Yes.

11                  MR. BAKER:  You work on your own car?

12                  PANEL MEMBER RODRIGUEZ:  Yes.

13                  MR. BAKER:  What kind of car?

14                  PANEL MEMBER RODRIGUEZ:  I currently own a

15      Chevrolet Cruz.  I'm saving money to hopefully buy myself a

16      classic automobile.

17                  MR. BAKER:  What are you interested in?

18                  PANEL MEMBER RODRIGUEZ:  More interest in American

19      muscle.

20                  MR. BAKER:  I have a 1969 Camaro.  I understand.

21      Thank you.

22                  THE COURT:  Thank you very much.  We'll let you return

23      to the jury assembly room.

24          If we can see Mr. Fajardo.  Good morning, welcome.  How are

25      you?
```

1              PANEL MEMBER FAJARDO:  Fine.

2              THE COURT:  You may take that off.  You are from

3    Robinson or currently living there but from 2000.  What brought

4    you from Ohio to Texas?

5              PANEL MEMBER FAJARDO:  My dad worked at General Tire,

6    and he transferred to Waco and shutdown here.  He was going to

7    transfer to Kentucky, but decided not to and made a home here

8    in Waco.

9              THE COURT:  How long have you been an RN?

10             PANEL MEMBER FAJARDO:  Since 2011.

11             THE COURT:  How long have you worked at Senior Care?

12             PANEL MEMBER FAJARDO:  About two years.

13             THE COURT:  Generally speaking, what are your duties

14   there?  I think we know generally.  What do you do on a

15   day-to-day basis?

16             PANEL MEMBER FAJARDO:  I work with the elderly, and do

17   the nursing care, and do the charting, and work with the

18   Foley catheters, and IVs.

19             THE COURT:  Prior to going to school as an RN, what

20   did you do?

21             PANEL MEMBER FAJARDO:  I worked in material handling.

22             THE COURT:  Specifically, for whom did you work and

23   what kind of -- describe what your duties were?

24             PANEL MEMBER FAJARDO:  I worked in Walmart return

25   center, and did scanning there, and did work in receiving, and

1   also worked in loss prevention for them.

2          THE COURT:  You indicated that you are the type of

3   person whenever new technology comes out you like to be right

4   in on that.  Give us examples.

5          PANEL MEMBER FAJARDO:  My son is into the X Box and

6   stuff like that.

7          THE COURT:  Do you play?

8          PANEL MEMBER FAJARDO:  I don't.  He does.

9          THE COURT:  I didn't know if you were interested in

10  Madden, or NBA, or whatever.

11     What do you like to do for fun?

12         PANEL MEMBER FAJARDO:  Play golf.

13         THE COURT:  How long have you played?

14         PANEL MEMBER FAJARDO:  I play when I can.  We have a

15  tournament the 22nd hopefully.

16         THE COURT:  Very good.  Where is the tournament being

17  held?

18         PANEL MEMBER FAJARDO:  I'm not sure yet.

19         THE COURT:  What is your favorite course you ever

20  played?

21         PANEL MEMBER FAJARDO:  I like the Waco course,

22  Cottonwood.

23         THE COURT:  Have you ever been a party to a lawsuit

24  other than family law?

25         PANEL MEMBER FAJARDO:  Yes; civil suit.

1           THE COURT:  You were a party to a lawsuit?

2           PANEL MEMBER FAJARDO:  No.  I was on the jury.

3           THE COURT:  It is what I thought.  You said no, you

4   had not been a party on your questionnaire.  I was clarifying.

5           PANEL MEMBER FAJARDO:  Sorry.

6           THE COURT:  Let's talk about that jury service.  Civil

7   case, was it here in McLennan County?

8           PANEL MEMBER FAJARDO:  Yes.

9           THE COURT:  Was it state court or federal court?  In

10  this building or the other?

11          PANEL MEMBER FAJARDO:  The other courthouse.

12          THE COURT:  What type of case was it?  What was it

13  about?

14          PANEL MEMBER FAJARDO:  I don't recall.  It has been a

15  while.  I don't recall.

16          THE COURT:  Fair enough.  Were you able to reach a

17  verdict in the case?  Don't tell me what it was.

18          PANEL MEMBER FAJARDO:  Yes.

19          THE COURT:  Were you, by chance, the foreperson?

20          PANEL MEMBER FAJARDO:  No.

21          THE COURT:  Have you ever worked for the government?

22          PANEL MEMBER FAJARDO:  The Exchange service.

23          THE COURT:  What do you do for AEFIS?

24          PANEL MEMBER FAJARDO:  Loaded trailers and worked in

25  the shipping and receiving.

1          THE COURT:  Any engineering experience or training?

2          PANEL MEMBER FAJARDO:  No.

3          THE COURT:  Other than just general knowledge, any

4    familiarity with how the patent system works?

5          PANEL MEMBER FAJARDO:  No.

6          THE COURT:  Mr. Barr?

7          MR. BARR:  Mr. Fajardo, are you interested in

8    computers?

9          PANEL MEMBER FAJARDO:  I work with computers daily.

10          MR. BARR:  You use them in your job?

11          PANEL MEMBER FAJARDO:  Yes.

12          MR. BARR:  What type of work?

13          PANEL MEMBER FAJARDO:  Charting PCC, point and click

14    care is what we use for the residents.

15          MR. BARR:  You mentioned your educational background

16    you have post college.  What is your post college degree?

17          PANEL MEMBER FAJARDO:  Just Associate's.

18          MR. BARR:  You were talking about your medical

19    training?

20          PANEL MEMBER FAJARDO:  Right.

21          MR. BARR:  At Walmart, did you ever work with any

22    point-of-sale systems like we are talking about in this case,

23    the card readers and iPads to do transactions or working in the

24    back?

25          PANEL MEMBER FAJARDO:  Just the scanning.

```
1              MR. BARR:  Like boxes?

2              PANEL MEMBER FAJARDO:  Yes.

3              MR. BARR:  Thank you.

4              THE COURT:  Mr. Baker?

5              MR. BAKER:  Where did you work before Hewitt?

6              PANEL MEMBER FAJARDO:  Richcrest Retirement Center.

7              MR. BAKER:  How long did you work there?

8              PANEL MEMBER FAJARDO:  About seven years.

9              MR. BAKER:  Were you doing similar things?

10             PANEL MEMBER FAJARDO:  Same thing.

11             MR. BAKER:  I think on your form you said your spouse

12   teaches?

13             PANEL MEMBER FAJARDO:  Yes.  She is a teacher at

14   Spring Valley Elementary; kindergarten teacher.

15             MR. BAKER:  Thank you.

16             THE COURT:  Thank you very much, Mr. Fajardo.  I will

17   let you return to the jury assembly room.

18        We'll see Tracy Martin.  Good morning, Professor.  Welcome.

19   How are you?

20             PANEL MEMBER MARTIN:  Doing well.

21             THE COURT:  You may keep the mask on or take it off,

22   however you prefer.  Tell us what you teach at CTC?

23             PANEL MEMBER MARTIN:  I teach computer science

24   courses.

25             THE COURT:  That's why you answered you were familiar
```

1   with computer programming?

2           PANEL MEMBER MARTIN:  Yes.

3           THE COURT:  Even a non-rocket scientist can figure

4   that out.

5       How long have you been in the field?

6           PANEL MEMBER MARTIN:  I taught about six years, and

7   prior to that I worked for the University of Baylor in the IT

8   department 11.5 years.

9           THE COURT:  What is your undergraduate degree and

10  where you achieved it?

11          PANEL MEMBER MARTIN:  Temple College for computer

12  programming.

13          THE COURT:  Any postgraduate training and studying?

14          PANEL MEMBER MARTIN:  I graduated from UMHB with a

15  Bachelor's and Master's.

16          THE COURT:  What was the Master's in?

17          PANEL MEMBER MARTIN:  Information systems.

18          THE COURT:  Did you have to write a Master's thesis?

19          PANEL MEMBER MARTIN:  No.  We did a project.

20          THE COURT:  What was the project?

21          PANEL MEMBER MARTIN:  We created a program for a

22  bakery out of Dallas.  We were partners, and so we had to

23  create a program for her bakery and how she could take all of

24  her ingredients, and put it into the program, and if she took a

25  cup out, what was left.  We had to create a program that kind

```
 1   of --
 2           THE COURT:  Like inventory management?
 3           PANEL MEMBER MARTIN:  Yes.  It was on ingredients.
 4           THE COURT:  Interesting.  What are the classes you
 5   teach at CTC?
 6           PANEL MEMBER MARTIN:  I teach business computers.  It
 7   is like a basic course with Word, PowerPoint XL, the basic one.
 8   I also teach a computer concepts course.  I teach networking.
 9   I teach virtualization.  I had a couple of more.  Security and
10   mostly networking is kind of my specialty.
11           THE COURT:  Can you write and create software?
12           PANEL MEMBER MARTIN:  I probably could.  I just don't.
13   Programming is not my actual forte.  I prefer to do the actual
14   networking portion of it.
15           THE COURT:  What about your knowledge of computer
16   hardware?  Can you take one down and build it back?
17           PANEL MEMBER MARTIN:  It is one of the courses I
18   teach.  I forgot that one.
19           THE COURT:  Other than family law, have you ever been
20   a party to a lawsuit?
21           PANEL MEMBER MARTIN:  No.
22           THE COURT:  Do you have any legal training?
23           PANEL MEMBER MARTIN:  No.
24           THE COURT:  Have you ever served in the military?
25           PANEL MEMBER MARTIN:  No.
```

1          THE COURT:  Have you ever worked for the United States
2  government?
3          PANEL MEMBER MARTIN:  No.
4          THE COURT:  Any engineering experience or training?
5          PANEL MEMBER MARTIN:  No.
6          THE COURT:  Any familiarity with how the patent system
7  works?
8          PANEL MEMBER MARTIN:  No.
9          THE COURT:  Have you ever known anyone who applied for
10  a patent?
11          PANEL MEMBER MARTIN:  No.
12          THE COURT:  Have you ever applied for a patent?
13          PANEL MEMBER MARTIN:  I have not.
14          THE COURT:  Some of your answers make sense now.  You
15  being one of the people who really likes to dive into new
16  technology.  I get that now.  I see all of the IT training that
17  all makes sense.
18      What do you like to do when not fiddling around with
19  computers and teaching?  What are your hobbies and interests?
20          PANEL MEMBER MARTIN:  I have grandchildren.  I love
21  being around my children and grandchildren.  I like to party
22  plan.  I do that kind of party planning where everything that
23  goes together with that where you do from the beginning all the
24  way down to the actual setup and doing all the fun things.
25          THE COURT:  Kind of a sideline.  Do you do it as a

```
 1    business?
 2             PANEL MEMBER MARTIN:  No.  My niece actually has a
 3    business.  I just kind of help her out sometimes.
 4             THE COURT:  Very good.
 5        Mr. Barr?
 6             MR. BARR:  It sounds like you're more than a
 7    professor.  It sounds like you're the entire department over
 8    there at the college?
 9             PANEL MEMBER MARTIN:  Not necessarily.
10             MR. BARR:  In your extensive computer experience, have
11    you done much with the cloud computing?
12             PANEL MEMBER MARTIN:  Yes
13             MR. BARR:  Do you teach a course on that?
14             PANEL MEMBER MARTIN:  We don't have a specific one
15    course.  We touch on it in a lot of other courses.
16             MR. BARR:  On the bakery program that you worked on
17    with your team, did you guys try to get a copyright to protect
18    the program you created?
19             PANEL MEMBER MARTIN:  No.
20             MR. BARR:  Do you teach any courses that deal with
21    point-of-sale systems or the type of software you used in those
22    systems?
23             PANEL MEMBER MARTIN:  I do not.
24             MR. BARR:  Thank you.
25             THE COURT:  Mr. Baker?
```

1          MR. BAKER:  No questions.

2          THE COURT:  Thank you, Professor.  I will let you

3    return to the jury assembly room.

4       Counsel, we have seven on the jury.  We have four strikes.

5    It is 15 people.  We have interviewed 16 people giving us a

6    little cushion of one.

7       Do we need to continue interviewing at this point?  Should

8    we wait to see how it plays out after any challenges for cause

9    or what is your request?  I will give you a few seconds to

10   caucus.

11      From the Plaintiff?

12         MR. BARR:  The Plaintiff will take the Court's

13   suggestion, and we are fine with we got the number of people.

14         THE COURT:  Does the Plaintiff have challenges for

15   cause?

16         MR. BARR:  We don't.

17         THE COURT:  From the Defense?

18         MR. BAKER:  We would like to interview one more

19   because we believe we're going to have one challenge for cause.

20         THE COURT:  If you have a challenge for cause, it

21   still leaves 15 people.  It is why I chose 16.  You really

22   would not need to interview anyone else.  Seven will be on the

23   jury.  There is no double strikes.  It is 15.

24         MR. BAKER:  No. 6 is already out.

25         THE COURT:  You're right.  Sorry, my bad math.  Good

1    catch.  We will do one more.  Kimberly Mer.  Thank you for the

2    catch.  It wears down on you a little as you continue to have

3    the same conversation.

4        Good morning, Professor.

5            PANEL MEMBER MER:  Good morning.

6            THE COURT:  How are you?

7            PANEL MEMBER MER:  Well.

8            THE COURT:  Tell us what you teach over at Baylor?

9            PANEL MEMBER MER:  Professor in the Christian Studies

10   Department.

11           THE COURT:  How long have you been in that role?

12           PANEL MEMBER MER:  Four years.

13           THE COURT:  What is your educational background from

14   undergrad?  What is your focus and postgraduate?

15           PANEL MEMBER MER:  I have undergraduate degree from

16   Simmons University in Biblical Studies and Biblical Languages,

17   and I did a Master's at Duke University in Sociology, and Ph.D

18   at Baylor in Religion.

19           THE COURT:  What is your subspecialty and your thesis

20   for your doctorate?

21           PANEL MEMBER MER:  My subspecialty is Old Testament.

22   I did a dissertation on Psalms 120 to 137 for those who are

23   interested.

24           THE COURT:  What classes do you teach?

25           PANEL MEMBER MER:  I teach a research and writing

1   class, and I teach every semester every student at UMHB takes

2   Old and New Testament.  I teach Old Testament to every student

3   that comes through, and I teach specialty upper level classes

4   in Hebrew bible and Hebrew.

5           THE COURT:  Which languages are you proficient in

6   reading and interpreting?

7           PANEL MEMBER MER:  Hebrew primarily, and also done

8   Greek, and some ancient languages.

9           THE COURT:  Very good.

10      Other than family law, have you ever been a party to a

11   lawsuit?

12          PANEL MEMBER MER:  I have not.

13          THE COURT:  Do you have any legal training?

14          PANEL MEMBER MER:  I do not.  I am around a lot of

15   lawyers.  My family has a lot of attorneys.  I am the black

16   sheep.

17          THE COURT:  Anything about having lots of attorneys in

18   the family that cause you not to be fair and impartial here?

19          PANEL MEMBER MER:  I don't believe so.

20          THE COURT:  What law firms, if any, do your family

21   members work for?

22          PANEL MEMBER MER:  My sister works for 7-11 as

23   corporate counsel, and my dad is retired; county attorney.

24          THE COURT:  County attorney?

25          PANEL MEMBER MER:  Yes.

```
 1                THE COURT:  Have you ever served in the military?

 2                PANEL MEMBER MER:  No.

 3                THE COURT:  Ever worked for the government?

 4                PANEL MEMBER MER:  No.

 5                THE COURT:  I see you served on a criminal jury

 6     before?

 7                PANEL MEMBER MER:  Yes.

 8                THE COURT:  Where?

 9                PANEL MEMBER MER:  Comanche County.

10                THE COURT:  How long ago?

11                PANEL MEMBER MER:  I was 19 or 20 years old; 15 years

12     ago.

13                THE COURT:  Were you, by chance, the foreperson?

14                PANEL MEMBER MER:  No.

15                THE COURT:  Were you able to reach a verdict?

16                PANEL MEMBER MER:  Yes.

17                THE COURT:  Any engineering experience or training?

18                PANEL MEMBER MER:  No.

19                THE COURT:  Other than general knowledge, any

20     familiarity with patents?

21                PANEL MEMBER MER:  No.

22                THE COURT:  Know anyone that ever applied for a

23     patent?

24                PANEL MEMBER MER:  No.

25                THE COURT:  Know anyone that has ever been involved in
```

1    a dispute about a patent?

2            PANEL MEMBER MER:  No.

3            THE COURT:  What do you like to do when not teaching,

4    and working, and all of that; hobbies and interests?

5            PANEL MEMBER MER:  I have not had a lot of free time

6    this year.  I have been juggling kids and work at the same time

7    and childcare.

8            THE COURT:  When you did?

9            PANEL MEMBER MER:  When I did, I exercise, and would

10   take walks, and go to the park together, and reading, and

11   watching television together.

12           THE COURT:  What is your favorite show you binged

13   during COVID?

14           PANEL MEMBER MER:  Always go back to The Office.

15           THE COURT:  You can't go wrong with that.  What was

16   the last book you read?

17           PANEL MEMBER MER:  Just started and brought it with

18   me.  The Gilead by Marilyn Robinson; fiction.

19           THE COURT:  Very good.

20      Mr. Barr?

21           MR. BARR:  I see when you mentioned childcare, you

22   have small children, four months and five years.

23      Would that be trouble for you if you are on the jury for a

24   week you had the small children at home?

25           PANEL MEMBER MER:  I have some part-time help about 15

 1    hours a week.  Me and my husband can juggle working from home

 2    with part-time help.  We bring my parents in.  It would be

 3    stressful but manageable.

 4            MR. BARR:  You also mentioned you had lawyers in the

 5    family, and your sister works in-house with a large company.

 6        Would the fact our clients have filed the lawsuit against a

 7    large company cause to you lean one way or the other in this

 8    case?

 9            PANEL MEMBER MER:  I don't believe so.

10            MR. BARR:  Thank you.

11            THE COURT:  Mr. Baker?

12            MR. BAKER:  Your husband is seminary staff?

13            PANEL MEMBER MER:  Yes.

14            MR. BAKER:  Where is that?

15            PANEL MEMBER MER:  Truitt Seminary here in Baylor.

16            MR. BAKER:  No further questions.

17            THE COURT:  Thank you very much, Doctor.  I will let

18    you return to the jury assembly room.

19        That should give us, I believe, sufficient people.  Let me

20    ask the Plaintiff again, are there any challenges for cause?

21            MR. BARR:  No, Your Honor.

22            THE COURT:  Does the Defense have any challenges for

23    cause?

24            MR. BAKER:  Yes, Your Honor, No. 2.

25            THE COURT:  Would you like to present argument?  Is it

1    opposed?

2              MR. BARR:  Yes, Your Honor.

3              THE COURT:  You might present the argument, and I will

4    hear from the Plaintiff and rule.

5              MR. BAKER:  Your Honor, two main issues she said on

6    the record.  She slightly leans towards the Plaintiff.  When I

7    questioned her about if she could be fair and impartial, she

8    said I believe so.  When I continued questioning that kind of

9    fell apart, and we don't think she can be fair and impartial

10   and that she favors the other side.

11             THE COURT:  Mr. Barr?

12             MR. BARR:  We disagree.  We think Ms. Drozd, the Court

13   questioned her extensively about the issue.  She expressed

14   several times she would follow the law and the Court's

15   instructions in following the law.  She indicated she took jury

16   service as a citizen very seriously, and she would follow the

17   law in this case.  We don't believe she should be struck for

18   cause.

19             THE COURT:  The challenge for cause will be sustained.

20   I agree with the Defense.  She was very much equivocating

21   throughout and indicated she did have the Plaintiff ahead, and

22   she certainly expressed a lot of empathy with respect to the

23   inventors.  It is granted and sustained.

24             MR. BAKER:  Thank you.

25             THE COURT:  I believe I indicated I will give you 15

1    minutes to caucus.  You will have until 12:10 to visit and turn

2    in your strikes to the clerks of court.

3         Is there any objection to the Court going and giving the

4    Panel an update and letting them know where we are?  I told

5    them noon.  I will let them know it is like 12:20.

6              MR. BARR:  No objection.

7              MR. BAKER:  No objection.

8              THE COURT:  Thank you very much.

9                        [Recess taken]

10             THE COURT:  Is the juror list in order?  Any

11   objections to the array as selected from the Plaintiff?

12             MR. BARR:  No objections.

13             THE COURT:  From the Defendant?

14             MR. BAKER:  No objections.

15             THE COURT:  Thank you very much.  Let's bring everyone

16   in, and we'll get started.

17        In the preliminary instructions, is there any need for me

18   to re-cover the instruction I read them about until the trial

19   is over to not discuss, don't discuss with other jurors?  You

20   want me to go over that again?  It is identical to what I read

21   earlier.

22             MR. BARR:  Plaintiff is fine with you skipping going

23   over it.

24             MR. BAKER:  Fine, Your Honor.

25             THE COURT:  Under A-2, I will take out the third,

1     fourth, and fifth paragraphs of A-2.

2                          [Jury panel enters]

3          THE COURT:  Ladies and Gentlemen, at this time I will

4     have the clerk of court call the names and juror numbers of

5     those selected to serve.

6          When your name is called, if you will come forward, and the

7     court security officer will direct you to the appropriate seat

8     in the jury box.

9          MS. MILLER:  Seat No. 1, Katelyn Smith, Juror No. 340;

10    Seat No. 2, Bryan Perkins, Juror No. 341; No. 3, Lynn Wright,

11    No. 366; Juror No. 4, Susan Borg, No. 374; Juror No. 5,

12    James Morris, Juror No. 349; Juror No. 6, Noe Rodriguez,

13    Juror No. 350; Juror 7, Fernando Fajardo, Juror No. 336.

14         THE COURT:  Thank you, Ms. Miller.

15         Ladies and Gentlemen, that 99.9% I referenced is 100% for

16    all of you.  You're free to go.  I said my parting words

17    previously.  Thank you for your service to the Court.

18         All rise for the Panel, please.

19                      [Excused Panel members exit]

20         THE COURT:  I will have the clerk of court give the

21    oath.

22         MS. MILLER:  Do you, and each of you, solemnly swear

23    in the case styled CloudofChange, LLC, versus NCR Corporation

24    now before the Court that you will a true verdict render

25    according to the law and the evidence so help you God?

```
1              JURY MEMBERS:  Yes [by all].

2              THE COURT:  You may be seated.

3       As I mentioned, once selected for the jury, I would have

4   some instructions that I need to share with you that will guide

5   your service as jurors in the case.  Then upon the conclusion

6   of my instructions, and these will take about 15 minutes

7   probably, upon the conclusion, you will retire probably back to

8   the jury room to watch the video that gives you a bigger

9   overview of the patent experience.  Once you have seen that,

10  Melissa will give you your final instructions, and you will be

11  free to go only to return on Monday.

12      Members of the Jury, you have now been sworn as the jury to

13  try this case.  As the judge, Judge Albright will decide all

14  questions of law and procedure.  As the jury, you are the

15  judges of the facts.  At the end of the trial, Judge Albright

16  will instruct you on the rules of law you must apply to the

17  facts as you find them.

18      You may take notes during the trial.  Do not allow your

19  note taking to distract you from listening to the testimony.

20  Your notes are an aid to your memory.  If your memory should

21  later be different from the notes, you should rely on the

22  memory.  Do not be unduly influenced by the notes of other

23  jurors.  A juror's notes are not entitled to any greater weight

24  than each juror's recollection of the testimony.

25      At times, there will be some issues of law and procedure
```

1    Judge Albright must decide and that the attorneys and he must

2    discuss.  Those issues are not part of what you must decide,

3    and they are not properly discussed in your presence.

4        To avoid having you leave the courtroom, and to save time,

5    he may discuss these issues with the attorneys at the bench out

6    of your hearing.  When he confers with the attorneys at the

7    bench, please do not listen to what is being discussed.  In

8    fact, there's a sound system that will play loud static that

9    can be very aggravating that you will hear during that so it

10   would be hard for you to listen even if you were so inclined.

11       If the discussions require more time, he may have you leave

12   the courtroom until he and the lawyers resolve the issues.  I

13   promise you he will try and keep these interruptions as few and

14   brief as possible.

15       On Monday, the trial will begin.  Lawyers for each side

16   will make opening statements.  Opening statements are intended

17   to assist you in understanding the significance of the evidence

18   that will be presented.  Opening statements are not evidence.

19       After the opening statements, the Plaintiff will present

20   its case through witness testimony and documentary or other

21   evidence.  Next, the Defendant will have the opportunity to

22   present its case.  The Plaintiff may then present rebuttal

23   evidence.

24       After all the evidence is introduced, Judge Albright will

25   instruct you on the law that applies to the case, and the

1    lawyers will make closing arguments.  Closing arguments are not

2    evidence but rather the attorneys interpretation of what the

3    evidence had shown or not shown.  Finally, you will go in the

4    jury assembly room to deliberate and reach a verdict.

5        Keep an open mind during the entire trial.  Do not decide

6    the case until you have heard all of the evidence, the closing

7    arguments, and Judge Albright's instructions.

8        What a patent is and how one is obtained.  This case

9    involves a dispute relating to United States patents.

10   Before summarizing the positions of the parties, and the issues

11   involved in the dispute, let me take a moment to explain what a

12   patent is and how one is obtained.

13       Patents are granted by the United States Patent & Trademark

14   Office sometimes called the PTO.  A valid United States patent

15   gives the patent holder the right for up to 20 years from the

16   date the patent application was filed to prevent others from

17   making, using, offering to sell, or selling the patented

18   invention within the United States or from importing it into

19   the United States without the patent holder's permission.

20       A violation of the patent holder's rights is called

21   infringement.  The patent holder may try to enforce a patent

22   against persons believed to be infringers by a lawsuit filed in

23   federal court.

24       The process of obtaining a patent is called patent

25   prosecution.  To obtain a patent, one must first file an

1    application with the PTO.  The PTO is an agency of the federal

2    government who employs trained examiners who review

3    applications for patents.

4        The application includes what is called a specification

5    which contains a written description of the claimed invention

6    telling what the invention is, how it works, how to make it,

7    and how to use it.  The specification concludes with one or

8    more numbered sentences.  These are the patent claims.

9        If a patent is eventually granted by the PTO, the claims

10   define the boundaries of its protection and give notice to the

11   public of those boundaries.

12       After the applicant files the application, an examiner

13   reviews the application to determine whether or not the claims

14   are patentable, meaning appropriate for patent protection, and

15   whether or not the specification adequately describes the

16   invention claimed.

17       In examining a patent application, the examiner reviews

18   certain information about the state of the technology at the

19   time the application was filed.  The PTO searches for and

20   reviews information that is publicly available or that is

21   submitted by the applicant.  This information is called

22   prior art.  The examiner reviews this prior art to determine

23   whether or not the invention is truly an advance over the state

24   of the art at the time.  Prior art is defined by law.

25   Judge Albright will give you at a later time during these

1   instructions specific instructions as to what constitutes

2   prior art.

3        However, in general, prior art includes information that

4   demonstrates the state of technology that existed before the

5   claimed invention was made or before the application was filed.

6   A patent lists the prior art that the examiner considered.

7   This list is called cited references.

8        After the prior art search and examination of the

9   application, the examiner informs the applicant in writing of

10  what the examiner has found and whether the examiner considers

11  any claim to be patentable and thus would be allowed.   This

12  writing from the officer examiner is called an office action.

13       If the examiner rejects the claim, the applicant has an

14  opportunity to respond to the examiner to try to persuade the

15  examiner to allow the claims and to change the claims or to

16  submit new claims.   This process may go back and forth for some

17  time until the examiner is satisfied that the application meets

18  the requirements for a patent and the application issues as a

19  patent or that the application should be rejected and no patent

20  should issue.

21       Sometimes patents are issued after appeals within the PTO

22  or to a court.   The papers generated during the communications

23  between the examiner and the applicant are called the

24  prosecution history.   The fact that the PTO grants a patent

25  does not necessarily mean that any invention claimed in the

1    patent, in fact, deserves the protection of a patent.

2        For example, the PTO may not have had available to it all

3    other prior art that will be presented to you.

4        In addition, there is the possibility that mistakes were

5    made or that information was overlooked.  Examiners have a lot

6    of work to do, and no process is perfect.

7        Also, unlike a court proceeding, patent prosecution takes

8    place without input from those later alleged to infringe the

9    patent.

10       A person accused of infringement has the right to argue

11   here in federal court that a claimed invention in the patent is

12   invalid because it does not meet the requirements for a patent.

13   It is your job to consider the evidence presented by the

14   parties and determine independently whether or not NCR has

15   proven that the patent is invalid.

16       To help you follow the evidence, I will now give you a

17   summary of the positions of the parties.  The parties in this

18   case are CloudofChange, LLC, and NCR Corporation.  The case

19   involves two United States patents, United States Patent

20   Nos. 9,400,640 and 10,083,012, obtained by the inventors,

21   Wayne Baratta and Quentin Olson and transferred by

22   Wayne Baratta and Quentin Olson to CloudofChange.

23       For your convenience, the parties and the Court will often

24   refer to United States Patent No. 9,400,640 by the last three

25   numbers of the patent number, namely as the '640 patent, and

1    similarly for United States Patent 10,083,012 as the '012

2    patent.  I will collectively refer to these, or Judge Albright

3    will, as the asserted patents or the patents in suit.

4        CloudofChange filed suit in this Court seeking money

5    damages from NCR for allegedly infringing the '640 patent and

6    the '012 patent by making, using, selling, and offering for

7    sale in the United States certain software and hardware systems

8    of NCR that CloudofChange argues are covered by Claims 1, 3, 4,

9    5, 6, 11, 12, and 13 of the '640 patent, and Claims 1 through 4

10   and 9 of the '012 patent.  All of these claims are sometimes

11   referred to as the asserted claims.  The products that are

12   alleged to infringe are the NCR's Silver point-of-sale software

13   and hardware system.

14       NCR denies it has infringed the asserted patents and

15   claims.  NCR also argues that the asserted claims are invalid.

16       Judge Albright will instruct you later as to the ways in

17   which a patent may be invalid.  In general, however, a patent

18   is invalid if it is not new or it is obvious in view of the

19   state of the art at the relevant time.

20       Your job will be to decide whether or not the asserted

21   claims have been infringed and whether or not the claims are

22   invalid.  If you decide that any claim of the '640 patent, or

23   the '012 patent, has been infringed and is not invalid, you

24   will then need to decide any money damages to be awarded to

25   CloudofChange to compensate it for the infringement.

1     You will also need to make a finding as to whether the

2   infringement was willful.  If you decide any infringement was

3   willful, that decision should not affect any damage awards you

4   give.  Judge Albright will take willfulness into account later.

5     Judge Albright has already determined the meaning of the

6   claims of the '640 patent and the '012 patent.  You will be

7   given a document reflecting the meanings.  For a claim term for

8   which he has not provided you with a definition, you should

9   apply the ordinary meaning of the term in the field of the

10  patent.  You are to apply Judge Albright's definition of the

11  terms he has constructed through this case.

12    However, his interpretation of the language of the claims

13  should not be taken as an indication he has a view regarding

14  issues such as infringement and invalidity.  These issues are

15  yours to decide.  He will provide you with more detailed

16  instructions on the meaning of the claims before you retire to

17  deliberate your verdict.

18    I will now talk a little bit about the applicable law.  The

19  first issue you will be asked to decide is whether or not NCR

20  has infringed the claims of the '640 patent or the '012 patent.

21    Infringement is assessed on a claim by claim basis.

22  Therefore, there may be infringement as to one claim but not

23  infringement as to another.

24    To show infringement of a patent claim, CloudofChange must

25  show by a preponderance of the evidence that NCR's products

1    include each and every element in the patent claim.  There are

2    a few different ways that a patent may be infringed.

3    Judge Albright will explain the requirements for each of these

4    types of infringement throughout the jury instructions.

5        In general, NCR may infringe the '640 patent, or the '012

6    patent, by making, using, selling, or offering for sale in the

7    United States, or by importing into the United States a system

8    meeting all the requirements of an asserted claim of the '640

9    patent or the '012 patent.

10       Another issue you will be asked to decide is whether the

11   asserted patents at issue are invalid.  A patent may be invalid

12   for a number of reasons including because the claimed subject

13   matter is not new or is obvious.  For a claim to be invalid

14   because it is not new, NCR must show by clear and convincing

15   evidence that all of the elements of the claim are present in a

16   single previous device, or method, or sufficiently described in

17   a single previous printed publication or patent.  We call these

18   prior art.  If the claim is not new, it is said to be

19   anticipated.

20       Another way that a claim may be invalid is it may have been

21   obvious.  Even though every element of the claim is not shown,

22   or sufficiently described, in a single piece of prior art, the

23   claim may still be invalid if it is shown by clear and

24   convincing evidence that it would have been obvious to a person

25   of ordinary skill in the field of technology of the patent at

1    the relevant time.

2         You will need to consider a number of questions in deciding

3    whether the inventions claimed in the asserted patents are

4    obvious.  Judge Albright will provide you detailed instructions

5    on these questions at the conclusion of the case.

6         If you decide that any claim of the '640 patent, or '012

7    patent, has been infringed, you will then need to decide any

8    money damages to be awarded to CloudofChange to compensate it

9    for the infringement.  A damages awarded should put

10   CloudofChange in approximately the same financial position that

11   it would have been had the infringement not occurred.  In no

12   event would the damage awards be less than what CloudofChange

13   would have received had it been paid a reasonable royalty.

14   Judge Albright will instruct you later on the meaning of a

15   reasonable royalty.

16        The damages you award are meant to compensate CloudofChange

17   and not to punish NCR.  You may not include in your award any

18   additional amount as a fine, or penalty, in order to punish

19   NCR.  Judge Albright will give you more detailed instructions

20   on the calculation of damages at the conclusion of the case.

21        There are two standards of proof you will apply to the

22   evidence depending on the issue you're deciding.  On some

23   issues, you must decide whether certain facts have been proven

24   by a preponderance of the evidence.  A preponderance of the

25   evidence means that the fact that is to be proven is more

1   likely true than not, that is that the evidence in favor of

2   that fact being true is sufficient to tip the scale, even if

3   slightly, in its favor.

4      On other issues Judge Albright will identify for you, you

5   must use a higher standard in deciding whether the fact was

6   proven by clear and convincing evidence, that is, that you have

7   been left with a clear conviction that the fact has been

8   proven.  These standards are different from what you may have

9   heard about in criminal proceedings where a fact must be proven

10  beyond a reasonable doubt.

11     On a scale of these various standards of proof as you move

12  from preponderance of the evidence where the proof need only be

13  sufficient to tip the scales in favor of the party proving the

14  fact to beyond a reasonable doubt where the fact must be proven

15  to a very high degree of certainty, you may think of clear and

16  convincing evidence as being between the two standards.

17     After the opening statements, CloudofChange will present

18  its evidence in support of the contention that the asserted

19  claims of the '640 patent and the asserted claims of the '012

20  patent have been, and continue to be, infringed by NCR and that

21  the infringement has been, and continues to be, willful.

22     To prove infringement of any claim, CloudofChange must

23  persuade you it is more likely than not that NCR has infringed

24  that claim.  To persuade you that any infringement was willful,

25  CloudofChange must also prove it is more likely than not that

1    the infringement was willful.

2        NCR will then present its evidence that the asserted claims

3    of the '640 patent and the '012 patent are invalid.  To prove

4    invalidity of any claim, NCR must persuade you by clear and

5    convincing evidence that the claim is invalid.

6        In addition to presenting its evidence of invalidity, NCR

7    will put on evidence responding to CloudofChange's evidence of

8    infringement and willfulness.  CloudofChange may then put on

9    additional evidence responding to NCR's evidence that the

10   claims of the '640 patent and '012 patent are invalid and offer

11   any additional evidence of infringement and willfulness.  This

12   is referred to as rebuttal evidence.  CloudofChange's rebuttal

13   evidence may respond to any evidence offered by NCR.

14       Finally, NCR may have the option to put on its rebuttal

15   evidence to support its contentions as to the validity of the

16   asserted claims of the '640 patent, or the '012 patent, by

17   responding to any evidence offered by CloudofChange on that

18   issue.

19       During the presentation of the evidence, the attorneys will

20   be allowed brief opportunities to explain what they believe the

21   evidence has shown or what they believe upcoming evidence will

22   show.  The attorneys comments, again, are not evidence and are

23   being allowed to comment solely for the purpose of helping you

24   understand the evidence.

25       After the evidence has been presented, the attorneys will

1   make closing arguments, and I will give you final instructions

2   on the law that applies to the case.  These closing arguments

3   by the attorneys are also not evidence.

4       After the closing arguments and instructions, you will then

5   decide the case.

6       That concludes the reading of the preliminary instructions;

7   very attentive group.  I appreciate that as do the attorneys.

8       I am now going to excuse you to watch the patent video,

9   about 20 minutes long.  Once you're done with that, you will

10  receive further reporting instructions on when to come back on

11  Monday.

12      Again, if at any time you need a break, Judge Albright is

13  great at giving breaks.  Raise your hand and say Judge, I need

14  a brief comfort break.  Your comfort is what is important to us

15  and the attorneys.  We want you focused on what is happening

16  here in the witness box.

17      All rise for the jury, please.

18                          [Jury exits]

19          THE COURT:  Anything for the Plaintiff?

20          MR. BARR:  No, Your Honor.

21          THE COURT:  From the Defendant?

22          MR. BAKER:  No, Your Honor.

23          THE COURT:  Counsel, and others, it has been a

24  pleasure working with you this morning.  I wish you both the

25  best.  Anything else I can do, let me know.  I think it went

1    smoothly, and we stayed on track.

2            MR. BARR:  Sorry, I forgot to mention, we have the

3    jury notebooks the parties had agreed upon.  Leave those here?

4            MR. BAKER:  They are already here.

5            MR. BARR:  Sorry, false alarm.

6            THE COURT:  Relax and get ready for Monday.  Have the

7    best weekend you can.  I know it will be busy.  I bet mine is

8    better.

9        Take care, and thank you.

10

11                              *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATION
                            _____
 2

 3        I certify that the foregoing is a correct transcript from

 4   the record of proceedings in the above-entitled matter.  I

 5   further certify that the transcript fees and format comply with

 6   those prescribed by the Court and the Judicial Conference of

 7   the United States.

 8

 9   Date:  May 13, 2021

10                                    /s/ Walter A. Chiriboga, Jr.
                                      _____
11                                    Walter A. Chiriboga, Jr.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```