# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

CloudofChange, LLC,

      *Plaintiff*,

              v.

NCR Corporation,

      *Defendant*.

Case No. 6:19-CV-00513-ADA

## PLAINTIFF'S RESPONSE IN OPPOSITION TO NCR'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR ALTERNATIVELY, FOR A NEW TRIAL

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   LEGAL STANDARD........................................................................................... 1

III.  ARGUMENT ....................................................................................................... 2

    A.   Substantial Evidence Supports NCR's Infringement ...................................... 2

        1.   The Jury was not erroneously instructed ................................................... 2

        2.   CoC produced sufficient evidence that NCR controls and benefits from the entire NCR Silver system........................................................................... 4

    B.   CoC Produced Sufficient Evidence to Show NCR Infringes ........................... 4

        1.   The Jury's finding that NCR meets the "internet connection" limitation is supported by legally sufficient evidence ................................................... 4

        2.   The Jury's finding that NCR meets the "network" or "network access" limitation is supported by legally sufficient evidence................................ 7

        3.   The Jury's finding that NCR meets the "PC workstation" limitation is supported by legally sufficient evidence ................................................... 8

        4.   The Jury's finding that NCR meets the "POS terminal" limitation is supported by legally sufficient evidence ................................................... 9

        5.   The Jury's finding that NCR meets the "POS builder" limitation is supported by legally sufficient evidence ................................................. 10

        6.   The Jury's finding that NCR Silver is "installed" on / "runs on" and "interacts with" a "web server" is supported by legally sufficient evidence ................................................... 13

    C.   NCR Failed to Prove Its Invalidity Case with Evidence that the Jury Would Not be at Liberty to Disbelieve........................................................................... 14

        1.   NCR's expert admitted each of Woycik and Brown fail to teach claim elements ..... 14

        2.   NCR failed to offer any evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references ................... 14

    D.   The Jury's Willfulness Finding is Supported by Sufficient Evidence ........... 16

    E.   The Jury's Damages Award is Supported by Sufficient Evidence ................ 18

IV.   CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Bayer Healthcare LLC v. Baxalta Inc.*,
    989 F.3d 964 (Fed. Cir. Mar. 1, 2021)................................................................... 16

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys.*,
    809 F.3d 1295 (Fed. Cir. 2015)........................................................................... 19

*Datatreasury Corp. v. Wells Fargo & Co.*,
    758 F. Supp. 2d 382 (E.D. Tex. 2010) .................................................................. 1

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
    2017 WL 2190055 (E.D. Tex. May 18, 2017)................................................... 16

*Graham v. John Deere Co. of Kansas City*,
    383 U.S. 1 (1966)............................................................................................... 15

*In re Magnum Oil Tools Int'l, Ltd.*,
    829 F.3d 1364 (Fed. Cir. 2016)........................................................................... 15

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012)..................................................................... 14, 15

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
    381 F.3d 1142 (Fed. Cir. 2004)........................................................................... 12

*Laxton v. Gap Inc.*,
    333 F.3d 572 (5th Cir. 2003) ............................................................................. 15

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
    244 F.3d 1365 (Fed. Cir. 2001)..................................................................... 1, 16

*Taylor-Travis v. Jackson State Univ.*,
    984 F.3d 1107 (5th Cir. 2021) .............................................................................. 1

*Whitehead v. Food Max of Miss., Inc.*,
    163 F.3d 265 (5th Cir. 1998) ............................................................................... 1

## I.    INTRODUCTION

On May 20, 2021, after 3 days of trial, the Jury returned a unanimous verdict in favor of CoC, finding that NCR willfully infringed both the '640 and '012 Patents, finding both patents not invalid, and awarding $13,200,000.00 in damages to CoC.  Dkt. 159.   The Court entered a judgment consistent with the Jury's findings on July 15, 2021.  *See* Dkt. 188.  NCR asks this Court to set aside the Jury's verdict, which was supported by legally sufficient evidence, and enter judgment as a matter of law or order a new trial based on NCR's rehashed trial arguments that the Jury heard and rejected, or based on new arguments that NCR did not make at trial.  The Court should deny NCR's Motion in its entirety.  *See* Dkt. 194.

## II.    LEGAL STANDARD

On a motion for judgment as a matter of law, "a 'court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'"  *Taylor-Travis v. Jackson State Univ*., 984 F.3d 1107, 1112 (5th Cir. 2021).  Likewise, "[t]he court 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'"  *Id*.  "Courts grant JMOL for the party bearing the burden of proof only in extreme cases, when the party bearing the burden of proof has established its case by evidence that the jury would not be at liberty to disbelieve and the only reasonable conclusion is in its favor."  *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1375 (Fed. Cir. 2001).

Similarly, Rule 59(a) of the Federal Rules of Civil Procedure allows a court to order a new trial only "where the jury's verdict is 'against the great weight of the evidence' or will result in a 'miscarriage of justice.'"  *Datatreasury Corp. v. Wells Fargo & Co.*, 758 F. Supp. 2d 382, 385 (E.D. Tex. 2010); *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998) (courts "should not grant a new trial on evidentiary grounds unless the verdict is against the great weight

1

of the evidence.").  As set forth herein, the Jury's verdict is supported by the substantial evidence presented at trial and neither judgment as a matter of law nor a new trial is warranted.

## III.    ARGUMENT

### A.    Substantial Evidence Supports NCR's Infringement

There is no dispute that NCR's customers use the NCR Silver system.  Dkt. 194, p. 3. However, NCR seizes on the use of the system by its customers to set up a straw man indirect infringement argument that CoC never made at trial.  CoC proved direct infringement based on use of the accused system by NCR and accordingly never asserted indirect infringement.  NCR's implication to the contrary is not supported by the facts or the law.  NCR's allegation that it does not "use" the system because it does not meet the claim limitations are contrary to the evidence at trial.

In its brief, NCR rehashes arguments rejected by the jury and offers new arguments not presented at trial that it is the customers of NCR that are using the system and not NCR.  The infringing use of the NCR Silver system by NCR's customers does not mean that NCR's own use of the Silver system does not also infringe.  Evidence at trial established NCR's own infringing "use" of the claimed system on two independently sufficient bases: 1) NCR "controls" and "obtains benefit" from every element of the NCR Silver system, which constitutes "use" under applicable law; and 2) NCR also itself "uses" each and every element of NCR Silver in connection with its own activities.  The Jury found direct infringement based on "use" by NCR in accordance with the Jury instructions and that verdict is supported by substantial evidence.

#### 1.    *The Jury was not erroneously instructed*

The Parties agree that "use" by NCR is established if NCR "control[s] the system and obtain[s] benefit from it."  *See* Dkt. 194, p. 2 (citing *Centillion*).  The Court correctly instructed the Jury, "[y]ou must compare the system with **each and every one of the requirements of a**

**claim** to determine whether or not all of the requirements of that claim have been met." Ex. 1, Trial Tr. 837:9-11 (emphasis added). The Court further instructed, "[i]f one party controls and makes beneficial use of a system that contains **all the requirements** of the claim, that party may be an infringer even though the parts of the system do not all operate in the same place or at the same time." Ex. 1, Trial Tr. 837:17-20 (emphasis added).

While NCR concedes that proof of control and benefit from the system constitutes "use" by NCR (*see* Dkt. 194, p. 2, citing *Centillion*), NCR contends that the jury instructions "misle[]d[] the jury to consider 'use' of the system from the perspective of an end-user (*e.g.*, merchant)." *Id.,* p. 4 (emphasis in original). NCR's argument is wrong.[1] Indeed, counsel for both sides emphasized in closing the requirement of proof that **NCR** "used"—*i.e.*, controlled or benefited from—every element of the claim.

During closing arguments, CoC's counsel stated:

> But specifically you should look at the instructions – I want to talk to you about the system instructions. This is -- NCR sells this as a system. And I expect that the defendant's are going to argue that it's not a system. They don't meet the system claim because we don't -- they don't supply **every part** of the system. That's not true…

Ex. 1, Trial Tr. 868:18-23 (emphasis added). NCR further emphasized the point:

> Finally, we heard a little bit about a while ago about how we don't meet the system claim limitation. And, again, they've got to prove, **it's their burden of proof that we supply all these things, that we control all these things**. And there's evidence after evidence after evidence.

Ex. 1, Trial Tr. 897:20-24 (emphasis added). NCR's request for a new trial should be denied, as the Court's Jury instruction, which was emphasized by counsels' closing arguments, was proper.

---

[1] Contrary to its earlier agreement that *Centillion* accurately provides that benefit and control constitute use, NCR later argues that "merely showing 'one party controls and makes beneficial use *of a system*'" is insufficient. *See* Dkt. 194, pp. 3-4. NCR cites no case for this legal proposition.

### 2. *CoC produced sufficient evidence that NCR controls and benefits from the entire NCR Silver system*

There was substantial evidence at trial that NCR controls and benefits from the entire NCR Silver system, thereby "using" the system under applicable law.  NCR's control was demonstrated by its Merchant Agreement (JTX-80), which places restrictions on the customers who desire to use NCR Silver.  *See also*, Ex. 1, Trial Tr. 469:19-22 (Crouse). Specifically, the Merchant Agreement requires customers to provide NCR access to their computer systems, requires that the customer provide Internet access, and requires that the customers provide the computer hardware necessary to operate the system, which hardware may be purchased from NCR.  Ex. 2, JTX-80, ¶¶ 8.1; 8.2.  NCR's benefit from the entire NCR Silver system was also established at trial.  It was not disputed that NCR charges its customers a monthly subscription fee to access NCR Silver that benefits NCR.  Specifically, NCR's Mr. Quinn testified:

> Q.  And NCR benefits from the sale of the entire NCR Silver Solution, which includes both the point-of-sale and the Back Office, right?
>
> A.  That's correct.

Ex. 1, Trial Tr. 167:11-14 (Quinn).  NCR further benefits, at least, from the following: product improvements through testing and evaluation of beta products by merchants (Ex. 2, JTX-80, ¶ 1.6); product ideas generated by merchants (*Id*., ¶ 1.7); use of transaction data from merchant sales (*Id*., ¶ 9.3); revenues from third party products or services (*Id*., ¶ 8.2); marketing rights associated with the merchant's use (*Id*., ¶ 15); and advertising (*Id*., ¶ 8.3).

## B. CoC Produced Sufficient Evidence to Show NCR Infringes

### 1. *The Jury's finding that NCR meets the "internet connection" limitation is supported by legally sufficient evidence*

#### a) *NCR controls and benefits from its customers' internet connection*

NCR cites only two brief snippets of testimony from CoC's expert, Mr. Crouse, in support

4

of its "internet connection" argument, neither of which contradict "use" by NCR. *See* Dkt. 194,

p. 5. Indeed, NCR's Director of Engineering, McGill Quinn testified at trial that NCR *requires* its

customers to provide internet access:

> Q. Would you agree that both the NCR Silver and the NCR Silver Pro are cloud-based solutions that consist of two applications, a point-of-sale and a Back Office?
>
> A. Correct.
>
> Q. Okay. And the way that the customer accesses the Back Office part is through a web browser, right?
>
> A. That's correct.
>
> …
>
> Q. So NCR requires its customers to provide Internet access in order to use the NCR Silver system, right?
>
> A. That's correct.
>
> Q. And is it true that merchants can enter their menu through the web? Is that right, sir?
>
> A. So -- yes.

Ex. 1, Trial Tr. 166:19-25, 177:2-178:11 (Quinn).  Mr. Quinn's testimony is consistent with the

NCR Silver Merchant Agreement (Ex. 2, JTX-80) with its customers, which provides:

8.    <u>Your Responsibilities</u>

8.1    You are responsible for installing and configuring, and using the Service, Software, and Hardware, including account set up and configuration settings (unless NCR provides remote support for any of the foregoing as part of your subscription to the Service), compliance with applicable laws and regulations, and establishing any payment processing or other services certified by NCR for use with the Service (including through NCR's wholly owned affiliate, Jetpay). You will provide NCR access to your network, system, data, and relevant information as reasonably required to perform the Service.  You acknowledge that NCR personnel may require, and you will provide, the ability to access and correct transaction or input data while the Service is being provided to you. NCR is not responsible for any damage caused by errors or omissions in any information, instructions, data or scripts you or a third party provides on your behalf in connection with the Service, or any actions NCR takes at your direction.

8.2  <mark>To use the Service, you must maintain Internet access at your own expense.</mark> NCR IS NOT RESPONSIBLE FOR AND DOES NOT WARRANT THE PERFORMANCE OF ANY INTERNET SERVICE OR OTHER PROVIDER OR ITS SERVICES, AND YOU AGREE THAT NCR HAS NO LIABILITY TO YOU FOR SUCH PERFORMANCE OR SERVICES.

Ex. 2, JTX-80, Paragraph 8.1, 8.2; *see also* Trial Tr. 177:11-18.

Substantial evidence at trial established that NCR controls and benefits from its Silver system, including the requirement that customers who use the system supply an internet connection and network access to do so. The Jury's conclusion should not be disregarded.

#### b)    *NCR's independent use of the internet connection*

There was also substantial evidence at trial that NCR **itself** also uses an "internet connection" to operate its own NCR Silver Back Office functionality.  For example, as NCR's Mr. Quinn testified, "[NCR] need[s] the Internet only when we want to have the reporting capability…if [he's] trying to keep records and keep track of those things, [he] would need the Internet to upload that data to the Back Office."  Ex. 1, Trial Tr. 230:6-12.

NCR's expert Dr. Chatterjee conceded,

Q. Okay. So this whole system doesn't operate unless you have the web server sitting there; is that correct?

A. The data entry -- as the system works right now, the data entry happens through the web server.

…

Q. And running reports and functionality, where I look at the transaction data, that also requires that web server, correct?

A. Running reports are done on the application server. The web server simply formats that on a web page and sends it back to you.

Q. So the Back Office software that's running on the Google hardware and software, in order to look at my reports of my transaction data, requires the web server you've put in your drawing here, yes, sir?

A. The web server makes it viewable on your browser. Yes.

6

Ex. 1, Trial Tr. 644:1-19[2]; *see also* 230:6-12 (Quinn: "we need the Internet only when we want to have the reporting capability"), 428:4-22 (Crouse explaining the system's need for the Internet in order to have transaction data show up in the Back Office). Certainly, legally sufficient evidence exists to support the Jury's finding that NCR meets the "internet connection" limitation.

> **2.**     ***The Jury's finding that NCR meets the "network" or "network access" limitation is supported by legally sufficient evidence***

Contrary to NCR's allegation in its brief, CoC did not rely solely on the testimony of Mr. Crouse to prove NCR meets the "network" or "network access" limitation. As set forth above, the Jury heard ample evidence that NCR requires its customers to provide network access via an internet connection, and that NCR itself uses an internet connection for its Back Office functionality. *Supra*, III.B.1 (citing JTX-80, and trial testimony of Quinn, Chatterjee, and Crouse).

The Jury also heard and saw substantial documentary evidence that "the hardware and software of the NCR Silver system can use HTTPS to communicate." Ex. 1, Trial Tr. 178:20-23; *see also* 179:3-17 (Quinn); Ex. 3, JTX-30, NCR Silver Training Video; *see also* JTX-23, JTX-70. The Jury saw screenshots of several NCR training videos, which confirmed the NCR Silver system uses the internet to communicate with HTTPS. *See* Ex. 1, Trial Tr. 201:7-18 (citing *e.g.*, JTX-23).

In addition, the Jury heard evidence that NCR sells Silver as a monthly subscription service that includes cloud-based services. *See* Ex. 1, Trial Tr. 165:8-11 (Quinn); 313:19-314:14 (Schoonover); 512:23-513:1 (Salters); 770:5-17 (Ikizler). For example, NCR's witnesses confirmed, "NCR Silver stores data in the cloud that is acquired in connection with transactions that are performed by its customers for NCR Silver." Ex. 1, Trial Tr. 254:24-255:2 (Schoonover). NCR supplies cloud services by purchasing third-party internet hosting platforms to be used by its

---

[2] Dr. Chatterjee attempted to distinguish an application server from a web server. The Jury was not required to believe Dr. Chatterjee. The verdict demonstrates that the Jury did not.

customers as part of the monthly subscription service with NCR. Specifically, JTX-89, the "Google Cloud Addendum" is an agreement "**between Google and NCR** for cloud hosting services." Ex. 1, Trial Tr. 282:17-22; 341:18-24 (Schoonover) (emphasis added). Not one witness testified that NCR customers have their own agreement with Google. Instead, NCR pays these hosting costs—$5.4M to Google in 2020, for example—"to run [NCR's] hosted solutions, and NCR Silver uses -- runs in the Google Cloud platform." Ex. 1, Trial Tr. 340:10-341:17 (Schoonover). These hosting services "benefit NCR Corporation." Ex. 1, Trial Tr. 363:20-24 (Schoonover). Accordingly, the evidence established that NCR both uses and benefits from the network and network access. The Jury's determination that NCR satisfies the network and network access claim limitations is supported by legally sufficient evidence.

### 3. The Jury's finding that NCR meets the "PC workstation" limitation is supported by legally sufficient evidence

The evidence at trial proved NCR meets the "PC workstation" limitation in at least two ways. NCR misconstrues both the law and the facts when it says that it "does not provide PC work-stations to any merchants." Dkt. 194, p. 5.[3] Whether or not NCR itself sells the PC workstation, as long as NCR controls and benefits from the system as discussed above, NCR "uses" the system and thereby infringes. In addition, also as discussed above, where NCR itself "uses" the system in connection with Back Office functions, NCR satisfies the PC workstation claim limitation. Contrary to NCR's argument in its brief, Mr. Crouse did not testify that he only leveraged his laptop as a PC workstation during his inspection at NCR. NCR ignores that Mr. Crouse further testified that "there was NCR hardware there set up as workstations, and [he]

---

[3] NCR's argument that because POS terminal and PC workstation are different terms they must be different structures is contrary to the law. *See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) (use of two terms in a claim requires only that the terms connote different meanings, not that the terms necessarily refer to two different structures).

was able to use those workstations that were set up to build screens." Ex. 1, Trial Tr. 388:9-23;

*see also* 388:24-389:7 (discussing Ex. 3, JTX-30 and the display of a web browser on a workstation

in the Back Office); 424:6-16 (discussing ability to see built screens on workstation).

Contrary to NCR's unsupported attorney argument that "tablets are quite plainly *not* 'PC

Workstations'" (Dkt. 194, p. 6), NCR's Ms. Schoonover testified:

> Q. You've never heard anybody that sells NCR Silver refer to the iPad part
> as the workstation?
>
> A. Oh, okay. I thought you were saying they were two different things. …
> Yes. The iPad is the point-of-sale device.
>
> Q. And that can be called a workstation, right?
>
> A. Sure.
>
> Q. And it often is, right?
>
> A. Okay. Yes.

Ex. 1, Trial Tr. 300:7-18.

### 4. *The Jury's finding that NCR meets the "POS terminal" limitation is supported by legally sufficient evidence*

NCR again ignores the law on use by benefit and control as well as its own use for Back

Office operations in claiming that NCR does not practice the "POS terminal" limitation.  In

addition, NCR tellingly and incorrectly contends in its brief that "[f]or **many** sales, NCR does not

practice the 'POS terminal' limitation."  Dkt. 194, p. 6 (emphasis added).  In other words, NCR

does not dispute that CoC produced evidence to show that NCR meets the "POS terminal"

limitation in at least **some** (if not "many") sales.  NCR's semantics are unavailing since "any"

infringing use is all that is needed to prove infringement.  NCR asserts its "some v. many"

argument in support of an entirely new damages theory that was not presented at trial and that was

not in NCR's damages expert report.

In its brief, NCR contends for the first time that damages should be reduced "[b]ecause more than 75% of NCR Silver sales are for an iPad, not Android." Dkt. 194, p. 6. NCR relies solely on a single sentence from Ms. Schoonover's trial testimony in support of remittitur contending that "about 75 percent of [NCR's] customers use iPad devices, and those devices are bought directly from Apple, or if they have iPads themselves, they can use them." Ex. 1, Trial Tr. 314:15-23. This 75% allegation is not supported by any documents or other evidence offered at trial. Moreover, even if this statement were true, it does not impact the damages award. There was no evidence at trial that the percentage of NCR's customers using iPads has any correlation to NCR's revenues attributable to software subscriptions. CoC requested that the Jury award damages only for NCR's subscription sales—not NCR's hardware sales. *Infra*, III.E. In fact, hardware sales were apportioned out of the damages that CoC requested from the Jury. Ex. 1, Trial Tr. 523:22-524:11 (Salters) ("[W]hat I included for my royalty was not both. It was just the software, because what I wanted to focus on really was those core functionality in the software that's covered by the patents-in-suit."). Thus, the percentage of NCR's revenues attributable to particular subset of its hardware sales is irrelevant, especially when CoC did not request damages on any hardware sales.

### 5.    The Jury's finding that NCR meets the "POS builder" limitation is supported by legally sufficient evidence

NCR's allegation that it does not meet the "point of sale builder software" limitation is simply a rehashing of its trial argument rejected by the Jury that NCR Silver is "prebuilt." None of NCR's documents described NCR Silver as "prebuilt," an argument based solely on the litigation argument of its expert, Dr. Chatterjee:

> Q. The question was, in any of that stack of manuals, did any of them use the term "prebuilt"
>
> A. I couldn't tell you, but I don't recall seeing it.

Ex. 1, Trial Tr. 633:3-5. Similarly, NCR's Mr. Quinn testified,

> Q. Okay. But by the way, this word "prebuilt" that we've been hearing today from NCR and its lawyers, that word doesn't appear in any of these manuals that I showed you about how to work this system, does it?
>
> A. It does not.
>
> Q. It doesn't appear in any of these hour-long videos that we've been looking at, does it, sir?
>
> A. It does not.

Ex. 1, Trial Tr. 207:24-208:6. Despite Dr. Chatterjee's "prebuilt" argument, the Jury heard that he never used NCR Silver to build a POS terminal from a blank slate—so he was in no position to say what is or is not "prebuilt" into the software as delivered to a customer. *See* Ex. 1, 635:13-19 ("I haven't used it with a blank slate, so I couldn't tell you.").

### a)    *NCR Misleadingly Cites Evidence Unrelated to NCR Silver*

NCR misleadingly cites the testimony of CoC's expert, Mr. Crouse, related to his use of IBM POS builder software to build POS screens at his **prior employment** to imply that this experience relates to his investigation of NCR Silver. *See* Ex. 1, Trial Tr. 455:1-4, 456:22-457:2, 457:3-5, 457:22-458:5, 457:19-20, 458:11-18 (all describing Mr. Crouse's building POS terminals at Perot Systems). Most egregiously, NCR states "Mr. Crouse agreed that the merchant or customer 'could not build the POS terminal' because the terminal software was 'prebuilt.'" Dkt. 194, p. 7 (citing Ex. 1, Trial Tr. 458:23-25; 459:1-4). This testimony relates solely to Mr. Crouse's work at Perot Systems and has nothing to do with his investigation of NCR Silver. Indeed, NCR's counsel's next question to Mr. Crouse began with, "[t]he customers who used the prebuilt terminal software **in this Chase example**…" Ex. 1, Trial Tr. 459:1-6 (emphasis added). NCR's allegation that Mr. Crouse's testimony is "conclusory and inconsistent" is wrong. Mr. Crouse testified in

11

detail as to how NCR Silver meets the "POS builder" limitation. *See* Trial Tr. 411:6-412:10 (discussing builder software), 416:5-17 (discussing builder interface over web browser).[4],[5]

### b) *The Court's claim construction is proper*

The Court's construction of the term "point of sale builder software" as having its "[p]lain and ordinary meaning, wherein plain and ordinary meaning means 'software that builds the POS terminals'" is correct. Dkt. 44, p. 3. NCR's argument is a rehash of its litigation-driven claim construction positions that ignore its own prior statement that the term "point of sale builder software" "is a term of art used in the POS industry." Dkt. 37, p. 6. Indeed, there is nothing in the shared specification of the '640 and '012 patents that suggests CoC intended to deviate from the plain and ordinary meaning used in the POS industry. NCR's proposed construction that was rejected by the Court sought to import more than 30 words from the specification. NCR's request for a new trial (and for JMOL) based on claim construction should be denied. The Court's instructions to the Jury, to which NCR did not object at trial, were proper. *See* Ex. 1, Trial Tr. 817:12-19.[6] Indeed, since NCR did not object to the claim construction Jury instruction, NCR's challenge is waived. *See, e.g., Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1196 (Fed. Cir. 2004) (internal citations omitted).

---

[4] NCR's repeated attempts to mislead in its briefing do not support its JMOL argument, but do provide additional support for the willfulness and exceptional case findings sought by CoC.

[5] NCR again argues that Mr. Crouse did not use the Court's claim construction. That is not correct. *See* Dkt. 83, p. 9 (Sealed).

[6] "THE COURT: And other than that, the charges -- let me start over. Other than the omission of those three paragraphs whose numbers I don't remember, but they had to do with the systems charge, and I think it's pretty clear -- I think it's pretty clear in your submission to me which those three are, I just don't remember their numbers, does the defendant have any other objections? MR. PHIPPS: No, Your Honor." Ex. 1, Trial Tr. 817:12-19.

In addition, this Court, and then the Jury, heard NCR's "mere data entry" argument (*e.g.*, Dkt. 68, p. 12) more than once. *See* Dkt. 194, p. 10. Contrary to NCR's repeated allegation, Mr. Crouse did not fail to apply the Court's claim construction. The Jury heard Mr. Crouse's opinions that NCR Silver meets the point of sale builder software limitation. The Jury also heard Dr. Chatterjee's contrary opinions. The Jury weighed the evidence, made credibility determinations, and ultimately found that the limitation was met. The Jury's determination was supported by legally sufficient evidence and should not be disturbed.

> **6.    The Jury's finding that NCR Silver is "installed" on / "runs on" and "interacts with" a "web server" is supported by legally sufficient evidence**

There is no legitimate dispute that NCR Silver software is "installed" on, "runs on," and "interacts with" a **"**server." *See* Dkt. 194, p. 12. Even NCR's Dr. Chatterjee does not dispute these points. However, Dr. Chatterjee gave the "server" a different name—"application server"—in an attempt to avoid the "web server" limitation. Like "prebuilt," the term "application server" does not appear in a single NCR document. Ex. 1, 633:6-22 (Dr. Chatterjee "[didn't] remember seeing 'application server'" in any NCR documents). The Jury considered the evidence and found infringement. The Jury's conclusion that the "web server" limitation was met is supported by many examples of NCR Silver running / installed on, and interacting with, a web server, such as Ex. 3-B (JTX-30, p. 3-B-6), which NCR's Mr. Quinn confirmed is an NCR training video showing "How to Set Up NCR Silver (BO)," "How to Use NCR Silver (POS)," and "What are you getting out of the system? (BO)." *See* Ex. 1, Trial Tr. 191:25-192:1. Even Dr. Chatterjee admitted that the NCR training videos show "[t]he web browser is communicating with the web server." Ex. 1, Trial Tr. 640:9-17; *see also* 644:14-19. NCR's own documents and witness testimony provide legally sufficient evidence that NCR Silver is "installed" on / "runs on" and "interacts with" a "web server."

C.   **NCR Failed to Prove Its Invalidity Case with Evidence that the Jury Would Not be at Liberty to Disbelieve**

1.   *NCR's expert admitted each of Woycik and Brown fail to teach claim elements*

NCR mischaracterizes CoC's argument in its brief.  At trial, Mr. Crouse testified that neither *Woycik* nor *Brown* disclosed required claim limitations, including the: (1) "wherein said POS builder software is configured to interact with one or more POS terminals over the communications network;" and (2) the "subscription" limitations.  *See, e.g.*, Ex. 1, Trial Tr. 784:16-785:2; 786:11-14; 786:17-25.  Mr. Crouse also explained other reasons why *Brown* was unrelated to the Asserted Patents.  *See, e.g.*, Ex. 1, Trial Tr. 788:13-16.

Dr. Chatterjee had to acknowledge that *Woycik* and *Brown* do not expressly teach each and every limitation of the Asserted Claims.  *See* Ex. 1, Trial Tr. 622:5-8 ("there's express **or inherent** teachings") (emphasis added).  For example, Dr. Chatterjee testified, "[t]he Woycik central server is **inherently** capable of being provided as a subscription."  Ex. 1, Trial Tr. 601:14-17 (emphasis added).  NCR parrots the same arguments in its Motion.  The Jury was not required to believe Dr. Chatterjee's inherency arguments, and NCR's post-trial positions can hardly be considered substantial evidence to show NCR's invalidity case is one of such an "extreme nature" to require the Jury's decisions and credibility determinations to be overturned.

2.   *NCR failed to offer any evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references*

NCR tried to remedy the shortcomings of the *Woycik* and *Brown* references with a deficient obviousness case.  "Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness."  *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) (citing *Graham v. John Deere*

*Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). "Importantly, [Federal Circuit decisions] have repeatedly emphasized that an obviousness inquiry requires examination of all four Graham factors and that an obviousness determination can be made only after consideration of each factor." *In re Magnum Oil Tools Int'l, Ltd*., 829 F.3d 1364, 1376 (Fed. Cir. 2016). Relating to factors one through three, "[a] party seeking to invalidate a patent on the basis of obviousness must demonstrate by clear and convincing evidence that a skilled artisan would have been **motivated to combine** the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Kinetic Concepts*, 688 F.3d at 1360. NCR failed to do so at trial. NCR further ignores its burden of proof and the rule that a JMOL must be denied if the verdict is supported by "evidence that amounts to more than a mere scintilla." *Laxton v. Gap Inc.*, 333 F.3d 572, 585 (5th Cir. 2003).[7]

Here, NCR failed to even present a *prima facie* case of obviousness based on any combination of *Woycik*, *Brown*, and *Michaud*, much less a case so strong that no reasonable jury could disagree that NCR had proven obviousness by clear and convincing evidence. [8, 9] In fact, Dr. Chatterjee failed to offer any testimony or evidence regarding motivation to combine the obviousness references. *See* Ex. 1, Trial Tr. 621:22-624:4 (seven line entirety of Dr. Chatterjee's testimony on obviousness). Mr. Crouse checked the transcript during trial and testified that

---

[7] Rather than focus on its lack of evidence to support invalidity, NCR again mischaracterizes CoC's arguments and the testimony of Mr. Crouse, which explained that in addition to the failures of *Woycik* and *Brown,* there was no motivation to combine and no discussion of secondary considerations.

[8] NCR's citation to *KSR* is irrelevant since NCR offered no evidence at trial to show that the elements of *KSR* were met in a way that eradicated their requirement to demonstrate a motivation to combine.

[9] Michaud was fully considered by the USPTO during prosecution of the '640 Patent. *See* Ex. 1, Trial Tr. 590:23-591:7 (Chatterjee); 791:22-24 (Crouse).

Dr. Chatterjee "didn't mention any motivation to combine."  Ex. 1, Trial Tr. 791:2-10.

Dr. Chatterjee also failed to provide any testimony or evidence regarding secondary

considerations.  For at least these reasons, NCR's invalidity case was not one of the "extreme

cases" that warrant JMOL "for the party bearing the burden of proof."  *Mentor H/S*, 244 F.3d at

1375.

### D.    The Jury's Willfulness Finding is Supported by Sufficient Evidence

The Court properly instructed the Jury regarding willfulness, and NCR did not object to

the instruction.  The Court instructed the Jury, "[y]ou may not determine that the infringement was

willful just because NCR was aware of either of the patents and infringed it.  Instead, you must

also find that NCR **deliberately infringed** either or both of the patents."  Ex. 1, Trial Tr. 838:4-7

(emphasis added).  The instruction included the following list of non-exclusive factors:

> First, did NCR act consistently with the standards of behavior for its industry?
> Did it intentionally copy a product of CloudofChange that is covered by these
> patents?  Whether or not NCR reasonably did not infringe or that the patent
> was invalid.   Whether or not NCR made a good-faith effort to avoid
> infringing the patents.  For example, whether it attempted to design around
> these patents or whether or not NCR tried to cover up its infringement.

Ex. 1, Trial Tr. 838:11-19.  CoC's counsel reiterated the importance of the factors to the Jury and

specifically went through the factors in closing arguments.  Ex. 1, Trial Tr. 881:11-883:24.  The

Jury considered the evidence and concluded that the infringement was willful.[10]  Dkt. 159.

Certainly, CoC produced sufficient evidence at trial that: (1) CoC sent NCR a certified

Notice Letter (Ex. 4, JTX-5), (2) to an NCR office (Ex. 1, Trial Tr. 360:1-10), and (3) the certified

letter was signed for by R. Brees (Ex. 4, JTX-5).  The evidence also showed NCR did not conduct

---

[10] NCR's cited non-jury cases are distinguishable on this basis.  *See Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. Mar. 1, 2021) (district court granted pre-verdict JMOL so willfulness never went to the jury); *see also Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 2017 WL 2190055, at * 2 (E.D. Tex. May 18, 2017) (Bryson, J.) (same).

any meaningful investigation into the Notice Letter. Indeed, NCR's Mr. Quinn testified that "right before [his] deposition," he "looked in [their] employee system to identify if there was an R. Brees," but admitted he never "call[ed] the human resources department to see if perhaps R. Brees wasn't on the list [he] looked at because it was a former employee." Ex. 1, Trial Tr. 174:5-175:25. NCR attempted to minimize its disregard of the notice with a post-trial declaration. Dkt. 177-26. While that "evidence" is not relevant at this stage since it was not before the Jury, NCR's post-trial declarations only further emphasized NCR's egregious behavior and disregard for the truth in this case since NCR: (1) made false statements in the declaration, and (2) conspicuously omitted the date the "investigation" was conducted.[11] Now, NCR again attempts to minimize willfulness by pointing to NCR's development of "its own technology," but the "NCR has its own patents argument" was also deceptive as NCR's Executive Director of Product Management, Ms. Schoonover, testified she was "not personally aware" of any NCR patents related to NCR Silver. Ex. 1, Trial Tr. 244:25-245:3.

Not only did CoC produce evidence that NCR had knowledge of the patents (by at least service of the lawsuit), but sufficient evidence supports that NCR's infringement was deliberate and intentional. There was no evidence that NCR reasonably did not infringe or that the patents were invalid. Indeed, the evidence at trial was that NCR made no good faith effort to avoid infringing, made no attempt to design around the patents (even though NCR claimed that a design around was cheap and easy), and tried to cover up its infringement with frivolous arguments.

The Jury had the opportunity to consider NCR's baseless arguments, including, the "prebuilt" argument and Dr. Chatterjee's inconsistent testimony that "[t]he NCR Silver product,

---

[11] If the "investigation" occurred pre-trial, NCR concealed the investigation and CoC had no opportunity for discovery; if the "investigation" occurred post-trial, it was too little too late.

… does not meet the web server limitations, but we can just very easily remove the web server." Ex. 1, Trial Tr. 624:24-625:4.  Despite this "simple" design around, NCR did not produce any evidence that NCR ever implemented its purported design around or otherwise stopped infringing. Likewise, the Jury heard NCR's insufficient invalidity arguments (*supra*, III.C.2).  It is clear from the verdict that the Jury weighed the evidence, made credibility determinations, and ultimately disagreed with NCR's positions—as the Jury was entitled to do.  NCR has not presented any basis to overturn the Jury's verdict.

### E.    The Jury's Damages Award is Supported by Sufficient Evidence

Ms. Salters testified, based on Mr. Crouse's testimony, that the four core functionalities of NCR Silver are "drivers of demand for merchant customers purchasing the NCR Silver product." Ex. 1, Trial Tr. 510:18-23.  NCR's allegation that "CoC had *no* evidence that the patented features drive demand" ignores this testimony and NCR's  own documents and witnesses.  Dkt. 194, p. 19 (emphasis in original).  Particularly, bullet three of NCR's Strawhecker Report identifies the four elements that drive merchant demand for POS systems, and confirms Mr. Crouse's opinions.  PTX-117 (NCR006493) (snipped below).



NCR's Executive Director of Product Management, Ms. Schoonover, testified,

> Q. And last but not least, the third bullet talks about merchant demand for this product.  Do you see that it says in the third bullet that merchant demand is -- requires payments capability, integrated with inventory control, order management, and POS functions across in store, online, and mobile devices. Do you see that, ma'am?

> A. Yes.
>
> Q. Those are the four things that drive merchant demand according to The
> Strawhecker Group, right?
>
> A. Payments capability integrated with those things.  Yes.

Ex. 1, Trial Tr. 264:5-15.  Because the evidence demonstrates that the patented features drive demand, the entire market value theory is entirely appropriate.  *See Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015) ("Under the entire market value rule, if a party can prove that the patented invention drives demand for the accused end product, it can rely on the end product's entire market value as the royalty base").

However, Ms. Salters did not rely solely on an entire market value analysis.  Instead, Ms. Salters appropriately walked the Jury through an apportionment of damages.  NCR's argument to the contrary is false and lacks evidentiary citation.  Specifically, Ms. Salters testified:

> Q. So after considering all of the Georgia-Pacific factors, did you determine
> a reasonable royalty?
>
> A. I did.

Ex. 1, Trial Tr. 523:22-24.  She then identified for the Jury the specific ways in which she apportioned the damages to reach her reasonable royalty.

*First*, while what's accused of infringement here is the hardware and the software, as Ms. Salters testified, "[u]ltimately, what I included for my royalty calculation was not both.  It was just the software, because what I wanted to focus on really was those core functionalit[ies] in the software that's covered by the patents-in-suit."  Ex. 1, Trial Tr. 524:6-11.  *Second*, Ms. Salters explained that while NCR's data reflected "over 700,000 subscriptions … as I reviewed the detailed descriptions of those, those didn't seem to all have sort of the full functionality or the core features really of the patents-in-suit.  So instead, I did not include those which potentially had a limited functionality, and I only included those which seemed to have the full software product,

Silver software product. And those ultimately were about 550,000 versus the over 700,000, which were all of those subscriptions." Ex. 1, Trial Tr. 524:13-23. *Third*, Ms. Salters stated "[NCR's] pricing was all over the place. What we had really seen was $79 to $200, that was the price range of their monthly subscriptions that they charged their merchants. And so what I considered within my royalty base, to be conservative, really was just that $79 number." Ex. 1, Trial Tr. 524:24-525:4. *Finally*, "even though I saw … over 75 to 90 percent industry profits, specific to NCR's level of sales, it was actually 79 percent. I only considered profits of … 28 percent, which NCR claims, to … 47 percent, which was my revised calculation to get to my reasonable royalty." Ex. 1, Trial Tr. 525:5-10. As the foregoing analysis demonstrates, Ms. Salters' reasonable royalty calculation included several apportionments, which support the Jury's damages verdict.

NCR's remaining remittitur arguments also fail. Specifically, NCR argues that "no more than 8 to 11 percent" is appropriate based on the testimony of Dr. Ikizler. Dkt. 194, p. 20. The Jury heard Dr. Ikizler's testimony and presumably disagreed with, or disbelieved, Dr. Ikizler's testimony. The Jury was entitled to do so. [12] Similarly, NCR again argues that remittitur of 75% is appropriate because 75% of merchants use their own iPads. *Id*. Here again, NCR's argument is irrelevant and ignores that the apportioned damages CoC requested related to NCR's subscription software sales—not NCR's hardware sales.

## IV.    CONCLUSION

For the foregoing reasons, the Jury's verdict is supported by the record evidence. Plaintiff therefore respectfully requests that the Court deny NCR's Motion for Judgment as a Matter of Law or Alternatively, for a New Trial.

---

[12] The 8 to 11 percent theory was based on features-based apportionment from a document created by an intern that was never used—and did not include a discussion with NCR's Ms. Schoonover, who was the person in charge of features at NCR. *See* Trial Tr. 284:11-17 (Schoonover).

Dated:  August 24, 2021

Respectfully submitted,

*/s/ John H. Barr, Jr.*

John H. Barr, Jr.
Attorney In Charge
Texas Bar No. 00783605
jbarr@pattersonsheridan.com

John A. Yates
Texas Bar No. 24056569
jyates@pattersonsheridan.com

B. Todd Patterson
Texas Bar No. 00789537
tpatterson@pattersonsheridan.com

Edgar N. Gonzalez
Texas Bar No. 24092431
egonzalez@pattersonsheridan.com

Kyrie K. Cameron
Texas Bar No. 24097450
kcameron@pattersonsheridan.com

Patterson + Sheridan LLP
24 Greenway Plaza, Suite 1600
Houston, Texas 77046
(Tel.): 713-623-4844
(Fax): 713-623-4846

Abelino Reyna
Texas Bar No. 24000087
areyna@pattersonsheridan.com

Patterson + Sheridan LLP
900 Washington Ave., Suite 503
Waco, Texas 76701
(Tel.): 254-777-5248
(Fax): 877-777-8071

*Attorneys for Plaintiff,*
*CloudofChange, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent electronic notification of such filing to all other counsel of record.

*/s/John H. Barr, Jr.*
John H. Barr, Jr.

Charles E. Phipps, cphipps@lockelord.com
Daniel G. Nguyen, dnguyen@lockelord.com
Steven F. Meyer, smeyer@lockelord.com
Donald E. Frechette, donald.frechette@lockelord.com
Charles S. Baker, cbaker@lockelord.com
Scarlett Collings, scarlett.collings@lockelord.com
**LOCKE LORD LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
*Counsel for Defendant NCR Corporation*


Paul W. Hughes, phughes@mwe.com
Adam W. Burrowbridge, aburrowbridge@mwe.com
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol St. NW
Washington, D.C. 20001
*Counsel for Defendant NCR Corporation*