**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

CLOUDOFCHANGE, LLC,
*Plaintiff*

–vs–

NCR CORPORATION,
*Defendant*

§
§
§
§
§
§
§
§
§
§
§

**W-19-CV-00513-ADA**

**ORDER DENYING DEFENDANT NCR'S RULE 50(B) MOTION FOR JUDGMENT AS**
**A MATTER OF LAW OR ALTERNATIVELY, A NEW TRIAL**

Before the Court is Defendant NCR Corporation's ("NCR") Rule 50(b) Motion for

Judgment as a Matter of Law ("JMOL") and Rule 59 Motion for a New Trial filed on August 10,

2021. ECF No. 194. Plaintiff CloudofChange, LLC ("CoC") filed its Response on August 24,

2021. ECF No. 196. NCR then filed its Reply on August 31, 2021. ECF No. 197. NCR asks this

Court for a judgment as a matter of law ("JMOL") of no infringement for U.S. Patent Nos.

9,400,640 ("'640 Patent") and 10,083,012 ("'012 Patent"), a judgment of invalidity for the asserted

claims of the '640 Patent and the '012 Patent, a judgment of no willfulness, and a judgment of no

damages or a remittitur. *Id.* After considering the parties' briefs and relevant law, the Court

**DENIES** Defendant's Motion for the reasons below.

## I.      BACKGROUND

CoC filed its suit for patent infringement on August 30, 2019. ECF No. 1. In its Complaint,

CoC accused NCR of infringing the '640 Patent and '012 Patent (collectively, the "Asserted

Patents"). On May 17, 2021, following a four-day trial, the jury found that NCR infringed claims

1, 3, 4, 5, 6, 11, 12, and 13 of the '640 Patent and claims 1, 2, 3, and 4 of the '012 Patent

(collectively, the "Asserted Claims"). ECF No. 159 at 3–4. The jury also found that NCR had not

met its burden to prove that claims 1, 3, 4, 5, 6, 11, 12, or 13 of the '640 Patent were invalid; nor did the jury find that claims 1, 2, 3, 4, or 9 of the '012 Patent were invalid. *Id.* at 5–6. The jury also found that NCR's infringement was willful. *Id.* at 8. Accordingly, the jury awarded CoC lump-sum damages in a total of $13,200,000.00. *Id.* at 7–8. NCR subsequently filed a Rule 50(b) Motion for JMOL and alternatively a Rule 59 Motion for a New Trial on August 10, 2021. ECF No. 194.

## II.    LEGAL STANDARD

A court may grant JMOL against a prevailing party only if a reasonable jury would not have a legally sufficient evidentiary basis to find for the non-moving party on that issue. Fed. R. Civ. P. 50(a)(1). In deciding a renewed JMOL motion, a "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1112 (5th Cir. 2021). The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* This is because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013).

Courts grant JMOL for the party bearing the burden of proof as to invalidity only in extreme cases, when the party bearing the burden of proof has established its case by evidence that the jury would not be at liberty to disbelieve, and the only reasonable conclusion is in its favor. *Mentor H/S, Inc. v. Medical Device All., Inc.*, 244 F.3d 1365, 1375 (Fed. Cir. 2001). JMOL is inappropriate if the record evidence is such that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003).

A jury verdict must stand unless there is a lack of substantial evidence, in the light most favorable to the successful party, to support the verdict. *Am. Home Assur. Co. v. United Space All.,*

*LLC*, 378 F.3d 482, 487 (5th Cir. 2004). Substantial evidence is more than a scintilla, but less than a preponderance. *Nichols v. Reliance Standard Life Ins. Co.*, 924 F.3d 802, 808 (5th Cir. 2019). Thus, JMOL must be denied if a jury's verdict is supported by legally sufficient evidence that amounts to more than a mere scintilla. *Laxton*, 333 F.3d at 585.

Similarly, a court may grant a new trial on all or some of the issues only when "the verdict is against the great weight of the evidence." *Whitehead v. Food Max Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998). In other words, the movant must show "an absolute absence of evidence to support the jury's verdict." *Id.* The court need not view the evidence in the light most favorable to the nonmoving party. *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). There must be a "miscarriage of justice" for a court to grant a new trial. *Datatreasury Corp. v. Wells Fargo & Co.*, 758 F. Supp. 2d 382, 385 (E.D. Tex. 2010).

## III.    DISCUSSION

### A.  The jury was not erroneously instructed.

Rule 51 of the Federal Rules of Civil Procedure states that "A party may assign as error: (A) an error in an instruction actually given, if that party properly objected; or (B) a failure to give an instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected." Because objections to jury instructions are a procedural matter, the law of the Fifth Circuit applies. *See Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000).

"A party seeking to alter a judgment based on erroneous jury instructions must establish that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error." *Advanced Display*, 212 F.3d at 1281. A district court's refusal to give a requested jury instruction is reversible error "only if the instruction 1) was a substantially

correct statement of law, 2) was not substantially covered in the charge as a whole, and 3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the [party's] ability to present a given [claim]." *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 578 (5th Cir. 2004) (quoting *United States v. McClatchy*, 249 F.3d 348, 356 (5th Cir. 2001)).

NCR contends that a new trial is necessary because an instructional error was made to the jury. ECF No. 194 at 3. NCR asserts that the jury should have been instructed that to find infringement, CoC had to prove that NCR controls and benefits from "each element" of the claimed system. *Id.* at 2. NCR argues that the jury instructions allowed the jury to find infringement if NCR controlled and benefited from the system as a whole without instructing the jury to find that NCR controlled and benefited from each individual element of the system. ECF No. 197 at 4. Because the jury instruction "conflate[d] 'use' by the end-user with 'use' by NCR," at minimum, a new trial is required. ECF No. 194 at 3–4.

CoC argues that a new trial is unnecessary because the jury was not erroneously instructed. Both parties agreed that the "use" standard is whether NCR "control[s] the system and obtain[s] benefit from it." ECF No. 196 at 2. CoC points out that the instructions required the jury, immediately preceding the contested language, to "compare the system with each and every one of the requirements of a claim to determine whether or not all of the requirements of that claim have been met." *Id.* at 3 (citing Trial Tr. 837:9–11) (emphasis omitted). The instructions also stated that "[i]f one party controls and makes beneficial use of a system that contains all the requirements of the claim, that party may be an infringer even though the parts of the system do not all operate in the same place or at the same time." *Id.* (citing Trial Tr. 837:17–20).

The Court does not find NCR's argument persuasive. The record shows that the jury instructions tasked each juror with determining whether "the accused system includes each element of the asserted claim" and to "compare the system with each and every one of the requirements of a claim." Trial Tr. 837:13–14, 837:9–11. In short, the first sentence is the controlling instruction as to the depth of the analysis. Thus, when the instruction is read as a whole, it instructs the jury that to find infringement, the jury must analyze each and every element, or requirement, of a claim, and that use follows the same analysis. NCR's argument simply does not reflect the language of the jury instructions as to literal infringement.

Even if the instruction were in error, as NCR claims, for failure to differentiate between a system level analysis and a claim-element level analysis, NCR's proposed instruction does not remedy the error. After the charge conference, NCR stated, "But we want you to make it very clear that a single-actor infringer of a systems claim does not have to have physical control but still has to put it into service consistent with the instructions that defendant NCR Corporation recommended to be included in the final charge." Trial Tr. 816:16–20.[1] To the Court's knowledge, the last recommendation was filed as a supplement to the pretrial order. *See* ECF No. 124-2 at 36. In those instructions, NCR disagreed with the language: "If one party controls and makes beneficial use of a system that contains all the requirements of the claim, that party may be an infringer even though the parts of the system do not all operate in the same place or at the same time." *See id.* at 35. NCR provided alternative instructions which stated in full:

> Direct infringement of a system claim by use occurs if a party must put the invention into service, i.e., controls the system as a whole and obtain benefit from it. Plaintiff has made the assertion that NCR has used the systems covered by the Asserted Claims. To prevail on this assertion, Plaintiff must prove that NCR, as a single entity, put the system into serve, i.e., controls the system as a whole and obtains

---

[1] In the Court's view, NCR should have read its proposed instruction into the record to provide explicit "alternative instructions that would have remedied the error." *Advanced Display*, 212 F.3d at 1281.

> benefit from it. If a customer, instead of NCR, uses the system by
> putting it into service, then NCR has not directly used that claim.

*Id.* at 36. These instructions are redundant of the Court's instructions. "NCR, as a single entity, put the system into serve, i.e., controls the system as a whole and obtains benefit from it," *see id.*, is the equivalent of the Court's instructions that "[i]f one party controls and makes beneficial use of a system that contains all the requirements of the claim . . .," *see* Trial Tr. 837:17–20. Additionally, "[i]f a customer, instead of NCR, uses the system by putting it into service, then NCR has not directly used that claim," *see* ECF No. 124-2 at 36, is also covered by the Court's instruction that "the accused system includes each element of the asserted claim" and "one party controls and makes beneficial use of a system . . .," *see* Trial Tr. 837:13–14, 17. NCR's repetitive instruction would not cure the alleged deficiency.

In addition, while attorneys cannot fix errant instructions, both attorneys clearly argued that only "use" by NCR, not "use" by the end-user, constituted direct infringement. The parties' arguments remove any doubt as to a misunderstanding. At closing arguments, CoC argued:

> But specifically you should look at the instructions -- I want to talk
> to you about the system instructions. This is -- NCR sells this as a
> system. And I expect that the defendants are going to argue that it's
> not a system. They don't meet the system claim because we don't --
> they don't supply every part of the system. That's not true.

Trial Tr. 868:18–23. NCR responded in its closing arguments with the same point:

> Finally, we heard a little bit about a while ago about how we don't
> meet the system claim limitation. And, again, they've got to prove,
> it's their burden of proof that we supply all these things, that we
> control all these things.

Trial Tr. 897:20–24. The Court's instructions provided the necessary support for each party to reference to emphasize that "use" was required by NCR at an element level, not a system level. Thus, the Court denies NCR's motion for a new trial based on errant jury instructions for "use" of

a system. The jury was instructed to evaluate control and benefit at an element level, not merely a system level. Having determined that the Court properly instructed the jury, the Court addresses the remaining arguments regarding whether substantial evidence supported the jury's findings of infringement.

### B. Substantial Evidence Supports the Jury's Infringement Findings for the Asserted Patents.

Under 35 U.S.C. § 271, to prove a literal infringing "use" of a system, "a patentee must demonstrate 'use'—that is, 'control' and 'benefit'—of the claimed system by an accused direct infringer." *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1328 (Fed. Cir. 2017). The jury found that the NCR Silver system sold by NCR literally infringed the '640 Patent and the '012 Patent. NCR seeks JMOL on those findings and, in the alternative, a new trial.

#### 1. Substantial Evidence Supports the Jury's Infringement Finding for the "Internet Connection," "Network," and "Network Access" Limitations.

NCR argues that CoC failed to meet its burden of proof because there is no substantial evidence that NCR itself controls end users' network connections. ECF No. 197 at 5. Specifically, NCR points to Claim 1 of the '640 Patent, which requires the presence of "a network, wherein the network comprises the Internet" and/or "the worldwide web." ECF No. 194 at 5 (citing '640 Patent at Cl. 1). Similarly, Claim 1 of the '012 Patent requires "a communications network." *Id.* (citing '012 Patent at Cl. 1). NCR points out that it is ultimately the merchant's decision, not NCR's, on whether or not the NCR Silver software is installed and runs. *Id.* NCR points to the concession of CoC's expert witness, Mr. Crouse, that merchants "put NCR Silver into service," and that the merchant "controls its own use of NCR Silver." Tr. 469:10–25. Additionally, NCR argues that because the "network" elements do not exist without the "affirmative decisions and actions of third parties," CoC has not shown that NCR "controls" the end users' network connections. ECF No. 194 at 4. NCR claims that evidence showing NCR Silver requires a network for its full use is not

evidence that NCR exerts control over the claimed element. *Id.* (citing *LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1326 (Fed. Cir. 2016) ("The claimed inventions . . . affirmatively required action by a third party, without which a limitation would be absent.").

CoC argues that evidence established at trial does show NCR controls the "network access" limitation. ECF No. 196 at 4−8. For the internet, NCR exerts control over the end user through its Merchant Agreement, which directs merchants to obtain and maintain their own Internet access to use the NCR Silver software. *Id.* at 5−6. CoC also points out that there is ample testimony that NCR uses an internet connection for its Back Office functionality, which shows use through control and benefit. *Id.* at 6. Specifically, CoC points out that the jury saw evidence that "the hardware and software of the NCR Silver system can use HTTPS to communicate" and that one of those pieces of evidence included a screenshot of several NCR training videos showing internet connection. *Id.*; Trial Tr. 178:20–23.  Additionally, NCR "benefits" from the entire NCR Silver system from the monthly subscription fee, product improvements through testing and evaluation, product ideas, transaction data, revenues from third-party products and services, marketing rights associated with the merchant's use, and advertising. *Id.* at 4. Specifically, as to the "Network access" limitation, NCR received a benefit through its Back Office functionality. *Id.* at 6.

At the outset, the Court notes that patentees have "little chance of prevailing in a multiple-party scenario by asserting direct infringing 'use' against the company entity that provided the system to its end-users." Dolly Wu, *The Use of Use for Patented Systems in A Single or Joint Infringement World*, 14 COLUM. SCI. & TECH. L. REV. 514, 544 (2013). The caselaw is daunting; results can turn on fact-specific scenarios, the definitional language used for some terms overlaps with that of other unrelated terms, and standards used among system and method claims may or may not differ in inarticulable ways. CoC's proof requirements are particularly difficult as it only

asserts a direct infringement theory of "use" against NCR, having abandoned all other theories. *See* ECF No. 196 at 2.

The parties agree that NCR is liable for direct infringement for "use" if it "control[s] the system and obtain[s] benefit from it." *See id.* at 2 (citing ECF No. 194 at 2); *see also Centillion Data Sys., LLC v. Qwest Communs. Int'l*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) ("We hold that to 'use' a system for purposes of infringement, a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it."). For a finding of direct infringement, CoC must prove one of two types of control: (1) control and beneficial use, i.e., single party direct infringement, or (2) control under a theory of vicarious liability, i.e., divided infringement. *See Centillion*, 631 F.3d at 1286 (explaining that if the defendant did not "use" the patented invention itself, the plaintiff must show that the defendant is vicariously liable for the acts of others). Here, the sticking point is whether CoC provided substantial evidence to support a theory of vicarious liability as to certain claim elements. If it did, then the jury could have correctly found that NCR directly infringed the Asserted Claims. Otherwise, judgment as a matter of law in favor of NCR is required.

### 1.  NCR's Independent "Use" of the Accused System

The Federal Circuit holds that "to 'use' a system for purposes of infringement, a party must put the invention into service." *Centillion*, 631 F.3d at 1284 (citing *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)). "In order to 'put the system into service,' the end user must be using all portions of the claimed invention." *Id.* To "put the system into service" the accused infringer must "control the system as a whole and obtain benefit from it." *Id.* (citing *NTP, Inc.*, 418 F.3d at 1317). Yet the requisite control need not be "physical" or "direct" control over each individual element of the system. *See id.*

The *Centillion* opinion is a guide for divining the necessary "control" of an accused system running software on a front- and back-end. In *Centillion*, the Federal Circuit considered asserted system claims and determined that the defendant, Qwest, did not exercise sufficient control over the accused system despite owning and operating all the back-end components. *Id.* at 1286−87. Yet Qwest's customers, who only contribute the front-end hardware, *did* exercise sufficient control. *Id.* at 1285. The accused system included two parts: Qwest's back-end systems and front-end client applications that Qwest's customers could install on their personal computer. *Id.* at 1281. The accused products provided two different modes of operations. *Id.* at 1285. First, Qwest offered an "on-demand" operation in which a customer could create a query with "particular and specified information" that the Qwest back-end system processes to provide a result for the customer to download. *Id.* Second, Qwest offered a "standard" operation in which, after a customer subscribes to receive monthly summary reports, Qwest's back-end systems automatically creates summary reports every month that the customer may download. *Id.*

The *Centillion* panel determined that the customer controls the system and obtains a benefit from it in the on-demand operation:

> The customer controls the system by creating a query and transmitting it to Qwest's back-end. . . . This query causes the back-end processing to act for its intended purpose to run a query and return a result. The user may then download the result and perform additional processing as required by the claim. If the user did not make the request, then the back-end processing would not be put into service. . . . It makes no difference that the back-end processing is physically possessed by Qwest.

*Id.* at 1285. It reached the same conclusion for the standard operation:

> By subscribing a single time, the user causes the back-end processing to perform its function on a monthly basis. Like the on-demand operation, the back-end processing in normal operation is performed in response to a customer demand. The difference though is that a single customer demand (the act of subscribing to the service) causes the back-end processing monthly. But in both modes

> of operation, it is the customer initiated demand for the service which causes the back-end system to generate the requisite reports. This is "use" because, but for the customer's actions, the entire system would never have been put into service. This is sufficient control over the system . . . and the customer clearly benefits from this function.

*Id.* The *Centillion* panel rejected the theory that Qwest itself controls the system and obtains benefit from it. *Id.* at 1286. The discussion was brief: "While Qwest may make the back-end processing elements, it never 'uses' the entire claimed system because it never puts into service the personal computer data processing means. Supplying the software for the customer to use is not the same as using the system." *Id.*

Centillion's effects in the software space are slowly percolating through district courts. For example, in *Acceleration Bay LLC v. Activision Blizzard, Inc.*, the U.S. District Court for the District of Delaware concluded that a defendant, Activision, did not "use" the accused system where Activision's customers installed and executed Activision's software on the customer's own computer. 324 F. Supp. 3d 470, 483–84 (D. Del. 2018). The asserted claims were directed to "networks" or "channels" made up of "participants" and "connections" between "participants." *Id.* at 479. The plaintiff's experts agreed that "participants" are ultimately "application programs"— namely, video games—executing on Activision's customers' computers. *Id.* at 480. It was undisputed that "the customer must install Activision's software" on a computer, "execute it, and choose an online, multiplayer game mode with more than 5 other participants to make and use the accused networks." *Id.* at 481. Invoking *Centillion*, the *Acceleration Bay* court determined that Activision's "exclusive ownership and control of the game software" did not "put the invention into service." *Id.* at 482. Activision never used the entire claimed system because "[n]o claimed system can be put into service until multiple [Activision] customers install the software and

'execut[e] [it] on the client computers.'" *Id.* The Court also found that Activision did not benefit from the use of each element of the claimed system. *Id.* at 483.

This Court finds itself in accord with the *Centillion* and *Acceleration Bay* opinions in concluding that NCR, although it owns and operates the Back Office, does not put the accused system into service because it does not itself control the network. In *Centillion*, the accused infringer's customers put the accused system into service by initiating, on the front-end components, a demand for service that caused back-end components to act out their intended purpose: running a query and returning a result. 631 F.3d at 1285. Accordingly, the accused infringer did not control the accused system—the customers did. Like the customers in *Centillion*, NCR's merchants put the accused system into service by obtaining internet access. NCR's merchants, therefore, control this portion of the accused system—not NCR. And, as in *Centillion*, it is of no moment that NCR supplies "the software for the customer to use." *Id.* at 1286.

## 2.   The Merchants' "Use" Can Be Attributed to NCR

NCR's argument solely focuses on the role of the end user, asserting that the merchants "must maintain Internet access at [their] own expense." ECF No. 197 at 1 (citing ECF No. 194-4 ¶¶ 8.1, 8.2). CoC does not meaningfully dispute that the merchants obtain the internet access, though it argues NCR itself also uses the internet. Thus, the parties largely agree on the lack of the first form of control, i.e., single-party infringement. But NCR does not opine on whether such language from the NCR Silver Merchant Agreement (ECF No. 194-4, JTX 80) constitutes "direction or control" over the merchant such that NCR controls the network limitations. CoC's theory of the case relies on this point—"NCR controls and benefits from its Silver system, including the requirement that customers who use the system supply an internet connection and network access to do so." ECF No. 196 at 6. The Court finds that substantial evidence supports the

jury's finding of direction and control, i.e., divided infringement via vicarious liability, and the control and beneficial use of each of the elements of the system.

In *Centillion*, the Federal Circuit concluded, as this Court does here, that the accused infringer has not committed infringement through traditional "use" because the accused infringer has not put the entire accused system into service. 631 F.3d at 1286. Yet this Court, like the *Centillion* court, will not end its analysis there. The *Centillion* panel then considered whether it could attribute Qwest's customers' use of the front-end components to Qwest under a "vicarious liability" theory. *Id.* In doing so, the court heavily cited divided infringement caselaw restricted to the method-claim context. *Id.* (first citing *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007); then citing *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008); and then citing *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005)). The *Centillion* court concluded there was no vicarious liability because "Qwest in no way directs its customers to perform nor do its customers act as its agents." *Id.* at 1287 ("While Qwest provides software and technical assistance, it is entirely the decision of the customer whether to install and operate this software on its personal computer data processing means.").

The Court views *Centillion* as endorsing the theory that divided infringement applies to infringement through the "use" of system claims just as it applies to method claims. *Centillion* supposes that vicarious liability may be used to attribute a customer's use of a claimed component to the accused service provider. And the *Centillion* court separated its vicarious-liability analysis from its analysis as to whether Qwest put the entire system into service. The *en banc* Federal Circuit's *Akamai V* opinion then clarified and expanded how to attribute one entity's conduct to another using vicarious liability principles.[2] *Akamai V* articulated these viable theories, stating that

---

[2] The *Akamai V* court clarified, however, that unnamed previous opinions used the term "vicarious liability" loosely. 797 F.3d at 1022 n.2. "In the context of joint patent infringement, an alleged infringer is not liable for a third party's

a single entity directs or controls the acts of another "if it acts through an agent (applying traditional agency principles) or contracts with another to perform one or more steps of a claimed method." 797 F.3d at 1022–23. The court then expanded the available vicarious liability theories, adding that liability under § 271(a) "can also be found when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance." *Id.* at 1023. "In those instances, the third party's actions are attributed to the alleged infringer such that the alleged infringer becomes the single actor chargeable with direct infringement. Whether a single actor directed or controlled the acts of one or more third parties is a question of fact, reviewable on appeal for substantial evidence, when tried to a jury." *Id. Akamai V* did not, as far as this Court can tell, overturn *Centillion*[3] or its application of principles of attribution. Accordingly, the Court finds it only appropriate to apply the principles of vicarious liability endorsed in *Akamai V* in this context as well.[4]

Unlike Qwest in *Centillion¸* NCR "directs its customers to perform" by requiring its merchants to obtain and maintain internet access. This fact was the at the heart of the parties' contentions before the jury. Specifically, CoC relied on the NCR Silver Merchant Agreement, ECF No. 194-4, JTX 80. Repeatedly, the jury observed particular segments of the agreement, namely sections entitled "NCR Responsibilities" and "Your Responsibilities." *Id.* at 5. Within these

---

commission of infringement—rather, an alleged infringer is responsible for method steps performed by a third party." *Id.*

[3] *See, e.g., United Servs. Auto. Ass'n v. Wells Fargo Bank, N.A.*, No. 2:18-CV-00366-JRG-RSP, 2019 U.S. Dist. LEXIS 217004, at *5 (E.D. Tex. Dec. 17, 2019) ("The Court finds that even in light of *Akamai, Centillion* continues to be the appropriate standard under which to analyze infringement of system claims."); *CenTrak, Inc. v. Sonitor Techs., Inc.*, No. 14-183-RGA, 2017 U.S. Dist. LEXIS 139277, at *16 (D. Del. Aug. 30, 2017) ("There is no indication that *Centillion* has been overruled or that its holding is no longer good law.").

[4] To be sure, *Lyda v. CBS Corp.* opined that "[o]ur cases have applied joint infringement to method claims and not system claims." 838 F.3d 1331, 1339 (Fed. Cir. 2016). Nevertheless, the *Lyda* panel cannot overturn the *Centillion* opinion or its application of divided-infringement principles to system claims. *See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This Court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned [*e*]*n banc*.").

responsibilities, NCR states that it will provide remote support for the service in return for the subscription fee. *Id.* ¶ 7.1. As for the merchants, each agrees that it "will provide NCR access to [its] network, system, data, and relevant information as reasonably required to perform the Service." *Id.* ¶ 8.1. And, all importantly, "[t]o use the Service, you must maintain Internet access at your own expense." *Id.* ¶ 8.2. Here, NCR "contracts with [merchants] to perform one or more" of the claimed elements, i.e., internet or network access. *See Akamai V*, 797 F.3d at 1023. Indeed, NCR "directs its customers to perform" the relevant claim elements. *See Centillion*, 631 F.3d at 1287; *see also BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007) ("A party cannot avoid infringement, however, simply by contracting out steps of a patented process to another entity. In those cases, the party in control would be liable for direct infringement. It would be unfair indeed for the mastermind in such situations to escape liability."), *overruled on other grounds by Akamai V*, 797 F.3d 1020. The control asserted in this case, and accepted by the jury, was more than instructions, directions, or an option to be employed by an end-user; instead, it was a contractual requirement.

If any questions abound regarding the contractual obligation NCR requires for the purposes of infringement, it can be settled under the "condition and benefit" analysis from *Akamai V*. Not only does NCR control its merchants via their contractual obligations, it also conditions a benefit to its merchants—e.g., access to the software—based on the merchants' performance of claim elements established by NCR—e.g., obtain internet or network access. *See Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1378 (Fed. Cir. 2017) (quoting *Akamai V*, 797 F.3d at 1023) (concluding that "liability under § 271(a) can also be found when an alleged infringer 'conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method' and 'establishes the manner or timing of that performance'"). For these reasons, the Court finds

substantial evidence to support the jury's finding of infringement as to the "network" and "network access" limitations.

### 2. Substantial Evidence Supports the Jury's Infringement Finding for the "PC Workstation" Limitation.

NCR argues that CoC did not provide substantial evidence to allow a jury to find infringement on the "PC Workstation" limitation. NCR points out that Mr. Crouse used his personal laptop as a workstation during his investigation. ECF No. 194 at 5. NCR asserts that this does not show control by NCR, but rather how customers use NCR Silver. ECF No. 197 at 2. Thus, NCR argues that the merchants control the "PC Workstation," which makes the evidence presented by CoC categorically irrelevant. ECF No. 194 at 5.

NCR also claims CoC's argument for the "POS terminals" doubling as "PC Workstations" fails. NCR asserts that even with the assumption that a tablet is a "PC Workstation," CoC still has not met its burden of proof in demonstrating that NCR 'uses' each element of the system because NCR does not control the tablet. ECF No. 197 at 2–3. NCR argues that per the words of the patent claim, two different structures exist: a "PC workstation" and a separate "POS terminal." *Id.* at 3. NCR also points out that the testimony of Ms. Schoonover, NCR's Executive Director of Product Management, did not establish that a tablet is a "personal computer workstation" but only a "workstation." *Id.* NCR contends that Ms. Schoonover's testimony cannot be the basis for legally sufficient evidence to support the jury's finding of infringement as to this claim. *Id.*

CoC contends that the evidence at trial is legally sufficient to show NCR meets the "PC Workstation" limitation. ECF No. 196 at 8. CoC points to Mr. Crouse's testimony to show that NCR itself "uses" the system in connection with Back Office functions, which shows that NCR satisfies the "PC Workstation" limitation. *Id.* NCR "controls" the "PC Workstation" by requiring customers to provide their own computer hardware necessary to operate NCR Silver. *Id.*

CoC also argues that the "POS terminals" double as "PC Workstations." *Id.* CoC lists three reasons to support its contention. First, assuming that a tablet is a "PC Workstation," CoC demonstrated through NCR's use of Back Office functions that there is sufficient "control" and "benefit." *Id.* Second, the "PC Workstation" claim does not require two unique structures but rather two different meanings. *Id.* at 8 n.3. Third, Ms. Schoonover testified at trial that an iPad can and often does double as a "PC Workstation." *Id.* at 11.

The Court does not find NCR's arguments persuasive. Given the Court's analysis above regarding "use" and "control," the Court agrees with CoC that the evidence presented at trial demonstrates that NCR "uses" the infringing system by exerting "control" and "benefit" over the "PC workstation." CoC provided testimony and evidence showing that NCR exerted control over the "PC workstations" through Back Office functions. ECF No. 196 at 8–9. The testimony of Mr. Crouse and Ms. Schoonover is instructive and substantial.

The Court also does not find NCR's arguments refuting the "POS terminals" doubling as "PC Workstations" contention persuasive. CoC provided the jury with substantial evidence that NCR's use of Back Office functions was sufficient to constitute "control" and "benefit" to establish infringement as to this limitation. *Id.* at 8. Additionally, NCR's assertion that because the patent claim lists "PC Workstation" and "POS terminal" as two separate terms, they must be unique structures, is unpersuasive. In its response, CoC cites *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000), for the proposition that the "use of these terms in the claims connotes different meanings." *Id.* at 8. CoC never argued that the "PC Workstation" and the "POS terminals" have the same meaning, but rather it is possible for a "PC Workstation" to be a "POS terminal." Also, the language of the '640 Patent does not clearly support NCR's argument of distinguishing structure. ECF No. 197 at 3 (citing to ECF No. 194 at

5; ECF No. 194-2, JTX-1, Col. 2:9–14). Finally, while Ms. Schoonover did not explicitly say that a "tablet" was a "PC Workstation," the context surrounding the line of questioning demonstrates that the discussion centered around the topic of "PC Workstations." ECF No. 196 at 9. The jury could, therefore, reasonably find that the iPads function as both the point-of-sale devices and PC Workstations. Legally sufficient evidence supports the jury's findings as to the PC Workstation limitations.

### 3. *Substantial Evidence Supports the Jury's Infringement Finding for the "POS Terminal" limitation.*

NCR argues that because it does not supply or control the majority of the POS terminals, it cannot directly infringe as to a majority of sales. ECF No. 197 at 3. NCR reasons that because customers usually obtain their own POS terminals in the form of iPads, NCR cannot be charged with supplying or controlling the "POS terminal" element. *Id.* NCR claims that 75% of NCR Silver sales are for an iPad, not Android, eliminating most CoC's claimed damages. ECF No. 194 at 6. Additionally, NCR contends that because it does not use the "POS terminal," it cannot meet this element of the claim. ECF No. 197 at 3.

CoC argues that it demonstrated the requisite benefit and control through evidence showing NCR's use of Back Office operations through the "POS terminals." ECF No. 196 at 9. CoC argues that NCR's "75% number" is not supported by any documents or other evidence presented at trial but rather is solely based on Ms. Schoonover's testimony. *Id.* at 13. However, CoC contends that even if Ms. Schoonover's statement is true, it does not impact the damages award. *Id.* CoC requested that the jury award damages solely for NCR's software subscription sales and not NCR's hardware sales. *Id.* CoC points out that its damages expert, Ms. Salters, apportioned hardware sales out of the damages when presenting it to the jury. *Id.* Thus, CoC contends that the "percentage of NCR's revenues attributable to particular subset of its hardware sales is irrelevant.…" *Id.*

Again, using the same framework indicated above, the evidence supports the jury's finding that NCR controls the POS terminals and therefore directly infringes.

### 4.  Substantial Evidence Supports the Jury's Infringement Finding for the "POS Builder" limitation.

NCR argues that under the Court's construction of using "plain and ordinary" meaning, the parties were left to explain the term "builder." NCR reasons that its proffered construction of the term should be preferred because it reflects the language of the patent claim. ECF No. 197 at 4. NCR points to conflicting testimony given by CoC technical expert Mr. Crouse. He testified that in his experience, "there was coding involved" to "build" POS terminals. So, under Mr. Crouse's understanding, "building" requires coding to manipulate the look and feel. ECF No. 194 at 7 (citing Trial Tr. 457:22–458:5). Further, Mr. Crouse agreed that the merchant, "could not build the POS terminal" because the software was "prebuilt." *Id.* (citing Trial Tr. 458:23–25; 459:1–4). Mr. Quinn, NCR's Director of Engineering for NCR Silver, stated that NCR Silver is pre-built because, "when you purchase an application from the App Store, you get it already prebuilt." *Id.* at 8 (citing Trial Tr. 207:19–23). NCR argues that independent claim 1 of the '640 Patent confirms its position because it states, "build or edit said POS terminals in real time." *Id.* at 9 (citing JTX-1, Col. 6:18–20). NCR points to the "or" as instructive in distinguishing "building" a POS screen from "changing" one that has already been built. *Id.* at 9. Additionally, NCR points to Mr. Crouse's testimony to illustrate the discrepancy. *Id.* at 10.

NCR also contends that the Court's decision to rest on the term's plain and ordinary meaning was independent error because "it failed to give clear meaning to an essential term." ECF No. 194 at 8. NCR argues that a "term of art" is not the same as "plain and ordinary meaning." ECF No. 197 at 4–5. NCR once again points to the discrepancy between the two parties in the construction of "builder" and that because the case turns "substantially on the meaning of a

disputed term" that the Court "*must* provide guidance" through construction. *Id.* at 5 (emphasis in original).

CoC argues that NCR's use of Mr. Crouse's testimony was misleading and taken out of context because it related to his prior employment and not his investigation of NCR Silver. ECF No. 196 at 11. CoC points to NCR's statement that "Mr. Crouse agreed that the merchant or customer 'could not build the POS terminal' because the terminal software was 'prebuilt.'" *Id.* (citing ECF No. 194 at 7). CoC responds by explaining that this testimony related solely to Mr. Crouse's "work at Perot System and has nothing to do with his investigation of NCR Silver." *Id.* at 11. CoC then asserts that Mr. Crouse testified in detail as to how NCR Silver meets the "POS builder" limitation. *Id.* at 11–12 (citing Trial Tr. 411:6–412:10, 416:5–17).

CoC also argues that the Court's claim construction was proper making the jury instructions void of error. *Id.* CoC first points out that NCR's argument ignores its own prior statement that the term "point of sale builder software" "is a term of art used in the POS industry." *Id.* (citing ECF No. 37 at 6). CoC argues that because there is no evidence to suggest that CoC intended to "deviate from the plain and ordinary meaning used in the POS industry," there is no need for further clarification beyond the term's plain and ordinary meaning. *Id.*

CoC presents more compelling arguments as to this limitation and its construction. First, the Court agrees with CoC that Mr. Crouse's testimony was indeed cited misleadingly and that the testimony only related to Mr. Crouse's prior employment. NCR argues that regardless of prior employment, its argument stands to show that there is a discrepancy in defining the plain and ordinary meaning of "builder" sufficient to warrant a new trial. The Court disagrees. The jury heard Mr. Crouse's opinion that NCR Silver met the limitation and Dr. Chatterjee's contrary opinion. In its fact-finding duties, the jury weighed the evidence, made credibility determinations,

and found that the limitation was met. Because the jury's verdict was not against the great weight of the evidence, the Court denies NCR's motion for a new trial.

As to the claim construction, NCR waived any rehashing of the term. The Court addressed these arguments at claim construction, the parties relied on the constructions in preparation for and at trial, and NCR failed to object to the Court's jury instructions, which incorporated the relevant construction. *See Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1150 (Fed. Cir. 2004) (holding that because defendant did not object to the jury's instructions on a claim term, it failed to preserve its rights to object to the court's claim construction).

### 5. *Substantial Evidence Supports the Jury's Infringement Finding for the "Web Server" Limitation.*

NCR contends that for CoC to succeed on the "Web Server" limitation, CoC must prove that NCR's alleged builder software resides on the claimed "web server." ECF No. 194 at 11. NCR argues that because Dr. Chatterjee's expert testimony demonstrated that the alleged "builder software" resides on an application server, and not a web server, there can be no infringement. *Id.* From here, NCR asserts that CoC failed to meet its burden of proof because CoC provided no evidence that the builder software itself resides on a web server. *Id.* Additionally, NCR argues that Dr. Chatterjee's testimony shows that the training video does not show that the web server "houses or runs the Back Office software" and is thus not legally sufficient evidence to support the jury's finding of infringement. ECF No. 197 at 5.

CoC argues that there is no legitimate dispute that NCR Silver software is "installed," "runs on," and "interacts with" a "server." ECF No. 196 at 13. CoC claims that Dr. Chatterjee's testimony on the application/web server distinction is merely semantics in an attempt to avoid the "web server" limitation. *Id.* CoC compares NCR's argument to the "prebuilt" argument because "application server" does not appear in any NCR document and is only mentioned through Dr.

Chatterjee's testimony. *Id.* CoC further points out that during the trial, CoC presented numerous examples of NCR Silver running, being installed on, and interacting with a web server. *Id.* CoC argues that these examples are substantial evidence that allows the jury's finding to be grounded in legally sufficient evidence. *Id.*

The jury heard the competing testimonies of Mr. Crouse and Dr. Chatterjee. The jury also saw examples of NCR Silver running and interacting with a web server. NCR presented arguments in an attempt to discredit CoC's examples. But the jury's finding is supported by legally sufficient evidence presented at trial. Thus, the Court denies NCR's motion for JMOL. Similarly, the jury's finding is not against the great weight of the evidence, and its verdict is not a miscarriage of justice. Thus, the Court also denies NCR's motion for a new trial.

### C. The Proposed Invalidity Claim is Unpersuasive.

NCR next argues it proved, through the testimony of Dr. Chatterjee, that the '640 and '012 Patents are invalid twice over, by prior art references Woycik and Brown. According to NCR, Woycik discloses "the claimed 'web-based point of sale (POS) builder stem' in [0121] that store administrators may access on a remote central server in [0122] using a standard web browser." ECF No. 194 at 13. NCR further argues that Woycik discloses "an internet connection from said one or more point of sale terminals to a web server." *Id.* at 14. Last, Woycik discloses "'point of sale builder software which runs on said web server, wherein said local or remote workstations are utilized to build or edit said POS terminals in real time, from anywhere in the world and over the worldwide web' through its discussion of the 'administration tool.'" *Id.* NCR also points to Brown, arguing that it discloses "the claimed web-based point of sale builder system and software that builds POS terminals." *Id.* at 15.

In response, CoC argues that there was sufficient evidence for a reasonable jury to conclude that Woycik and Brown did not anticipate the '012 and '640 Patents. CoC alleges that Dr.

Chatterjee's testimony was insufficient to show NCR's invalidity case was of such an "extreme nature" to require the jury's decision to be overturned. ECF No. 196 at 14. Specifically, CoC contends that Dr. Chatterjee admitted Woycik and Brown do not expressly teach each of the limitations of the asserted claims. *Id.* Instead, Dr. Chatterjee only made inherency arguments and as a result the jury was not required to believe them. *Id.*

The Court agrees that the jury was not required to believe NCR's argument through Dr. Chatterjee's testimony. The jury's duty was to weigh the evidence presented by both parties' expert witnesses and reach a conclusion based on the evidence. NCR claims the jury could not have rationally sustained a verdict in favor of CoC because Mr. Crouse's testimony was "wholly conclusory." ECF No. 197 at 5. Mr. Crouse's conclusory statements were no different than those cited by NCR as support from Dr. Chatterjee's testimony—concise final opinions after proceeding through the analysis. *Compare, e.g.*, Tr. 784:25–785:2 (Mr. Crouse, testifying: "Q. And would a person of skill in the art understand the local are network in Woycik to satisfy that claim element? A. No, sir."), *with* Tr. 617:20–23 (Dr. Chatterjee, testifying: "Q. Now, is it your opinion that Brown also discloses all the limitations in the dependent claims from the '640 patent and the '012? A. Yes. Yes."). Ultimately, Mr. Crouse's statements were not solely conclusory as he also opined and explained why he disagreed with Dr. Chatterjee's opinions regarding Woycik and Brown. *See e.g.*, Trial Tr. 785:20–786:1; 786:9–19; 788:20–25. Given the competing evidence, the Court concludes NCR failed to provide sufficient reason to overturn the jury's findings.

As to obviousness, NCR relies on combining Michaud with Woycik and/or Brown to invalidate the claim, stating that "[c]ommon sense and ordinary creativity suffice to justify combining Michaud with Woycik and/or Brown." ECF No. 197 at 6. CoC contends that NCR's obviousness case was deficient because NCR failed to present a *prima facie* case of obviousness

based on any combination of Woycik, Brown, and Michaud as "Dr. Chatterjee failed to offer any testimony or evidence regarding motivation to combine the obviousness references." ECF No. 196 at 15.

This Court agrees with CoC that NCR's argument fails for a couple of reasons. First, an obviousness claim "is a question of law based on factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) the objective indicia of nonobviousness." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966)). NCR must prove by "clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Id.* NCR failed to meet this standard as only Dr. Chatterjee supplied evidence supporting an obviousness conclusion. With the benefit of all the referenced evidence before it, the jury found that the claims were not rendered invalid by obviousness. Whether the jury remained unconvinced after Dr. Chatterjee's testimony, *see* Tr. 621:22–624:3, or perhaps gave more credit to Mr. Crouse's testimony in rebuttal, *see* Tr. 790:23–793:12, the jury's findings of no invalidity on the asserted patents need not be disturbed. *See Mentor H/S*, 244 F.3d at 1375 ("Courts grant JMOL for the party bearing the burden of proof only in extreme cases, when the party bearing the burden of proof has established its case by evidence that the jury would not be at liberty to disbelieve and the only reasonable conclusion is in its favor.").

Finally, NCR argues Dr. Chatterjee's testimony "that a person of ordinary skill in the art would appreciate the 'subscription service' element to be disclosed by the central server 22/84 and understand that vendor subscriptions are an implicit and well known method of monetization"

24

sufficiently meets the requisite standard to render the '640 Patent's claims invalid despite the jury's verdict. ECF No. 194 at 15. According to NCR, no combination with Brown is required as "a product is inherently capable of being leased rather than sold." *Id.* at 15–16. To this, NCR claims CoC does not respond.

But again, the jury was not convinced as to NCR's inherency arguments. The jury also could have credited the testimony of Mr. Crouse when he opined that the prior art did not disclose vendor subscription services. *See* Tr. 786:11–14; 788:13–22; 789:15–16; 792:10–24. In sum, NCR bears the burden of showing facts supported by clear and convincing evidence to prove the patents invalid. *Mentor H/S*, 244 F.3d at 1375. Competing expert testimony and evidence supports the jury's finding. Thus, the Court denies NCR's motion for a judgment of invalidity or new trial regarding validity.

### D. CloudofChange Sufficiently Proved Willfulness.

NCR argues that CoC failed to prove that NCR had a "specific intent" to infringe at the time of the challenged conduct and this Court should enter a judgment of no willful infringement or grant a new trial. ECF No. 194 at 17 (citing *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021)). As justification, NCR points to *Erfindergemeinschaft UroPep GbR v. Eli Lilly Co.*, 2017 WL 2190055, at *1–3 (E.D. Tex. May 18, 2017), where the court granted a pre-verdict JMOL because the court found it would be inappropriate to put the issue of willfulness before the jury. ECF No. 197 at 7. NCR effectively argues it only had "mere knowledge" of the patent and claims and that it never resorted to "intentional copying or an intent to harm a market competitor." *Id.*

CoC argues that the jury's finding of willfulness should be affirmed because NCR had more than "mere knowledge." ECF No. 196 at 17. CoC alleges that NCR should be found willful because NCR made false statements in its post-trial declaration and omitted the date that NCR

conducted an "investigation" into the notice letter. *Id.* Additionally, CoC claims that NCR's infringement was intentional because NCR made no good-faith effort to avoid infringing, no attempt to design around the patent, and tried to cover up its infringement. *Id.* at 17−18. Accordingly, CoC argues that the jury had the opportunity to weigh the evidence, make credibility determinations, and find against NCR's positions. *Id.* at 18.

The Court finds sufficient evidence to support the jury's finding of willfulness. Despite NCR's claim that this case is similar to *UroPep*, the two cases are distinguishable. Here, this Court allowed the willfulness argument to be presented before the jury because the notice letter, in conjunction with Mr. Quinn's testimony identifying a partial investigation, provided a sufficient basis to bring the issue before the jury; this was not the case in *UroPep*. Accordingly, contrary to NCR's assertions, the Court does not disregard case law approving use of post-trial declarations for willfulness; rather, the Court uses its discretionary authority to affirm the jury's verdict. Nonetheless, the issue is largely moot as this Court denied CoC's Motion for Enhanced Damages. *See* ECF No. 207; *see also UroPep*, 2017 WL 2190055, at *3 ("Finally, the Court notes that the question whether the issue of willfulness should have been submitted to the jury is rendered largely moot by the fact that the decision whether to enhance damages on a finding of willfulness is for the Court.").

### E.  Substantial Evidence Supported the Jury's Damages Award.

The jury awarded a lump sum of $13.2 million for infringement of the '640 and '012 Patents. ECF No. 159. NCR argues that it is entitled to be granted a new trial or, alternatively, enter a remittitur of 75%. ECF No. 194 at 18. First, NCR claims Ms. Salters, CoC's damages expert, erred by relying on the entire market value. *Id.* Second, NCR asserts that Ms. Salters failed to apportion damages to the allegedly patented features separately. *Id.* at 9. Third, NCR argues that it is entitled to a remittitur based on Dr. Ikizler, NCR's expert, providing the sole apportionment

evidence identifying the value of patented versus unpatented features. ECF No. 197 at 10. Accordingly, NCR requests this Court remit damages to the sole appropriate basis in the record, or alternatively order a new trial. *Id.* NCR calculates that an appropriate remitted amount totals no more than 11% of the $18.4 million gross profit, or approximately $2 million. ECF No. 194 at 20.

CoC responds that it presented substantial evidence supporting the damages award. First, CoC argues NCR's allegation that "CoC had *no* evidence that the patented features drive demand" ignores CoC's expert testimony and NCR's own documents and witnesses. ECF No. 196 at 18 (quoting ECF No. 194 at 19). CoC points to four elements that drive merchant demand for POS systems derived from an NCR document, Mr. Crouse's opinions, and testimony from Ms. Schoonover, NCR's Executive Director of Product Management. *Id.* Second, CoC alleges that the four-part apportionment analysis Ms. Salters presented to the jury was specific and reasonable to justify the royalty. *Id.* at 19. Such apportionment included focus on the software, accounting for only the full software product subscriptions (550,000 versus 700,000), accepting the lower end of the subscription price range ($79 versus up to $200), and profits of 28 to 47 percent. *Id.* at 19−20. Third, CoC claims that NCR's remittitur argument should also fail because the jury was entitled to disagree with Dr. Ikizler's apportionment testimony. *Id.* at 20. And CoC claims that NCR's remittitur argument is based on a hardware apportionment, but CoC apportioned and requested damages only related to NCR's subscription software sales. *Id.*

CoC cannot entertain both a theory of entire market value *and* apportionment. "A patentee is only entitled to a reasonable royalty attributable to the infringing features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). "Recognizing that each case presents unique facts, we have developed certain principles to aid courts in determining when an expert's apportionment model is reliable." *Commonwealth Sci. & Indus. Rsch.*

*Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015). In other words, royalties generally must be based not on the entire product, but instead on the smallest salable patent-practicing unit. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). "The entire market value rule is a narrow exception to this general rule." *Id.*; *see also Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("These strict requirements limiting the entire market value exception . . ."). The entire market value rule acts as a check to ensure that damages sought are reasonable given the technology at issue. *Id.*

Here, CoC's damages expert, Ms. Salters, based her damages calculations on the entire market value of NCR Silver. Contrary to CoC's arguments, Ms. Salters did not apportion the damages the question is whether CoC presented substantial evidence to support an entire market value theory. "[A] patentee may assess damages based on the entire market value of the accused product *only where* the patented feature creates the basis for customer demand or substantially creates the value of the component parts." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (emphasis in original) (quoting *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013)). CoC highlights four factors, derived from the Strawhecker Report and addressed in testimony from Ms. Salters, Mr. Crouse, and Ms. Schoonover, including: (1) transaction handling, (2) inventory/item management, (3) content management, and (4) POS infrastructure. Trial Tr. 509:6–510:23. NCR disputes that such evidence suffices to show that "the patented feature is the *sole* driver of customer demand or substantially creates the value of the component parts." ECF No. 194 at 18 (quoting *Power Integrations*, 904 F.3d at 979). NCR asserts that several other factors, unrebutted by CoC's evidence at trial, preclude application of the entire market value theory. *Id.* at 19. Those factors included NCR's strength of brand, NCR's 24/7

customer support, and a unique distribution model. *Id.* The Court disagrees with the basis of NCR's

"other factors" for the following reasons.

NCR relies heavily on *Power Integrations* in support of its position. For clarity, the Court

provides the relevant language from the Federal Circuit's order describing the parameters of the

entire market value theory.

> As *LaserDynamics, Versata,* and *VirnetX* held, the entire market value rule is appropriate only when the patented feature is the sole driver of customer demand or substantially creates the value of the component parts. The burden of proof in this respect is on the patent holder. The question is whether the accused product, compared to other products in the same field, has features that would cause consumers to purchase the products beyond the patented feature, i.e., valuable features. Where the accused infringer presents evidence that its accused product has other valuable features beyond the patented feature, the patent holder must establish that these features do not cause consumers to purchase the product. A patentee may do this by showing that the patented feature "alone motivates customers to purchase [the infringing product]" in the first place. But when the product contains multiple valuable features, it is not enough to merely show that the patented feature is viewed as essential, that a product would not be commercially viable without the patented feature, or that consumers would not purchase the product without the patented feature. When the product contains other valuable features, the patentee must prove that those other features do not cause consumers to purchase the product.

*Power Integrations*, 904 F.3d at 979 (internal citations omitted). NCR hangs its hat on the final

sentence above, arguing that CoC must disprove the value of NCR's strength of brand, NCR's

24/7 customer support, and a unique distribution model. ECF No. 194 at 19. However, the Court

finds that the proposed "features" are not other non-patented features of a multi-component

product. *See LaserDynamics*, 694 F.3d at 68 (finding that the plaintiff "failed to present evidence

showing that the patented disc discrimination method drove demand for the laptop computers");

*see also Power Integrations*, 904 F.3d at 979 (finding the "power supply controllers had other

valuable features, such as jittering;" also noting "the *product contains* multiple valuable features")

(emphasis added). Here, none of the allegedly unrebutted features relate to the system claims at issue in this case. Nor has NCR pointed to any caselaw that identifies similar features as applying against the entire market value theory. If NCR's contentions were correct, plaintiffs would be forced to contest an unlimited amount of market-based "features," wholly removed from the context of the patented features in a multi-component product. The Court also made this clear in its instructions. *See* ECF No. 150 at 32 ("The amount you find as damages must be based on the value attributable to the patented technology, as distinct from other, unpatented features of the accused product, or other factors such as marketing or advertising, or NCR's size or market position.").

Nonetheless, an alleged infringer does not carry the burden to disprove application of the exception. The burden to prove that the entire market value theory applies rests with the patentee. Thus, CoC must prove that the patented feature is the sole driver of customer demand to rely on the entire market value exception. Whether the patented feature is the sole driver of customer demand is a question for the jury. The Court finds that CoC provided sufficient evidence to support a damages award based on the entire market value. CoC provided the jury four factors that drove customer demand, all of which are patented features of the accused product. Furthermore, the jury was instructed that "damages must be based on the value attributable to the patented technology, as distinct from other, unpatented features of the accused product." ECF No. 150 at 32. With this instruction, the jury found that CoC was entitled to damages based on the entire market value of NCR's product. NCR has not provided sufficient reason to overturn the jury's findings.

Lastly, the Court finds NCR's remaining remittitur argument unpersuasive. The Court disagrees with NCR's allegation that CoC failed to supply sufficient evidence to support the jury's damages award. As discussed above, the Court finds that CoC provided sufficient evidence for a

reasonable jury to find that the entire market value theory applies. Because a reasonable jury could find that the entire market value exception applies, the jury could have rationally disagreed with the testimony of NCR's expert, Dr. Ikizler. Rather than considering whether the totality of the evidence supported the jury's finding, this Court must limit its determination to whether the jury's verdict is based on legally sufficient evidence that amounts to more than a scintilla. The jury satisfied this standard by relying on CoC's damages expert's royalty calculation. While NCR may disagree with this result, NCR fails to prove that jury's verdict was unreasonable and should be overturned or remitted. Therefore, the jury's damage findings stand.

## IV.    CONCLUSION

For the reasons above, the Court finds that CoC produced sufficient evidence to support the jury's verdict in this case. The Court therefore **DENIES** NCR's Motion for Judgment as a Matter of Law or Alternatively, For a New Trial (ECF No. 194).


**SIGNED** this 27th day of October, 2022.


ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE